## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

**MACK ARTHUR KING**                   **Petitioner,**

**versus**                                 **No. 1:10cv7-SA**

**CHRISTOPHER EPPS, COMMISSIONER,**
**MISSISSIPPI DEPARTMENT OF**
**CORRECTIONS; JIM HOOD, ATTORNEY**
**GENERAL**                          **Respondents.**

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY

[This petition is in the form dictated by the Uniform District Court Rules and the Model Form for use in applications for Habeas Corpus pursuant to 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in the United States District Courts. Paragraphs 1 through 13 provide procedural and other required information; Paragraphs 14(A) through 14(M) state the federal constitutional grounds upon which Petitioner claims that the judgment and sentence imposed upon him are unlawful; Paragraphs 15 through19 contain required technical information; and Paragraph 20 contains the relief requested]. Needs correcting before filing******************************************%%^&&**(()

## I. INTRODUCTION.

Petitioner, Mack Arthur King, [hereinafter "Petitioner" or "Mr. King"], files this Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 *et seq.* asserting that the trial record and record of his state post-conviction proceedings reflect a number of substantial constitutional violations. As a result of these errors Mr. King is entitled to have the writ of habeas corpus issue on his behalf. References made herein will be as follows: Tr.-Transcript of the 2003 direct appeal of Petitioner's Sentencing hearing; P.C. - Mr. King's Motion for Post Conviction Relief. P.C. Exhibits-Exhibits attached to the Petitioner's Motion for Post Conviction Relief; Exhibit 1, 1980-

## II. PROCEDURAL AND OTHER REQUIRED INFORMATION

1.    Place of Confinement: Mississippi Department of Corrections, Unit 32-C, Parchman, MS, 38738. Petitioner's Department of Corrections Number is 37111.

2.    Name and location of court which entered sentence under attack: Circuit Court of Lowndes County, Mississippi.

3.    Date of judgment of sentence: Petitioner was sentenced to death on March 28, 2003.

4.    Length of sentence: Death

5.    Nature of offense involved: Capital murder

6.    What was your plea: Not guilty

7.    Kind of trial: Sentencing hearing

8.    Did you testify at trial: No

9.    Did you appeal from the judgment of sentence: Yes

10.    If you appealed, give the following information:

    a.    Name of court appealed to: Mississippi Supreme Court

    b.    Result: Sentence of death affirmed

    c.    Date of result: May 31, 2007, and rehearing denied, 890 So.2d 901 (Miss. 9/2/2004)

    d.    Grounds raised:

### Pre-Trial Errors

I.    The Trial Court Improperly Denied Mr. King's Motion for Funds to Obtain Expert Assistance.

    A.    The Trial Court Erred In Denying Mr. King Funds To Retain An Expert To Assess His Mental Condition.

2

B.    The Trial Court Erred In Denying Mr. King Funds To Retain An Expert Pathologist.

II.    The Trial Court Erred By Failing To Follow Constitutionally Required Procedures To Determine Whether Mr. King Was Mentally Retarded.

A.    Mr. King Was Entitled To A Full Evidentiary Hearing To Determine Whether He Was Mentally Retarded.

B.    The Trial Court's "Hearing" On the Issue of Mental Retardation Was Wholly Inadequate.

III.    The Trial Court Committed Reversible Error In Denying Mr. King's Motion To Change Venue.

A.    Legal Standard For Change Of Venue In Mississippi.

B.    The Absence of Rebuttal Evidence by the State Rendered the Trial Court's Denial of the Motion Reversible Error.

C.    Mr. King Presented Sufficient Evidence And Testimony To Create An Irrebuttable Presumption For Change Of Venue.

IV.    The Trial Court Erred In Denying Mr. King's Motion To Exclude The Death Penalty As A Sentencing Option Because Mr. King's Indictment Was Deficient.

A.    Because Mr. King's Indictment Failed To Charge The Underlying Offense As A Necessary Element Of A Burglary Charge, The Indictment Could Not Support A Finding Of Capital Murder.

B.    Mr. King Was Not Barred, Procedurally Or Otherwise, From Challenging The Sufficiency Of His Indictment.

V.    The Trial Court Erred In Denying Mr. King's Motion To Exclude The Death Penalty Because Of (A) 22-Year Incarceration On Death Row And (B) Unavoidable Jury Bias.

A.    Mr. King's Extended Time on Death Row Violates His Right to Be Free from Cruel and Unusual Punishment.

B.    Mr. King's Re-Sentencing Hearing Was Irreparably Tainted By Unavoidable Juror Bias Due To Mr. King's Previous Death Sentences.

Trial Errors

VI. The Trial Court Erred By Striking Jurors Based Upon Their Views Of The Death Penalty.
    A. Ms. Shellie Stewart Was Improperly Excused For Cause By The Trial Court.
    B. The Trial Court Improperly Excused Ms. Barbara Tucker For Cause.

VII. The Trial Court Erred In Denying Mr. King The Opportunity To Present Evidence And Challenge The State's Evidence Regarding The Identity Of Lela Patterson's Actual Killer.

    A. Whether Mr. King Actually Killed Lela Patterson Was Relevant To The Mitigating And Aggravating Circumstances Considered By The Jury.
    B. Whether Mr. King Actually Killed Lela Patterson Was Relevant To The *Enmund* Factors.
    C. Evidence Of Whether Mr. King Actually Killed Mrs. Patterson Was Not Barred By The Doctrine Of Res Judicata.

VIII. The Trial Court Erred In Allowing Impermissible Victim Impact Testimony Highly Prejudicial To Mr. King At The Re-Sentencing Hearing.

Jury Instruction Errors

IX. The Trial Court Erred in Instructing the Jury on the Aggravator "Especially Heinous, Atrocious or Cruel," And There Was Insufficient Evidence of The Aggravator, In Violation of the United States and Mississippi Constitutions and This Court's Specific Mandate.
    A. The Prosecution Submitted, And The Trial Court Approved, A Limiting Instruction That Violated The Express Command Of This Court.
    B. There Was Insufficient Evidence To Support The Heinous, atrocious or cruel Aggravating Circumstance.

X. The Trial Court's Jury Instructions Were in Error for Several Other Reasons.

A.  The Trial Court's Instructions Misled the Jury That the
Death Sentence Was Mandatory If the Aggravating
Circumstances Outweighed the Mitigating Circumstances.

B.  The Trial Court's Instructions Improperly Directed the Jury
to Find an *Enmund* Factor.

C.  The Trial Court Improperly Submitted To The Jury An
Instruction On The Avoiding Arrest Aggravator, Where
There Was Insufficient Evidence To Support That
Aggravator And The Aggravator Was Not Presented To
The Jury At Mr. King's 1980 Sentencing Or 1998 Re-
Resentencing.

D.  The Trial Court Failed To Properly Instruct The Jury
Regarding The Accomplice Mitigating Factor.

E.  The Trial Court Erred By Failing To Give Dsp-19.

XI.  The Aggregate Of The Errors In This Case Requires Reversal Of
The Death Sentence.

11.  <u>If you did not appeal, briefly explain why</u>: Not applicable.

12.  <u>Other than a direct appeal from the judgment of conviction and sentence, have
you previously filed any petitions, applications, or motions with respect to this judgment in any
state or federal court</u>? Yes.

1.  <u>Name of court</u>: Mississippi Supreme Court

2.  <u>Nature of Proceedings</u>: Motion for Leave to Proceed in the Trial
Court with a Petition for Post Conviction Relief, with Exhibits.

3.  <u>Grounds for Relief</u>:

Ground I:
Mississippi's Lethal Injection Procedure Creates a
Substantial Risk of Serious Harm in Violation of the Eight
Amendment.

A.  The MDOC Injection Team As Described Is Not
Qualified To Mix And Prepare Execution Drugs Or
Syringes.

C.  The MDOC's Intention to Mix the Maximal

5

Possible Concentration of Thiopental Is Bizarre and Unacceptable.

D.     The MDOC's Failure To Have Appropriately Qualified And Trained Personnel Monitor The Condemned Inmate After The Administration Of Thiopental To Ensure That There Has Been No IV Access Issue And To Assure That The Inmate Has Reached An Appropriate Plane Of Anesthesia Prior To The Administration Of Drugs Which Would Cause Suffering Is Contrary To All Standards Of Practice For The Administration Of Anesthetic Drugs And Creates A Severe And Unnecessary Risk That The Condemned Will Not Be Adequately Anesthetized Before Experiencing Asphyxiation And/Or The Pain Of Potassium Chloride Injection.

Ground II:

Mack Arthur King Was Denied Due Process Of Law When The Trial Court Denied Him Funds For A Mental Health Expert Witness, And This Court Affirmed The Denial, Thereby Denying Him The Opportunity To Develop Fully The Substance Of His Claim.

Ground III:

Trial Court Erred In Failing To Allow Presentation Of Mitigation Evidence.

Ground IV:

The Petitioner Was Denied His Sixth Amendment Right To The Effective Assistance Counsel Within The Meaning Of *Strickland V. Washington* And Corresponding Portions Of The Mississippi Constitution.

A.     Ineffective Assistance Of Counsel.

B.     Mack Arthur King Received Ineffective Assistance Of Counsel When His Prior Counsel Failed To Challenge The Sufficiency Of The Indictment In A Timely Fashion.

C.     Appellate Counsel Was Ineffective In Violation Of Petitioner's 14th Amendment Rights Due To Appellate Counsel's Mishandling Of The Challenge To The Unconstitutional Restrictions On His Right To Present Relevant And Compelling Evidence In

6

Mitigation Of Punishment And As Rebuttal Evidence To The State's Case Regarding 99-19-101 (1)(7) And Statutory Aggravating Circumstances.

1. Counsel Was Ineffective in Failing to Challenge the Constitutional of Mississippi's Lethal Injection Protocol.

2. Prior Counsel Was Ineffective For Failing to Raise *Panetti V. Quaterman*, 127 S.Ct. 2842 (2007) On Rehearing.

3. Prior Counsel Was Ineffective For Improperly Litigating The Mental Retardation Issue.

Ground V:

Mack Arthur King Is Mentally Retarded As Defined By The Court In *Chase V. State*, And Thus He Is Ineligible For The Death Penalty.

Ground VI:

Petitioner Was Denied His Rights Guaranteed By The Fifth, Sixth, Eighth And Fourteenth Amendments To The Federal Constitution And Mississippi Law Due To The Cumulative Effect Of The Errors At His Capital Trial.

Ground VII:

The Sentence Rendered Against The Petitioner Is Disproportionate And In Violation Of The Eighth And Fourteenth Amendments To The United States Constitution And Corresponding Portions Of The Mississippi Constitution.

**Supplement** to Petition for Post Conviction Relief with Exhibits, filed with the Mississippi Supreme Court on August 08, 2008. This document supplemented Ground V of the initial Petition.

**Second Supplement** to Petition for Post Conviction Relief with Exhibits filed with the Mississippi Supreme Court on September 19, 2008. This document supplemented ground IV to the initial Petition bringing for that the trial counsel failed to adequately litigate the mental retardation issue; failed to investigate, develop and present an

mitigating evidence and a social history that existed in abundance; and trial counsel failed to develop evidence of a brain dysfunction of Petitioner.

4.   <u>Did you receive an evidentiary hearing on your petition</u>?  No.

5.   <u>Result</u>: Not Applicable (NA)

6.   <u>Date of Result</u>:   NA.

7.   <u>If the result was against you, did you appeal</u>:  NA.

8.   <u>If you appealed, state the name of the court appealed to and the result of the appeal</u>: NA.

9.   <u>If you did not appeal, explain why not</u>:  NA.

13.   <u>Additional procedural history</u>: This history taken verbatim from the Mississippi Supreme Court opinion denying Mr. King's Motion to file a Petition for Post Conviction with Exhibits in the trial court. *King v. State*, 23 So. 3d 1067 (Miss. 2009)

1.   "Mack Arthur King was convicted of capital murder of Lela Patterson in 1980 and was sentenced to death. On October 27, 1982, this Court affirmed both the conviction and the sentence. *King v. State,* 421 So. 2d 1009 (Miss. 1982). This Court denied without prejudice King's subsequent application for leave to file a petition for writ of error coram nobis on December 14, 1983, for failure to comply with Court rules. King then filed a second application for leave to petition the circuit court for writ of error coram nobis, and this Court ordered the trial court to conduct an evidentiary hearing regarding King's claim of ineffective assistance of counsel. *See King v. Thigpen,* 441 So. 2d 1365 (Miss. 1983); *King v. Thigpen,* 446 So. 2d 600 (Miss. 1984). The trial court conducted a

8

hearing and found that counsel had rendered effective assistance. This Court affirmed the trial court's denial of relief. *King v. State,* 503 So. 2d 271 (Miss. 1987). King's petition for writ of habeas corpus was then denied by the United States District Court for the Northern District of Mississippi. However, on August 24, 1993, the Fifth Circuit Court of Appeals vacated the sentence of death and remanded the case with instructions to return it to the state court for reconsideration of the sentence of death. *King v. Puckett,* 1F.3d 280 (5th Cir. 1993). This Court vacated the sentence of death and remanded for a new sentencing trial. *King v. State,* 656 So. 2d 1168 (Miss. 1995). On April 9, 1998, King was again sentenced to death. King appealed, and this Court reversed the death sentence and remanded for a new sentencing hearing on the ground that the trial Court had erred in instructing the jury to disregard sympathy in its deliberations. *King v. State,* 784 So. 2d 884 (Miss. 2001). King was again sentenced to death in 2003 and subsequently appealed. This Court affirmed the conviction of capital murder and sentence of death on May 31, 2007. *King v. State,* 960 So. 2d 413 (Miss. 2007).

Thereafter, King filed this application for leave to seek post-conviction relief in the trial court pursuant to *Mississippi Code Section 99-39-5.* He filed a supplemental petition on September 19, 2008. King asserts the following: 1) Mississippi's lethal injection procedure creates a substantial risk of serious harm in violation of the Eighth Amendment; 2) he was denied due process when the trial court denied funds for a mental health expert and this Court affirmed the denial, thus denying him the opportunity to fully develop evidence of mental

retardation; 3) the trial court erred in failing to allow presentation of mitigation evidence; 4) he was denied his Sixth Amendment right to the effective assistance of counsel pursuant to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and the corresponding portions of the Mississippi Constitution; 5) he is mentally retarded as defined by the Court in *Chase v. State,* 873 So. 2d 1013 (Miss. 2004), and is ineligible for the death penalty; 6) he was denied his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Mississippi law due to the cumulative effect of the errors at trial; and 7) the sentence is disproportionate and in violation of the Eighth and Fourteenth Amendments to the United States Constitution and corresponding portions of the Mississippi Constitution."

14.    State below concisely every ground on which you claim you are being held unlawfully:

## GROUNDS FOR RELIEF

### GROUND A

**PETITIONER WAS DENIED HIS RIGHT TO PRESENT MITIGATING EVIDENCE, TO REBUT THE STATE'S CASE IN SUPPORT OF AGGRAVATING CIRCUMSTANCES, AND CHALLENGE WHETHER HE WAS DEATH-ELIGIBLE UNDER *ENMUND V.* FLORIDA, 458 U.S. 782 (1982) WHEN THE STATE PRECLUDED HIM FROM ASSERTING THAT HE WAS A MERE ACCOMPLICE AND NOT THE ACTUAL KILLER IN VIOLATION OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.**

The Petitioner was denied the opportunity to introduce to the jury relevant mitigating evidence and to present evidence that is constitutionally required under *Enmund v. Florida,* 458

U.S. 782 (1982). The trial court also prohibited Mr. King from challenging the State's evidence in aggravation. The prosecutor's staunch objection to this evidence was a knowing and purposeful effort to deny Mr. King a fundamentally fair trial and deny the jury relevant information that would guide them in making a differentiation between those who should be subject to the ultimate penalty of death and those who should not. The specially appointed trial judge made a critical, fundamental mistake when he erroneously prohibited the introduction of this evidence before the jury.

## Facts Essential to an Understanding of the Constitutional Issues[1]

The offense in this case took place on August 3, 1980. The indictment was recorded and a capias issued on August 21, 1980. The trial began four (4) months later on December 4, 1980 and concluded with a sentence of death one (1) day later on December 5, 1980. Petitioner's defense has been consistent since 1980. Initially, Petitioner denied any involvement in the offense. Mr. King's questioning began at 8:30 a.m. on August 06th, 1980 wherein he denied involvement in the crime. (Exhibit 1 - 1980 Tr. 166-172)(Tr. 494-497). At 1:00 a.m. on August 07th, 1980 Mr. King gave his second (2nd) statement wherein he admitted to going with his uncle Willie Porter to the home of Mrs. Lela Patterson to burglarize Mrs. Patterson's home. According to Mr. King he went inside Mrs. Patterson's home while Willie Porter served as his "look-out." Mr. King went inside and took some household goods and items, including food from the freezer. After Mr. King finished he went outside to where Willie Porter was waiting. Mr. Porter had been drinking alcohol all afternoon. Mr. King told his uncle Willie Porter that he had gotten things from the house. Willie Porter went inside Mrs. Patterson's house and Mr. King left and went home. Mrs. Patterson was alive when Mr. King left and he does not know if Willie Porter

---

1 The 1980 transcript is attached hereto as an exhibit and labeled "Exhibit 1 – 1980".

killed her or not. (Exhibit 1 – 1980 Tr. 157-189)(Tr.499-503). Mr. King unequivocally stated that he did not kill Mrs. Patterson. Mr. King went home and went to bed.

Ms. Barbara Jordan shared a ramshackle home with Mr. King. The home had no electricity or running water. Barbara Jordan confirmed in her testimony that Mr. King came in at about 2:00 a.m. Sunday, August 3rd, 1980. Mr. King went to bed and then got up later at about 5:30 a.m. and went outside to sit on the porch. Barbara Jordan heard Mr. King talking to someone who Petitioner said was his uncle Willie Porter. (Exhibit 1 – 1980, page 284) (Barbara Jordan 1980 Statement, Exhibit 2). During the 2003 Sentencing Hearing Barbara Jordan testified that now she could "not recall" who was on the porch with Mr. King. (TR. 559). In his second statement to law enforcement Mr. King stated that his uncle Willie Porter came over and said he too had taken items out of the home of Mrs. Patterson. (Exhibit 1-1980 Tr. 181). Willie Porter wanted to know why Mr. King did not wait on him, obviously making reference to Willie Porter serving as a "look out" for Mr. King, but Mr. King left Mrs. Patterson's house and did not serve as a "look out" for Mr. Porter. (Exhibit 1-1980 Tr. 182). Of course when interviewed by law enforcement in 1980 Willie Porter denied any knowledge of the crime. (Willie Porter 1980 Statement, Exhibit 3)

During the course of Mr. King's 1980 trial his counsel brought out before the jury the second statement of Mr. King to law enforcement wherein Mr. King denied having any connection with Mrs. Patterson's death. In the cross examination of Barbara Jordan, Mr. King's live-in girlfriend, Petitioner's counsel brought out that Mr. Willie Porter came over to Mr. King's home in the early morning hours after the burglary of Mrs. Patterson's home. (Exhibit 1 – 1980, page 300). Counsel for Mr. King attempted to confirm the same facts in the 2003 Sentencing Hearing but as stated above Barbara Jordan claimed to have no present recall of who was on

12

their porch in the early morning hours after the burglary and murder of Mrs. Patterson. (Tr. 558-560). All of counsel's efforts in the trial were directed toward contesting the intent factors set forth in *Enmund* and in establishing mitigating factors or contesting aggravating factors.

The fact that Barbara Jordan gave prior testimony and gave a statement that she was told Willie Porter was on the porch of her home and the home of Mr. King was corroborative of Mr. King's second statement. (Exhibit 2 – 1980). It is clear that Mr. King's defense was that he did not kill Mrs. Patterson and he did not know if his uncle Willie Porter killed Mrs. Patterson. The State offered and was granted instructions which stated Mr. King could be guilty of the capital murder of the Mrs. Patterson if he was "acting alone, or in conjunction with another or others…" during the commission of the crime of burglary and "with or without the design to effect the death…." (Exhibit 1-1980, Tr. 362, 367; Instruction S-2A, and Instruction S-2). There were fingerprints found belonging to Mr. King on items burglarized from Mrs. Patterson's but there were also prints found in the bathroom where Mrs. Patterson died that did not belong to Mr. King and were never identified. (Tr. 511).

During the State's closing in 1980 the prosecutor argued against the theory that Willie Porter was involved in the crime. The State's argument was based on the lack of physical evidence that Willie Porter was present. (Exhibit 1-1980 Tr. 236). During closing for Mr. King his counsel argued that Willie Porter was an alternative theory for her death. (Exhibit 1-1980 Tr. 333-338). Under either theory Mr. King could have been found guilty of capital murder due to his involvement in the underlying offense as an accomplice. The jury verdict in 1980 did not contain findings that Mr. King actually killed, attempted to kill, intended to kill, or contemplated the use of lethal force. The 2003 Sentencing Jury did not have the benefits of these 1980 arguments since they did not hear the guilt phase evidence that the 1980 jury heard when

13

Petitioner was convicted of capital murder. In the 2003 closing arguments Petitioner was prohibited from arguing relevant issues due to rulings by the trial court. (Tr. 564-565).

It was not disputed in either 1980 or the sentencing hearing in 2003 that Mr. King burglarized the home of Mrs. Patterson. Mr. King admitted to burglarizing her home. It was his defense that her death may have been caused by his uncle, Willie Porter, or others. The State contested this issue. Petitioner claimed the defense was corroborated by Mississippi Crime Law Reports. (Exhibit 13 to the Petition for Post Conviction Relief). Those reports according to the State corroborated their theory. The crime lab report showed there was no transfer of fibers between Mrs. Patterson and Mr. King. *Id.* There was also a statement taken from two (2) of Mrs. Patterson's neighbors describing an old blue car with a loud muffler that passed by multiple times on the night of her death. The neighbor believed the car may have "belonged to blacks" that had been working at Mrs. Patterson's house for a week. (Exhibit 14 to the Motion for Post Conviction Relief). None of this evidence was presented to the jury in the 2003 Sentencing Hearing. When put into context it is obvious that in the 1980 trial Mr. King's counsel was raising as *the defense* the fact that Mr. King committed a burglary, but he did not commit a murder. In other words, Mr. King was an accomplice and played a minor role in the capital murder offense. M.C.A. § 99-19-101(6) (d). At the time of the 1980 trial the decision of *Enmund v. Florida,* 485 U.S. 782 (1982) had not been decided. There were no jury findings on whether Mr. King killed, attempted to kill, intended a killing take place, or contemplated the use of lethal force.

### The Right to Present this Evidence

The State filed a Motion in Limine to stop Mr. King from presenting evidence that he did

not kill Mrs. Patterson.    (C.P. 348). The trial Court granted the motion under the misunderstanding that Mr. King was "re-litigating the issue of guilt." (Tr. 8-20). Throughout the trial and afterwards counsel for King made it absolutely clear that he was not re-litigating guilt. (Opening Statement, Tr. 397; Cross-Examination of Roy Grinder, Tr. 521-533; 527-530); Motion for Mistrial, Tr. 564-567; Motion for New Trial, Tr. 436; 460; 462)  Mr. King was constitutionally allowed to prove that he did not actually kill, attempt to kill, intend that a killing take place, or contemplate that lethal force would be used. *Enmund v. Florida,* 485 U.S. 782 (1982); *Branch v. State,* 882 So. 2d 36, 71 (Miss. 2004).

At the time of Mr. King's first trial the *Enmund* case did not exist.  Mr. King was convicted of capital murder and an accomplice instruction was given to the jury. (Exhibit 1-1980 Tr. 362-367).  We have no way of knowing in 1980 whether the jury convicted Mr. King for the actual murder or as an accomplice to the offense of burglary. Mr. King could be guilty of capital murder if he was an accessory before the fact to burglary and if the jury believed Mr. Willie Porter committed the murder. Since Mr. King was granted a new sentencing hearing in 2003 he had the absolute constitutional right to contest the *Enmund* factors. In addition to the *Enmund* factors Mr. King had the absolute right to cross examine the evidence the State produced at the Sentencing Hearing that was relevant to aggravating circumstances.   The *Enmund* factors are relevant and constitutionally required to be decided by a jury.  In order for the fact finding process to work in an adversary system both parties must be allowed to introduce and/or challenge evidence of the four (4) *Enmund* facts.  Contrary to the rulings made by the trial judge Mr. King was not re-litigating guilt.  He was establishing a defense to the *Enmund* factors and introducing mitigating evidence.

Throughout the 2003 re-sentencing hearing Mr. King attempted to challenge the State's

evidence of the *Enmund* factors. The challenge began in the opening statement Mr. King's counsel asked the jury to hold the State to the burden that Mr. King "actually killed her or intended or attempted to kill." (Tr. 399). These are three (3) of the four (4) factors right out of *Enmund*. The prosecutor argued to the court that Mr. King's counsel could cross-examine but they could not rebut that Mr. King killed Mrs. Patterson. This is not a correct statement or interpretation of the law. Mr. King could not re-litigate that he was *guilty* of capital murder but he could constitutionally challenge the *Enmund* factors. The trial court sustained the State's objection denying Mr. King's counsel the right to present a coherent opening on this issue. (Tr. 399-404).

Mr. King sought during cross-examination to contest the State's evidence of the *Enmund* factors and/or to introduce relevant evidence himself of the lack of those factors. The trial court continued along with a fatal misunderstanding that Petitioner was contesting guilt when in fact Mr. King made it abundantly clear he was contesting the *Enmund* factors not his guilt to capital murder. The denial of a fundamental right to present *Enmund* evidence continued throughout the trial. Mr. King moved for a mistrial due to the actions of the trial court. (Tr. 564, R.E. 48, 51) The challenge was also by attempting to present evidence that Mr. King's case did not meet the *Enmund* factors. The trial Court blocked these efforts. (Tr. 564).

Mr. King's case was a re-sentencing. The original guilty verdict was in 1980. The State therefore had to present evidence to prove beyond a reasonable doubt that Mr. King had the *requisite mental intent* as set out in the four (4) *Enmund* factors. If the State could introduce evidence of the requisite mental intent as set in *Enmund,* basic constitutional principles of fundamentally fairness allow Mr. King to *rebut* that evidence. The State moved to introduce all the evidence from the guilt phase into evidence. (Tr. 407, 563). If the State could introduce all

16

the evidence from the 1980 guilt phase into evidence, and in 1980 Petitioner had raised the defense that Willie Porter may have done the killing and he was only an accomplice to burglary, then Petitioner should have been permitted to raise again the same evidence that he was only an accomplice. This evidence would not have allowed him to escape liability to capital murder, because an accomplice can be liable. It would have allowed him to present evidence relevant to the *Enmund* factors that were heard by the jury in 1980 but not heard by the jury in 2003. The 1980 jury heard the accomplice evidence but *Enmund* did not exist. Now that *Enmund* does exist the new jury must have been permitted to hear the accomplice defense.

Proving that Petitioner was not the person that killed Mrs. Patterson is *not* re-litigating guilt. Mr. King was convicted in 1980 and he may well have been convicted under the "accomplice" (Exhibit 1-1980, Tr. 362, 367). Introducing evidence that he did not kill Mrs. Patterson *is the first of the Enmund factors.* This challenge to the *Enmund* factors is not a re-litigating of guilt. The trial Court erroneously granted the State's Motion in Limine. (Tr. 8-20; R.E. 18-30). The trial repeatedly ruled that Mr. King was litigating "residual" doubt (Tr. 400-01; R.E. 73-74).

Mr. King attempted to prove Willie Porter had no alibi for the night of the crime. Mr. Porter had committed prior crimes and blamed them on Mr. King. (Tr. 525, 564; R.E. 48). Mr. King wanted to prove that his fingerprints were not found in Mrs. Patterson's bedroom. He also attempted to show that the 1980 forensic investigation was incomplete. (Tr. 565). The trial Court handcuffed and hobbled Mr. King's attempts to contest the State's *Enmund* proof.

Mr. King moved in Limine to prevent the State from bringing into evidence that some type of blood was on the Petitioner's pants. (C.P. 261-266). DNA was not conducted in 1980. The Petitioner wanted to DNA test the pants but they were the single piece of evidence lost by

17

the state. The court did not grant the Motion in Limine and instead allowed the State to bring out evidence of the blood but Petitioner was not allowed to rebut the evidence. (Tr. 20).

The 1980 jury never made any *Enmund* factors. The *Enmund* factors are sentencing factors. When a person is granted a new sentencing hearing the *Enmund* factors must be proven the same as aggravating factors. There is no res judicata in a new sentencing hearing. Res judicata did apply to Mr. King's guilty verdict. He was found guilty in 1980 of capital murder. Mr. King's defense was that Willie Porter or others committed the offense. To counter Mr. King's defense the prosecutor presented accomplice liability. Being guilty of capital murder as an accomplice in a burglary where a death occurs does not impose any form of res judicata upon requisite intent factors required by *Enmund.*

Mr. King should have been allowed to present evidence that he did not kill Mrs. Patterson; attempt to kill her; intend that a killing take place; or contemplate the use of lethal force. At no time throughout the 2003 Sentencing Hearing was the Petitioner allowed to challenge the State's evidence. The trial court incorrectly ruled on the motion of the State that it was *residual* doubt evidence. Both the trial court and the State misunderstood or mischaracterized the evidence. This testimony that the prosecutor blocked was relevant to *Enmund* and could have made the difference between life and death. The evidence Petitioner sought to introduce or contest would not have resulted in a *new* not guilty verdict but would have guided the jury in their constitutional findings. In fact the jury returned a verdict that omitted any of the *Enmund* findings. At that point the State acknowledged the constitutional importance of these findings though the State successfully prohibited with the trial court's approval the Petitioner from contesting these factors throughout the Sentencing Hearing. (Tr.847-866).

18

.        **The trial Court erred by prohibiting constitutionally permissible mitigating evidence and by limiting Mr. King from challenging the State's aggravating evidence.**

The United States Supreme Court has held that the Eighth and Fourteenth Amendments require an individualized sentencing determination made through a full consideration of all evidence the defendant offers in mitigation. *Locket v. Ohio,* 438 U.S. 586 (1978); *Mississippi Code Annotated,* § 99-19-101 (5) and (6) (2005) lists the aggravating and mitigating circumstances.

The State offered evidence that: 1) the offense was committed during the course of a burglary; 2) the crime was committed in order to avoid arrest; 3) the crime was especially heinous, atrocious, or cruel. In the presentation of its case the prosecution argued the manner of Mrs. Patterson's death was especially heinous, atrocious or cruel. (Tr. 398). By showing that someone else may have killed Mrs. Patterson, Petitioner would have been able to demonstrate the last two statutory aggravating circumstances were not applicable to him.

Mr. King was denied the right to contest this evidence by cross-examining Ray Grinder that no skin, hair or fibers where found where Mrs. Patterson drown that connected Mr. King to the murder. (Tr. 519; 522-523; 525). Contesting these facts or establishing them when they are relevant to mitigating or aggravating factors is not re-litigating guilt. Since the State claimed that the killing was especially heinous, atrocious or cruel in the manner of the death, Mr. King had the right to contest that he did the killing. He could be guilty of capital murder without having actually killed. It is fundamental that evidence may be inadmissible for one purpose but wholly admissible for another. (Tr. 19; R.E. 29); Tr. 450-51; 456; 466; 509-511; 513-519). As shown earlier in this Petition, Mr. King was prohibited from arguing in opening against the aggravating factors sought by the State. (Tr. 402-403). A limiting instruction would have adequately

19

informed the jury of the purpose of the evidence Petition offered.

Mr. King attempted to prove mitigating factors during the sentencing hearing. On cross-examination the State objected to Mr. King questioning a deputy about Willie Porter's alibi. (TR. 525, R.E. 80). This was offered to establish that Mr. King was a minor participant in the offense and that he acted under the influence of his uncle Willie Porter. Mr. King even by the State's older psychological evaluation is borderline mentally retarded. These facts are both relevant under the Mississippi Capital Murder Statute and Federal Constitutional Law. *M.C.A.,* § 99- 19-101(6)(d)(e) (2005); *Locket v. Ohio, Id; Eddings v. Oklahoma,* 455 U.S. 104 (1982). The trial Court prohibited the presentation of this relevant evidence. Oddly the court stated "you can argue that, but this witness (ex-deputy Ray Grinder) cannot testify to that. (Tr. 525-527). Since the jury who determined guilt in 1980 did not do the Sentencing Hearing, allowing the State to introduce their theory about what happened without allowing the Petitioner to challenge the *Enmund* factors resulted in a constitutionally flawed Sentencing Hearing and verdict of death. Mr. King had the constitutional right to present evidence to support mitigating factors which the trial court candidly admitted he could "argue".

The trial judge prohibited the introduction that there was no transfer of fibers between Mr. King and Mrs. Patterson. (Tr. 518-519). (Exhibits 13 and 14 to the Petition for Post Conviction). Petitioner also tried to offer mitigating evidence that he was under the influence of his older uncle Willie Porter who was a heavy drinker and who had in the past blamed Petitioner for crimes Willie Porter had committed. He was again stopped by the trial court. (Tr. 526-527).

Throughout the entire re-sentencing transcript the State was permitted to pursue their theory of the statutory aggravating factors and present evidence concerning its theory of the offense. The State was not limited in the proof it was permitted to introduce. Mr. King was

20

prohibited and forbidden from contesting the statutory aggravating factors and from introducing relevant mitigating evidence or from providing the jury with evidence relevant to the circumstances of the offense under the trial court's erroneous legal belief that Mr. King's evidence was relitigating guilt. From the beginning of the trial to the Motion for a New Trial (C.P. 456), Mr. King presented a clear Federal constitutional basis for the evidence he offered. The denial of all the evidence mentioned herein and offered during the 2003 re-sentencing hearing resulted in a fundamentally unfair Sentencing Hearing. For these reasons, Petitioner is entitled to habeas corpus relief. This issue was raised on appeal and fully exhausted.

**GROUND B**

**THE PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.**

**Prior counsel was ineffective for failing to properly litigate petitioner's mental retardation claim.**

**Facts Relevant to this Ground for Relief**

James Rocap was lead counsel for the re-sentencing hearing of Mack King. In February 2002, Rocap filed a *Motion For Permission to Proceed Ex Parte on Application for Funds to Retain Expert Assistance*. (C.P. 68-79). Trial Counsel filed an In Camera Motion For Funds to Obtain Expert Assistance requesting four experts to assist in Petitioner's defense. Counsel requested 1) a mental retardation expert, along with a licensed psychologist, 2) a social worker/investigator who can assist in the development of factual evidence in mitigation; 3) a pathologist; and 4) a prison adaption expert. (Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 305-327). In the Motion Counsel acknowledged the need for "an evaluation

of adaptive skills" and "an evaluation of developmental delays" both of which would require conducting interviews with individuals who knew Mr. King. (Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 316). The Motion also notes a need for a "social history, going back to Mr. King's youth." *Id.* At the hearing on the Motion for Funds in Chambers, Counsel acknowledged that the defense team could conduct investigation on their own and had in fact done some investigation in 1998 but that was four years ago and "there is probably more out there we could have found and presented to the jury." (Sealed Transcript of In Chambers hearing on Sept. 25, 2002 at 398).

Despite the fact that trial counsel recognized the need for a complete social history investigation and investigation into Mr. King's adaptive deficits, Mr. Rocap conducted little investigation. Instead, Rocap relied on the information obtained from Mr. King's sister Ethel Connor and the school records.

A complete social history and adaptive deficit investigation would have revealed that Mack King had many adaptive deficits. Mack Arthur had "trouble learning to tie his shoes." (*See* Post-Conviction Exhibit 22). His clothing often did not match. *Id.* His hair was never groomed or cut. (*See* Post-Conviction Exhibit 25). He did not learn the alphabet until he was 7 or 8 years old. (*See* Post-Conviction Exhibit 22). He was described as "not smart," "special child" and slow. (*See* Post-Conviction Exhibits 25, 26, and 27). Mack King was easily misled. (*See* Post-Conviction Exhibit 24). Mack King could only perform jobs involving "muscle" that did not require him to use his brain. (*See* Post-Conviction Exhibits 24, 26). Mr. King's father had to make sure he awoke on time to get to work. (*See* Post-Conviction Exhibit 24*).* Mack King was unable to read or follow directions and could only follow simple instructions. *(See* Post-Conviction Exhibit 26*).* Mack King was unable to access community resource because he could

not leave the neighborhood. (*See* Post-Conviction Exhibit 24, 26*).* Mr. King was unable to effectively handle money. (*See* Post-Conviction Exhibit 26*).* All of these facts if they had been presented at trial would have illustrated Mack King's adaptive deficits and supported a diagnosis of mental retardation or at least supported a motion to retain an expert to assist in the development of evidence of mental retardation.

Although these witnesses were available, Rocap did not ask that they be called at a hearing before the trial court, and he did not call or elicit this information during the resentencing proceeding. Additionally, Rocap did not present this type of evidence in support of his motion for an expert to establish that King was mentally retarded. Rocap had no strategic reason for not developing and presenting evidence of deficits in adaptive functioning to supplement the evidence of King's subaverage intellectual functioning or for not presenting this type of evidence in support of the motion for expert assistance.

Petitioner was prejudiced by counsel's deficient performance. There is at least a reasonable probability that the trial court would have granted funds for an expert if Rocap had developed some evidence of deficits in adaptive functioning or that the results of the resentencing proceeding would have been different.

For these reasons, Petitioner is entitled to Habeas Corpus relief.

How this issue was presented to the state courts:

This issue was raised in state court post-conviction proceedings.

**Trial counsel was ineffective for not investigating and developing mitigation evidence.**

**Trial counsel fell below a standard of reasonableness by not investigating petitioner's social history.**

**Facts Relevant to this Ground for Relief:**

At the sentencing hearing, trial counsel called 3 witnesses, Sammy Townsend, Ethel Conner and Robin King. Sammy Townsend was the principal of New Hope Elementary from 1974 to 1998. Mack King did not attend New Hope during the time that Mr. Townsend was principal. (Tr. 569). As the records custodian for New Hope Elementary, Mr. Townsend identified Mack King's school records. (Tr. 570). Mr. Townsend did not have any personal knowledge of Mack King. He could only testify to the records. Mr. Townsend did not know whether the teacher that taught Mack King second grade the first time was the same teacher that taught Mack King the second time. (Tr. 578). Mr. Townsend did not know what "family problem" Mack King's third grade teacher was referring to when she noted "A family problem is his handicap" on the school records. (Tr. 580). The second witness called, Dr. Robin King, had not spoken to trial counsel in approximately 20 years. (Tr. 589). Dr. King had evaluated Mack King in 1983. *Id.* In 2003, Dr. King's practice was radically different than the practice he maintained in 1983. In 2003, Dr. King was specializing almost exclusively in the treatment of mood disorders and was not in the practice of administering intellectual measurements. Thus, Dr. King was hesitant to remember many of the details of his evaluation. (Tr. 611). He was primarily called because he had administered an IQ test to Petitioner, but it had been so long that Dr. King did any work in the mental retardation field, he could not even explain elementary matters regarding the IQ test and was easily discredited by the prosecution. The third witness, Ethel Connor, Mack King's older sister was the only witness that could offer a glimpse into Mack King's life. (Tr. 695-709).

An adequate investigation would have revealed that Mack Arthur King grew up in poverty and was raised by alcoholic parents who were often violent with each other. The

24

family lacked resources to obtain food, clothes and hygiene supplies. The family depended upon the donations by family members and members of the community. (*See* Post-Conviction Exhibits 25, 27*)*. Mississippi Department of Human Service Records report that the family had no regular income and no car and that his family received food stamps. (Exhibit 4 - Lowndes County DHS Records at DHS-LC 0012).

Mack King's parents, Teavell and Minnie Pearl King, abused alcohol prior to and after his birth (*See* Post-Conviction Exhibits 22, 27*)*. Mack's mother Minnie Pearl drank far more than her husband. On weekends, the children were left unattended while their mother went drinking and their father worked. Minnie Pearl left on Friday nights and returned on Sunday evening. (*See* Post-Conviction Exhibits 25, 27).

Mack's younger brother Jake is severely disabled. With the help of Lowndes County Department of Human Services, Jake was placed in Ellisville State school for the Mentally Retarded on Sept. 22, 1970 at the age of 8. (Habeas Exhibit 4 - Lowndes County DHS Records at DHS-LC 0013). Psychological testing performed at Ellisville found that Jake scored at the level of profound Mental Retardation with a reported IQ score of 3 and 5. (Exhibit 5 at ESS019, ES0021). Social history taken at Ellisville notes that the Kings had five children that died in their first year from pneumonia with high fever and convulsions. (Exhibit 5 at ES0017).

Mack Arthur witnessed violence between his parents including an episode where his mother stabbed his father in the back of his right leg. After this incident, the father had to be taken to the hospital. (*See* Post-Conviction Exhibits 25, 27*)*.

This abject poverty coupled with a history of family alcoholism, violence and neglected clearly affected Mack King and is precisely the kind of evidence that should have been investigated and presented to the jury. For these reasons, Petitioner is entitled to Habeas Corpus

25

relief.

<u>How this issue was presented to the state courts:</u>

This issue was raised in state court post-conviction proceedings

**Trial counsel fell below the standard of reasonableness by filing to investigate and present evidence of brain dysfunction.**

### Facts Relevant to this Ground for Relief:

Despite indications that Petitioner likely suffered brain dysfunction, trial counsel did not even seek neuropsychological testing.

Mr. King does indeed suffer from brain dysfunction. (Post-Conviction Exhibit 28 affidavit of Marc Zimmermann*).* A full scale Luria Nebraska Neuropsychological Battery (LNNB) was given to Mr. King on October 24, 2008. Dr. Zimmermann administered to Mr. King the full battery of the Luria Nebraska Neuropsychological Battery and the Test of Memory Malingering (TOMM). The results of the TOMM, a 37 on trial 1 and a 50 on trial 2 indicate a very low probability that Mr. King was malingering. *Id.* The testing of the clinical scales, Mack King showed three scales, Rhythm, Intellectual Process and Arithmetic above the Critical Level which demonstrate neurological impairment. *Id.* The neuropsychological tests revealed dysfunction in the Intellectual Process scale and a pervasive/global dysfunction which is often associated with mental retardation. *Id.* Dr. Zimmermann concluded "to a reasonable degree of scientific certainty that Mr. King suffers from neurological impairments." *Id.* Evidence of brain dysfunction is powerful mitigating evidence that should have been presented to the jury. For these reasons, Petitioner is entitled to Habeas Corpus relief.

<u>How this issue was presented to the state courts</u>:

This issue was raised in state court post-conviction proceedings, but the state court did not adjudicate the merits of the claim.

### Mack Arthur King Received Ineffective Assistance of Counsel When His Prior Counsel Failed to Challenge the Sufficiency of the Indictment in a Timely Fashion.

Mack Arthur King was indicted on August 3, 1980. His indictment read in relevant part:

> Mack Arthur King late of the County aforesaid, on or about the 3rd day of August in the year of our Lord, 1980, did then and there willfully, unlawfully, and feloniously and of his malice aforethought kill and murder a human being Lela Patterson without authority of law and not in necessary self-defense, while he, the said Mack Arthur King was then and there engaged in the commission of the crime of burglary in violation of Section 973-19(2)(E) of the Mississippi Code of 1972 as amended contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi. (C.P. 9)

Mr. King's indictment was legally insufficient because it failed to properly charge the underlying offense of burglary. *State v. Berryhill*, 703 So. 2d 250, 256 (Miss. 1997). In *Berryhill*, the defendant was indicted for "capital murder while engaged in the commission of a burglary, attempted kidnaping [sic] of a child, possession of a firearm by a convicted felon, and as an habitual offender." *Berryhill*, 703 So. 2d at 252. The trial court quashed the indictment and allowed the defendant to plead guilty to simply murder. *Id.* The State appealed the trial court's ruling quashing the indictment, and on appeal this Court held that trial court correctly quashed the capital murder portion of the indictment. *Id.*

The Court in *Berryhill* specifically held:

> [W]e hold that capital murder indictments that are predicated on burglary are required to state the underlying offense to the burglary. The reasons that we find this to be the better rule are twofold, and both arise out of the purposes of the indictment generally. First, as Justice Lee noted in *Lambert*, an indictment that fails to give notice to a defendant of the charges to which he has

27

been hailed into court to defend will fail to provide him an opportunity to prepare a defense. We have repeatedly held that an indictment must give notice of the nature and cause of the charges, although a reasonably concise statement of the crime will suffice. *Williams v. State,* 445 So.2d 798, 804 (Miss.1984) (concise statement of crime will serve purpose of indictment to provide description of charge which will enable accused to prepare defense); *Bullock v. State,* 391 So.2d 601, 606 (Miss.1980) (indictment gives accused fair notice of crime charged). In the context of capital murder, this Court has further held that a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient. *Mackbee v. State,* 575 So.2d 16, 35 (Miss.1990).

. . . . . . . . . . . . . . . . . . . . .

The second reason that we hold that murder indictments made capital must specify the nature of the underlying burglary is predicated upon the well-settled law that a defendant cannot be put in jeopardy for crimes except those which a grand jury of his peers has presented. As the trial court noted below in its bench opinion, only a grand jury can advise a defendant of what he is to be charged with. *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273-74, 4 L.Ed.2d 252 (1960) ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."); 41 Am.Jur.2d *Indictments and Informations* § 1 (1995) ( "An indictment can be made only by a grand jury, and no court or prosecutor can make, alter, or amend an indictment returned by a grand jury.").

*State v. Berryhill,* 703 So.2d at 255-57.

On September 23, 2002, Petitioner filed a *Motion to Exclude Death Penalty as a Sentencing Option Under State v. Berryhill and Memorandum in Support Thereof.* (C.P. 188-193). The Motion was denied. (C.P. 216). This issue was raised by King in his direct appeal from his 2003 sentencing trial. The Court, found the issue time-barred because King did not raise it within the applicable statute of limitations. *King v. State,* 960 So. 2d 413, 431 (Miss. 2007).

28

James Rocap first began representing Mack Arthur King 1982. (*See P*ost-Conviction Exhibits 18 & 19 Affidavits of James Rocap). During that time his representation was continuous and uninterrupted until the Mississippi Office of Capital Post-Conviction Counsel was appointed to represent him on September 25, 2007. (*See* Post-Conviction Exhibit 18*)*.

State Court Post-Conviction was the first opportunity that Mr. King has had to raise his ineffective assistance of counsel claims against his Mr. Rocap. *Wiley v. State*, 750 So. 2d 1193, 1198 n.1 (Miss. 1999) (citing *Woodward v. State, 635 So.2d 805, 807-08 (Miss.1993))*. "Where the same counsel represents the defendant at trial and on direct appeal, the claim [of ineffective assistance of counsel] is procedurally viable on application for post-conviction relief." *Woodward v. State, 635 So. 2d 805, 807-08 (Miss.1993).*

Had Mr. Rocap filed the appropriate pleadings before 2000, relief would have been granted to King regarding this issue because of the plain and unambiguous language of *Berryhill*. Indeed, in its brief on direct appeal, the State, citing *Lambert v. State*, 41 So. 2d 804 (Miss. 2006), admitted that *Berryhill* likely constituted an intervening decision. Appellee's Brief, *King v. State*, 2005-DP-00419-SCT, page 56, n.11. Thus, Mr. Rocap clearly rendered ineffective assistance of counsel by not raising *Berryhill* and seeking to quash the indictment in a timely fashion. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387 (1985). For these reasons, Petitioner is entitled to Habeas Corpus relief.

How this issue was presented to the state courts:

This issue was raised in state court post-conviction proceedings.

**Appellate Counsel Was Ineffective in Violation of Petitioner's 14th Amendment Rights Due To Appellate Counsel's Mishandling of the Challenge to the Unconstitutional Restrictions on His Right to Present Relevant and Compelling Evidence in Mitigation of Punishment and as Rebuttal Evidence to the State's Case Regarding 99-19-101(1)(7) and Statutory Aggravating Circumstances**

As argued *in Ground A*, King denied his constitutional right to present mitigating evidence of his limited role in the crime to rebut the State's evidence regarding aggravation. To the extent that the Court might find any part of that claim procedurally barred, Petitioner asserts that his prior counsel was ineffective in failing to properly preserve, litigate, and/or appeal the claim. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387 (1985). For these reasons, Petitioner is entitled to Habeas Corpus relief.

How this issue was presented to the state courts:

This issue was raised in state court post-conviction proceedings.

## GROUND C

## MACK ARTHUR KING IS MENTALLY RETARDED AND THUS HE IS INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA*.

Mack Arthur King is mentally retarded an ineligible for the death penalty under the Eighth Amendment. In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court held that the execution of mentally retarded individuals violates the Eighth Amendment, but left to the states the task of defining mental retardation and "developing appropriate ways to enforce thi[s] constitutional restriction." *Id.* at 317.

Following *Atkins*, the Mississippi Supreme Court adopted a definition of mental retardation to be used in Mississippi Courts:

The *Atkins* majority cited, with approval, two specific, almost identical, definitions of "mental retardation." The first was provided by the American Association on Mental Retardation (AAMR):

30

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

*Atkins*, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, *citing* Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992). The second was provided by the American Psychiatric Association:

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000).

*Id.*

> The *Diagnostic and Statistical Manual of Mental Disorders*, from which the American Psychiatric Association definition is quoted provides that mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75.

*Chase v. State*, 873 So. 2d 1013, 1027-28 (Miss. 2004). *See also Foster v. State*, 848 So. 2d 172, 174-175 (2003) (diagnosis of mental retardation includes intellectual functioning and other factors).

In particular, the Mississippi Supreme Court held that no defendant may be *adjudged* mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:

1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;

31

2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.
*Chase v. State*, 873 So. 2d 1013, 1029 (Miss.2004).

The Mississippi Supreme Court specifically held that for defendants whose trials were held prior to this opinion, an affidavit with the required information shall be attached to the defendant's motion for post-conviction relief. *Chase v. State*, 873 So. 2d at 1029-1030. (Miss.2004). Mack King was tried prior to *Chase*. An affidavit exceeding these requirements was attached to Mack King's Petition for Post Conviction Relief. (*See* Post-Conviction Exhibit 20 and 21*).*

In *Lynch v. State,* 951 So. 2d 549, 557 (Miss. 2007), the Mississippi Supreme Court ruled that the trial court was not limited to using the Minnesota Multiphasic Personality Inventory-II (MMPI-II) test to show the defendant is not malingering but rather could use that test and/or other similar tests; overruling *Scott v. State*, 938 So. 2d 1233 (Miss. 2006), *Goodin v. State, 856* So. 2d 267 (Miss. 2003).

**Mack Arthur King meets all three criteria for mental retardation.**

**Mack King has subaverage intellectual functioning.**

Mr. King's 2003 sentencing trial was held before the Mississippi Supreme Court decided *Chase v. State*, 873 So. 2d 1013(Miss. 2004). However, the state post-conviction petition submitted on Mr. King's behalf was filed after *Chase*. As of (at least) the post-conviction proceedings, Mr. King clearly met the test for a hearing under *Chase*, and is entitled to an order barring the State from executing him pursuant to *Atkins*. (*See* Post-Conviction Exhibit 21*).*

As is pointed out in *Chase*, the *Diagnostic and Statistical Manual of Mental Disorders*, from which the American Psychiatric Association Definition is quoted provides that mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75. *Chase v. State*, 873 So. 2d 1013, 1027 (Miss. 2004).

Mack King has taken three IQ tests over the last twenty-five years and has scored in the mentally retarded range on each test. On April 15, 1983, Dr. Robin King administered the Weschsler Adult Intelligence Test-Revised (WAIS-R) and found Mr. King to have a full-scale IQ of 71. (Tr. 612). However, Dr. King later found an error in his scoring and found Mr. King's full-scale IQ to be 69. (Tr. 615).

On June 23, 1983, Mr. King was tested by Dr. Michael Whelan using the Wechsler Adult Intelligence Test (WAIS), which was outdated and had been replaced by the WAIS-R. Dr. Whelan determined Mack King's full-scale IQ to be 71. (Tr. 679).

Petitioner arranged for an evaluation by Marc Zimmermann, Ph.D. Dr. Zimmermann is an expert in the field of assessing mental retardation in the administration and interpretation of tests and the evaluation of persons for the purposes of determining mental retardation. On May 30, 2008, Dr. Zimmermann administered the Wechsler Adult Intelligence Test-III (WAIS-III). On the WAIS-III Mack King's full-scale IQ was a 67. Dr. Zimmerman, a licensed psychologist gave an opinion to a reasonable degree of psychological certainty that Mack King has subaverage intellectual functioning and satisfies the first criterion for a finding of mental retardation. It was Dr. Zimmermann's opinion that King was not malingering on the WAIS-III. (*See* Post-Conviction Exhibit 21*)*.

**Mack King has Significant Deficits In Adaptive Functioning.**

33

The second criteria for establishing mental retardation is whether Mr. King has deficits in adaptive functioning. Mack King clearly has well documented deficits in several areas. Dr. Zimmermann found Mack King to have adaptive deficits in functional academics as evidenced by school records and achievement tests. Mack King failed the first, second and third grades. Dr. Zimmermann points out that achievement tests given to Mack King while in school consistently show him as functioning at the first grade level in vocabulary, reading and language. (*See* Post-Conviction Exhibits 21, 23*)*.

Dr. Zimmermann also noted that King had deficits in daily living and vocational abilities and that King was unable to access community and unable to effectively deal with money. (*See* Post-Conviction Exhibit 21*)*. As noted by individuals who knew him well, Mack Arthur had "trouble learning to tie his shoes." (*See* Post-Conviction Exhibit 22*)*. His clothing often did not match. *Id.* His hair was never groomed or cut. (*See* Post-Conviction Exhibit 25*)*. He did not learn the alphabet until he was 7 or 8 years old. (*See* Post-Conviction Exhibit 22*)*. He was described as "not smart." "special child" and slow. *See* Post-Conviction Exhibits 25, 26, and 27. Mack King was easily misled. (*See* Post-Conviction Exhibit 24*)*. Mack King could only perform jobs involving "muscle" that did not require him to use his brain. (*See* Post-Conviction Exhibits 24, 26). Mr. King's father had to make sure he awoke on time to get to work. (*See* Post-Conviction Exhibit 24*)*. Mack King was unable to read or follow directions and could only follow simple instructions. *(See* Post-Conviction Exhibit 26*)*. Mack King was unable to access community resource because he could not leave the neighborhood. (*See* Post-Conviction Exhibit 24, 26). Mr. King was unable to effectively handle money. (*See* Post-Conviction Exhibit 26*)*. Based on this information and his own evaluation, Dr. Zimmermann found King to satisfy the second criteria for a diagnosis of mental retardation.

34

**Mack King's deficits manifested before age 18.**

The third criteria for a finding of mental retardation is whether there was evidence of onset before age 18. It must be emphasized, however, that requiring a finding of developmental onset does not require that the diagnosis have been made before the age of eighteen or that standardized testing used to support the diagnosis have been administered before the age of eighteen. *See* Richard J. Bonnie & Katherine Gustafson, *The Challenge of Implementing* Atkins v. Virginia: *How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases*, 41 U. RICH L. REV. 811, 855 (2007).

Mr. King's school records prove that his intellectual deficits manifested before the age of 18. The school records document that Mack King failed First Second and Third grades and dropped out in Fourth grade in 1972. (Tr. 571, 573, 574 *See Also* Post-Conviction Exhibit 23*)*. The Achievement test scores on the school records also indicate that Mr. King was performing well below grade level. (Tr. 575; *See Also* Post-Conviction Exhibit 23*)*. The School records also show that Mack King received the lowest possible conduct mark of "5" on a scale of 1 to five (Five being the lowest) on every conduct category: "assumes responsibility," " initiative," "leadership," "personal grooming" and "works well with others." (Post-Conviction Exhibit 23*)*.

In summary, prior records, lay witness, and expert affidavits prove Mr. King has subaverage intellectual functioning, limitations in two or more adaptive skill areas and that the onset of his mental condition was before age 18. Dr. Marc Zimmermann, a licensed psychologist, is of the opinion to a reasonable psychological certainty that: "Mr. King meets the definitions of mental retardation as defined by the DSM-IV-TR and the AAMR and accepted by the federal and state courts in Atkins and Chase." (*See* Post-Conviction Exhibit 21). Thus, Mr. King is ineligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002) and is entitled to

Habeas Corpus Relief. In the alternative, he more than satisfied the requirements for obtaining

an evidentiary hearing and should receive a hearing on this ground for relief.

How this issue was presented to the state courts:

This issue was raised in state court post-conviction proceedings.

## GROUND D

## MACK ARTHUR KING WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT DENIED HIM HIS RIGHT TO DUE PROCESS OF AND A MEANINGFUL OPPORTUNITY TO DEVELOP EVIDENCE OF MENTAL RETARDATION

In *Atkins v. Virginia,* 536 U.S. 304 (2002), the United States Supreme Court held that

mentally retarded offenders were not eligible for the death penalty. The Court left it to the

individual states to develop the means to enforce its decision. *Id.* at 317. The procedures that a

State applies must comport with due process and must not infringe on the individual's Eighth

Amendment rights guaranteeing that a mentally retarded offender must not be executed. *Hill v.

Schofield*, 608 F.3d 1272 (11th Cir. 2010); *Rivera v. Quarterman,* 505 F.3d 349 (5th Cir. 2007);

*see also Panetti v. Quarterman,* 551 U.S. 930 (2007) (finding that arbitrary state court

procedures denied the petitioner a full and fair opportunity to develop a claim regarding his

incompetency to be executed). While *Atkins* gave the states latitude to development procedures,

it "did not give the states unfettered authority to develop procedures that nullify the Eighth

Amendment's prohibition on the execution of the mentally retarded." *Hill v. Schofield*, 608 F.3d

at 1277-78.

The Mississippi Supreme Court has adopted procedures to follow in cases arising under

*Atkins. Chase v. State,* 873 So. 2d 1013 (Miss. 2004). However, it failed to afford petitioner a

full, fair, and meaningful opportunity to present evidence to establish his mental retardation

36

thereby denying his rights guaranteed by the Eighth and Fourteenth Amendments.

The Mississippi Supreme Court did not apply its own procedural rules consistently to Petitioner. In *Chase*, the state supreme court held that any prisoner tried before *Chase* would have the benefit of its procedures in state post-conviction proceedings. *Chase*, 873 So. 2d at 1029. Although Petitioner was tried before *Chase* and although he fully complied with *Chase* in state post-conviction proceedings, he was arbitrarily denied its benefit and never had the opportunity to present evidence from a qualified expert at an evidentiary hearing.

The Mississippi Supreme Court found that the pre-trial proceedings were close enough to *Chase* to satisfy due process. Such a finding is unreasonable for several reasons. First, Petitioner was denied his right to a qualified and competent expert. *Chase* requires an expert who is "a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation." 873 So. 2d at 1029. In addition, the Mississippi Supreme Court provided that at a pre-trial hearing, "the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation." *Chase*, 873 at 1013. The *Chase* Court also stated, "The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence if limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in *Atkins* . . . ." *Id.*

On September 25, 2002, trial counsel filed a sealed Motion for Funds to Obtain Expert assistance. (Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 305-327). In this motion, trial counsel asked for four experts including a mental retardation expert and a licensed psychologist. (Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 306). Trial

Counsel specifically asked for the appointment of Caroline Everington, Ph.D., an Associate Dean of the Richard Riley College at Winthrop University who has published extensively in the field of mental retardation and criminal justice, Dr. Everington is eminently qualified to assess mental retardation. (CP. 324-337). After an ex parte hearing in chambers, the Court denied the request for funding. (C.P. 196).

Without an expert of his own, Petitioner lacked a qualified expert witness who could interpret prior testing, determine if additional testing was required, and do a complete and thorough assessment of adaptive functioning. Petitioner was thus denied a central guarantee of *Chase.*

As a result, Petitioner was forced to rely on Dr. Robin King, an admittedly unqualified witness, who was actually subpoened by the State, (Tr.599), and had not spoken to trial counsel in 20 years. (Tr. 598). Dr. King was not an expert in mental retardation or the administering and evaluating of tests. In fact, for the fifteen years prior to the re-sentencing hearing, Dr. King was practicing in the sub-specialty of the treatment of mood disorders, anxiety, obsessive/compulsive disorder, and severe depression. (Tr. 611). Moreover, Dr. King was unprepared to serve as a witness. He was unable to recall the details of his evaluation of Mack King. *Id.* It had been so long that Dr. King did any work in the mental retardation field, he could not even explain elementary matters regarding the IQ test and was easily discredited by the prosecution.

Additionally, Dr. King's 1983 evaluation was not even close to being adequate to assess mental retardation. Although he administered an IQ test, Dr. King conducted no assessment for limitations in adaptive functioning. Prior to the 2003 resentencing proceeding, Dr. King did nothing to address that shortcoming, and was not qualified to make that type of assessment.

The only other psychologist who conducted an evaluation was Michael Whelan, Ph.D., who testified for the State. Dr. Whelan gave an outdated version of an IQ test and never took into account aging norms or test obsolescence. As Dr. Zimmerman points out if one were to allow for the Flynn Effect, the adjusted score on Dr. Whelan's WAIS would be a Full-Scale IQ of 63. Similarly, If Dr. King's Scores were adjusted for the Flynn Effect, the Full Scale IQ would be a 67 (See Post-Conviction Exhibit 21.) Dr. Whelan never undertook a thorough evaluation of adaptive functioning. He found certain discrete items that Petitioner performed better than expected. Someone with mental retardation can perform some tasks capably. An individual found to have deficits is mentally retarded despite having relative strengths in other areas. Dr. Everington pointed out that Dr. Whelan's expert testimony was problematic in at least two respects:

> First, Dr. Whelan should not have simply relied on other trial testimony
> in making his assessments of Mr. King's mental capacity. Second,
> Dr. Whelan's conclusions were incomplete without a proper and
> thorough assessment of Mr. King's adaptive skills, which is necessary
> to make an accurate diagnosis of mental retardation.
> C.P. 322, affidavit of Caroline Everington.

*Chase* provides an opportunity to present evidence after a defendant makes a preliminary showing that he has subaverage intellectual functioning. Both Dr. King and Dr. Whelan testified that Mack King had a Full-Scale IQ below 75. Dr. King originally found Mr. King's Full-Scale IQ to be a 71, but after correcting for a scoring error, he determined it to be a 69. (Tr. 615). Dr. Whelan testified that Mr. King had a Full-Scale IQ of 71. (Tr. 679). All prior IQ tests (especially if adjusted to account for aging norms of the testing) placed Petitioner in the mentally retarded range of functioning, yet he was not afforded an opportunity to present witnesses, have a qualified expert, or challenge the conclusions of Dr. Whelan.

The proceedings in front of the jury were equally inadequate. Petitioner presented the same unqualified and unprepared witness in Dr. King. Because Dr. King was both unqualified and had not spoken to trial counsel in 20 years and therefore totally unprepared, Petitioner had no meaningful opportunity to challenge the state's unqualified witness. Moreover, the Circuit Court denied the proffered jury instruction on Mental Retardation (Tr. 771) and thus the jury had no guidance to make a determination. No instruction given to the jury contained a definition of Mental Retardation or informed the jury that Mental Retardation was anything more than one mitigating circumstance to consider.

When Petitioner complied with requirements for obtaining a post-conviction hearing to ascertain whether he was mentally retarded, the Mississippi Supreme Court denied relief without even considering Petitioner's evidence. Marc Zimmermann, Ph.D., an expert in the field of assessing mental retardation in the administration and interpretation of tests and the evaluation of persons for the purposes of determining mental retardation gave an opinion to a reasonable degree of psychological certainty that Mack King is Mentally Retarded as defined by the DSM-IV-TR and the AAMR. Dr. Zimmermann specifically found that all measures of IQ had placed Mr. King's intellectual abilities at a score less than 75, that Mr. King suffers from adaptive deficits in academics and vocational abilities; and that he is unable to access the community or effectively handle money. Further, Dr. Zimmermann found King's disability manifested before he was 18. See Post-Conviction Exhibit 21. Because petitioner was denied his due process right to an expert and fair and reliable procedures to determine his mental retardation, he is entitled to habeas relief or an evidentiary hearing.

<u>How this issue was presented to the state courts:</u>

This issue was raised on direct appeal and in post-conviction proceedings.

40

## GROUND E

**THE PETITIONER WAS DENIED HIS RIGHT UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND THE EQUAL PROTECTION CLAUSE WHEN THE TRIAL COURT REFUSED TO GRANT HIM MONEY TO RETAIN AN EXPERT PATHOLOGIST TO WHICH HE WAS ENTITLED UNDER AKE V. OKLAHOMA, 470 U.S. 68 (1985).**

Mr. King filed a Motion for funds to obtain expert assistance. Mr. King requested funds for the assistance of a pathologist to assist his attorneys in presenting evidence that would be critical in contesting the aggravating evidence the State would elicit. The Motion for funds was taken up *ex parte* and *in camera*. (C.P.217). It was unsealed by counsel for Petitioner. (Motion for Funds to Obtain Expert Assistance, Tr. 305-341; Transcript of Hearing under Seal, Tr. 342-407). Specifically, the State sought to prove as one of the aggravating circumstances that the offense was especially heinous, atrocious, and cruel and as it had done in prior proceedings, the State relied on expert testimony to establish that aggravating circumstance. The United States Supreme Court has held that the Fourteenth Amendment's due process clause required the States to provide indigents the fair opportunity to present a defense. This defense includes the defense of statutory aggravating factors. *Ake v. Oklahoma*, 470 U.S. 68 (1985).

Mr. King set forth in detail the basis for his need for an expert pathologist in his motion. An expert would be able to refute the State's contention that the crime was "heinous, atrocious or cruel." The Mississippi Supreme Court had in a previous opinion involving Mr. King that this was a "crucial issue." *King v. State*, 98-DP-01134-SCT, Paragraph 18 (Miss. 2001). The State built its case for the heinous, atrocious or cruel aggravating circumstance bases on the testimony of Dr. Martin. (Tr. 728-30). During the closing arguments the State spoke extensively to the jury about the injuries described by Dr. Martin and how Mrs. Patterson suffered. (Tr. 799-802).

41

Mr. King provided the affidavit of Dr. Leroy Riddick, an expert in forensic pathology, to establish that there were genuine issues of fact that were disputed from his examination of Dr. Martins' autopsy. (Affidavit of Dr. Riddick, attachment to the Motion for Funds to Obtain Expert Assistance.). (Tr. 328-330). Dr. Riddick would have provided direct, relevant testimony that Mrs. Patterson did not suffer as Dr. Martin testified. This testimony is important because Mr. King was also putting forth the defense that he played a minor role in the offense and that he did not have the requisite intent as required under *Enmund v. Florida.*

Dr. Riddick has a detailed affidavit of his testimony and his costs. These issues were presented to the trial judge in camera. (Tr. 393-397). During the hearing the trial court stated he thought that the defense *could use some help* but he felt the money was too high. At one point the trial judge opinioned that maybe he was just old and behind the times. (Tr. 401-407). The court took the issue under advisement and eventually overruled the motion. (C.P. 224) This ruling denied Mr. King the rights secured under *Ake*, Id. For these reasons, Petitioner is entitled to habeas corpus relief. This claim was raised on direct appeal.

## GROUND F

**PETITIONER WAS NOT AFFORDED A FUNDAMENTALLY FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO THE TRIAL COURT'S REFUSAL TO CHANGE VENUE. ALTERNATIVELY, THE SENTENCING HEARING WAS IRREPARABLY TAINTED BY THE JUROR BIAS DUE TO MR. KING'S PRIOR TRIAL IN THE COUNTY.**

Mr. King filed a motion to change venue prior to his sentencing hearing. (C.P. 134-60, R.E. 189-222). Attached were numerous broadcasts from media outlets in Lowndes County. (Tr. 148-167. R.E. 203-21). The motion was in conformity with *Mississippi Code Annotated*, § 99-15-35 (2005). Mr. King called witness and met his burden. (R.E. 372-75). The filing of the sworn motion and presentation of testimony met the presumption that a fair trial could not be obtained

42

in Lowndes County. The State presented no evidence at all to rebut the presumption. The State did not call witnesses or introduce any testimony.

Mr. King's case has a lengthy history in Lowndes County. Mr. King had an initial trial in 1980. He had a later Error Coram Nobis hearing. Mr. King had two (2) reversals and each time the case was retried in Lowndes County. The 2003 Sentencing hearing was the fourth (4) time Mr. King had been to trial. There had been substantial media coverage about Mr. King. (C.P. 149-67, R.E. 203-20). The articles covered the graphic details of Mrs. Patterson's death and Mr. King's race. The articles called one of the reversals a "technicality."

Mr. King was a man with an extremely limited mental capacity. He was African American and the victim was white. After so many trials in Lowndes County it was error for trial court to deny a change of venue. The trial court noted that it thought there was a "possibly" a change of venue might be needed yet the court refused to change in spite of the fact the State wholly failed to rebut the presumption. The Mississippi Supreme Court denied relief, and its adjudication of this ground for relief was unreasonable. This claim was raised on direct appeal.

### GROUND G

**TRIAL COURT IMPRORELY GRANTED INSTRUCTIONS FOR THE STATE AND IMPROPERLY REFUSED INSTRUCTIONS FOR MR. KING THEREBY DENYING HIM A RELIALBLE SENTENCING HEARING IN VIOLATION OF THE SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS OF THE UNITES STATES CONSTITUTION**

#### The trial court erred by instructing on the aggravating circumstance "heinous, atrocious, or cruel."

The aggravating circumstance "heinous, atrocious or cruel" must be accompanied by a proper limiting instruction. *Shell v. Mississippi*, 498 U.S. 1 (1980). In a prior appeal this issue was raised by Mr. King and the Mississippi Supreme Court instructed the trial court to use the

"precise language" of the limiting instruction that was set forth in *Edwards v. State*, 737 So. 275, 315 (Miss. 1999). See *King v. State*, 784 So. 2d. at 891 (Miss. 2001)

During Mr. King's 2003 Re-Sentencing Mr. King offered the precise instruction recommended by the Mississippi Supreme Court. (DSP-2; C.P. 435). The State offered an instruction that varied from the instruction demanded by the Mississippi Supreme Court and one that was inadequate in terms of guiding the jury. (SSP-5, C.P. 411). Mr. King objected to the State's instruction but the trial court overruled the instruction the objection. (Tr.753, R.E. 96; Tr. 754, 756-58; R.E. 97, 990-101).

The language that the State deliberately omitted in defiance of the Mississippi Supreme Court is the exact language that constitutionally narrows the class of individuals to which the aggravator may apply. *Georgia v. Godfery*, 446 U.S. 420, 427 (1980). (When an aggravator could fairly apply to all murders it ceases to serve a "meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not..."). In the present case the State deliberately and with full knowledge of the prior ruling of the Mississippi Supreme Court, and with full knowledge of its constitutional duty to narrow the class of person to whom the "heinous, atrocious or cruel" aggravator may apply, nevertheless altered the instruction and offered an constitutionally inferior instruction.

The language omitted defined heinous as "extremely wicked or shockingly evil,' atrocious as "extremely wicked and vile;" and cruel as "designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others." This language was omitted and it could have come from nothing but the State's effort to divert the jury from it constitutional obligations.

There was an inadequate factual basis to give the heinous, atrocious or cruel aggravating

44

jury instruction. The Mississippi Supreme Court has in cases defined this aggravating circumstances focusing on the torturous element; an element stressing prolonged torture. Evidence of this was absent. The State relied on the fact that ice cream was left out of Mrs. Patterson's freezer on the night of the burglary and murder. (Tr. 801, 806, 841). The State also argued that strangulation could make the murder heinous, atrocious, or cruel. The Mississippi Supreme Court has held that strangulation cannot make a murder heinous, atrocious, or cruel. *Taylor v. State*, 672 So. 2d 1246, 1275-76 (Miss. 1996).

The testimony from the State's pathologist was unclear whether Mrs. Patterson lost consciousness immediately. (Tr. 458-62). In the first trial in 1980 the testimony was more beneficial to Mr. King. The State's pathologist actually leaned more toward the State in the 2003 trial. The State made ample use of Dr. Martin's testimony in closing. This also exemplifies why Mr. King should have been entitled to *Ake* help through an independent pathologist. The trial court erred by not giving the instruction previously directed by the Mississippi Supreme Court.

### The Trial Court's Instructions misled and confused the jury into believing that the death penalty was mandatory if the aggravating circumstances out weighed the mitigating circumstance.

The trial court refused Mr. King's jury instructions (DSP-1, C.P. 427; R.E. 180; Tr. 759 and DSP-3, C.P. 436; R.E. 181; Tr. 767, R.E. 110). These instructions informed the jury in clear and unequivocal terms that it may sentence Mr. King to life even if there are no mitigating circumstances.

The State's instruction led the jury to believe that death was the conclusion if the mitigating circumstances did not outweigh the aggravating circumstances. (SSP-4A, C.P. 408, R.E. 183). The State offered SSA-4A(3)(b). (C.P. 409, R.E. 184). Mr. King's counsel made an

45

objection to the confusing nature of the instructions. (Tr. 749-50).

The State's Instructions are also contradictory and confusing. In SSP-4A(2) it requires the aggravators to outweigh the mitigating circumstances. In SSP-A4(3)(a) it states that the mitigating circumstances do not outweigh the aggravators. Then in SSA-4A(3)(b) this instruction uses the language that the aggravators do not outweigh the mitigating circumstances. (C.P. 407-9. R.E. 182-84). Confusing instructions do not constitutionally guide and channel the jury. *Smith v. State*, 436 So. 2d 1028, 1029-30 (Miss. 1984). In the present case the jury experienced considerable confusion as unequivocally shown by the fact the jury returned a verdict that did not include any of the *Enmund* factors. (Tr. 848-49, R.E. 52-53).

### The trial court improperly directed the jury to find one of the Enmund factors.

Before a person may be sentenced to death for a capital crime the jury must find that he/she committed the killing, attempted the killing, intended the killing take place, or contemplated the use of lethal force. *Enmund v. Florida*, 458 U.S. 782 (1982). In the case the jury returned a verdict without finding any of the *Enmund* factors. (Tr. 848-49, R.E. 52-53). Instead of imposing a life sentence the trial court instructed the jury that their verdict was deficient in form. (C.P. 397, Tr. 851-61, R.E.186., 154-64). Mr. King objected the trial court's actions. (Tr. 854, 856, 862, R.E. 58, 60, 66). The court erred by sending the jury back with instructions to make findings that were not made when the jury returned the verdict.

### The trial court erred by submitting to the jury the aggravating circumstance that the offense was committed for the purpose of avoiding an arrest.

The Constitution requires that statutory aggravating circumstances narrow the class of persons subject to the death penalty. There was inadequate proof in the record to support the

granting of this instruction. The State argued that Mr. King's first statement was a lie to the police and qualified as a basis for granting of this instruction. However, lying to the police alone does not prove that the purpose of the murder was to avoid arrest. *Traylor v. State*, 672 So.2d 1246 (Miss. 1996). Mr. King objected to the granting of the instruction. (Tr. 740-743).

This particular aggravating instruction was not granted during the 1980 capital murder trial. (Exhibit 1, 1980). The instruction was offered in 1998 but withdrawn by the State. (Tr. 740-743). The Petitioner attempted throughout the trial to establish the lack of the requisite mental intent under *Enmund*. In each instance where the Petitioner tried to show he did not kill, attempt to kill, intend to kill, or contemplate that lethal force would be use the trial court foreclose the proof or cross-examination. The State cannot be allowed to prove an aggravating circumstance that the defendant killed to avoid a lawful arrest if the defendant cannot challenge that proof. Hobbling a person on trial for his life is not constitutional.

### The trial court failed to properly instruct the jury regarding statutory mitigating circumstances.

Mr. King asserted in his first capital murder trial that his uncle Willie Porter more than likely committed the offense of murder. Petitioner went into the house first while Willie Porter served as a "lookout". When Mr. King left Mrs. Patterson's home he was supposed to serve as a look out for Willie Porter. Instead Mr. King went home leaving Willie Porter at the home of Mrs. Patterson. (Exhibit 1-1980 Tr. 157-159).

The State in the 1980 capital murder trial responded to this defense by submitting an accomplice instruction. Under an accomplice theory Mr. King could be guilty of capital murder but he would not be subject to the death penalty unless one of the *Enmund* factors existed. Under *Enmund* a defendant must kill, intended a killing take place, attempt to kill, or contemplated that

47

lethal force be used.

Since 1980 Mr. King has asserted that he burglarized Mrs. Patterson's house but she was alive and well when he left. (Exhibit 1-1980 Transcript 157-159). In the 2003 Re-Sentencing hearing Mr. King attempted to establish the lack of *Enmund* factors and he attempted to put forth mitigating evidence. The State objected and the trial judge incorrectly granted those objections. The mitigating circumstance Mr. King sought to establish was that he was an "accomplice in the capital offense committed by another person and his participation was relatively minor." This is a mitigating circumstance straight from Mississippi Statutes. It was relevant and justified by the evidence since 1980. *Miss. Code Ann.* § 99-19-101)6) (d)(2005). Mr. King offered this instruction and it was refused by the trial court. (Tr. 759-61, R.E. 102-04, 187; C.P. 429). The evidence offered by the State-the admission of Mr. King that he burglarized the home of Mrs. Patterson with his uncle Willie Porter but that he did not kill her-is the same evidence that supported this mitigating instruction. There can be no valid reason or purpose in allowing the State to use the statement to argue an aggravating circumstance and not allow Mr. King to use it to argue a mitigating circumstance.

### The trial judge failed to grant a circumstantial evidence theory.

Mr. King admitted to burglarizing Mrs. Patterson's home. He denied causing or knowing about her death. Her death may have been the result of his Uncle Willie Porter or the other vehicle heard around her home that evening. (Exhibit 14 to the Motion for Post Conviction Relief). A circumstantial evidence instruction was offered and refused by the trial court. (DSP-19, C.P. 446, Tr. 782, R.E. 125, 201). These claims were raised on direct appeal.

48

## GROUND H

### THE TRIAL COURT FAILED TO PROPERLY ISNTRUCT THE JURY REGARDING THE ACCOMPLICE MITIGATING FACTOR.

Since 1980 Petitioner admitted his role in the burglary of Mrs. Patterson's home. He denied being responsible for her death. The trial Court refused an mitigating instruction that he was "an accomplice in the capital offense committed by another person. (C.P. 429, Tr. 759-61) This instruction followed a statutory mitigating circumstance. *M.C.A. § 99-19-101 (6)(d) (2005)*.

Petitioner has in this Petition previously pleaded facts justifying the introduction of evidence under *Enmund* and as statutory mitigating circumstances. These facts would not have been residual doubt or re-litigating the issue of guilty. An instruction should have been granted together with the admission of the evidence. This claim was raised on direct appeal.

## GROUND I

### PETITIONER'S RIGHTS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED WHEN THE TRIAL COURT IMPROPERLY EXCLUDED TWO JURORS FOR CAUSE.

The trial court improperly excluded two (2) jurors who never said they would refuse to follow the law. A court may not excuse a juror for cause merely because that juror expresses "conscientious objections to capital punishment." *Wainwright v. Witt.* 469 U.S. 412 (1985). In the present case the court violated. *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

Juror number 25 was Shellie Stewart. She was excused for cause over the objection of Mr. King's counsel. (Tr. 366-374). Juror questionnaires were filled out by the jury. Ms. Stewart indicated that she "mildly disagreed" with the death penalty. (R.E. 129-130). During the jury selection Ms. Stewart stated that she was personally against the death penalty but she would vote to impose it depending on the circumstances. (Tr. 258-59). She could not think of any

49

circumstances "right now" that she could impose it. At the time Ms. Stewart had not heard any

aggravating or mitigating circumstance. (Tr. 261).

The State attempted to elicit information that might give it a challenge for cause but Ms.

Stewart answered in a conscientious manner:

> MR. ALLGOOD:  So if the Judge instructed you about that
> weighing – I was telling you about the weighing yesterday and
> about finding the aggravating circumstances and finding the
> mitigating circumstances.  What you're telling me is that you
> would always, no matter what the Judge instructed you, you would
> always – if you found that one circumstance that he was of law
> I.Q., you wouldn't weigh any of those circumstances and you
> would automatically vote for some sentence other than death; is
> that right?
>
> MS. STEWART: No, I would weigh it.  I would weigh it.  I would
> weigh the circumstances.
>
> MR. ALLGOOD:  You would weigh it?
>
> MS. STEWART:  Yes.
>
> (Tr. 262, R.E. 132).
>
> Upon questioning by the defense, Ms. Stewart clarified her
> position:
>
> MR. ROCAP:  We're just trying to find out what your true beliefs
> are here.  As I understand what you've said, you don't know what
> the facts and circumstances of this case are, do you?
>
> MS. STEWART:  No.
>
> MR. ROCAP:  And you would want to hear those facts and
> circumstances before you made a determination about whether life
> or life without parole or death was appropriate; is that right?
>
> MS. STEWART:  Right, right.
>
> (Tr. 263, R.E. 133).

Ms. Stewart did not make any statements that would have disqualified her as a juror. Rather she indicated again at a later point she would be a fair and impartial juror:

> MR. ROCAP: And you would be equally open to each one of those possibilities once you heard what the circumstances were; is that right?
>
> MS. STEWART: Yes.
>
> MR. ROCAP: And whatever the Judge told you, whatever the Judge told you in terms of how the law in Mississippi should be applied, you would follow those instructions; is that right?
>
> MS. STEWART: Yes.

The trial judge granted a challenge for cause to Ms. Stewart without a proper legal basis. The State sought to remove Ms. Stewart not because of her opinion on the death penalty; her opinions were similar to other jurors who stayed on the panel. The State sought to remove Ms Stewart because of her opinions on mitigating evidence. Ms. Stewart indicated a willingness to listen to and accept Mr. King's mental illness as a mitigating factor. (Tr. Tr. 261-62).

The trial court also removed for cause over objection Barbara Tucker, juror 30. (Tr.369).The responses of Ms. Tucker did not reflect that she would refuse to follow the instructions of the court. Instead they showed a juror that would use her conscience and apply the law as given by the court. (Tr.272-75). A juror is permitted to have an opinion opposed to the death penalty. A juror is permitted to have a general opinion against imposing the death penalty, or one making it difficult to impose the death penalty. However, a juror must be willing to set aside personal opinions and follow the law. (Tr. 274).

Ms. Tucker unequivocally stated she would listen to both the aggravating and mitigating circumstances before making her decision:

51

MR. ROCAP: Let me run it a little bit different way. You haven't heard any of the facts and circumstances about this case yet, have you?

MS. TUCKER: No.

MR. ROCAP: And if you're seated in the jury box here and the State puts on its evidence of what it calls aggravating circumstances and the defendant puts on their evidence of what's called mitigating circumstances, would you fairly listen to all of that and take all of it into consideration before you made a determination?

MS. TUCKER: Yeah, I could do that.

MR. ROCAP: And isn't that like any situation in life? You need to hear the circumstances before you can make a decision about what's right and what's wrong?

MS. TUCKER: I would fairly listen to all the evidence and then make my determination. That's what you asked me, right?

MR. ROCAP: That's right. That's like what you do everyday? Whether the situation is a difficult situation or whether it's not too difficult a situation, you try to listen to all the facts and circumstances before you make up your mind about what's right or what's wrong or what should be done; isn't that right?

MS. TUCKER: Yes. I would listen to all the facts. I could hear that, yeah.

MR. ROCAP: And is it possible that something could be presented to you after you listen to all of the evidence that Mr. Allgood puts on and all of the evidence that we put on and that you would say, Yeah, this is a case where the death penalty is appropriate rather than life or life without parole? Can you imagine that happening and that you could go back in the jury room and say to your fellow jurors, this is a case where the death penalty is appropriate for that individual.

MS. TUCKER: It's possible.

MR. ROCAP: And it's not only possible, is it, but you would be fair to the State and you would be fair to the defendant in making that determination; is that right?

MS. TUCKER: I believe so.

(Tr. 276-78, R.E. 141-43).

The jury that sentenced Mr. King was heavily pre-disposed toward the death penalty. Ten (10) of the twelve (12) jurors with strongly or mildly agreed with the death penalty. (C.P. 1648-1778). The trial court was quick to remove jurors for cause who expressed a reservation against the death penalty, but would not remove for cause Juror 19, Mr. Cook, who had a strong disposition for death and who would require the accused to offer a good reason not to be put to death. Jurors Stewart and Tucker were improperly removed for cause by the trial court. For these reasons, Petitioner is entitled to habeas corpus relief. This issue was raised on direct appeal.

## GROUND J

### THE INDICTMENT WAS FATALLY DEFECTIVE AND FAILED TO PROVIDE DUE PROCESS NOTICE TO PETITIONER OF THE CRIME THEREBY VIOLATING THE EIGHT AND FOURTEENTHMENT AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**Petitioner was denied his right to due process by the failure of the indictment to charge an offense.**

Mr. King was charged with a capital murder. The indictment alleged that Mr. King committed a burglary during which a murder occurred yet the underlying indictment failed to charge the essential elements of burglary. Petitioner filed a pre-trial Motion to Exclude the Death Penalty as a Sentencing Option. (C.P. 188-193) The trial Court denied the Motion. (C.P. 216) The ruling of the trial Court was in error under *State v. Berryhill,* 703 So.2d 250 (Miss. 1997). The Mississippi Supreme Court has definitely ruled that an indictment must list the elements of

the underlying felony that constitute part of the capital murder. This issue was raised on direct appeal.

### GROUND K

**IMPROPER AND PREJUDICIAL VICTIM IMPACT EVIDENCE WAS INTRODUCED DURING THE TRIAL THEREBY DENYING MR. KING FUNDAMENTALLY FAIR SENTENCING HEARING AND INTRODUCING ARBITRATRY AND CAPRICIOUSNESS INTO THE SENTENCING HEARING. THIS VIOLATED THE EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

During the Course of the trial the daughter of Mrs. Lela Patterson testified about the impact of her mother's death on the family. The State went far beyond the evidence that is permitted by law. (Tr. 408-26). Mr. King moved for a mistrial and it was denied by the Court. The testimony concerned Mrs. Patterson physical appearance, favorite clothing, church attendance, hobbies, family ties and relationships, and living habits.

The State went far beyond the brief statement permitted by *Payne v. Tennessee*, 501 U.S. 808 (1991). Mrs. Anderson talked about the family's opinion of the crime, how tragic her death was and how hard that was on the entire family. The sole purpose of the testimony was to inflame the jury and divert their attention from the issues of the crime and the defendant. The Petitioner attempted to establish the lack of requisite intend under the *Enmund* factors. Petitioner also was prohibited from providing his defense through both the Mississippi Statutory Mitigating circumstance and those almost unlimited mitigating circumstances permitted by *Lockett*, Id. By contrast the prosecutor was allowed unlimited right to present inflammatory victim impact evidence. The resulted in an unreliable sentencing hearing. Petitioner is therefore entitled to habeas corpus relief.

54

## GROUND L

## PETITIONER WAS DENIED HIS RIGHTS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS DUE TO THE CUMULATIVE EFFECT OF THE ERRORS AT HIS TRIAL.

Although each individual ground for relief listed above would entitle Petitioner to relief, he is also entitled relief due to the cumulative effect of the errors. This matter was raised on direct appeal and in state post-conviction proceedings.

## IV. OTHER REQUIRED TECHNICAL INFORMATION.

15.    If any grounds listed in Question 14 have not been presented in the state courts, explain why: not applicable

16.    Do you now have any petition(s) or appeals(s) now pending in any court, state or federal, pertaining to the judgment under attack: no

17.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked:

      a.     preliminary hearing: unknown

      b.     arraignment and plea: petitioner was arraigned and plead not guilty on August 22, 1980, represented by Joe Sams, Jr. (deceased)

      c.     trial: Michael Farrow, 518 2nd Avenue North, Columbus, MS 39701, James E. Rocap, III, Steptoe and Johnson, 1330 Connecticut Avenue NW, Washington, D.C. 20036, Michael J. Barta, 1299 Pennsylvanue Avenue, NW, Washington, D.C. 20004

      d.     sentencing: Michael Farrow, 518 2nd Avenue North, Columbus, MS 39701, James E. Rocap, III, Steptoe and Johnson, 1330 Connecticut Avenue NW, Washington, D.C. 20036, Michael J. Barta, 1299

Pennsylvanue Avenue, NW, Washington, D.C. 20004

e.    on appeal:    Michael Farrow, 518 2nd Avenue North, Columbus, MS 39701, James E. Rocap, III, Steptoe and Johnson, 1330 Connecticut Avenue NW, Washington, D.C. 20036

f.    any post-conviction proceeding: Glenn Swartzfager and Louwlynn Vanzetta Williams, Office of Capital Post-Conviction Counsel, 239 N. Lamar Street, Suite 404, Jackson, MS 39201

g.    on appeal from adverse ruling of a post-conviction proceeding: not applicable

h.    at parole or probation revocation hearing: not applicable

18. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court at the same time: no

19. Do you have any future sentences to serve after you complete the sentencing imposed by the judgment under attack: no

20. What relief do you ask the United States District Court for the Southern District of Mississippi to Grant you:

Petitioner prays that the Court grant:

a.    an evidentiary hearing as to all claims not fully developed on the trial, appellate and state post-conviction record;

b.    summary judgment of issuance of the writ of habeas corpus under 28 U.S.C. Section 2254 vacating Petitioner's conviction and death sentence where there are no genuine issues of material fact as to the claims herein pled;

c.    funding for expert and investigative assistance to develop facts in support of the grounds alleged;

  d.  such general relief or other relief to which Petitioner may be entitled in this proceeding.

This Petition was executed on the 8th day of October, 2010.

          Respectfully submitted,
          MACK ARTHUR KING

    By:  */s/ Mérrida (Buddy) Coxwell*
       MÉRRIDA (BUDDY) COXWELL

  I declare, under penalty of perjury, that the foregoing is, to the best of my knowledge, true and correct, this the 8th day of October, 2010.

          */s/ Mérrida (Buddy) Coxwell*
          MÉRRIDA (BUDDY) COXWELL

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing petition on the following via the Court's ECF system on this the 8th day of October, 2010.

Marvin L. White, Jr.
Patrick J. McNamara, Jr.
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220

*/s/ Mérrida (Buddy) Coxwell*
MÉRRIDA (BUDDY) COXWELL

Of Counsel:

Merrida Coxwell
Coxwell & Associates, PLLC
500 North State Street
Jackson, MS 39201
Phone: (601) 948-1600
Fax: (601) 948-7097
Email: merridac@coxwelllaw.com

Stacy Ferraro
P.O. Box 708
Flora, MS 39701
Phone: (601) 853-8331
Fax: (601) 853-8331
Email: stacy@watervalley.net