

25                    Mrs. C. Hughes/DE

Q        Mrs. Hughes, I'll hand you another photograph, and I'll ask if you would look at that photograph and tell the ladies and gentlemen of the jury whether or not you can identify what that is a photograph of?

A        This is a photograph of the telephone line on the outside of the house.

Q        Did you observe that that morning?

A        I found it.

Q        Does that photograph truly and accurately depict the telephone wire on the side of the house that you found on the morning of August the 3rd of 1980?

A        Yes, exactly.

MR. HOWARD:

         Your Honor, we tender this as an exhibit to this witness's testimony at this time.

THE COURT:

         Let it be received and marked.

         (COURT REPORTER MARKS PHOTOGRAPH SHOWING TELEPHONE
         LINE OUTSIDE THE HOUSE AS STATE'S EXHIBIT NO. 3
         IN EVIDENCE)



State's Exhibit #3- Evidence /s/KHB 12-4-80

Q      MRS. HUGHES, AFTER YOU ASKED MRS. ANDERSON TO STAY
OUTSIDE WHAT DID YOU DO THEN?

A      I WENT THROUGH THE HOUSE ROOM BY ROOM.

Q      DID YOU FIND MRS. PATTERSON AT THAT TIME?

A      NO.

Q      WHAT DID YOU DO THEN?

A      WELL, WE KNEW THAT SOMETHING HAD HAPPENED TO MRS.
PATTERSON, SO I WENT BACK OUT AND I SAYS, "WE'LL GO BACK OUT
TO MY HOUSE; YOU CAN CALL THE SHERIFF'S OFFICE FROM MY
TELEPHONE."

Q      OKAY, AND WHAT DID YOU DO?

A      THAT'S WHAT WE DID; WE CALLED THE INVESTIGATION
DETAIL FIRST.

Q      AFTER YOU MADE THAT PHONE CALL WHAT DID YOU AND
MRS. ANDERSON DO?

A      WE WENT BACK OUT THERE.

Q      BACK OUT TO WHERE, TO MRS. --

A      TO MRS. PATTERSON'S HOUSE, AND WE SEARCHED ALL
AROUND THE GARDEN, OUT TO THE BARN. WE COULDN'T FIND ANY SIGN
OF HER.

Q      WHEN DID THE POLICE OR THE SHERIFF'S DEPARTMENT
ARRIVE?

A      OH, SEEMED LIKE MAYBE FIFTEEN OR TWENTY MINUTES
AFTER WE CALLED.

Q      AND AFTER THEY ARRIVED WHAT WAS DONE THEN?

A      WELL, I WENT THROUGH THE HOUSE AGAIN WITH MR.
MORDECAI; HE WAS THE FIRST ONE OUT THERE.

Q      NOW WHO IS HE?

A      HE'S THE DETECTIVE.

Q      WITH THE SHERIFF'S DEPARTMENT?

A      WITH THE SHERIFF'S DEPARTMENT.

Q        Okay, and what did y'all do when you went through the house?

A        Well, we observed all the upheaval, and we found that the front door was open, the back door was open when it was first located, so therefore both doors were open, but still we didn't find her body because we just looked in the bathroom without turning on a light.

Q        And then what did y'all do?

A        Went back outside and waited and then the sheriff's office came with --I mean a car came with a deputy, and it was after that that I found where the telephone line had been torn loose from the outside because the telephone was dead, and no wires cut inside.

Q        Was that the photograph you've identified here --

A        Yeah.

Q        --and been introduced into evidence. After that occurred did you go back in the house again?

A        Yes, after we found that, Mrs. Patterson's youngest brother was out there and I just called him --motioned to him.

Q        What was his name?

A        A. J. Hughes.

Q        And what did y'all do?

A        I wanted him to see part of the mess inside the house, so we got to the bathroom door, and there was a drop cord light, and I told him, I said, "It won't carry a finger-print so I'm going to turn it on," and when I turned it on I was in the middle of the bathroom, and I saw her body in the tub.

Q        Whose body did you see in the tub?

A        Mrs. Lela Patterson.

MR. HOWARD:

  MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

  YOU MAY.

Q  MRS. HUGHES, I'M GOING TO HAND YOU A SERIES OF FOUR PHOTOGRAPHS, AND I'LL ASK IF YOU WILL LOOK AT THESE PHOTO-GRAPHS, AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER OR NOT YOU CAN IDENTIFY THESE PHOTOGRAPHS?

  (WITNESS LOOKS THROUGH PHOTOGRAPHS)

A  YES, SIR.

Q  CAN YOU IDENTIFY EACH ONE OF THESE FOUR PHOTOGRAPHS?

A  YEAH.

Q  AND WHAT ARE THESE PHOTOGRAPHS OF, MRS. HUGHES?

A  THE FIRST ONE IS A PHOTOGRAPH OF THE FLOOR WHERE SOME BLOOD HAD BEEN WIPED UP EVIDENTLY.

Q  THE FLOOR WHERE?

A  RIGHT IN FRONT OF THE TUB, JUST BEFORE YOU GET TO THE TUB, AND THE REST OF THEM ARE PICTURES OF HER BODY IN THE TUB.

Q  I'LL ASK YOU WHETHER OR NOT THAT BATHROOM OR THAT IS IN THE BATHROOM THAT YOU'VE TESTIFIED ABOUT WHERE YOU SAW THE BLOOD ON THE FLOOR?

A  UH-HUH.

Q  IS THAT THE BATHROOM OF MRS. LELA PATTERSON?

A  YES.

Q  AND THREE PHOTOGRAPHS THAT SHOWED THE BODY IN THE TUB, IS THAT THE BODY OF MRS. LELA PATTERSON?

A  YES.

Q  DO THESE PHOTOGRAPHS TRULY AND ACCURATELY SHOW OR DEPICT THE BATHROOM AND THE TUB AND THE BODY IN THE TUB AS YOU

29                    Mrs. C. Hughes/DE

FOUND IT --

A        Exactly.

Q        --on August the 3rd of 1980?

A        Yes.

MR. HOWARD:

Your Honor, we tender these as an exhibit to this witness's testimony at this time.

THE COURT:

Let them be received and marked.

(COURT REPORTER MARKS FOUR PHOTOGRAPHS SHOWING BATHROOM AREA AND BODY IN TUB AS STATE'S EXHIBIT NO. 4 IN EVIDENCE - 4 A -D)



State's Exhibit #4 – Evidence /s/KHB   12-4-80   Page 1

68





Q       Mrs. Hughes, after you discovered the body of Mrs. Patterson what did you do then?

A       We went back --A. J. Hughes, who was with me, and I went back outside, and I sat down on the doorstep while he was looking for the deputy to inform him that her body had been found.

Q       Were the deputies then notified?

A       Yes, he went into the crowd and notified him, and he came around then and went into the house, and looked at her.

Q       Would that have been Deputy Skipper and Deputy Mordecai?

A       No, it was just the colored deputy.

Q       Deputy Skipper?

A       Is that his name?

Q       Yes, ma'am.

MR. HOWARD:

        Nothing further of this witness, your Honor.

THE COURT:

        You may cross-examine.

MR. SAMS:

        No questions.

THE COURT:

        You may step down, Mrs. Hughes.

        You may call your next witness.

                MIKE MORDECAI,

        A witness for the State of Mississippi, having been duly sworn by Deputy Clerk, John Wiggins, testified as follows:

31                              MORDECAI/DE

## DIRECT EXAMINATION

BY MR. HOWARD:

Q       Would you tell the ladies and gentlemen of the jury what your name is, please?

A       Mike Mordecai.

Q       What is your job or occupation, Mike?

A       I work for the Lowndes County Sheriff's Department.

Q       And what particular division or field do you work in, Mike?

A       Investigative Division.

Q       Would that division concern burglaries, and homicides and robberies and things of that nature, investigations of those crimes?

A       Yes, sir.

Q       Mike, I'll ask you whether or not you were employed by the Lowndes County Sheriff's Department on August the 3rd of 1980?

A       Yes, sir, I was.

Q       I'm going to direct your attention to that date, and I'll ask if you had the occasion to be summoned to the residence of Mrs. Lela Patterson?

A       Yes, sir.

Q       Approximately what time were you summoned to that residence?

A       Around ten A. M.

Q       When you arrived at that residence who was present?

A       Mrs. Hughes and Mrs. Jane Anderson.

Q       Were you the first deputy or law enforcement officer on the scene?

A       Yes, sir, I was.

Q    WHAT WAS DONE WHEN YOU ARRIVED, MIKE?

A    I TALKED WITH MRS. HUGHES, AND WE WENT IN THE
HOUSE. THEY HAD DISCOVERED THAT THE DOOR HAD BEEN LEFT OPEN,
AND SAW SOME STUFF HAD BEEN RE-ARRANGED IN THE HOUSE, AND THE
HOUSE WAS LEFT RANSACKED.

Q    DID YOU GO IN THE HOUSE?

A    YES, I DID.

Q    DID YOU OBSERVE THE INTERIOR AND THE CONDITION OF
THE HOUSE WHEN YOU WENT IN?

A    YES, SIR.

Q    I'LL ASK YOU WHETHER OR NOT DURING THE COURSE OF
THIS ENTIRE INVESTIGATION YOU WENT ALL THROUGH EACH ROOM OF
THE HOUSE OUT THERE AT LELA PATTERSON'S HOUSE?

A    YES, SIR.

Q    MIKE, WERE YOU PRESENT WHEN THE BODY OF LELA
PATTERSON WAS FOUND?

A    YES, SIR, I WAS.

Q    AND YOU YOURSELF DID NOT FIND THAT, DID YOU?

A    NO, SIR, I DIDN'T.

Q    AFTER IT WAS FOUND WHAT DID YOU DO?

A    SERGEANT SKIPPER WORKS WITH THE SHERIFF'S
DEPARTMENT, AND I WENT IN; THE BODY WAS IN THE BATHROOM IN THE
BATH TUB; WE THEN CALLED FOR A CORONER.

Q    AFTER THIS WAS FOUND WHAT WAS DONE WITH THE SCENE
OR THE CRIME SCENE OF THE HOUSE IT --AND THE HOUSE ITSELF?

A    THE CRIME SCENE WAS SECURED BY THE SHERIFF'S
DEPARTMENT, AND THEN IT WAS PROCESSED.

Q    AND WHAT DID YOU DO DURING THE PROCESSING OF THIS
CRIME SCENE?

A    WE REMOVED --

WHAT IS THAT?

PROCESSING THE CRIME SCENE, WE REMOVE ITEMS, PLACE THEM IN CONTAINERS, FINGERPRINTING, ANY TYPE PHYSICAL EVIDENCE THAT MAY BE OBTAINED.

I'LL ASK YOU WHETHER OR NOT ANY OTHER LAW ENFORCEMENT AGENCY WAS SUMMONED IN THIS STATE TO ASSIST IN THIS INVESTIGATION?

YES, SIR, THERE WAS.

AND WHO WAS THAT?

IT WAS THE MISSISSIPPI CRIME LAB.

WERE YOU PRESENT AT THE CRIME SCENE WHEN THEY ARRIVED?

YES, SIR.

DID YOU ASSIST PEOPLE FROM THE CRIME LAB IN GATHERING CERTAIN EVIDENCE THERE AT THE SCENE?

YES, I DID.

WHAT WAS DONE WITH ALL OF THE EVIDENCE THAT WAS GATHERED IN YOUR PRESENCE BY THE PEOPLE FROM THE CRIME LAB?

ALL THE EVIDENCE WAS LABELED AND MARKED, INITIALED, TIME AND DATE, AND RELEASED TO THE CRIME LAB.

MIKE, I'LL ASK YOU WHETHER --WHO THE PERSON FROM THE CRIME LAB WAS THAT CAME UP?

JESSE MOORE.

I'LL ASK YOU WHETHER OR NOT THERE CAME A TIME DURING THE INVESTIGATION THAT YOUR INVESTIGATION CENTERED ON A SINGLE SUSPECT?

YES, IT DID.

APPROXIMATELY HOW LONG AFTER THE 3RD WAS THIS THAT IT CENTERED ON A SINGLE SUSPECT?

TWO --COUPLE OF DAYS --TWO DAYS I BELIEVE.

AND WHO WAS THIS SUSPECT THAT IT --THAT YOU SINGLED OUT?

MACK ARTHUR KING.

WOULD YOU LOOK AROUND THE COURTROOM AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER THAT INDIVIDUAL IS IN THE COURTROOM TODAY?

YES, HE IS.

WOULD YOU POINT HIM OUT FOR THE PURPOSES OF THIS RECORD, PLEASE?

SITTING RIGHT HERE.

MR. HOWARD:

YOUR HONOR, WE'D ASK THAT THE RECORD REFLECT THAT THE WITNESS HAS INDICATED --

IS IT THE MAN AT THE END OF THE TABLE?

YES, SIR.

IN THE BLUE --

THE BLUE --

--SHIRT?

YES, SIR.

MR. HOWARD:

--THAT THE WITNESS HAS INDICATED THE DEFENDANT, MACK ARTHUR KING.

THE COURT:

THE RECORD WILL SO REFLECT.

DID YOU OBTAIN A WARRANT FOR THIS INDIVIDUAL'S ARREST?

YES, I DID.

WAS THERE ANY PARTICULAR REASON THAT MACK ARTHUR KING WAS SOUGHT IN CONNECTION WITH THIS PARTICULAR INCIDENT?

YES, SIR.

AND WHAT REASON WAS THAT?

FOR FINGERPRINTS WE GOT FROM MRS. PATTERSON'S HOME.

WHEN WAS MACK ARTHUR KING ARRESTED?

I CAN'T REMEMBER THE DATE; THE DAY WE GOT THE FINGERPRINTS OR GOT WORD THAT HIS FINGERPRINTS WERE THE ONES--

DO YOU REMEMBER WHAT DAY THAT WAS?

THE FIFTH --I BELIEVE IT WAS THE FIFTH --THE SEVENTH I THINK IT WAS.

WAS THIS DEFENDANT INTERVIEWED AFTER HIS ARREST CONCERNING THIS BURGLARY?

YES, HE WAS.

WHO WAS HE INTERVIEWED BY?

MYSELF AND DETECTIVE RAY GRINER.

WHERE WAS HE APPREHENDED, DO YOU KNOW, MIKE?

AT HIS HOME.

AND WHERE IS HIS HOME LOCATED?

IT'S ON FRISCO ROAD, ROUTE 8, BOX 132 IN COLUMBUS.

DID YOU, YOURSELF, DISCOVER OR DEVELOP THE FINGER-PRINTS THAT LED TO THE IDENTIFICATION OF MACK ARTHUR KING?

DID I --NO, SIR.

WHO DID?

JESSE MOORE.

IF YOU KNOW?

JESSE MOORE.

WERE YOU THERE WHEN THEY WERE FOUND AND LIFTED?

NO --HE --HE LIFTED SOME PRINTS AT THE OFFICE --AT THE SHERIFF'S OFFICE.

WERE YOU AT THE SHERIFF'S OFFICE WHEN HE LIFTED THESE PRINTS?

YES, SIR.

WERE THESE PRINTS LIFTED IN YOUR PRESENCE?

NO, SIR --YES, SIR, THEY WERE --SOME OF THEM WERE.

THERE WERE QUITE A FEW OF THEM --

YES, SIR.

--SOME OF THEM WERE IN YOUR PRESENCE?

SOME OF THEM WERE, YES, SIR.

WHAT WAS DONE AFTER MACK ARTHUR KING WAS ARRESTED; WHAT DID YOU DO THEN?

AFTER HE WAS ARRESTED?

YES.

HE WAS BROUGHT TO THE SHERIFF'S OFFICE AND INTERVIEWED.

BY WHOM?

BY MYSELF AND RAY GRINER.

DURING THE COURSE OF THIS INTERVIEW OR PRIOR TO THIS INTERVIEW WAS THIS DEFENDANT ADVISED OF HIS RIGHTS UNDER THE MIRANDA DECISION?

YES, SIR, HE WAS ADVISED AT THE TIME OF HIS ARREST, ALSO BEFORE HE WAS INTERVIEWED.

WERE YOU PRESENT WHEN HE WAS ADVISED OF THESE PARTICULAR RIGHTS ACCORDING TO THE MIRANDA DECISION?

YES, SIR, I WAS.

WHO ELSE WAS PRESENT DURING THIS TIME?

OFFICER RAY GRINER.

WOULD YOU TELL THE COURT AND THE LADIES AND GENTLEMEN OF THE JURY HOW IT'S PHYSICALLY DONE THAT HE'S ADVISED OF HIS RIGHTS; HOW IS THAT PHYSICALLY ACCOMPLISHED?

WE HAVE A STANDARD FORM THAT WE READ --THEY HAVE A COPY; WE --THEY ARE ALLOWED TO READ IT, AND WE ALSO READ IT TO THEM.

AND WAS THAT DONE IN THIS PARTICULAR CASE?

YES, IT WAS.

DID MACK ARTHUR KING GIVE YOU ANY INDICATION THAT

HE DID NOT UNDERSTAND WHAT HIS RIGHTS WERE?

A       NO, SIR, HE DID NOT.

Q       DID YOU OR ANYONE ELSE IN YOUR PRESENCE THREATEN, PROMISE, OFFER ANY HOPES OF REWARDS, GRATUITIES, PHYSICAL ABUSE OR CHASTISE THIS DEFENDANT IN ANYWAY TO GET HIM TO GIVE YOU A STATEMENT OR SIGN HIS WAIVER OF RIGHTS?

A       NO, SIR.

MR. HOWARD:

        MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

        YOU MAY.

Q       MIKE, I AM GOING TO HAND YOU A ONE PAGE DOCUMENT, AND I'LL ASK IF YOU WILL LOOK AT THAT, AND TELL THE COURT AND LADIES AND GENTLEMEN OF THE JURY WHETHER OR NOT YOU CAN IDENTIFY THAT?

A       (WITNESS EXAMINES DOCUMENT)  YES, I CAN.

Q       AND WHAT IS THAT DOCUMENT?

A       IT'S THE RIGHTS --YOUR RIGHTS FORM, AND ALSO A WAIVER OF RIGHTS.

Q       AND DO ANY SIGNATURES APPEAR ON THAT DOCUMENT?

A       YES, THEY DO.

Q       WHOSE SIGNATURES APPEAR ON THAT DOCUMENT?

A       MACK ARTHUR KING'S, RAY GRINER, AND MYSELF.

Q       DID MACK ARTHUR KING AND RAY GRINER SIGN THAT DOCUMENT IN YOUR PRESENCE?

A       YES, THEY DID.

MR. HOWARD:

        YOUR HONOR, WE'D ASK THAT THIS BE MARKED FOR IDENTIFICATION PURPOSES TO THIS WITNESS'S TESTIMONY.

THE COURT:

        LET IT BE RECEIVED AND MARKED FOR IDENTIFICATION.

38                    MORDECAI/DE

(COURT REPORTER MARKS RIGHTS AND WAIVER OF RIGHTS
FORM AS STATE'S EXHIBIT NO. 5 FOR IDENTIFICATION)

78

Rights and Waiver of Rights Form

State's Exhibit # 5 - Identification
    Testimony of Mike Mordecai

See Page _162_

Q      AFTER THE DEFENDANT SIGNED IN YOUR PRESENCE WHAT'S
BEEN MARKED AS STATE'S EXHIBIT 5 FOR IDENTIFICATION, DID YOU
AND DETECTIVE RAY GRINER ASK MACK ARTHUR KING ANY QUESTIONS
CONCERNING THIS INCIDENT?

A      YES, WE DID.

Q      DID MACK ARTHUR KING GIVE YOU A STATEMENT
CONCERNING THIS INCIDENT?

A      YES, HE DID.

Q      HOW WAS THIS STATEMENT TAKEN DOWN?

A      IT WAS AN ORAL STATEMENT; HE --HE --WE JUST ASKED
HIM SOME QUESTIONS AND THEN WENT BACK OVER IT AND WROTE IT
DOWN ON PAPER, AND HE WAS ALLOWED TO READ IT; IT WAS READ TO
HIM, AND HE SIGNED IT.

Q      I'M GOING TO HAND YOU ANOTHER THREE PAGE DOCUMENT,
AND I'LL ASK YOU IF YOU WILL TELL THE COURT AND THE LADIES AND
GENTLEMEN OF THE JURY WHETHER OR NOT YOU CAN IDENTIFY THAT
DOCUMENT?

A      (WITNESS EXAMINES DOCUMENT)  YES, SIR, I CAN.

Q      AND WHAT IS THAT DOCUMENT?

A      IT'S A STATEMENT GIVEN BY MACK ARTHUR KING.

Q      AND ON WHAT DATE?

A      IT'S GOT 8/6 OF 80 ON HERE.

Q      AUGUST 6 OF 1980?

A      RIGHT.

Q      AND IS THAT DOCUMENT SIGNED?

A      YES, IT IS.

Q      BY WHOM?

A      SIGNED BY MACK ARTHUR KING, MYSELF, AND RAY GRINER.

Q      AND IN HOW MANY PLACES IS IT SIGNED, MIKE?

A      SIGNED ON EACH PAGE, THREE DIFFERENT PLACES.

Q      AND WHO WAS PRESENT WHEN THIS DOCUMENT WAS TAKEN?

40                                    MORDECAI/DE

WHEN IT WAS TAKEN MACK ARTHUR KING, MYSELF, AND RAY
SINER.

I'LL ASK YOU WHETHER OR NOT ANY PROMISES, OR OFFERS
OF REWARD OR OFFERS OF HOPES OF LENIENCY, COERCION, DURESS,
OR ANY OTHER THREATS GIVEN OR ISSUED TO MACK ARTHUR KING BY
YOURSELF OR ANYONE ELSE IN YOUR PRESENCE TO OBTAIN THE
STATEMENT FROM HIM?

        NO, SIR.

MR. HOWARD:

    YOUR HONOR, WE'D ASK THAT THIS BE MARKED FOR
IDENTIFICATION PURPOSES AT THIS TIME.

THE COURT:

    LET IT BE RECEIVED AND MARKED FOR IDENTIFICATION.


    (COURT REPORTER MARKS STATEMENT DATED AUGUST 6,
     1980, AS STATE'S EXHIBIT NO. 6 FOR IDENTIFICATION)


8/

Statement Dated 8-6-80

State's Exhibit No. 6 - Identification

Testimony of Mike Mordecai

See Page No. *167-169*

41                      MORDECAI/DE

Q    MIKE, DURING THE COURSE OF THIS INTERVIEW DID MACK ARTHUR KING INDICATE THAT HE KNEW ANYTHING ABOUT WHAT HAD HAPPENED AT MRS. PATTERSON'S RESIDENCE?

A    THE FIRST INTERVIEW, NO, SIR.

Q    WHAT WAS DONE OR WHAT DID YOU DO AFTER THIS FIRST INTERVIEW WITH MACK ARTHUR KING CONCERNING THE INVESTIGATION OF THIS CASE?

A    WE QUESTIONED HIM SOME MORE ABOUT HIS STATEMENT THAT HE HAD GIVEN.

Q    AND THAT WAS ON THE SIXTH?

A    YES, SIR.

Q    WHAT WAS DONE PHYSICALLY OTHER THAN TALKING TO HIM CONCERNING THE OBTAINING OF EVIDENCE OR ANY OTHER ITEMS DURING THIS PERIOD OF TIME?

A    WELL, WE OBTAINED A SEARCH WARRANT FOR --

Q    OKAY, AND WHO OBTAINED THAT SEARCH WARRANT?

A    I DID.

Q    OKAY, AND WHAT WAS THAT A SEARCH WARRANT FOR?

A    FOR ITEMS TAKEN FROM MRS. PATTERSON'S HOME.

Q    OKAY, AND WHERE WAS IT ISSUED TO BE; WHERE WERE YOU TO SEARCH?

A    MACK ARTHUR KING'S RESIDENCE.

MR. HOWARD:

     MAY I APPROACH THE WITNESS AGAIN, YOUR HONOR?

THE COURT:

     YOU MAY.

Q    MIKE, I WILL ASK YOU WHETHER OR NOT YOU OBTAINED A SEARCH WARRANT FOR THE RESIDENCE OF MACK ARTHUR KING BEING A DWELLING LOCATED AT ROUTE 8, BOX 132 IN DISTRICT THREE OF LOWNDES COUNTY, MISSISSIPPI?

A    YES, SIR.

Q      I'LL HAND YOU A DOCUMENT AND I'LL ASK IF YOU CAN TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER OR NOT YOU CAN IDENTIFY THAT DOCUMENT?

A      (WITNESS EXAMINES DOCUMENT)  YES, SIR.

Q      AND WHAT IS THAT DOCUMENT?

A      IT'S A SEARCH WARRANT FOR THE MACK ARTHUR KING RESIDENCE.

Q      WAS THAT SEARCH WARRANT EXECUTED?

A      YES, IT WAS.

Q      AND WHAT JUSTICE OR JUDGE ISSUED THAT SEARCH WARRANT?

A      JUDGE JAMES GLENN.

Q      OKAY, AND WHO EXECUTED THAT SEARCH WARRANT?

A      MYSELF AND RAY GRINER.

Q      AND HOW DID YOU AND RAY PHYSICALLY EXECUTE THE WARRANT?

A      WENT TO HIS RESIDENCE AT ROUTE 8, BOX 132.

Q      AND WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT YOU DID WHEN YOU WENT TO EXECUTE THAT WARRANT?

A      WE OPENED THE FRONT DOOR; THERE WAS NO ONE AT HOME; WENT IN AND FOUND SEVERAL ITEMS --WENT THROUGH THE HOUSE, FOUND SEVERAL ITEMS THAT WE BELIEVED BELONGED TO MRS. PATTERSON.

Q      OKAY, AND HAD YOU OBTAINED A PARTIAL DESCRIPTION OF THE ITEMS THAT WERE MISSING FROM MRS. PATTERSON'S HOUSE?

A      AS --AS BEST WE COULD, YES, SIR.

MR. HOWARD:

       YOUR HONOR, WE TENDER THIS AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

       LET IT BE RECEIVED AND MARKED.

43                              Mordecai/DE

(COURT REPORTER MARKS SEARCH WARRANT AS STATE'S
EXHIBIT NO. 7 IN EVIDENCE)

# SEARCH WARRANT

STATE OF MISSISSIPPI }

COUNTY OF LOWNDES }

TO ANY OFFICER IN LOWNDES _____COUNTY, MISSISSIPPI:

WHEREAS, J.M. MORDECAI, DEPUTY SHERIFF OF LOWNDES COUNTY MISSISSIPPI ____,

_____ and _____ (have) (has) made

affidavit before me that (they) (he):

1. (Have) (Has) good reason to believe and (do)(does) believe: that, certain things hereafter described are now being concealed in or about the following place in the City of COLUMBUS _____, Mississippi: A DWELLING HOUSE LOCATED AT RT.#8 BOX#132, DISTRICT #3, LOWNDES COUNTY MISSISSIPPI. THE HOUSE IS H SHINGLE CONSTRUCTION WITH BLUE AND WHITE SHINGLES ON THE FRONT, TWO FRONT DOORS ONE WITH "THE KING PAD" WRITTEN ON IT, THE OTHER WITH "LOVE POWER" WRITTEN ON IT. TRAVEL HWY. 69 SOUTH TO OLD PICKENSVILLE RD. TURN RIGHT ONTO OLD PICKENSVILLE RD. AND TRAVEL TO FRISCO ROAD. TURN RIGHT ONTO FRISCO ROAD AND TRAVEL TO DRIVEWAY WITH RED MAIL BOX BESIDE IT MARKED WITH M. KING RT.8 BOX 132. HOUSE IS AT END OF THIS DRIVEWAY.

together with all approaches and appurtenances thereto.

2. That the place described above is occupied and controlled by:
MACK ARTHER KING

3. That said things are particulary described as follows:
ONE .22 CALIBER SINGLE SHOT RIFLE
ONE .410 BOLT ACTION SHOTGUN
ONE SILVER DOLLAR DATED 1896
CLOTHES CONTAINING BLOOD

4. That (possession of the above described things is in itself unlawful) (or the public has a primary interest in, or primary right to possession of, the above described things), in that said things are: FRUITS OF THE CRIME OF CAPITAL MURDER AND INSTRUMENTS USED IN THE COMMISSION OF SAID CRIME WHICH IS IN VIOLATION OF THE MISSISSIPPI CODE OF 1972 ANNOTATED AND AMMENDED SECTION 97-3-19 paragraph 2 subsection e.

against the peace and dignity of the State of Mississippi.

5. This Court, having examined and considered said affidavit, and also having heard and considered evidence in support thereof from the affiants named therein does find that probable cause for the issuance of a search warrant does exist. THEREFORE, you are hereby commanded to proceed at any time in the day or night to the place described above and to search forthwith said place for the things specified above, making known to the person or persons occupying or controlling said place, if any, your authority and purpose for so doing, before making a search or forcible entry prior to said search, and if the things specified above be found there to seize them, leaving a copy of this warrant and a receipt for the things taken; and bring the things seized before this Court Instanter; and prepare a written inventory of the items seized, and have then and there this writ, with your proceedings noted thereon.



6. Do not interpret this writ as limiting your authority to seize all contraband and things the possession of which in itself is unlawful which you find incident to your search, or as limiting your authority to make otherwise valid arrests at the place described above.

Witness my hand this, the _____6_____ day of _____Oct._____ 19 80

_____M. Glenn_____
Police Justice and Ex Officio
Justice of the Peace,
_____, Mississippi

### RETURN

I received this warrant on the _____6_____ day of _____August_____,
19 80, and have executed it as follows:

On the _____6_____ day of _____August_____, 19 80, at _____1:30____ P M,
I searched the place described in said warrant and I left a copy of the warrant with _____Mack, Mother King Attached to Front door_____, the person occupying and controlling said place, together with a receipt for the items seized.

The following is an inventory of the things taken pursuant to the warrant:
One Gray Town Clad Penney's Sport Coat
One Ladies White Gold Timex Watch
One Parker Yellow Gold Pencil And Gift Box
One Burgandy Sports coat
17 First Class postage Stamps
1 K-Mart Ladies Blouse Pink in Color
1 Century Funeral Home Gandee
This inventory was made in the presence of _____Jim Mordecai_____ _____Ray Grimer_____,
_____Ben Kilgore_____ _____Bobby Pearson_____ and _____Steve Harriman_____

I swear that this inventory is a true and detailed account of all the things taken by me on the warrant.

_____Jim Mordecai_____

Subscribed and sworn to and returned before this the _____6_____ day of _____Aug_____, 19 80

_____Judge Dunn M. Glenn_____
Official Title

2 J.C. Penny Electric Blankets Green in Color
1 Partially burned Purse Red in Color
1 Partially burned Chain Necklace
1 Partially burned Jewelry Box
1 Box Containing 22 Cal. Winchester Superx shells (3 Short, 2 Longs, 2 Bird shot
1 Pair man's Blue Jeans

S E,

STATE OF MISSISSIPPI }

COUNTY OF LOWNDES }

TO ANY OFFICER IN LOWNDES

WHEREAS, J.M. MORDECAI, DE

affidavit before me that (they) (he):

1. (Have) (Has) good reason to believe and
   being concealed in or about the followin
   A DWELLING HOUSE LOCATED AT
   MISSISSIPPI. THE HOUSE IS N
   SHINGLES ON THE FRONT, TWO
   ON IT, THE OTHER WITH "LOVE
   TO OLD PICKENSVILLE RD. TUR
   TO FRISCO ROAD. TURN RIGHT
   RED MAIL BOX BESIDE IT MARK
   END OF THIS DRIVEWAY.

   together with all approaches and appui

2. That the place described above is occi
   MACK ARTHER KING

3. That said things are particulary descr
   ONE .22 CALIBER SINGLE SHOT
   ONE .410 BOLT ACTION SHOTGU

6. Do not interpret this writ as limiting your authority to seize all contraband on
   which in itself is unlawful which you find incident to your search, or as limitir
   otherwise valid arrests at the place described above.

Witness my hand this, the_____6_____day of_____

Police Justice and Ex Officio
Justice of the Peace,

State's Exhibit No. 7 - Evidence /s/KHB 12-4-80

86

MIKE, I'M GOING TO ASK YOU IF YOU WOULD TO STEP DOWN AND EXAMINE THE ITEMS I'VE PLACED ON THE FLOOR, AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER OR NOT YOU CAN IDENTIFY THESE ITEMS.

(WITNESS EXAMINES ITEMS ON FLOOR) YES, SIR, I CAN.

AND WHAT ARE THESE ITEMS?

THIS IS A BOX OF 22-CALIBER RIFLE SHELLS; THEY WERE FOUND AT THE MACK ARTHUR KING RESIDENCE; AND ONE PARKER PENCIL IN A BOX THAT WAS ALSO FOUND THERE.

MR. MONTGOMERY:

YOUR HONOR, COULD WE GET THE WITNESS TO SPEAK UP?

THE COURT:

SPEAK UP A LITTLE OR GET BACK ON YOUR --

A ROLL OF POSTAGE STAMPS THAT WE FOUND AT THE MACK ARTHUR KING RESIDENCE; ONE LADIES WRIST WATCH WAS ALSO FOUND THERE; TWO ELECTRIC BLANKETS.

MR. HOWARD:

OKAY, YOU CAN HAVE A SEAT BACK THERE.

WERE THESE ITEMS SEIZED BY YOU AND OFFICER RAY GRINER AT THE RESIDENCE OF MACK ARTHUR KING?

YES, THEY WAS.

DO THESE ITEMS APPEAR TO BE IN SUBSTANTIALLY THE SAME SHAPE TODAY AS THEY WERE WHEN THEY WERE SEIZED BY YOU AND RAY GRINER ON AUGUST THE 6TH OF 1980?

YES.

MR. HOWARD:

YOUR HONOR, WE'D TENDER THESE AS EXHIBITS TO THIS WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

ANY OBJECTION?

45                    MORDECAI/DE

MR. SAMS:

No OBJECTION, SUBJECT TO CROSS-EXAMINATION.

THE COURT:

ALL RIGHT, LET THEM BE RECEIVED AND MARKED THEN.

(COURT REPORTER MARKS PLASTIC BAG CONTAINING LADIES
WRIST WATCH AS STATE'S EXHIBIT NO. 8 IN EVIDENCE)

88

Plastic Bag Containing Ladies Wrist Watch

State's Exhibit No. 8 - Evidence

Testimony of Mike Mordecai


   To Be Forwarded Upon Request

46                          MORDECAI/DE

(COURT REPORTER MARKS PLASTIC BAG CONTAINING 22-
 CALIBER RIFLE SHELLS AS STATE'S EXHIBIT NO. 9 IN
 EVIDENCE)