Box Containing Papers, Manila Folders, ETC.

State's Exhibit No. 24 - Identification

Testimony of Mike Mordecai

See Page No. *222*

72                          MORDECAI/DE

Q        I'LL HAND YOU ANOTHER PLASTIC BAG CONTAINING A
SMALL GOLDSTEIN'S JEWELER'S BOX, AND ASK IF YOU CAN IDENTIFY
THAT PARTICULAR ITEM?

A        (WITNESS EXAMINES PLASTIC BAG AND CONTENTS)  YES,
SIR, I CAN.

Q        AND WHERE WAS THAT ITEM FOUND OR LOCATED?

A        IT WAS FOUND IN THE WOODS WRAPPED IN THE BLANKET
AT THE MACK ARTHUR KING RESIDENCE.

Q        WERE YOU PRESENT WHEN IT WAS FOUND BY DETECTIVE RAY
GRINER?

A        YES, SIR, I WAS.

MR. HOWARD:

         YOUR HONOR, WE'D ASK THAT THIS BE MARKED FOR
IDENTIFICATION PURPOSES TO THIS WITNESS'S TESTIMONY.

THE COURT:

         LET IT BE RECEIVED AND MARKED FOR IDENTIFICATION.


         (COURT REPORTER MARKS PLASTIC BAG CONTAINING
         GOLDSTEIN'S JEWELER'S BOX AS STATE'S EXHIBIT NO.
         25 FOR IDENTIFICATION)

Plastic Bag Containing Goldstein's Jeweler's Box

State's Exhibit No. 25 - Identification

Testimony of Mike Mordecai

See Page No. _____146_____

Q        MIKE, AFTER ALL OF THESE PARTICULAR ITEMS THAT YOU'VE JUST IDENTIFIED AND BEEN MARKED FOR IDENTIFICATION PURPOSES HAD BEEN RECOVERED, WERE THEY SHOWN TO MACK ARTHUR KING?

A        YES, SIR, THEY WERE.

Q        AND WAS HE QUESTIONED ABOUT EACH OF THESE ITEMS?

A        HE WAS SHOWN ALL THE ITEMS; YES, SIR.

Q        AND DID HE MAKE ANY STATEMENTS TO YOU AND DETECTIVE GRINER CONCERNING WHERE HE OBTAINED THESE PARTICULAR ITEMS?

A        YES, SIR, HE DID.

Q        AND WHERE DID HE SAY HE OBTAINED THESE ITEMS?

A        FROM LELA PATTERSON'S HOME.

Q        AND WHEN DID HE SAY HE GOT THEM?

A        THE NIGHT OF THE SECOND --AUGUST THE SECOND.

Q        DID HE IDENTIFY THESE ITEMS AS BEING THE ITEMS THAT HE TOOK FROM THE RESIDENCE?

A        YES, SIR, HE DID.

MR. HOWARD:

        YOUR HONOR, AT THIS TIME I CAN GO THROUGH EACH ONE OF THEM PARTICULARLY ONE BY ONE, AND MOVE TO EXHIBIT EACH ITEM ONE BY ONE; I BELIEVE WE CAN GO ON THE WHOLE AT ONCE, JOE, IF YOU WANT TO GET IN THE RECORD WHAT YOU --

MR. SAMS:

        BASED UPON MY CONFERENCE WITH THE --WITH THE DEFENDANT, WE KNOW OF NO OBJECTION TO THOSE WHICH ARE MARKED FOR IDENTIFICATION NOW BEING MARKED AND ADMITTED INTO EVIDENCE.

MR. HOWARD:

        YOUR HONOR, THE STATE WOULD MOVE TO INTRODUCE EACH OF THE ITEMS THAT HAVE BEEN MARKED FOR IDENTIFICATION PURPOSES WITH THE EXCEPTION OF THE WAIVERS AND STATEMENTS INTO EVIDENCE AT THIS PARTICULAR TIME.

THE COURT:

WELL, THERE ARE SOME EXHIBITS MARKED FOR IDENTIFICATION THAT CAME FROM THE HOME OF LELA PATTERSON I BELIEVE. I'M NOT SURE THEY WOULD BE COVERED BY THE STIPULATION OR NOT. IF THEY ARE, WE --

MR. SAMS:

THOSE WHICH CAME FROM THE HOME, I COULD NOT STIPULATE AS TO; THOSE WHICH WERE FOUND AS THE RESULT OF THE SEARCH, OR DISCLOSURE I COULDN'T BE RESPONSIBLE FOR AT THIS TIME.

THE COURT:

ALL RIGHT, THE ONES THAT WERE FOUND AS A RESULT OF THE SEARCH, AND THE ONES THAT THE DEFENDANT HAS NO OBJECTION TO INTRODUCING MAY BE MARKED INTO EVIDENCE AT THIS TIME.

MR. HOWARD:

YOUR HONOR, I WOULD MOVE THE COURT AT THIS TIME BY STIPULATION TO ENTER WHAT'S BEEN MARKED AS STATE'S EXHIBIT 15 FOR IDENTIFICATION AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

LET IT BE RECEIVED AND MARKED INTO EVIDENCE.

(COURT REPORTER MARKS BOX CONTAINING NUMEROUS ITEMS AS STATE'S EXHIBIT NO. 26 IN EVIDENCE)

Box Containing Numerous Items

State's Exhibit No. 26 - Evidence

Testimony of Mike Mordecai

To Be Forwarded Upon Request

Q       MIKE, I'LL ASK YOU WHETHER OR NOT STATE'S EXHIBIT 16 FOR IDENTIFICATION WAS SHOWN WITH THE REST OF THE EXHIBITS TO MACK ARTHUR KING, AND IDENTIFIED WHEN THE OTHER STUFF WAS IDENTIFIED AS BEING ITEMS THAT WERE TAKEN FROM THE MACK ARTHUR --I MEAN FROM THE LELA PATTERSON RESIDENCE AND RECOVERED BY BARBARA JORDAN?

A       YES, SIR.

Q       FROM BARBARA JORDAN, I MEAN?

A       YES, SIR.

MR. HOWARD:

        YOUR HONOR, AT THIS TIME WE WOULD INTRODUCE OR TENDER STATE'S EXHIBIT 16 FOR IDENTIFICATION AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY.

THE COURT:

        ALL RIGHT, LET IT BE RECEIVED AND MARKED INTO EVIDENCE.

        (COURT REPORTER MARKS FIVE PLASTIC BAGS CONTAINING ITEMS AS STATE'S EXHIBIT NO. 27 IN EVIDENCE)

Five Plastic Bags Containing Items

State's Exhibit No. 27 - Evidence

Testimony of Mike Mordecai

To Be Forwarded Upon Request

76                                          MORDECAI/DE

THE COURT:

    IT'S ALREADY STIPULATED, COUNSEL, THAT ANY ITEMS
FOUND AS A RESULT OF THE SEARCH MAY BE NOW MARKED
INTO EVIDENCE. I DON'T SEE ANY NEED IN GOING BACK
OVER EACH ITEM SEPARATELY AS LONG AS YOU GET THE
ONES THAT WERE FOUND AS THE RESULT OF THE SEARCH.

MR. HOWARD:

    THAT WILL BE FINE, YOUR HONOR. I JUST WANTED TO--
I JUST THOUGHT MAYBE I'D HELP HER --

THE COURT:

    JUST MOVE THAT EXHIBIT SO AND SO FOR IDENTIFICATION
BE NOW MARKED INTO EVIDENCE.

MR. HOWARD:

    I'D SO MOVE ON EXHIBIT 20 FOR IDENTIFICATION, AND
EXHIBIT 21 FOR IDENTIFICATION, EXHIBIT 23 FOR IDENTIFICATION,
EXHIBIT 24 FOR IDENTIFICATION.

MR. MONTGOMERY:

    NO, EXHIBIT 22 IS THE BOX AND THE BLANKET, NOT 23.

MR. HOWARD:

    20, 21, 22, AND 24.

MR. MONTGOMERY:

    25 WILL BE INTRODUCED; NOT 24.

    (COURT REPORTER MARKS GUN AS STATE'S EXHIBIT NO.
    28 IN EVIDENCE)

Gun

State's Exhibit No. 28 - Evidence

Testimony of Mike Mordecai

To Be Forwarded Upon Request

(COURT REPORTER MARKS GUN AS STATE'S EXHIBIT NO.
29 IN EVIDENCE)

Gun

State's Exhibit No. 29 – Evidence

Testimony of Mike Mordecai

    To Be Forwarded Upon Request

78                              MORDECAI/DE

(COURT REPORTER MARKS BOX CONTAINING ASSORTED ITEMS
AS STATE'S EXHIBIT NO. 30 IN EVIDENCE)

Box Containing Assorted Items

State's Exhibit No. 30 - Evidence

Testimony of Mike Mordecai

To Be Forwarded Upon Request

79                          MORDECAI/DE

(COURT REPORTER MARKS PLASTIC BAG CONTAINING
GOLDSTEIN'S JEWELER'S BOX AS STATE'S EXHIBIT NO.
31 IN EVIDENCE)

Plastic Bag Containing Goldstein's Jeweler's Box

State's Exhibit No. 31 - Evidence

Testimony of Mike Mordecai

To Be Forwarded Upon Request

Q        MIKE, WERE THE ITEMS THAT YOU HAVE TESTIFIED ABOUT
THAT WERE RECOVERED PURSUANT TO THE SEARCH, AND THE ITEMS
YOU'VE IDENTIFIED AS BEING THE BOX AND THE FILE FOLDERS, AND
MANILA FOLDERS TAKEN FROM LELA PATTERSON'S HOUSE --WHAT WERE
DONE WITH THEM AFTER THEY WERE RECEIVED AND OBTAINED IN THE
CUSTODY OF THE SHERIFF'S DEPARTMENT?

A        WHICH ITEMS? I'M SORRY, I DIDN'T HEAR.

Q        WERE THE ITEMS THAT YOU RECOVERED FROM LELA
PATTERSON'S HOUSE FORWARDED TO THE CRIME LAB?

A        YES, SIR, THEY WERE.

Q        ALONG WITH THE OTHER ITEMS THAT YOU'VE TESTIFIED
ABOUT IN THIS CASE?

A        YES, SIR.

Q        I'LL ASK YOU WHETHER OR NOT YOU YOURSELF OBSERVED
THE LOCATION OF THE WOUNDS AND THE PHYSICAL APPEARANCE OF
MRS. LELA PATTERSON'S BODY?

A        YES, SIR, I DID.

Q        I'LL ASK YOU WHETHER OR NOT THERE WERE PHOTOGRAPHS
MADE OF THE PARTICULAR WOUNDS AND THE AREAS ON MRS. PATTERSON'S
BODY?

A        YES, SIR.

MR. HOWARD:

         MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

         YOU MAY.

Q        I'M GOING TO HAND YOU TWO PHOTOGRAPHS, MIKE, AND
ASK WHETHER OR NOT YOU CAN IDENTIFY THOSE TWO PHOTOGRAPHS?

A        (WITNESS LOOKS AT PHOTOGRAPHS) YES, SIR.

Q        DO THOSE PHOTOGRAPHS TRULY AND ACCURATELY DEPICT
THE AREAS OF THE WOUNDS AND BRUISES ON THE UPPER PORTION AND

HEAD OF MRS. LELA PATTERSON'S BODY?

A          YES, SIR, THEY DO.

Q          IS ONE OF THOSE PHOTOGRAPHS OR DO ONE OF THOSE PHOTOGRAPHS DEPICT MRS. PATTERSON IN A PARTIALLY UNDRESSED CONDITION?

A          YES, SIR.

MR. HOWARD:

          YOUR HONOR, WE WOULD MOVE TO INTRODUCE BOTH OF THESE PHOTOGRAPHS AS EXHIBITS TO THIS WITNESS'S TESTIMONY AND ASK THE COURT LEAVE TO DELETE A PORTION OF ONE OF THESE PHOTOGRAPHS BECAUSE IT DISPLAYS THE VICTIM IN A PARTIALLY DISROBED MANNER, AND HAS NO EFFECT ON THE PROBATIVE VALUE FOR THE INTRODUCTION OF THESE PHOTOGRAPHS.

THE COURT:

          LET'S SEE THE PHOTOGRAPHS.

          (COURT EXAMINES PHOTOGRAPHS)

THE COURT:

          THEY MAY BE RECEIVED AND MARKED INTO EVIDENCE, AND YOU MAY COVER ANY PORTION OF THAT PHOTOGRAPH YOU WISH TO COVER.

          (COURT REPORTER MARKS PHOTOGRAPH OF VICTIM AS STATE'S EXHIBIT NO. 32 IN EVIDENCE)



State's Exhibit No. 32 - Evidence /s/KHB    12/4/80

82                                    Mordecai/DE

(COURT REPORTER MARKS PHOTOGRAPH OF VICTIM AS
STATE'S EXHIBIT NO. 33 IN EVIDENCE)



State's Exhibit No. 33 - Evidence /s/KHB    12-4-80

151

Q       MIKE, WERE ANY ITEMS OF CLOTHING RECOVERED FROM THE DEFENDANT, MACK ARTHUR KING?

A       YES, SIR.

Q       AND IN PARTICULAR WERE ANY PANTS RECOVERED FROM THIS DEFENDANT?

A       YES, SIR, THEY WERE.

Q       WHEN AND WHERE WERE THEY RECOVERED?

A       AT THE LOWNDES COUNTY SHERIFF'S OFFICE.

Q       AND BY WHOM?

A       RAY GRINER AND MYSELF.

Q       DO YOU KNOW WHAT WAS DONE WITH THESE PANTS AFTER THEY WERE REMOVED?

A       THEY WERE TURNED OVER TO THE CRIME LAB.

MR. HOWARD:

        MAY I APPROACH THE WITNESS AGAIN, YOUR HONOR?

THE COURT:

        YOU MAY.

Q       MIKE, I'M GOING TO HAND YOU A BROWN PAPER SACK, AND I'LL ASK IF YOU WILL LOOK AT THAT PAPER SACK AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY THE CONTENTS OF THAT PAPER SACK?

A       (WITNESS EXAMINES SACK AND CONTENTS)  YES, SIR, I CAN.

Q       AND WHAT DOES THAT PAPER SACK CONTAIN?

A       PANTS OF MACK ARTHUR KING AT HIS --AT THE TIME OF ARREST.

Q       AND THEY WERE RECOVERED BY RAY GRINER, IS THAT CORRECT?

A       YES, SIR.

Q       AND WHO FORWARDED THEM TO THE CRIME LAB?

A       RAY GRINER.

84                          MORDECAI/DE

MR. HOWARD:

      YOUR HONOR, I'D ASK THAT THIS BE MARKED FOR IDENTIFICATION PURPOSES AT THIS TIME.

THE COURT:

      LET THEM BE RECEIVED AND MARKED FOR IDENTIFICATION.

      (COURT REPORTER MARKS BAG CONTAINING PANTS OF DEFENDANT AS STATE'S EXHIBIT NO. 34 FOR IDENTIFICATION)

Bag Containing Pants of Defendant

State's Exhibit No. 34 – Identification

Testimony of Mike Mordecai


See Page No. _232_

Q        Mike, in what county and in what state was the body of Mrs. Lela Patterson located when you found --when you arrived at the scene and found --saw it in the bath tub yourself?

A        Lowndes County, State of Mississippi.

MR. HOWARD:

        Nothing further, your Honor.

THE COURT:

        You may cross-examine.

                    CROSS-EXAMINATION

MR. SAMS:

Q        Mike, I --I want to get some things straight here. Now, you've testified earlier about the statements, and you testified that each time you gave him a so-called waiver of rights statement which he signed?

A        Yes, sir.

Q        All right, I don't recall those exact exhibit numbers. Now, preparatory to his execution of those instruments by him, what statements did you make to him other than that which is shown on the form?

A        What --

Q        What statements did you make to him other than that shown on the form?

A        No statements were made to him other than --

Q        None whatsoever?

A        No, sir.

Q        All right, now, then at the time that he made disclosure to you, according to your testimony, that he had told you where these items were or these articles were, what-- what statements did you read to him at that time, if any, or

155

WAS IT TAKEN IN CONJUNCTION WITH THE STATEMENT?

A         IT WAS TAKEN WITH THE STATEMENT.

Q         IT WAS TAKEN WITH THE STATEMENT?

A         YES, SIR.

Q         AND THEREFORE AT THE TIME OF THE STATEMENT HE WOULD MAKE DISCLOSURE OF WHERE ITEMS MIGHT BE FOUND, IS THAT YOUR TESTIMONY HERE?

A         YES, SIR.

Q         AND YOU MADE NO THREATS WHATSOEVER TO HIM?

A         NO, SIR.

Q         DID YOU AT ANYTIME REVEAL OR DID ANYONE IN YOUR PRESENCE REVEAL THE FACT THAT MRS. PATTERSON HAD --HAD MET AN UNTIMELY DEATH AS AN --IN ORDER TO INDUCE THAT STATEMENT?

A         NO, SIR.

Q         IT WAS NEVER --

A         HE --HE WAS --HE WAS TOLD THAT THAT'S WHAT WE WERE INVESTIGATING.

Q         HE WAS TOLD THAT YOU WERE INVESTIGATING THAT?

A         YES, SIR.

Q         WHEN WAS HE TOLD THAT YOU WERE INVESTIGATING THAT PARTICULAR CRIME?

A         AT HIS --AT THE TIME OF HIS ARREST.

Q         AT THE TIME OF HIS ARREST?

A         YES, SIR.

MR. SAMS:

          MAY I HAVE THE COURT'S INDULGENCE?

          (CONFERENCE WITH OTHER DEFENSE COUNSEL)

Q         SPECIFICALLY DIRECTING YOUR ATTENTION TO THE SECOND STATEMENT, WHAT IMMEDIATELY PRIOR OR PREPARATORY TO TAKE --TO-- TO THE TAKING OF THE SECOND STATEMENT, WHAT STATEMENTS WERE MADE TO THIS DEFENDANT BY YOU OR BY ANYBODY ELSE IN LAW

MORDECAI/CE
GRINER/DE

87

ENFORCEMENT?

A        PRIOR TO THE --TO THE --

Q        THE SECOND STATEMENT?

A        --SECOND STATEMENT?

Q        YES, SIR.

A        WE ASKED HIM SOME QUESTIONS ABOUT THE FIRST

STATEMENT.

Q        WAS THAT BEFORE OR AFTER YOU READ HIM THE WAIVER

OF RIGHTS?

A        IT WAS AFTER.

Q        AFTERWARD?

A        RIGHT.

MR. SAMS:

          I'VE GOT NO FURTHER QUESTIONS OF THIS WITNESS AT

THIS TIME.

THE COURT:

          LET THE WITNESS COME DOWN.

          YOU MAY CALL YOUR NEXT WITNESS.

RAY GRINER,

          A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN

DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

MR. HOWARD:

Q        WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE

JURY WHAT YOUR NAME IS, PLEASE?

A        RAY GRINER.

Q        WHAT IS YOUR JOB OR OCCUPATION, RAY?

A        DETECTIVE AT THE SHERIFF'S DEPARTMENT.

Q        WERE YOU SO EMPLOYED BACK IN AUGUST OF 1980?

A        YES, SIR.

Q        I'LL ASK WHETHER OR NOT YOU HAD THE OCCASION TO
BECOME INVOLVED IN THE INVESTIGATION OF A BURGLARY/HOMICIDE
HERE IN LOWNDES COUNTY?

A        YES, SIR, I DID.

Q        AND WHO WAS THE PRINCIPAL OFFICER THAT WORKED ON
THIS CASE?

A        DETECTIVE MIKE MORDECAI.

Q        AND YOU --DID YOU ASSIST HIM IN THIS INVESTIGATION,
ALSO?

A        YES, SIR.

Q        I'LL ASK WHETHER OR NOT YOU WERE PRESENT WHEN THE
DEFENDANT, MACK ARTHUR KING, WAS ARRESTED?

A        YES, SIR, I WAS.

Q        AND FOR WHAT PURPOSE OR WHY WERE YOU AT MACK
ARTHUR KING'S RESIDENCE OR WHEREVER IT WAS HE WAS ARRESTED?

A        HE HAD ORIGINALLY WENT THERE TO ARREST HIM ON AN
ARREST WARRANT FOR MURDER.  THERE WAS NO ONE AT HOME AT THE
TIME.  WE LEFT OFFICERS AT HIS PLACE OF RESIDENCE, WENT BACK
TO TOWN, OBTAINED A SEARCH WARRANT FOR THIS RESIDENCE, AND WE
RETURNED WITH THE SEARCH WARRANT, AND WHILE WE WERE THERE
SEARCHING THE RESIDENCE--WE WERE RETURNING THE WARRANT WHEN-
EVER HE DROVE UP IN A VEHICLE.  AT THAT TIME HE WAS PLACED
UNDER ARREST.

Q        WAS HE ADVISED OF HIS RIGHTS AT THAT TIME?

A        YES, SIR, I ADVISED HIM OF HIS RIGHTS.

Q        BY YOU?

A        YES, SIR.

Q        WAS THE SEARCH CONDUCTED OR WERE YOU PRESENT WHEN
THE FIRST SEARCH WAS CONDUCTED THERE THAT AFTERNOON?

A        YES, SIR, I WAS.

Q        DO YOU KNOW WHAT DATE IT WAS THAT MACK ARTHUR KING
WAS ARRESTED?

A        IT WAS ON THE SIXTH OR --SIXTH OF AUGUST, I BELIEVE.

Q        THAT WOULD BE THE SAME DATE YOU SERVED THE FIRST
SEARCH WARRANT, IS THAT CORRECT?

A        YES, SIR.

Q        THEN IF THAT SEARCH WARRANT SHOWS IT WAS EXECUTED
THE SIXTH, THAT IS THE DATE THAT HE WAS ARRESTED?

A        THAT'S CORRECT.

Q        RAY, I'LL ASK YOU WHETHER OR NOT YOU ASSISTED IN
RECOVERING CERTAIN ITEMS FROM HIS HOUSE PURSUANT TO THAT FIRST
SEARCH WARRANT?

A        YES, SIR, I DID.

Q        WERE THERE ANY LATER SEARCH WARRANTS ISSUED AFTER
THE FIRST SEARCH WAS CONDUCTED?

A        YES, SIR, THERE WAS.

Q        DID YOU ASSIST IN SEIZING OR EXECUTING THAT SEARCH
WARRANT, THE SECOND ONE THAT WAS ISSUED?

A        YES, SIR, I DID.

Q        AND WHERE DID YOU SEARCH DURING THAT SECOND WARRANT?

A        WE WENT BACK AND WENT THROUGH HIS RESIDENCE AT
ROUTE 8, I BELIEVE IT'S --IT'S ON ROUTE 8, ON FRISCO ROAD.

Q        HAD YOU --HAD YOU INTERVIEWED A PERSON BY THE NAME
OF BARBARA JORDAN AT THAT TIME?

A        YES, SIR.

Q        WAS THERE A THIRD SEARCH CONDUCTED PURSUANT TO A
CONSENT TO SEARCH FORM?

A        YES, SIR, THERE WAS.

Q        BEFORE THE THIRD SEARCH DID YOU AND ANY OTHER
OFFICERS TAKE A STATEMENT FROM THE DEFENDANT, MACK ARTHUR

90                                          GRINER/DE

KING?

A          YES, WE DID.

Q          WHEN WAS THE FIRST STATEMENT TAKEN, DO YOU REMEMBER, RAY, THAT YOU TOOK OF MACK ARTHUR KING PERIOD?

A          THE FIRST STATEMENT THAT WE --MYSELF AND DETECTIVE MIKE MORDECAI TOOK FROM THE DEFENDANT WAS AT 8:30 P. M. ON THE SIXTH DAY OF AUGUST.

MR. HOWARD:

          MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

          YOU MAY.

Q          RAY, I'M GOING TO HAND YOU A DOCUMENT THAT HAS BEEN MARKED AS STATE'S EXHIBIT 5 FOR IDENTIFICATION, AND I'LL ASK IF YOU WILL LOOK AT THAT AND TELL THE COURT AND THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY IT?

A          (WITNESS EXAMINES DOCUMENT) I CAN IDENTIFY IT.

Q          AND WHAT IS THAT DOCUMENT?

A          THIS IS A --WHAT WE AT THE SHERIFF'S DEPARTMENT KNOW AS THE MIRANDA WARNING FORM, AND THE WAIVER OF MIRANDA RIGHTS FORM THAT WE READ AND --TO A DEFENDANT OR SUSPECT IN ANY CASE THAT WE'RE QUESTIONING.

Q          DO ANY PERSONS SIGNATURES APPEAR ON THAT PARTICULAR DOCUMENT?

A          YES, SIR.

Q          AND WHOSE SIGNATURES APPEAR ON THAT DOCUMENT?

A          THE DEFENDANT'S, MACK ARTHUR KING, MY SIGNATURE, AND DETECTIVE MORDECAI'S SIGNATURE.

Q          WAS THAT EXECUTED IN YOUR PRESENCE BY DETECTIVE MORDECAI AND MACK ARTHUR KING?

A          YES, SIR, IT WAS.

91                                    GRINER/DE

Q       AND YOU EXECUTED IT AS A WITNESS, IS THAT CORRECT?

A       THAT'S CORRECT.

Q       HAD MACK ARTHUR KING PREVIOUSLY BEEN ADVISED OF HIS RIGHTS BY YOU WHEN HE WAS ARRESTED IN ADDITION TO THIS?

A       YES, SIR, HE WAS.

Q       I'LL ASK YOU WHETHER OR NOT EITHER YOURSELF OR ANY-ONE ELSE IN YOUR PRESENCE MADE ANY THREATS, PROMISES, OFFERS OF HOPES OF REWARD, OR INDUCEMENTS, OR COERCION OR THREATS OF ANY KIND TO THE DEFENDANT, MACK ARTHUR KING, TO INDUCE HIM TO SIGN THAT DOCUMENT?

A       NO, SIR, WE DID NOT.

Q       WERE THERE ANY OTHER PERSONS PRESENT WHEN THAT DOCUMENT WAS SIGNED?

A       NO, SIR.

MR. HOWARD:

        YOUR HONOR, WE TENDER THIS AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

        LET IT BE RECEIVED AND MARKED INTO EVIDENCE.

        (COURT REPORTER MARKS RIGHTS AND WAIVER OF RIGHTS
        FORM AS STATE'S EXHIBIT NO. 35 IN EVIDENCE)

91                                    GRINER/DE

Q        AND YOU EXECUTED IT AS A WITNESS, IS THAT CORRECT?

A        THAT'S CORRECT.

Q        HAD MACK ARTHUR KING PREVIOUSLY BEEN ADVISED OF
HIS RIGHTS BY YOU WHEN HE WAS ARRESTED IN ADDITION TO THIS?

A        YES, SIR, HE WAS.

Q        I'LL ASK YOU WHETHER OR NOT EITHER YOURSELF OR ANY-
ONE ELSE IN YOUR PRESENCE MADE ANY THREATS, PROMISES, OFFERS
OF HOPES OF REWARD, OR INDUCEMENTS, OR COERCION OR THREATS OF
ANY KIND TO THE DEFENDANT, MACK ARTHUR KING, TO INDUCE HIM TO
SIGN THAT DOCUMENT?

A        NO, SIR, WE DID NOT.

Q        WERE THERE ANY OTHER PERSONS PRESENT WHEN THAT
DOCUMENT WAS SIGNED?

A        NO, SIR.

MR. HOWARD:

         YOUR HONOR, WE TENDER THIS AS AN EXHIBIT TO THIS
WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

         LET IT BE RECEIVED AND MARKED INTO EVIDENCE.


         (COURT REPORTER MARKS RIGHTS AND WAIVER OF RIGHTS
         FORM AS STATE'S EXHIBIT NO. 35 IN EVIDENCE)

Mack Arther King
Rt. 8 Box 731
Columbus MS.

## YOUR RIGHTS

Place _L.C.S.D._

Date _8/6/80_

Time _8:32 p.m._

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right ot stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and pressure or coercion of any kind has been used against me.

Signed X _mach arther King_

Witness _Ray Harris_

Witness _M Mordica_

Time _8:35 p.m._




STATE'S EXHIBIT #5 12-4-80 IDENTIFICATION RHB #6716

State's Exhibit No. 35 - Evidence /s/KHB    12-4-80

162

Q        AFTER THE EXECUTION OR THE SIGNING OF WHAT HAS BEEN MARKED AS STATE'S EXHIBIT 35 IN EVIDENCE, WHICH IS THE WAIVER OF RIGHTS FORM BY MACK ARTHUR KING, DID YOU OBTAIN A STATEMENT FROM HIM CONCERNING HIS CONDUCT AND ACTIONS OF THE PREVIOUS SATURDAY AND SUNDAY?

A        YES.

Q        WAS THAT DOCUMENT REDUCED TO WRITING?

A        YES, IT WAS.

Q        BY WHOM?

A        BY ME.

Q        AND IN WHOSE PRESENCE?

A        DETECTIVE MIKE MORDECAI IN THE DEFENDANT'S PRESENCE.

Q        MACK ARTHUR KING?

A        MACK ARTHUR KING.

Q        IS THAT MACK ARTHUR KING YOU'RE SPEAKING ABOUT IN THE COURTROOM HERE TODAY?

A        YES, HE IS.

Q        WOULD YOU POINT HIM OUT FOR THE LADIES AND GENTLEMEN OF THE JURY?

A        HE'S IN THE BLUE AND WHITE SHIRT SITTING AT THE COUNSEL'S TABLE BY --

Q        AT THE END OF THE TABLE?

A        YES, SIR.

MR. HOWARD:

        YOUR HONOR, WE'D ASK THAT THE RECORD REFLECT THAT THE WITNESS HAS INDICATED THE DEFENDANT.

THE COURT:

        THE RECORD WILL SO REFLECT.

Q        RAY, HOW WAS THIS STATEMENT ACTUALLY WRITTEN?

A        I WROTE IT OUT IN LONGHAND; IS THAT --

Q          AND WHAT DID YOU WRITE ON THAT STATEMENT?

A          I WROTE DOWN WHAT MACK ARTHUR KING TOLD ME AND DETECTIVE MORDECAI ABOUT WHAT HE DONE SATURDAY AND SUNDAY, AUGUST THE SECOND AND THIRD OF 1980.

Q          WAS MACK ARTHUR KING PRESENT WHEN YOU WERE WRITING THIS DOWN?

A          YES, SIR, HE WAS.

Q          WHO WAS TELLING YOU WHAT TO WRITE DOWN OR WHAT YOU WROTE DOWN ON THIS DOCUMENT?

A          MACK ARTHUR KING.

Q          I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT 6 FOR IDENTIFICATION, AND I'LL ASK IF YOU WILL LOOK AT THAT I BELIEVE THREE PAGE DOCUMENT, AND TELL THE COURT AND THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY THAT?

A          THIS IS THE FIRST STATEMENT THAT HE GAVE US --

Q          WHAT DATE?

A          ON THE SIXTH OF AUGUST AT 8:35 P. M.

Q          IS THAT THE FIRST STATEMENT TAKEN AFTER HIS ARREST?

A          THAT'S CORRECT, THE FIRST STATEMENT HE --

Q          AND WHO SIGNED THAT DOCUMENT?

A          MACK ARTHUR KING SIGNED IT; DETECTIVE MORDECAI SIGNED IT AS A WITNESS, AND I ALSO SIGNED IT AS A WITNESS.

Q          WAS THAT SIGNED IN YOUR PRESENCE?

A          YES, IT WAS.

Q          AFTER THAT WAS WRITTEN OR TAKEN DOWN, WHAT WAS DONE WITH IT CONCERNING MACK ARTHUR KING?

A          AFTER THE STATEMENT WAS WRITTEN AND TAKEN DOWN?

Q          YES.

A          IMMEDIATELY AFTER THIS STATEMENT WAS TAKEN WE BEGAN

94                                        GRINER/DE

TO TALK WITH MACK ARTHUR MORE ABOUT WHAT HAD HAPPENED; WE
CONFRONTED HIM WITH SEVERAL LIES THAT WE HAD --THAT WE KNEW
THAT HE TOLD IN THIS STATEMENT, AND --

Q          DID MACK --EXCUSE ME, LET ME INTERRUPT YOU, DID
MACK ARTHUR KING SIGN THAT STATEMENT?

A          YES, SIR, HE DID.

Q          DID HE TELL YOU THAT'S WHAT HE WAS DOING AND WHERE
HE WAS ON AUGUST THE 3RD AND 4TH OF 1980?

A          YES, SIR.

Q          DID HE SIGN THAT STATEMENT ON EACH PAGE?

A          YES, HE DID.

Q          DID HE READ THAT STATEMENT BEFORE HE SIGNED IT?

A          HE DID READ IT.

Q          IN YOUR PRESENCE?

A          IN MY PRESENCE AND DETECTIVE --

Q          AND IN THE PRESENCE OF WHO ELSE?

A          DETECTIVE MORDECAI.

Q          WHAT DID HE TELL YOU IN THE FIRST STATEMENT THAT HE
GAVE YOU, RAY?

MR. SAMS:

          YOUR HONOR, WE'RE GOING TO OBJECT ON THE GROUNDS
THE STATEMENT SPEAKS FOR ITSELF NOW.

MR. HOWARD:

          I HAVEN'T INTRODUCED IT, YOUR HONOR.

THE COURT:

          WELL, GO AHEAD AND INTRODUCE IT IF YOU WANT TO, AND
          THEN IF YOU WANT TO YOU CAN LET HIM READ THE
          STATEMENT.

MR. HOWARD:

          YOUR HONOR, AT THIS TIME, THEN I WOULD TENDER THIS
AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY.

95                          GRINER/DE

THE COURT:

ANY OBJECTION?

MR. SAMS:

NO OBJECTION.

THE COURT:

LET IT BE RECEIVED AND MARKED INTO EVIDENCE.


(COURT REPORTER MARKS STATEMENT DATED AUGUST 6,
1980, AS STATE'S EXHIBIT NO. 36 IN EVIDENCE)

Time: 8:35 p.m.    Date: 08/06/80

My name is Mack Arther King. My address is Rt. 8 Box 131, Columbus, MS. Barbara Jordan is my girlfriend. She has been living with me since sometime in May 1980. We are not married but she is currently carrying my child. I know Lela Patterson and have known her since I was a kid. I mowed her yards last summer and also mowed them one time the first of this summer. I gave up this job to Lawrence Guyton, Barbara's brother. The last time I was over at Lela Patterson's house was Monday or Tuesday approximately two weeks ago. I went there to see if she wanted her yards mowed. I found out Lawrence had already mowed them. I talked with Mrs. Patterson this time about 30 minutes about her yard and lawn mower. I talked to her in her kitchen as I stood in front of her back door inside her kitchen. This is the only room in Mrs. Patterson's house that I have been in since her husband died and the only time I have been inside her house since her husband died. I went to Mrs. Patterson's house the day before this occasion with my girlfriend but Mrs. Patterson was not at home. Neither me nor Barbara went inside Mrs. Patterson's home on this occasion. Last Saturday August 2, 1980 I stayed at home or at

x mack arther king



witness J M Mordecai

STATE'S EXHIBIT # 6 12-4-80 IDENTIFICATION RHB #6/16

until sometime that afternoon which I left and went over to my daddy's house. My daddy is T.B. King and lives on Nashville Ferry Road. I stayed at my daddy's house watching television until just before dark when I left and walked to my cousin Jessie Hargrow's house. I stayed at Jessie's house till about 8:30 p.m. visiting with Jessie, Willie Porter, Mary Hargrow and her kids. I left Jessie's house around 8:30 p.m. and went to Doris Porter's house next door to my house. I stayed at Doris' house till around 9 p.m., only Doris and myself were there at that time. I left there and went to my house and stayed there till 10:30 or 11:00 p.m. and then I went back over to my daddy's house. The only person there was my daddy and he was in the back room. I spent the night — Saturday August 2, 1980, at my daddy's house. My girlfriend stayed at our house by herself because she had went to my sister's kids party that day. I left my daddy's house around 7 a.m. Sunday morning August 3, 1980 and went back to my house. Sunday afternoon I went back to my daddy's house and stayed awhile before leaving with Roosevelt Rice and going to Paula's Cafe. I was at Paula's for about an hour then me and Roosevelt Rice left and went MC

mack arther ring

witness: Jim Meredith

withness: Roy Harris

to Arthur Gour house and I paid my rent which is $15 per month. We left there, me, Roosevelt, William Henry Rice, Vance T. Porter and went to Joes Stop and Shop. From Joes we went to Charlis One Stop and made a circle or around Nashville Ferry Road and went to Velma Browns house. We stayed at Velmas a few minutes and then went back to Paulas Cafe. I then left Paulas with Chris Field and went back to Velma's house. From Velma's house I left and walked home through the woods. I stayed home the rest of Sunday night. I am employed by Mike Hanson. I make $125 per week working for Mike. Mike ran out of work a couple of weeks ago and I haven't drawed a check for two weeks. The only money I've made is $7 in which I sold the transmission out of my car to Columbus Transmission on Highway 69. I did this yesterday. I haven't bought any guns or jewelry from anyone in the last two months. No one has given me any guns or jewelry in the last two months. I did not break into Mrs. Pattersons house last Saturday nite and I did not kill her nor do I know anyone or anyth about this crime. Mack arther ring

witness: JM Mordecai

witness: Ray Gun

Q        RAY, LET ME BACK UP JUST ONE MINUTE; I'M GOING TO HAND YOU WHAT HAS NOW BEEN MARKED AS STATE'S EXHIBIT 36 IN EVIDENCE, AND ASK IF YOU WOULD TELL THE COURT WHETHER OR NOT ANY PROMISES, THREATS, OFFERS OF HOPES OF REWARD, INDUCEMENTS, COERCION, OR THREATS OF ANY KIND WERE ISSUED TOWARD THE DEFENDANT BY YOURSELF OR ANYONE IN YOUR PRESENCE TO GET MACK ARTHUR KING TO GIVE YOU THAT STATEMENT AND SIGN IT?

A        THERE WAS NOT ANY.

Q        WOULD YOU READ THAT STATEMENT --DOES THAT STATEMENT CONTAIN EVERYTHING THAT MACK ARTHUR KING TOLD YOU ON THE FIRST STATEMENT ON THE EIGHTH --THE SIXTH DAY OF AUGUST OF 1980?

A        IT DOES.

Q        WOULD YOU READ THAT STATEMENT TO THE LADIES AND GENTLEMEN OF THE JURY, PLEASE?

A        "MY NAME IS MACK ARTHUR KING. MY ADDRESS IS ROUTE 8, BOX 131, COLUMBUS, MISSISSIPPI. BARBARA JORDAN IS MY GIRLFRIEND. SHE HAS BEEN LIVING WITH ME SINCE SOMETIME IN MAY OF 1980. WE ARE NOT MARRIED, BUT SHE IS CURRENTLY CARRYING MY CHILD. I KNOW LELA PATTERSON, AND HAVE KNOWN HER SINCE I WAS A KID. I MOWED HER YARDS LAST SUMMER AND ALSO MOWED THEM ONE TIME THE FIRST OF THIS SUMMER. I GAVE UP THIS JOB TO LAWRENCE GUYTON, BARBARA'S BROTHER. THE LAST TIME I WAS OVER AT LELA PATTERSON'S HOUSE WAS MONDAY OR TUESDAY APPROXIMATELY TWO WEEKS AGO. I WENT THERE TO SEE IF SHE WANTED HER YARDS MOWED. I FOUND OUT LAWRENCE HAD ALREADY MOWED THEM. I TALKED WITH MRS. PATTERSON THIS TIME ABOUT THIRTY MINUTES ABOUT HER YARD AND LAWN MOWER. I TALKED TO HER IN HER KITCHEN AS I STOOD IN FRONT OF HER BACK DOOR INSIDE HER KITCHEN. THIS IS THE ONLY ROOM IN MRS. PATTERSON'S HOUSE THAT I HAVE BEEN IN SINCE HER HUSBAND DIED, AND THE ONLY TIME