118                    GRINER/CE

A          IT IS TWO --IT IS TWO STATEMENTS.  FROM THE TIME WE
ENTERED THE ROOM AT 8:30 UNTIL WE CONCLUDED THE SECOND
STATEMENT, NO ONE LEFT THE ROOM.

Q          MACK ARTHUR KING DID NOT LEAVE THAT ROOM?

A          NO, SIR, NOT UNLESS HE GOT UP TO GO THE RESTROOM.

Q          I SEE.  NOW, SPECIFICALLY IMMEDIATELY BEFORE YOU
TOOK THE SECOND STATEMENT I BELIEVE YOU'VE TESTIFIED THAT YOU
CONFRONTED HIM WITH SOME THINGS, AND MAY --ASKED HIM SOME
QUESTIONS ABOUT THE FIRST STATEMENT, IS THAT RIGHT?

A          THAT'S CORRECT.

Q          WHAT SORT OF THINGS DID YOU ASK HIM?

A          THE FINGERPRINTS; WHY WAS HIS FINGERPRINTS FOUND IN
HER HOUSE; WHERE --I'VE ASKED HIM ABOUT --I ASKED HIM ABOUT
THE JEWELRY, AND THE ITEMS THAT WE HAD RECOVERED FROM BARBARA
JORDAN, THE ITEMS THAT WE HAD RECOVERED FROM THE HOUSE, THINGS
LIKE THAT.

Q          NOW, WHAT WAS YOUR PURPOSE IN CONFRONTING HIM WITH
THOSE --WITH THOSE THINGS?

A          TO SEE IF WE COULD GET HIM TO TELL US THE TRUTH
WHERE HE GOT THE STUFF FROM, AND WHAT ACTUALLY HAPPENED AT THE
PATTERSON HOME.

Q          WHO AS CONCERNS YOURSELF AND MR. MORDECAI, WHO DID
MOST OF THIS?

A          WELL, WE BOTH ACTUALLY QUESTIONED HIM; WE WERE BOTH
QUESTIONING MR. KING.

Q          ABOUT EQUALLY BETWEEN YOU?

A          I WOULD SAY SO, YES, SIR.

Q          NOW, DID YOU KNOW THESE THINGS THAT YOU CONFRONTED
HIM WITH BEFORE YOU TOOK THE FIRST STATEMENT?

A          YES, SIR.

Q          I BELIEVE YOU PHRASED ONE OF YOUR STATEMENTS ON

DIRECT EXAMINATION THAT HE FINALLY AGREED TO GIVE A SECOND
STATEMENT, IS THAT CORRECT?

A        I MIGHT HAVE PHRASED IT THAT WAY.

Q        WHY DID YOU PHRASE IT LIKE THAT; DID THIS --

A        HE --WHAT I REALLY MEANT TO SAY WAS HE CHANGED HIS
FIRST STATEMENT TO WHAT HIS SECOND STATEMENT WAS.

Q        HOW LONG --HOW MUCH TIME DID YOU SPEND IN THIS
CONFRONTATION?

A        AS I SAID I BELIEVE THE ORIGINAL --THE FIRST TIME
WHEN WE BEGAN TALKING TO HIM WAS APPROXIMATELY 8:30 ON THE
SIXTH OF AUGUST; THE SECOND STATEMENT WAS BEGUN AT APPROXIMATELY
ONE A. M. ON THE SEVENTH OF AUGUST --MAYBE A QUARTER AFTER ONE
THE SEVENTH OF AUGUST.

Q        SO THIS IS A SPACE OF FIVE --FIVE AND A HALF HOURS
WE'RE TALKING ABOUT?

A        ROUGHLY FIVE TO SIX HOURS.

Q        NOW, WAS IT DURING ALL THIS PERIOD OF TIME THAT YOU
WERE CONFRONTING HIM WITH THESE THINGS ON THE FIRST
STATEMENT?

A        YES, SIR, WE WERE JUST TALKING ABOUT HIS WHERE-
ABOUTS THE WEEKEND OF THE OFFENSE; WE WERE QUESTIONING HIM
ABOUT HIS ALIBIS; WHAT WE THOUGHT HE WAS LYING ABOUT.

Q        RAY, IF YOU CAN, DO YOU REMEMBER SPECIFICALLY ANY
OF THE LANGUAGE THAT YOU USED TO THE DEFENDANT IN YOUR ATTEMPT
TO GET THIS SECOND STATEMENT?

A        I COULDN'T SIT HERE AND QUOTE IT WORD FOR WORD --

Q        CAN YOU DO YOUR BEST?

A        --VERBATIM. THE DEFENDANT WAS QUESTIONED ABOUT HIS
WHEREABOUTS ON THE --I BELIEVE THE CRIME OCCURRED ON THE 3RD
OF AUGUST -- ON THE SATURDAY AND SATURDAY EVENING AND SUNDAY;
WE WAS QUESTIONING WHO HE --WHO HE WAS WITH AT THOSE TIMES,

120                                         GRINER/CE

HAD HE --WHAT HIS RELATIONSHIP TO MRS. PATTERSON WAS, HAD HE--
DID HE KNOW HER PERSONALLY, HAD HE EVER BEEN IN HER HOUSE, AND
IN RESPONSE TO HIS QUESTIONS SOME OTHER QUESTIONS MIGHT HAVE
ARISEN.

Q          WHEN YOU WERE QUESTIONING HIM, DID YOU USE THE
WORDS BURGLARY, AND MURDER, OR BOTH, OR WHICH IF ONLY ONE OF
THEM?

A          WE --WE USED BOTH OF THEM. HE WAS --HE WAS WELL
AWARE THAT WE SUSPECTED HIM OF MURDERING MRS. PATTERSON FROM
THE TIME THE FIRST STATEMENT BEGAN.

Q          NOW DURING THIS CONFRONTATION DID YOU USE THE WORD
BURGLARY MORE OR THE WORD MURDER MORE WITH REFERENCE TO THE
POSSIBLE CHARGES?

A          PROBABLY BOTH.

Q          ARE --IS IT YOUR TESTIMONY THAT EQUALLY --BOTH --
USED THEM BOTH?

A          THAT IS CORRECT.

Q          DID YOU EVER TELL HIM SPECIFICALLY THAT HE SHOULD
TELL YOU ABOUT THE BURGLARY PORTION OF IT?

A          I TOLD HIM THAT WE WANTED THE TRUTH EXACTLY WHAT
HAPPENED WHETHER IT WAS BURGLARY OR MURDER, YOU KNOW, I --I
WAS THERE TO TRY TO FIND OUT THE TRUTH FROM HIM, AND I
QUESTIONED HIM ALONG THOSE LINES.

Q          AND ALL OF THIS OCCURRED OVER THIS PERIOD OF FIVE--
FIVE AND A HALF HOURS?

A          THAT'S CORRECT.

MR. KESLER:

          I BELIEVE THAT'S ALL, YOUR HONOR.

THE COURT:

          ANY REDIRECT?

MR. HOWARD:

          NO, YOUR HONOR.

121                                          MOORE/DE

JESSE MOORE,

A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

MR. HOWARD:

Q        JESSE, WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT YOUR NAME IS, PLEASE?

A        JESSE MOORE.

Q        AND WHERE ARE YOU EMPLOYED?

A        MISSISSIPPI CRIME LAB.

Q        AND WHERE IS THAT LOCATED?

A        IN JACKSON, MISSISSIPPI.

Q        AND WHAT IS YOUR TITLE OR OCCUPATION WITH THE CRIME LAB, JESSE?

A        I'M A CRIME SCENE SEARCH INVESTIGATOR, AND ALSO A FINGERPRINT EXAMINER.

Q        I'LL ASK YOU WHAT --WHAT DO YOUR DUTIES ENTAIL IN CONCERNING CRIME SCENE INVESTIGATION AND FINGERPRINT EXAMINATION?

A        I WORK CRIME SCENES OVER THE STATE OF MISSISSIPPI, AND ALSO I WORK --EXAMINE --PROCESS CERTAIN PHYSICAL EVIDENCE FOR PRINTS.

Q        THAT WOULD BE FINGERPRINTS, IS THAT CORRECT, JESSE?

A        YES, SIR.

Q        I'LL ASK IF YOU HAD THE OCCASION TO BE SUMMONED OR COME UP TO COLUMBUS, LOWNDES COUNTY, MISSISSIPPI, INVOLVING A HOMICIDE BURGLARY?

A        YES, SIR.

Q        AND WHEN DID YOU ARRIVE UP HERE, JESSE?

A        AUGUST THE 4TH, 1980.

122                                    MOORE/DE

Q        I'LL ASK IF YOU HAD THE OCCASION TO OBTAIN CERTAIN
ITEMS OF PHYSICAL EVIDENCE FROM THE LAW ENFORCEMENT OFFICERS
HERE IN LOWNDES COUNTY?

A        YES, SIR.

Q        I'LL ASK YOU WHETHER OR NOT YOU EXAMINED OR
PERFORMED ANY TESTS OR EXAMINATIONS ON ANY OF THESE ITEMS?

A        YES, SIR, I DID.

Q        WHAT TYPE OF ITEMS AND EXAMINATIONS DID YOU
PERFORM, JESSE?

A        THERE WAS MANY ITEMS THAT WAS COLLECTED FROM THE
SCENE, SUCH AS PICTURE FRAMES, MILK CARTONS, WHAT NOTS, AND
IT WAS QUITE A BIT OF ITEMS THERE.

Q        I'LL ASK YOU IN PARTICULAR DID YOU HAVE THE
OCCASION TO EXAMINE A GRAY METAL FILE BOX?

A        YES, SIR, I DID.

Q        I'LL ASK YOU WHETHER OR NOT YOU HAD THE OCCASION
TO EXAMINE MANILA FOLDERS AND ENVELOPES AND FILE FOLDERS?

A        YES, SIR, I DID.

Q        IN REGARDS TO THE --THE PAPER ITEMS, THE MANILA
ENVELOPES AND FILE FOLDERS, WAS THERE ANYTHING UNUSUAL THAT
YOU HAD TO DO TO THESE ITEMS INSOFAR AS FINGERPRINTS ARE
CONCERNED?

A        ON --ON THE FOLDERS?

Q        YES.

A        YES, SIR, WE HAVE TO USE A CHEMICAL.

Q        DID YOU DISCOVER ANY LATENT PRINTS THAT YOU FELT
WERE OF VALUE ON EITHER THE METAL FILE BOX OR THESE MANILA
FOLDERS?

A        WHEN I PROCESS A METAL BOX OR THE FOLDERS IF THERE
ARE ANY PRINTS ON THERE I GO AHEAD AND --AND LIFT THEM.

123                     MOORE/DE

MR. HOWARD:

    MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

    YOU MAY.

Q    I AM GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT 3 FOR --23 FOR IDENTIFICATION, JESSE, AND I'LL ASK IF YOU WILL LOOK AT THAT AND TELL THE COURT AND THE LADIES AND GENTLEMEN OF THE JURY IF YOU CAN IDENTIFY THAT?

A    (WITNESS EXAMINES EXHIBIT) THAT'S A MANILA BROWN PAPER BAG CONTAINING ONE METAL BOX.

Q    DID YOU PERFORM ANY EXAMINATIONS ON THAT PARTICULAR BOX, JESSE?

A    YES, SIR.

Q    OKAY, WHAT TYPE OF EXAMINATIONS DID YOU PERFORM?

A    I USED WHAT WE CALL BLACK FINGERPRINT POWDER.

Q    AND WHAT DOES THAT DO?

A    IF ANY PRINTS ARE ON THE BOX USUALLY WHEN SOMEONE TOUCH AN OBJECT THEY USUALLY LEAVE SOME TYPE OF MOISTURE OR SOME TYPE OF SWEAT IF THEY TOUCH AN OBJECT WHICH A LATENT PRINT IS MEANING HIDDEN PRINTS, SO YOU HAVE TO USE SOME TYPE OF POWDER OR CHEMICAL TO BRING THE PRINTS OUT.

Q    AND WAS THAT USED IN THIS PARTICULAR CASE?

A    YES, SIR.

Q    AFTER THESE LATENT PRINTS WERE DISCOVERED WHAT WAS DONE THEN?

A    AFTER I PROCESSED THERE APPEARED TO BE SOME VALUE TO US, I PUT WHAT WE CALL A LIFTER TAPE ON THE METAL BOX.

Q    AND WHAT DOES THAT DO?

A    IT WILL LIFT UP THE PRINT THAT THE POWDER ABSORBS ON THE MOISTURE.

Q    OKAY, FINGERPRINTS ARE RELATIVELY HARD TO LIFT FROM

124                                    MOORE/DE

CERTAIN OBJECTS AND ITEMS, IS THAT CORRECT?

A          IT WILL DEPEND ON THE OBJECT AND THE CONDITION.

Q          AND THIS IS A SLICK METAL FINISH ON THIS PARTICULAR
OBJECT, IS IT NOT?

A          YES, SIR.

Q          JESSE, DID YOU, IN FACT, LIFT THE FINGERPRINTS FROM
THIS GRAY METAL BOX MARKED STATE'S EXHIBIT 23 FOR
IDENTIFICATION?

A          YES, SIR.

Q          WHAT WAS DONE WITH THE LIFT --LIFTED IMPRESSIONS
FROM THIS BOX?

A          WHEN I LIFTED THE PRINTS FROM THIS BOX I PUT ON A
LITTLE INDEX CARD, AND I PUT DOWN MY --THE DATE AND THE TIME
AND THE CASE NUMBER AND MY NAME AND WHERE I LIFTED THE PRINTS
FROM.

Q          AND WHAT IS DONE WITH THIS CARD?

A          THEN I TAKE THE CARD AND I SEND IT TO OUR CRIME
LAB AND THEN OUR FINGERPRINT MAN WILL LOOK AT IT.

Q          OKAY, AND WHO IS THAT PERSON THAT WILL DO THE
ACTUAL EXAMINATION OF THESE UNKNOWN LATENT PRINTS THAT YOU
LIFTED?

A          MR. RON SMITH.

Q          DID YOU, IN FACT, LIFT CERTAIN LATENT PRINTS FROM
THE METAL BOX, STATE'S EXHIBIT 23 FOR IDENTIFICATION?

A          YES, SIR.

Q          AND WHERE ARE THESE PRINTS THAT YOU LIFTED?

A          THESE RIGHT HERE, SIR.

Q          DO YOU HAVE THEM WITH YOU NOW?

A          YES, SIR.

Q          WERE THESE PRINTS TURNED OVER TO ANYONE THERE IN
THE CRIME LAB FOR COMPARISON PURPOSES?

127                              MOORE/DE

A        YES, SIR, I DID.

Q        AND WHAT DID THAT ENABLE YOU TO OBSERVE?

A        ONCE YOU SPRAY THE NINHYDRIN ON THIS YOU HAVE TO TAKE APPROXIMATELY TWENTY-FOUR HOURS TO LET IT SET OUT, AND IF IT'S ANY PRINTS ON THE OBJECT IT WILL COME OUT.

Q        DID YOU SPRAY THESE OBJECTS?

A        YES, SIR, I DID.

Q        DID YOU FIND ANY PRINTS OF VALUE THAT COULD BE USED ON THE ITEMS IN STATE'S EXHIBIT 24 FOR IDENTIFICATION?

A        WELL, WHEN I PROCESSED THESE ITEMS HERE AND THE PRINTS THAT COME OUT MR. RON SMITH HAD TO LOOK AT THEM.

Q        THESE COULD NOT BE LIFTED LIKE YOU CAN OFF OF A METAL OBJECT, IS THAT CORRECT?

A        NO, SIR.

Q        AND DID MR. SMITH MAKE A COMPARISON OF THE FINGER-PRINTS AND EXAMINE THE CONTENTS OF STATE'S EXHIBIT 24 FOR IDENTIFICATION?

A        YES, SIR, HE DID.

Q        DID YOU PHYSICALLY DELIVER THESE FINGERPRINTS TO THE CRIME LAB IN JACKSON?

A        NOW WHICH ONE ARE YOU TALKING ABOUT, THE LATENT PRINTS?

Q        THE LATENT PRINTS --

A        YES, SIR.

Q        --THAT YOU PICKED UP FROM THE BOX, IS THAT CORRECT?

A        YES, SIR, I DID.

MR. HOWARD:

          NOTHING FURTHER OF THIS WITNESS, YOUR HONOR.

THE COURT:

          YOU MAY CROSS-EXAMINE.

125                           MOORE/DE

A         YES, SIR.

Q         AND WAS THAT RON SMITH THAT YOU TESTIFIED ABOUT BEFORE?

A         YES, SIR.

Q         ARE THOSE THE ACTUAL PRINTS THAT HE USED FOR THE COMPARISON PURPOSES?

A         YES, SIR.

MR. HOWARD:

          YOUR HONOR, WE WOULD TENDER THIS AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY AT THIS TIME.

MR. SAMS:

          MAY WE SEE THEM?

          (PRINTS PASSED TO DEFENSE COUNSEL FOR EXAMINATION)

THE COURT:

          LET THEM BE RECEIVED AND MARKED.

          (COURT REPORTER MARKS FINGERPRINT CARD AS STATE'S EXHIBIT NO. 42 IN EVIDENCE)



State's Exhibit No. 42 - Evidence /s/KHB   12-4-80

*209*

126                    MOORE/DE

Q        I WILL HAND YOU A BOX, THE CONTENTS OF WHICH IS
MARKED AS STATE'S EXHIBIT NO. 24 FOR IDENTIFICATION, JESSE,
AND I'LL ASK IF YOU WOULD LOOK AT THAT AND TELL THE COURT AND
THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY
WHAT THAT IS?

A        (WITNESS EXAMINES EXHIBIT)  IT'S ONE CARDBOARD BOX
CONTAINING SEVERAL FOLDERS INSIDE IT.

Q        OKAY, WOULD YOU DESCRIBE THESE AS MANILA FOLDERS
AND FILE FOLDER TYPE OBJECTS --PAPER OBJECTS?

A        YES, SIR.

Q        DID YOU PERFORM ANY TESTS OR EXAMINATIONS OF THE
CONTENTS OF WHAT'S BEEN MARKED AS STATE'S EXHIBIT 24 FOR
IDENTIFICATION?

A        YES, SIR, I DID.

Q        AND WHAT TYPE OF TESTS AND EXAMINATIONS DID YOU
PERFORM ON THAT?

A        I USED WHAT THEY CALL A NINHYDRIN.

Q        OKAY, AND WHAT DOES NINHYDRIN DO?

A        IT WILL ABSORB --

Q        LET ME INTERRUPT YOU --COULD YOU SPELL THAT FOR THE
COURT REPORTER?

A        YEAH; N-I-N-H-Y-D-R-I-N.

Q        CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY
WHAT NINHYDRIN DOES?

A        IT WILL ABSORB ACID WHICH A PERSON FINGER WHEN IT
PERSPIRE THEY HAVE APPROXIMATELY NINETY-FIVE TO NINETY-EIGHT
PERCENT WATER, AND THE REST OF THE PERCENTAGE IT WILL HAVE
ACID AND SALT, AND NINHYDRIN WILL PICK UP ACID FROM THE
MOISTURE.

Q        DID YOU PREPARE THESE DOCUMENTS WITH THAT
CHEMICAL?

128                                    Moore/CE
                                       Smith/DE

### CROSS EXAMINATION

MR. SAMS:

Q         MR. MOORE, ONLY ONE QUESTION: YOU'RE NOT PREPARED AND YOU'RE NOT ATTEMPTING TO TESTIFY AS AN EXPERT AS TO WHO THOSE PRINTS BELONG TO, ARE YOU?

A         NO, SIR, I'M NOT.

MR. SAMS:

          THANK YOU. NO FURTHER QUESTIONS.

### RON SMITH,

          A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

### DIRECT EXAMINATION

MR. HOWARD:

Q         WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT YOUR NAME IS, PLEASE?

A         EDGAR RONALD SMITH.

Q         AND WHAT IS YOUR JOB OR WHERE ARE YOU EMPLOYED?

A         I'M EMPLOYED AT THE MISSISSIPPI CRIME LABORATORY.

Q         AND WHERE IS THAT LOCATED?

A         JACKSON, MISSISSIPPI.

Q         WHO IS THE HEAD OF THAT ORGANIZATION?

A         DR. ARTHUR S. HUME.

Q         WHAT IS YOUR TITLE OR JOB DOWN AT THE CRIME LAB, RON?

A         I'M EMPLOYED AS A FINGERPRINT EXAMINER.

Q         AND WHAT DO YOUR DUTIES CONSIST OF DOWN THERE AS A FINGERPRINT EXAMINER?

A         INCLUDED IN MY DUTIES AS A FINGERPRINT EXAMINER IS THE RESPONSIBILITY FOR EXAMINING A WIDE VARIETY OF PHYSICAL

2/2

EVIDENCE FOR LATENT PRINTS. ANY LATENT PRINTS I'M ABLE TO FIND OR DEVELOP ON THE SUBMITTED EVIDENCE I COMPARE WITH THE KNOWN INK PRINTS OF POSSIBLE SUSPECTS OR VICTIMS IN THAT PARTICULAR CASE. I REPORT MY FINDINGS TO THE CONTRIBUTING AGENCY OR OFFICER, AND PROVIDE TESTIMONY IN COURTS OF LAW IF CALLED UPON TO DO SO AS TO THE RESULTS OF MY EXAMINATIONS.

Q          HOW LONG HAVE YOU BEEN EMPLOYED IN FINGERPRINT WORK AND DOING THIS, RON?

A          APPROXIMATELY EIGHT AND ONE HALF YEARS.

Q          OKAY, WHAT TYPE OF TRAINING HAVE YOU HAD IN THE FIELD OF FINGERPRINT IDENTIFICATION, INCLUDING YOUR PAST EMPLOYMENT, YOUR SCHOOLING AND YOUR SEMINARS?

A          I BEGAN MY CAREER IN THE FIELD OF FINGERPRINT IDENTIFICATION IN 1972 WHILE EMPLOYED AS A FINGERPRINT TECHNICIAN WITH THE FEDERAL BUREAU OF INVESTIGATION LOCATED IN WASHINGTON, D. C. IN 1973 I ACCEPTED A POSITION AS FINGER-PRINT EXAMINER WITH THE ALABAMA BUREAU OF INVESTIGATION LOCATED IN MONTGOMERY, ALABAMA, WHERE I WAS EMPLOYED FOR APPROXIMATELY FIVE YEARS, AND ATTAINED THE POSITION OF UNIT SUPERVISOR. IN JANUARY OF 1978, I ACCEPTED A POSITION AS SUPERVISOR OF THE FINGERPRINT SECTION, MISSISSIPPI CRIME LABORATORY, WHERE I AM CURRENTLY EMPLOYED. DURING THAT TIME I'VE ATTENDED NUMEROUS SCHOOLS AND PROFESSIONAL SEMINARS INVOLVED IN THE FIELD OF FINGERPRINT IDENTIFICATION. I'M A GRADUATE OF THE FBI ADVANCED LATENT FINGERPRINT SCHOOL HELD AT THE FBI ACADEMY IN QUANTICO, VIRGINIA.

Q          HAVE YOU HAD THE OCCASION TO QUALIFY AS AN EXPERT IN FINGERPRINT COMPARISON IN COURTS OF THIS STATE?

A          I HAVE.

Q          ON APPROXIMATELY HOW MANY OCCASIONS?

A          APPROXIMATELY THIRTY-FIVE OCCASIONS.

130                                    SMITH/DE

Q        I'LL ASK YOU IF YOU'VE HAD THE OCCASION TO QUALIFY
AS AN EXPERT IN THE FIELD OF FINGERPRINT COMPARISONS IN COURTS--
IN THE COURTS OF ANY OTHER STATE?

A        I HAVE.

Q        AND IN WHAT STATES AND ON APPROXIMATELY HOW MANY
OCCASIONS?

A        IN THE STATE OF ALABAMA APPROXIMATELY FORTY TIMES.

Q        HAVE YOU BEEN CERTIFIED AS A LATENT FINGERPRINT
EXAMINER BY ANY PROFESSIONAL ASSOCIATION?

A        I HAVE.

Q        AND WHAT TYPE OF ASSOCIATION?

A        THE INTERNATIONAL ASSOCIATION FOR IDENTIFICATION.

MR. HOWARD:

         YOUR HONOR, AT THIS TIME WE WOULD TENDER THIS
WITNESS AS AN EXPERT IN THE FIELD OF FINGERPRINT COMPARISONS.

THE COURT:

         ALL RIGHT, HE MAY BE RECEIVED AS AN EXPERT IN THAT
         FIELD.

Q        RON, WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE
JURY WHAT AN INKED FINGERPRINT IS?

A        AN INKED FINGERPRINT IS AN INKED REPRODUCTION OF
THE END JOINT OF THE FINGER, AND IT'S USUALLY MADE BY PLACING
THE FINGER, AFTER IT HAS BEEN INKED, ON A CONTRASTING WHITE
SURFACE SUCH AS A STANDARD FINGERPRINT CARD, AND IT IS A
REPRODUCTION OF THE RIDGE DETAIL THAT ARE PRESENT ON THAT
FINGER.

Q        WHAT IS A --THE LATENT FINGERPRINT THAT WE HEAR;
WHAT --WHAT IS THAT TERM; WHAT IS THAT?

A        A LATENT FINGERPRINT IS A PRINT LEFT ON AN OBJECT
BY CHANCE,  AFTER THAT OBJECT HAS BEEN TOUCHED AND THE FINGER

131                                    SMITH/DE

HAS BEEN REMOVED. IT'S COMPOSED PRIMARILY OF PERSPIRATION AND
ANY FATS OR OILS WHICH MIGHT HAVE BEEN PRESENT ON THE FINGER
AT THE TIME THE OBJECT WAS TOUCHED. IF I WERE TO TOUCH THIS
PIECE OF WOOD BEFORE ME, AND THEN REMOVE MY FINGER THE FINGER-
PRINT WHICH REMAINS WOULD BE CALLED A LATENT FINGERPRINT.

Q          DOES THE SURFACE OF THE OBJECT --THE TEXTURE OF THE
OBJECT THAT YOU TOUCH DETERMINE HOW WELL THAT FINGERPRINT
REMAINS ON THAT OBJECT?

A          IT DOES.

Q          WHAT ARE THE --HOW DO YOU TAKE FINGERPRINTS AND
COMPARE THEM, RON?

A          WELL, FOUND ON THE FINGERS AND PALMS OF THE HAND
AS WELL AS THE BOTTOMS OF YOUR FEET, IS A SYSTEM OF INDIVIDUAL
RIDGES AND VALLEYS. IT'S SOMETHING LIKE A WASHBOARD, THE UP
AND DOWN MOVEMENT --OR MOVEMENT OR MOTION OF A WASHBOARD.
FOUND AMONG THIS SYSTEM OF RIDGES AND VALLEYS ARE SEVERAL
TYPES OF SEPARATE AND DISTINCT CHARACTERISTICS OR RIDGE
DETAILS. THIS MIGHT BE WHERE ONE RIDGE ENDS OR WHERE IT
SPLITS INTO TWO RIDGES SOMETHING LIKE THE FORK IN A ROAD OR
RIVER, MAYBE A SHORT RIDGE OR DOT, FOR INSTANCE. IT IS THE
PRESENCE OF A SUFFICIENT NUMBER OF THESE INDIVIDUAL RIDGE
CHARACTERISTICS IN THE SAME POSITION ON BOTH THE LATENT PRINT
AND THE INKED PRINT WHICH ESTABLISHES A POSITIVE IDENTIFICATION.
IN OTHER WORDS, IF YOU FIND THE SAME CHARACTERISTICS IN THE
SAME PLACE ON BOTH PRINTS, THEN IT CAN BE POSITIVELY
DETERMINED THAT BOTH WERE MADE BY THE SAME FINGER.

MR. HOWARD:

          MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

          YOU MAY.

Q          I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S

2/5

132                                    Smith/DE

Exhibit No. 42 into evidence, Ron, and I'll ask you whether or not you've ever seen those taped latent prints?

A        May I remove these from the envelope?

Q        Yes.

A        (Witness removes cards from envelope) I have.

Q        And how can you tell that you've seen them before?

A        They bear my initials, ERS, and the date, 8/6/80.

Q        And where did you see them, Ron?

A        In my office at the Mississippi Crime Laboratory.

Q        I'll ask you whether or not you performed any examinations on those particular latent fingerprints?

A        I did.

Q        I'll ask you whether or not you had any known fingerprint samples or known latent prints of --or inked prints of Mack Arthur King?

A        There were inked prints submitted.

Q        Were there any latent prints of Mack Arthur King already on file in the Crime Lab --

A        There --

Q        --did you already have them available?

A        There was a copy previously submitted; yes, sir.

Q        Did you obtain another copy of those from any law enforcement agency here in Lowndes County?

A        I did.

Q        Do you have those here with you today?

A        I do.

Q        Are they in your possession right now?

A        Yes, sir.

Q        Did you compare those latent fingerprints with the inked prints of Mack Arthur King?

A        Yes, sir.

Q        MAY I SEE THE INKED PRINTS THAT YOU USED FOR
COMPARISON?

        (PRINTS PASSED TO MR. HOWARD FOR EXAMINATION)

Q        DID YOU RECEIVE THESE INKED PRINTS AT THE CRIME
LAB IN JACKSON, MISSISSIPPI?

A        THEY WERE RECEIVED AT THE MISSISSIPPI CRIME
LABORATORY; YES, SIR.

Q        ARE THEY CONTAINED IN THIS --IN THIS ENVELOPE HERE?

A        YES, SIR.

Q        ARE THESE THE FINGERPRINTS OR THE INKED PRINTS THAT
YOU USED TO COMPARE WITH THE LATENT PRINTS LIFTED FROM THE --
THAT WERE SUBMITTED TO YOU AT THE CRIME LAB?

A        YES, SIR.

MR. HOWARD:

        YOUR HONOR, WE TENDER THIS AS AN EXHIBIT TO THIS
WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

        LET THEM BE RECEIVED AND MARKED.


        (COURT REPORTER MARKS INKED FINGERPRINTS AS STATE'S
         EXHIBIT NO. 43 IN EVIDENCE)

Inked Fingerprints

State's Exhibit No. 43 - Evidence

Testimony of Ron Smith


To Be Forwarded Upon Request

134                                    SMITH/DE

Q          WHAT CONCLUSIONS DID YOU ARRIVE AT WHEN YOU
COMPARED THE KNOWN FINGERPRINTS OF MACK ARTHUR KING WITH THE
LATENT PRINTS THAT YOU HAVE IN YOUR HAND THAT YOU EXAMINED AT
THE CRIME LAB, RON?

A          I FOUND THAT THE INKED OR THAT THE LATENT FINGER-
PRINTS AND PALM PRINTS WHICH APPEAR ON THESE CARDS WERE MADE
BY THE SAME FINGERS AND PALMS WHICH MADE THE INKED FINGERPRINTS
AND PALM PRINTS BEARING THE NAME, MACK ARTHUR KING.

Q          AND SUBMITTED TO YOU IN THE DOCUMENT MARKED AS
STATE'S EXHIBIT 43 IN EVIDENCE?

A          THAT IS CORRECT.

MR. HOWARD:

           YOUR HONOR, WE WOULD TENDER AT THIS TIME THE LATENT
PRINTS LIFTED --LIFTED AND EXAMINED BY THIS WITNESS FROM THE
METAL BOX AND SUBMITTED TO THE CRIME LAB.

THE COURT:

           ALL RIGHT, LET IT BE RECEIVED AND MARKED.

MR. HOWARD:

           I'M SORRY, YOUR HONOR, I'VE ALREADY INTRODUCED THEM
BEFORE.

THE COURT:

           ALL RIGHT.

Q          RON, I'LL ASK YOU IF YOU WOULD TO EXAMINE WHAT'S
BEEN --THE CONTENTS OF WHAT'S BEEN MARKED AS STATE'S EXHIBIT
24 FOR IDENTIFICATION, AND TELL THE COURT AND LADIES AND
GENTLEMEN OF THE JURY WHETHER YOU'VE EVER SEEN THOSE OBJECTS
BEFORE?

           (WITNESS EXAMINES CONTENTS OF BOX)

A          I HAVE.

Q          AND WHERE DID YOU SEE THOSE OBJECTS?

A          IN MY OFFICE AT THE MISSISSIPPI CRIME LABORATORY.

135                                                    SMITH/DE

Q.      AND DID YOU PERFORM ANY COMPARISONS OR EXAMINATIONS OF THE ITEMS FOUND IN STATE'S EXHIBIT NO. 24 FOR IDENTIFICATION?

A.      I DID CONDUCT AN EXAMINATION ON THESE ITEMS OF EVIDENCE.

Q.      DID YOU FIND ANY PRINTS CONTAINED ON THE ITEMS IN STATE'S EXHIBIT 24 FOR IDENTIFICATION OF SUFFICIENT CHARACTERISTICS TO ENABLE YOU TO MAKE A COMPARISON?

A.      I DID FIND ONE LATENT FINGERPRINT OF VALUE, AND ONE LATENT PALM PRINT OF VALUE ON TWO OF THE FOLDERS CONTAINED IN THAT BOX.

Q.      I'LL ASK YOU WHETHER OR NOT YOU COMPARED THAT LATENT FINGERPRINT AND THAT LATENT PALM PRINT THAT YOU FOUND IN THE ITEMS --AMONG THE ITEMS IN STATE'S EXHIBIT 24 FOR IDENTIFICATION WITH THE KNOWN HANDWRITING --KNOWN FINGERPRINTS AND PALM PRINTS OF MACK ARTHUR KING SUBMITTED IN STATE'S EXHIBIT NO. 43 IN EVIDENCE?

A.      I DID.

Q.      DID YOU ARRIVE AT ANY CONCLUSIONS BASED ON YOUR COMPARISON OF THE PALM PRINTS AND FINGERPRINTS IN STATE'S EXHIBIT 24 FOR IDENTIFICATION WITH THE KNOWN PALM PRINTS AND FINGERPRINTS OF MACK ARTHUR KING?

A.      I DID.

Q.      AND WHAT ARE --WHAT ARE THOSE CONCLUSIONS?

A.      I FOUND THAT THE LATENT FINGERPRINT WHICH I FOUND ON AN ITEM CONTAINED WITHIN THAT BOX WAS MADE BY THE SAME FINGER WHICH MADE THE INKED FINGERPRINT APPEARING IN THE RIGHT INDEX FINGERPRINT BLOCK OF THE FINGERPRINT CARD BEARING THE NAME, MACK ARTHUR KING. I IDENTIFIED THE LATENT PALM PRINT OF VALUE AS HAVING BEEN MADE BY THE SAME PALM WHICH MADE THE INKED RIGHT HAND PALM PRINT BEARING THE NAME, MACK ARTHUR KING.

136                    SMITH/DE

MR. HOWARD:

    YOUR HONOR, AT THIS TIME WE WOULD MOVE TO
INTRODUCE INTO EVIDENCE STATE'S EXHIBIT 24 FOR IDENTIFICATION
AT THIS TIME.

THE COURT:

    ALL RIGHT, LET IT BE RECEIVED AND MARKED.

    (COURT REPORTER MARKS BOX CONTAINING PAPERS,
    MANILA FOLDERS, ETC., AS STATE'S EXHIBIT NO. 44
    IN EVIDENCE)

Box Containing Papers, Manila Folders, Etc.

State's Exhibit No. 44 - Evidence

Testimony of Ron Smith


To Be Forwarded Upon Request

Q          RON, I'LL ASK YOU WHETHER OR NOT YOU RECEIVED THE KNOWN FINGERPRINTS OF ONE, WILLIE PORTER?

A          THE BEST OF MY RECOLLECTION, YES, SIR, I DID.

Q          DID YOU MAKE ANY COMPARISONS OF THE FINGERPRINTS THAT YOU FOUND WITH WILLIE PORTER'S FINGERPRINTS THEY SUBMITTED TO YOU?

A          THOSE THAT REMAIN, YES, SIR, I DID.

Q          DID YOU FIND ANY FINGERPRINTS BELONGING TO ONE, WILLIE PORTER, BASED ON YOUR COMPARISONS?

A          NO, SIR.

MR. HOWARD:

          NOTHING FURTHER OF THIS WITNESS, YOUR HONOR.

THE COURT:

          YOU MAY CROSS-EXAMINE.

MR. SAMS:

          MAY I PICK UP AN EXHIBIT, YOUR HONOR.

THE COURT:

          YOU MAY.

                    CROSS-EXAMINATION

MR. SAMS:

Q          NOW, YOU STATE, MR. SMITH, THAT YOU MADE A COMPARISON OF WHAT YOU REFER TO AS THE LATENT PRINTS WITH THE KNOWN PRINTS, IS THAT CORRECT?

A          YES, SIR, THAT IS CORRECT.

Q          AND IS THAT A MICROSCOPIC EXAMINATION?

A          IT IS A MAGNIFIED EXAMINATION NOT MICROSCOPIC.

Q          NOW, WHEN YOU MAKE THAT EXAMINATION, JUST FOR US LAYMEN, WOULD --WE SAY THAT THE FINGERS, PALMS, AND PERHAPS THE BOTTOM OF THE FEET ARE COVERED WITH --WITH LINES, IS THAT CORRECT?

138                         SMITH/CE

A       WELL, RIDGES AND VALLEYS; THAT IS CORRECT.

Q       RIDGES AND VALLEYS, AND DO THEY TURN OR ARE THEY STRAIGHT?

A       WELL, THEY MAY RUN STRAIGHT FOR A SHORT DISTANCE, BUT THEY WILL EVENTUALLY TURN.

Q       ALL RIGHT, AND WHEN WE --WHEN IT TURNS WHAT IS THAT CALLED?

A       WELL, IT'S NOT REALLY GIVEN A NAME.

Q       I'VE HEARD SUCH EXPRESSION AS WHIRLS; DOES THE PALM PRINT OR THE FINGERPRINT CONTAIN A WHIRL?

A       THERE ARE DIFFERENT TYPES OF FINGERPRINT PATTERNS, ONE OF THOSE IS A WHIRL.

Q       NOW, WHAT OTHER TYPE OF FINGERPRINT PATTERNS WOULD WE FIND?

A       THERE ARE THREE MAJOR BREAKUPS; THE ARCHES OF WHICH THERE ARE TWO, THE PLAIN, AND THE TINTED ARCH; THE LOOPS OF WHICH THERE ARE TWO, THE RADIAL AND ULNAR LOOP; AND THE WHIRL CATEGORY WHICH THERE ARE FOUR BREAKUPS, AND THAT WOULD BE THE PLAIN WHIRL, THE DOUBLE LOOP TYPE WHIRL, CENTRAL POCKET TYPE WHIRL, AND AN ACCIDENTAL WHIRL.

Q       ALL RIGHT, NOW, THEN ON THE FINGERPRINT OF THE NORMAL PERSON WHICH YOU EXPLAINED HERE EARLIER, HOW MANY DIFFERENT CHARACTERISTICS WOULD THAT NORMAL PRINT CONTAIN?

A       AN INKED FINGERPRINT --

Q       YES, SIR.

A       --OR THE FINGER ITSELF?

Q       AN INKED FINGERPRINT?

A       WELL, IT WOULD DEPEND ON HOW WELL THE PRINT WAS TAKEN, BUT NORMALLY AN INKED FINGERPRINT WOULD RANGE SEVENTY-FIVE TO A HUNDRED AND TWENTY-FIVE INDIVIDUAL CHARACTERISTICS.

Q       SEVENTY-FIVE TO A HUNDRED AND TWENTY-FIVE?

139                              SMITH/CE

A        YES, SIR, IT WOULD NORMALLY FALL WITHIN THAT RANGE.

Q        AND THE PALM WOULD CONTAIN HOW MANY?

A        SEVERAL HUNDRED FOR A FULLY INKED PALM PRINT.

Q        NOW, WERE THE INKED PRINTS WHICH YOU GOT, WERE THEY
SUBSTANTIALLY, SHALL WE SAY, TAKEN FROM MACK ARTHUR KING IN A
WORKMANLIKE MANNER WHERE YOU COULD DETERMINE HOW MANY WHIRLS,
LOOPS OR WHATEVER WE CALL THIS SORT OF THING THAT HE ACTUALLY
HAD ON HIS HAND?

A        THERE WERE SUFFICIENT INK PRINTS TO CONDUCT THE
COMPARISONS; YES, SIR.

Q        AND HOW MANY --IF WE HAVE SAY SEVENTY-FIVE TO A
HUNDRED DIFFERENT CHARACTERISTICS ON THAT FINGERPRINT AND
PERHAPS A COUPLE OF HUNDRED ON THE PALM, HOW MANY DO YOU FIND
A SIMILARITY IN BEFORE YOU CONCLUDE THAT THIS IS THE FINGER-
PRINT OF MACK ARTHUR KING?

A        PERSONALLY OR WITHIN THE FIELD?

Q        WELL, BOTH?

A        WELL, PERSONALLY I REQUIRE AT LEAST SEVEN
IDENTIFYING CHARACTERISTICS BEFORE I WOULD DETERMINE THAT IT
WAS A POSITIVE IDENTIFICATION. THERE IS NO SET NUMBER WITHIN
THE FIELD. IT DEPENDS ON THE INDIVIDUAL EXAMINER AND THE
AGENCY THAT THEY ARE EMPLOYED WITH. IT WOULD NORMALLY RANGE
FROM --RANGE FROM SEVEN TO TWELVE, NORMALLY IN MOST AGENCIES.

Q        MOST AGENCIES REQUIRE SEVEN TO TWELVE, AND YOU ARE
PERSONALLY COMFORTABLE WITH SEVEN, IS THAT CORRECT?

A        IT DEPENDS UPON THE CLARITY OF THE INDIVIDUAL PRINT
IN QUESTION.

Q        ALL RIGHT, IN THIS CASE HOW MANY SIMILAR
CHARACTERISTICS DID YOU FIND?

A        IT --WOULD YOU LIKE FOR ME TO POINT THEM OUT EACH
AT --INDIVIDUALLY?

Q        NO, JUST --I JUST ASKED YOU HOW MANY IN NUMBER,
THE NUMERICAL AMOUNT?

A        TOTAL?

Q        YES.

A        WELL, THERE WERE NINE LATENT PRINTS WHICH I
IDENTIFIED AS MATCHING THE PRINT SUBMITTED AS THOSE OF MACK
ARTHUR KING. I --I BELIEVE THERE WERE --

Q        NO, YOU FAILED TO UNDERSTAND MY QUESTION. HOW
MANY SIMILARITIES DID YOU FIND BETWEEN THE LATENT FINGERPRINT
AND THE KNOWN FINGERPRINT?

A        WELL, THAT'S WHAT I WAS FIXING TO TOTAL OUT FOR
YOU. THERE WERE ABOUT A HUNDRED AND FORTY-EIGHT --IN EXCESS
OF A HUNDRED AND FORTY-EIGHT.

Q        AND THAT WAS OFF OF HOW MANY DIFFERENT FINGERS?

A        WELL, THAT'S NINE DIFFERENT PRINTS.

Q        NINE DIFFERENT PRINTS; AND THAT WOULD BE NINE PRINTS
OF THE FINGERS OR THE PALMS?

A        A COMBINATION OF BOTH.

Q        A COMBINATION OF BOTH. THANK YOU.

THE COURT:

         ANY RE-DIRECT?

MR. HOWARD:

         NO, YOUR HONOR.

                    JOE. ANDREWS, JR.,

         A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN
DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

                    DIRECT EXAMINATION

MR. HOWARD:

Q        WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY
WHAT YOUR NAME IS, PLEASE?

A        JOE E. ANDREWS, JR.

Q        AND WHAT DO YOU DO FOR A LIVING, JOE?

A        I'M EMPLOYED AS A FORENSIC SCIENTIST AT THE
MISSISSIPPI CRIME LAB IN JACKSON, MISSISSIPPI.

Q        AND HOW LONG HAVE YOU BEEN EMPLOYED WITH THE
MISSISSIPPI CRIME LAB?

A        JUST OVER THREE YEARS.

Q        JOE, WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE
JURY WHAT A FORENSIC SCIENTIST DOES?

A        A FORENSIC SCIENTIST EXAMINES EVIDENCE USING KNOWN
SCIEN --KNOWN AND ACCEPTED SCIENTIFIC TECHNIQUES, THE FINDINGS
OF WHICH TO BE USED IN A COURT OF LAW.

Q        I'LL ASK YOU IF THE FIELD OF FORENSIC SCIENCE ALSO
INCLUDES WHAT WE CALL SEROLOGY?

A        YES, SIR.

Q        WHAT IS SEROLOGY?

A        SEROLOGY DEALS WITH THE IDENTIFICATION AND
INDIVIDUALIZATION OF BODY FLUIDS USUALLY IN DRIED FORM.  THE
MAIN THREE WE DEAL WITH WOULD BE BLOOD, SEMINAL FLUID, AND
SALIVA.

Q        JOE, WOULD YOU GIVE THE COURT AND THE LADIES AND
GENTLEMEN OF THE JURY THE BACKGROUND OF YOUR EDUCATIONAL
EXPERIENCE AND BACKGROUND IN THIS FIELD?

A        I HAVE A BACHELOR OF SCIENCE DEGREE FROM THE
UNIVERSITY OF MISSISSIPPI IN FORENSIC SCIENCE.  AS PART OF
THAT DEGREE PROGRAM I SERVED A THREE MONTH INTERNSHIP AT THE
MISSISSIPPI CRIME LAB WORKING IN THE AREA OF SEROLOGY, HAIR
AND FIBER EXAMINATION, AND SEVERAL OTHER AREA OF CRIMINALISTICS.
I ALSO RECEIVED ON THE JOB TRAINING AT THE MISSISSIPPI CRIME
LAB AFTER I BECAME EMPLOYED THERE.

Q        AND HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT IN

142                    Andrews/DE

THE FIELD OF FORENSIC SCIENCE IN THE COURTS OF THIS STATE?

A          YES, SIR, I HAVE.

Q          ON APPROXIMATELY HOW MANY OCCASIONS?

A          TWENTY-FIVE.

MR. HOWARD:

          YOUR HONOR, WE'D TENDER THIS WITNESS AS AN EXPERT
IN THE FIELD OF FORENSIC SCIENCE.

THE COURT:

          ALL RIGHT, HE WILL BE ACCEPTED AS AN EXPERT IN THE
          FIELD.

Q          JOE, IN THE FIELD OF SEROLOGY WHICH IS A PART OF
BEING A FORENSIC SCIENTIST, WHAT TYPE OF EXAMINATIONS DO YOU
DO?

A          AS I SAID BEFORE WE EXAMINE FOR THE PRESENCE OF
BODY FLUIDS ON CLOTHING OR WEAPONS INVOLVED IN A CASE. THE
MAIN THREE BODY FLUIDS WE EXAMINE FOR WOULD BE BLOOD, SEMINAL
FLUID, AND SALIVA.

Q          AND WHAT KIND OF TESTS DO YOU PERFORM TO DETERMINE
THE PRESENCE OR ABSENCE AND THE TYPES OF THESE BODY FLUIDS?

A          AS FAR AS FOR BLOOD WE HAVE THREE DIFFERENT SERIES
OF TESTS WE RUN. WHEN WE GET A STAIN THAT IS SUSPECTED OF
BEING BLOOD, WE FIRST OF ALL TEST IT TO SEE IF IT ISN'T --IF
IT IS INDEED BLOOD. IF OUR TESTS ARE POSITIVE FOR THIS, THEN
WE TEST TO SEE IF THE.--FOR THE SPECIES OF THE BLOOD, WHETHER
IT IS HUMAN BLOOD OR SOME ANIMAL TYPE, AND THEN IF THERE IS
ENOUGH STAIN PRESENT WE WILL GO INTO TYPING TESTS TO DETERMINE
THE SPECIFIC TYPE OF THE BLOOD TO SEE IF WE CAN INDIVIDUALIZE
IT DOWN TO HAVING COME FROM A CERTAIN INDIVIDUAL.

MR. HOWARD:

          MAY I APPROACH THE WITNESS, YOUR HONOR?

143                    ANDREWS/DE

THE COURT:

You may.

Q       Joe, I am going to hand you what's been marked as State's Exhibit No. 31 in evidence which is a small box, and I'll ask you if you can identify that?

A       (Witness examines exhibit) Yes, sir, I can. The box has our Mississippi Crime Lab case No. 80-2035, our crime lab exhibit Number No. 34, and it has my initials on it.

Q       And what type of examinations did you perform with relation to that exhibit?

A       I examined this box for the presence of blood.

Q       And what type of chemical or other test did you use to determine whether blood was present or absent?

A       We have two tests that we use to determine for the presence of blood. The first test is what we call the screening test, and it is a color reaction test; a small sample of the stain is swabbed with a cotton swab and this is touched to a reagent strip, and if the reagent strip turns to a blue color this indicates the presence of blood. This is not a conclusive test, so the second test we do is called the Takayama test. The Takayama test is a crystalline test; a small portion of reagent is added to a suspected blood stain and this is allowed to sit under --on a microscope slide for a few minutes, and then it is examined under a microscope. If blood is present you will see the presence of small crystalline structures and this is a positive test for the presence of blood. No --no other substance will give this test.

Q       Did you perform those tests on what's been marked as State's Exhibit No. 31 in evidence?

A       Yes, sir, I did.

Q       And what conclusions did you draw from the results

144                              Andrews/DE

OF THESE TESTS, JOE?

A        MY TEST INDICATED THE PRESENCE OF HUMAN BLOOD ON THE BOX.

Q        AND IN WHAT LOCATIONS ON THIS BOX?

A        ONE OF THE LOCATIONS IS ON THIS CORNER OF THE BOX, AND THE OTHER IS ON THE INSIDE PORTION OF THE BOX.

Q        CAN YOU OPEN THAT UP THROUGH THAT PLASTIC, JOE, AND OPEN IT UP AND SHOW US WHERE THAT IS?

         (WITNESS OPENS PLASTIC BAG AND EXHIBITS BOX)

A        OKAY, THE OTHER AREA IS ON THIS EDGE OF THE BOX ON THE INSIDE.

Q        IT WAS BOTH ON THE OUTSIDE AND THE INSIDE YOU FOUND THE PRESENCE OF HUMAN BLOOD?

A        YES, SIR.

Q        JOE, I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT NO. 34 FOR IDENTIFICATION, AND I'LL ASK IF YOU WILL EXAMINE THAT AND TELL THE COURT AND THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY THE CONTENTS OF THAT SACK?

A        (WITNESS OPENS SACK AND REMOVES CONTENTS) YES, SIR, I CAN. THEY ALSO HAVE OUR MISSISSIPPI CRIME LAB CASE NO. 80-2035, OUR EXHIBIT NUMBER 36, AND MY INITIALS.

Q        AND WHAT TYPE OF EXAMINATIONS DID YOU PERFORM ON THOSE PARTICULAR ITEMS --ITEM OF CLOTHING?

A        I EXAMINED --I EXAMINED THESE PANTS FOR THE PRESENCE OF BLOOD.

Q        AND DID YOU PERFORM THE SAME TYPE OF TESTS THAT WERE PERFORMED ON THE OTHER EXHIBIT THAT YOU TESTIFIED ABOUT?

A        YES, SIR, I DID.

Q        WHAT CONCLUSIONS DID YOU DRAW FROM YOUR EXAMINATION OF THESE PANTS?

145                                    ANDREWS/DE

A        MY TESTS REVEALED THE PRESENCE OF HUMAN BLOOD ON
TWO SPOTS ON THE PANTS.

Q        COULD YOU SHOW THE --STAND UP AND SHOW THE LADIES
AND GENTLEMEN OF THE JURY WHERE YOU DREW THESE BLOOD SAMPLES
FROM THE PANTS?

A        (WITNESS STANDS AND EXHIBITS PANTS)  IF YOU'LL
NOTICE I HAVE TWO AREAS MARKED T-1 AND T-2.  THERE WAS A SPOT
HERE, A SPOT HERE, AND BOTH OF THESE SPOTS TESTED POSITIVE
FOR THE PRESENCE OF HUMAN BLOOD.

Q        THERE ARE SOME OTHER MARKINGS AND CUTS OUT ON THAT
PANTS; WHAT ARE THEY, JOE?

A        THIS AREA DOWN HERE WHICH IS MARKED WITH A C IS A
CONTROL AREA, AND THIS IS AN AREA THAT I CUT OUT AND TESTED TO
MAKE SURE THAT THERE WAS NOTHING IN THE MATERIAL ITSELF THAT
WOULD INTERFERE WITH MY TEST.

Q        OKAY, AND WAS THERE ANY SUCH THING?

A        NO, SIR, THAT --THAT TEST GAVE A NEGATIVE TEST FOR
THE PRESENCE OF BLOOD.

Q        BUT THE OTHER TWO AREAS OF THE TROUSERS WERE
POSITIVE FOR BLOOD?

A        YES, SIR.

Q        HUMAN --IS THAT HUMAN BLOOD?

A        YES, SIR.

MR. HOWARD:

         YOUR HONOR, AT THIS TIME WE WOULD TENDER THIS AS AN
EXHIBIT TO THIS WITNESS'S TESTIMONY.

THE COURT:

         THERE BEING NO OBJECTION, LET IT BE RECEIVED AND
         MARKED INTO EVIDENCE.

         (COURT REPORTER MARKS BAG CONTAINING PANTS OF
          DEFENDANT AS STATE'S EXHIBIT NO. 45 IN EVIDENCE)

Bag Containing Pants of Defendant

State's Exhibit No. 45 - Evidence

Testimony of Joe E. Andrews, Jr.


To Be Forwarded Upon Request

146                                    Andrews/DE

Q       Joe, when you test these items of cloth for the presence or absence of blood do you test the whole --the whole garment or portions that you clip from it?

A       I'm not quite sure I understand your question.

Q       What I'm asking you is: did you perform the test on the whole garment that has been marked State's Exhibit No. 45 in evidence?

A       No, sir, when we perform a test on a garment such as this, we first of all do a visual examination and we look for --for stained areas, and if there is a stain which appears like it might be blood, then we test those areas for blood.

Q       Okay. I'm going to hand you what's been marked as State's Exhibit 40 for identification, and I'll ask if you've ever seen that before?

A       Can I open it?

Q       Yes.

        (Witness opens plastic bag to examine contents)

A       Yes, sir, I have. It also has our Mississippi Crime Lab Case Number, our exhibit number, and my initials on it.

Q       And what type of tests and examinations did you perform on this particular object?

A       I also tested this object for the presence of blood.

Q       And I notice that you cut out pieces of areas on that item just like you did on the other item?

A       Yes, sir.

Q       Did --what were the results of your tests and examinations on what's been marked as State's Exhibit 40 for identification?

A       My tests revealed the presence of human blood of

147                    ANDREWS/DE

ABO BLOOD GROUP TYPE O ON THIS EXHIBIT.

MR. HOWARD:

        YOUR HONOR, WE'D TENDER THIS AS AN EXHIBIT TO THIS
WITNESS'S TESTIMONY AT THIS TIME.

THE COURT:

        LET IT BE RECEIVED AND MARKED.


        (COURT REPORTER MARKS PLASTIC BAG CONTAINING WHITE
        CLOTH FOUND IN BATHROOM OF VICTIM'S HOME AS
        STATE'S EXHIBIT NO. 46 IN EVIDENCE)

Plastic Bag Containing White Cloth Found in Bathroom of
Victim's Home

State's Exhibit No. 46 - Evidence

Testimony of Joe E. Andrews, Jr.


        To Be Forwarded Upon Request

148                                ANDREWS/DE

Q       JOE, I'LL HAND YOU WHAT'S BEEN MARKED AS STATE'S
EXHIBIT 41 FOR IDENTIFICATION, AND I'LL ASK YOU IF YOU'VE EVER
SEEN THAT BEFORE?

A       (WITNESS EXAMINES EXHIBIT)  YES, SIR, I HAVE.

Q       AND WHAT ARE THE CONTENTS OF THAT?

A       THIS CONTAINS TUBES OF BLOOD REMOVED FROM THE BODY
OF THE VICTIM.

Q       AND DID YOU PERFORM ANY TESTS OR EXAMINATIONS ON
THAT TO DETERMINE THE BLOOD GROUPING?

A       YES, SIR, THE BLOOD TYPE OF --OF ONE OF THE TUBES
IN THAT CAN WAS DETERMINED.

Q       AND WHAT IS THAT?

A       THE --ONE OF THE TUBES OF BLOOD WAS FOUND TO --TO
CONTAIN BLOOD OF ABO BLOOD GROUP TYPE O.

Q       IS THAT THE SAME TYPING THAT YOU WERE ABLE TO PERFORM
ON STATE'S EXHIBIT 46 INTO EVIDENCE THAT YOU'VE JUST SEEN?

A       YES, SIR.

Q       I'LL ASK YOU WHETHER OR NOT THERE WERE SUFFICIENT
QUANTITIES OF BLOOD THAT YOU RECOVERED AND COULD FIND ON
STATE'S EXHIBIT 31 INTO EVIDENCE TO PERFORM A BASIS AS TO GIVE
US THE BLOOD GROUP TYPE?

A       NO, SIR, THERE WAS NOT.

Q       WAS THERE SUFFICIENT BLOOD ON STATE'S EXHIBIT NO.
31 IN EVIDENCE TO TELL WHETHER OR NOT THE BLOOD WAS HUMAN OR
AN ANIMAL?

A       YES, SIR, THERE WAS.

Q       AND WAS IT HUMAN OR ANIMAL?

A       IT WAS FOUND TO BE HUMAN BLOOD.

Q       I'LL ASK YOU WHETHER OR NOT THERE WAS SUFFICIENT
BLOOD ON STATE'S EXHIBIT 45 THAT YOU WERE ABLE TO SNIP OUT AND
RECOVER FROM THE PANTS THAT CONTAINED BLOOD TO --TO BE ABLE TO

149                                    ANDREWS/DE

TYPE?

A          NO, SIR, THERE WAS NOT.

Q          WERE YOU ABLE TO TELL WHETHER IT WAS HUMAN BLOOD OR ANIMAL BLOOD ON THE PANTS MARKED STATE'S EXHIBIT 45 IN EVIDENCE?

A          YES, SIR, THE BLOOD ON THE PANTS WAS DETERMINED TO BE OF HUMAN ORIGIN.

MR. HOWARD:

          YOUR HONOR, AT THIS TIME WE WOULD TENDER WHAT'S BEEN MARKED AS STATE'S EXHIBIT 41 FOR IDENTIFICATION INTO EVIDENCE AT THIS TIME.

THE COURT:

          LET IT BE RECEIVED AND MARKED.


          (COURT REPORTER MARKS CONTAINER CONTAINING BLOOD
          SAMPLE OF VICTIM AS STATE'S EXHIBIT NO. 47 IN
          EVIDENCE)

Container Containing Blood Sample of Victim

State's Exhibit No. 47 - Evidence

Testimony of Joe E. Andrews, Jr.

To Be Forwarded Upon Request

150                                    ANDREWS/CE

THE COURT:

YOU MAY CROSS-EXAMINE.

CROSS-EXAMINATION

MR. SAMS:

Q        MR. ANDREWS, I TAKE IT THAT IN SUMMATION OF YOUR
TESTIMONY WE COULD CONCLUDE THAT ON ALL THE PLACES WHICH YOU
CUT OUT OF THE TROUSERS SUBMITTED TO YOU THAT THE ONLY THING
YOU CAN DETERMINE IS THAT IT'S HUMAN BLOOD, IS THAT CORRECT?

A        ON TWO --ON TWO OF THE PLACES WHERE I CUT OUT, YES,
SIR, THAT'S ALL I COULD DETERMINE WAS THAT THERE WAS HUMAN
BLOOD THERE.

Q        AND YOU CAN'T TELL THIS JURY THAT IT WAS THE BLOOD
OF THE DECEDENT OR THE BLOOD OF THE DEFENDANT, CAN YOU?

A        NO, SIR, I CANNOT.

Q        AND THE SAME IS TRUE LIKEWISE OF THE BOX EXHIBIT
WHICH YOU WERE SHOWN, IS THAT ALSO CORRECT?

A        YES, SIR, THAT'S CORRECT.

Q        NOW, YOU CAUSED TO BE MADE A CRIME REPORT, IS THAT
CORRECT?

A        YES, SIR.

Q        AND I BELIEVE ON AUGUST 18TH, 1980, YOU EXECUTED
AND DR. HUME APPARENTLY INITIALED THIS CRIME REPORT; I SHOULD
SAY DATED AUGUST 18TH AND AUGUST 21ST, IS THAT CORRECT, SIR?

A        I HAD ONE ON AUGUST THE 21ST.

Q        AND THE ---AND MR. SMITH HAD ONE ON AUGUST THE
18TH, IS THAT CORRECT?

A        I'M NOT SURE ABOUT MR. SMITH.

MR. SAMS:

MAY I APPROACH THE WITNESS?

THE COURT:

YOU MAY.

Q        I'M GOING TO ASK YOU TO EXAMINE THIS WHICH I'M
HANDING YOU CONSISTING OF A TWO PAGE INSTRUMENT, AND ASK YOU
IF YOU RECOGNIZE IT, SIR?

A        (WITNESS EXAMINES DOCUMENT)  YES, SIR, IT APPEARS
TO BE A COPY OF MY REPORT.

Q        IS --WOULD THAT --WOULD THAT REPORT BE FULL,
COMPLETE, ACCURATE, AND IS THAT AN ACCURATE REPRODUCTION OF
YOUR REPORT?

A        YES, SIR.

Q        WOULD IT EXPLAIN IN DEPTH THE --THE RESULTS OF YOUR
FINDINGS?

A        YES, SIR.

MR. SAMS:

         WE ASK THIS BE MARKED FOR IDENTIFICATION --NO, WE
JUST GO AHEAD AND OFFER IT INTO EVIDENCE AS AN EXHIBIT TO THIS
MAN'S TESTIMONY.

MR. HOWARD:

         IF HE'S GOT THE ORIGINAL OF HIS TEST ON HIM, YOUR
HONOR, I DON'T MIND THAT BEING INTRODUCED.

         HAVE YOU GOT IT WITH YOU, JOE?

MR. ANDREWS:

         NO, I DON'T HAVE MY ORIGINAL WITH ME.

MR. HOWARD:

         I DON'T OBJECT TO HIM INTRODUCING A COPY IF THAT'S--
IS THAT YOUR ENTIRE REPORT?

MR. ANDREWS:

         YES, SIR, IT'S --IT'S BOTH PAGES OF THE REPORT.

MR. HOWARD:

         NO OBJECTION.

THE COURT:

         ALL RIGHT, LET IT BE RECEIVED AND MARKED INTO