152                                                  ANDREWS/CE

EVIDENCE.

Q       ALL RIGHT, NOW, I NOTICE ALSO --

THE COURT:

        JUST A MINUTE, MR. SAMS.

MR. SAMS:

        I'M SORRY.

        (COURT REPORTER MARKS COPY OF CRIME LAB REPORT AS
        DEFENDANT'S EXHIBIT NO. 48 IN EVIDENCE)

241

SUSPECT: SISSON, KEVIN
VICTIM: PATTERSON, LELA H.

MISSISSIPPI CRIME LAB
P. O. Box 5008
Jackson, MS 39216

Case No. 80-2035
Page No. One

August 21, 1980

EXAMINATIONS: Macroscopic, microscopic and chemcial

RESULTS:

The blood in exhibit 2A was determined to be of ABO Blood Group Type O.

The blood in exhibit 44A was determined to be of ABO Blood Group Type B.

Serological tests revealed the presence of human blood of ABO Blood Group Type O on the cloth, exhibit 15.

Serological tests revealed the presence of human blood on the box, exhibit 34 and on the pants, exhibit 36. The blood on exhibits 34 and 36 was in an amount insufficient for further serological tests.

Serological tests did not reveal the presence of blood on the shirt, exhibit 37, nor on the shoes, exhibit 38.

Head hairs of caucasian origin were removed from exhibits 1, 11, 13, 14, 17, 18, 19, 20, 24, and 25 which exhibit the same microscopic characteristics as the hairs in the known head hair samples, exhibits 4 and 5, and came from that individual or another individual of the same race whose head hairs exhibit the same microscopic characteristics.

Head hairs of caucasian origin were removed from exhibits 14 and 35 which do not exhibit the same microscopic characteristics as the hairs in the known head hair samples, exhibits 4 and 5, nor the known head hair sample, exhibit 26B.

Pubic hairs of caucasian origin were removed from exhibit 1 and exhibit 14. samples of known pubic hair were submitted for comparison.

Limb hairs and pubic hairs of negroid origin were removed from the socks, exhibit 35. No samples of known pubic hair were submitted for comparison.

Fragments of head hair of negroid origin were removed from the shirt, exhibit 37. The negroid hairs from exhibit 37 are unsuitable for comparison purpose.

No hairs were observed to be present on exhibits 3, 7, nor 36.

White acrylic fibers were removed from exhibit 16.

White cotton fibers and one blue cotton fiber were removed from the fingernail clippings, exhibit 3.

No transfer of textile fibers was detected between exhibits 1 and 20 and exhibits 35, 36, 37, and 38.

No textile fibers were observed to be present in the bags, exhibit 7.

It should be noted that hair comparisons do not constitute a basis for positive personal identification.

IS-24 (8-76)

DEFENDANT'S EXHIBIT 48 12-4-80 EVIDENCE

Defendant's Exhibit No. 48 - Evidence /s/KHB 12-4-80 Page 1

242

SPECT: SISSON, KEVIN
ICTIM: PATTERSON, LELA H.

MISSISSIPPI CRIME LAB
P. O. Box 5008
Jackson, MS  39216

Case No. 80-2035
Page No. Two

August 21, 1980

RESULTS: This evidence will be retained.

JOE E. ANDREWS, JR., FORENSIC SCIENTIST

DR. ARTHUR S. HUME, DIRECTOR

ln

15-24  (8-76)

Defendant's Exhibit No. 48 - Evidence /s/KHB  12-4-80 Page 2

243

153                                    ANDREWS/CE

MR. MONTGOMERY:

Your Honor, we're --we're going to object --

THE COURT:

Just a minute, she's not through marking the exhibit yet.

MR. MONTGOMERY:

We would object to the reports of Mr. Smith and Dr. Hume. We do not object to his report, and his findings about the blood and any other test that he conducted, but we would object to any tests that any other person at the crime lab --

MR. SAMS:

That --that's all the --

THE COURT:

He hadn't offered anything --

MR. MONTGOMERY:

Could we see what he's going to introduce.

THE COURT:

Yes.

MR. SAMS:

It's what you gave me.

(Exhibit examined by District Attorney)

MR. MONTGOMERY:

I have no objection to that.

MR. SAMS:

I've got no further questions of this witness at this time.

THE COURT:

Any re-direct?

MR. HOWARD:

Just a few questions, your Honor.

154        ANDREWS/RDE

### RE-DIRECT EXAMINATION

BY. HOWARD:

Q    JOE, YOU DID A LOT OF OTHER TESTS ON ALL OF THE ITEMS THAT WERE SUBMITTED TO YOU DOWN AT THE CRIME LAB, DIDN'T YOU?

A    YES, SIR, I DID.

Q    DID THAT INCLUDE HAIR AND FIBER EXAMINATIONS ON ITEMS THAT WERE SUBMITTED TO YOU?

A    YES, SIR, IT DID.

Q    YOU DON'T KNOW WHERE THESE HAIRS AND FIBERS CAME FROM, DO YOU, OR ANYTHING ABOUT THEM?

A    NO, SIR, I DO NOT.

Q    AND THEY'RE ALSO CONTAINED IN --IN THIS REPORT, IS THAT CORRECT?

A    YES, SIR, THAT'S CORRECT.

Q    OKAY, DID YOU EXAMINE EVERYTHING THAT THE LAW ENFORCEMENT OFFICERS SUBMITTED TO YOU FOR EXAMINATION?

A    YES, SIR, FOR THE --I BELIEVE SO; I'M NOT EXACTLY SURE.

Q    THEN A LOT OF THE ITEMS THAT ARE SUBMITTED HERE ON THIS PARTICULAR REPORT DOESN'T HAVE ANYTHING TO DO WITH THIS PARTICULAR CASE OR IS NOT RELEVANT INSOFAR AS YOUR FINDINGS, IS THAT CORRECT?

A    YES, SIR, THAT'S CORRECT.

Q    AND YOU DON'T KNOW WHERE ANY OF THESE ITEMS WERE OBTAINED OR WHY THEY WERE GOTTEN, DO YOU?

A    NO, SIR, I DO NOT.

Q    JOE, WOULD IT BE UNUSUAL FOR YOU TO HAVE A LOT OF ITEMS --ITEMS IN A PARTICULAR CASE SUBMITTED TO YOU AND NOT-- THEY NOT BE OR TURN OUT OF VALUE?

A    NO, SIR, IT WOULD NOT BE UNUSUAL.

155

MR. HOWARD:

> NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:

> ALL RIGHT, MAY THIS WITNESS BE FINALLY EXCUSED?

MR. HOWARD:

> YES, SIR.

MR. SAMS:

> YES, SIR.

THE COURT:

> YOU MAY BE FINALLY EXCUSED.

> YOU MAY CALL YOUR NEXT WITNESS.

MR. HOWARD:

> BARBARA JORDAN.

MR. MONTGOMERY:

> WE WOULD LIKE TO HAVE ABOUT A TEN MINUTE RECESS IF
WE COULD; WE'VE BEEN HERE ABOUT AN HOUR I BELIEVE. THIS
WITNESS MAY TAKE AWHILE.

THE COURT:

> ALL RIGHT, WE'LL TAKE A SHORT RECESS. JUST PUT HER
> BACK IN THE WITNESS ROOM; WE'RE GOING TO HAVE A
> TEN MINUTE RECESS. BAILIFF, SHOW THE JURY OUT.

> (JURY OUT)

MR. HOWARD:

> YOUR HONOR, MAY WE APPROACH THE BENCH?

THE COURT:

> YOU MAY.

> (BENCH CONFERENCE)

> (RECESS)

> FOLLOWING A TEN MINUTE RECESS, THE JURY RETURNED TO
THE COURTROOM, AND ALL MEMBERS OF THE COURT, INCLUDING THE

156          T. PATTERSON, JR./DE

JUDGE, COURT REPORTER, ATTORNEYS, CLERK, BAILIFFS, AND THE
DEFENDANT BEING PRESENT, THE FOLLOWING PROCEEDINGS WERE HAD:

(JURY IN)

TROY PATTERSON, JR.,

A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN
DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

MR. HOWARD:

Q          WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY
WHAT YOUR NAME IS, PLEASE?

A          TROY B. PATTERSON, JR.

Q          AND WHERE DO YOU LIVE, MR. PATTERSON?

A          AUBURN, ALABAMA.

Q          I'LL ASK YOU WHETHER OR NOT YOU WERE RELATED BY
BLOOD OR MARRIAGE TO LELA PATTERSON?

A          I'M HER SON.

MR. HOWARD:

          MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

          YOU MAY.

Q          TROY, I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS
STATE'S EXHIBIT 28 INTO EVIDENCE, AND I'LL ASK YOU IF YOU
WOULD TO EXAMINE THAT AND TELL THE LADIES AND GENTLEMEN OF THE
JURY WHETHER YOU CAN IDENTIFY THAT OBJECT?

A          (WITNESS EXAMINES EXHIBIT)  YES, THIS IS A 410
SINGLE SHOT SHOTGUN THAT BELONGED TO MY FATHER.

Q          AND WHERE WAS THIS GUN LOCATED AND KEPT?

A          IN THE HALLWAY BETWEEN THE DINING ROOM AND THE
BATHROOM, TO THE LEFT IF YOU --AS YOU GO FROM THE DINING ROOM
TO THE BATHROOM, ON THE WALL; IT WAS NAILS ON THE WALL.

157                    T. Patterson, Jr./DE

Q        At whose residence was it kept?

A        My mother's.

Q        That's Mrs. Lela Patterson?

A        Yes.

Q        I'm going to hand you what's been marked as State's Exhibit 29 into evidence, and I'll ask if you can identify that?

A        (Witness examines exhibit) Yes, this is a 22 rifle single shot. I gave this to my father.

Q        Do you know where that weapon or where that firearm was kept?

A        At the same place as the other one.

Q        And that is in the residence of your mother here in Lowndes County, Mississippi?

A        Yes.

Q        Mr. Patterson, I'm going to hand you one of the items contained in what's been marked as State's Exhibit 30 in evidence, and I'll ask if you'll examine those items, and tell the ladies and gentlemen of the jury whether you, yourself, can identify any of those items contained in that package?

A        I can identify this watch right here.

Q        Okay, and where was that watch kept and located?

A        My daddy used to keep it in the --in his trunk which was in the hall next to the deep freeze.

Q        Okay, and in what residence was that located?

A        My mother's residence.

Q        And that's here in Columbus, Mississippi, the residence of --

A        Right.

Q        --Mrs. Lela Patterson?

A        Right.

158                    J. ANDERSON/DE

MR. HOWARD:

      NOTHING FURTHER OF THIS WITNESS, YOUR HONOR.

THE COURT:

      YOU MAY CROSS-EXAMINE.

MR. SAMS:

      NO QUESTIONS OF THIS WITNESS.

THE COURT:

      YOU MAY STEP DOWN; YOU MAY CALL YOUR NEXT WITNESS.

MR. HOWARD:

      JANE ANDERSON, YOUR HONOR; THIS WITNESS HAS PREVIOUSLY TESTIFIED; I'D ASK THE COURT'S PERMISSION TO RECALL HER AT THIS TIME.

JANE ANDERSON,

      A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

MR. HOWARD:

Q      MRS. ANDERSON, YOU ARE THE SAME JANE ANDERSON WHO HAS PREVIOUSLY TESTIFIED IN THIS CAUSE, IS THAT RIGHT?

A      YES, SIR.

Q      AND YOUR MOTHER WAS MRS. LELA PATTERSON, IS THAT CORRECT?

A      YES, SIR.

Q      MRS. ANDERSON, I'M GOING TO HAND YOU SOME ITEMS THAT HAVE BEEN MARKED AS STATE'S EXHIBIT 27 IN EVIDENCE, AND I'LL ASK IF YOU WILL LOOK AT EACH OF THOSE ITEMS, ONE AT A TIME, AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY THOSE ITEMS, PLEASE.

A      (WITNESS EXAMINES EXHIBIT)  YOU WANT ME TO TELL ABOUT EACH ONE?

Q        CAN YOU IDENTIFY EACH ONE, ONE BY ONE, IF YOU WOULD, PLEASE?

A        YES, SIR, THIS WAS MY MOTHER'S KNIFE.

Q        THE SMALL POCKET KNIFE?

A        YES, SIR.

Q        AND WHERE WAS IT GENERALLY KEPT?

A        IN HER PURSE.

Q        AND WHAT IS THE NEXT ITEM THAT YOU HAVE?

A        OKAY, THIS WAS A --MY FATHER'S COIN LIKE THING; HE KEPT IT IN A WOODEN BOX ON THE MANTLE IN THE DINING ROOM.

Q        AND AT --DINING ROOM OF WHAT RESIDENCE?

A        OF MY MOTHER'S HOUSE.

Q        MRS. LELA PATTERSON HERE IN LOWNDES COUNTY, MISSISSIPPI?

A        YES, SIR.

Q        DO YOU SEE ANY OTHER ITEMS YOU CAN IDENTIFY, PLEASE, MA'AM?

A        OKAY, THESE KEYS WERE KEPT UP ON A LITTLE WHAT-NOT STAND UP ABOVE THE TELEPHONE IN THE DINING AREA.

Q        OF YOUR MOTHER'S RESIDENCE?

A        MY MOTHER'S HOUSE; YES, SIR.

Q        WHAT OTHER ITEMS DO YOU HAVE?

A        OKAY, THIS WAS A NECKLACE; THIS IS MY MOTHER'S NECKLACE; SHE WORE IT ALL THE TIME.

Q        OKAY, AND YOU CAN IDENTIFY THAT?

A        YES, I CAN. MY SISTER --MY OLDEST SISTER GAVE IT TO HER.

Q        AND SHE WORE THAT ALL THE TIME?

A        YES, SIR.

Q        CAN YOU IDENTIFY THAT PEN?

A        AND SHE HAD ONE LIKE THIS IN HER PURSE.

160                          J. ANDERSON/DE

Q        YOU HAVE IDENTIFIED ALL THE ITEMS CONTAINED IN THE COMPOSITE EXHIBIT NO. 27 IN EVIDENCE, IS THAT CORRECT?

A        YES, SIR.

Q        JANE, I'M GOING TO HAND YOU ANOTHER OBJECT THAT'S BEEN MARKED AS STATE'S EXHIBIT NO. 8 INTO EVIDENCE, AND I'LL ASK IF YOU WOULD LOOK AT THAT AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY IT?

A        (WITNESS EXAMINES EXHIBIT) THIS WAS MY MOTHER'S WATCH.

Q        THAT IS MRS. LELA PATTERSON?

A        YES, SIR.

Q        AND DO YOU KNOW WHERE SHE GENERALLY KEPT THAT WATCH?

A        ON HER ARM, BUT SHE WOULD HAVE PUT IT UP IN A -- THEY HAD A CORNER CABINET --CHINA CABINET IN HER DINING ROOM, AND IT STAYED UP THERE MOST OF THE TIME UNLESS SHE WAS GOING OUT.

Q        I'M GOING TO ASK IF YOU WOULD TO LOOK AT THE ITEMS CONTAINED IN COMPOSITE EXHIBIT NO. 26 INTO EVIDENCE, AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHETHER YOU CAN IDENTIFY ANY OF THOSE ITEMS, PLEASE, MA'AM.

A        (WITNESS EXAMINES EXHIBIT) THESE WERE HER SCARVES.

Q        YOUR MOTHER'S SCARVES?

A        YES, SIR, SHE KEPT THESE IN A CLOSET IN THE DINING AREA.

Q        AND THAT WOULD HAVE BEEN AT HER RESIDENCE --

A        YES, SIR.

Q        --HERE IN LOWNDES COUNTY? DO YOU SEE ANY OTHER ITEMS YOU RECOGNIZE IN THAT?

A        SHE HAD SOME PINK BED CLOTHES.

Q        YOU CAN'T TELL WHETHER THAT'S A PARTICULAR ONE THAT

CAME FROM HER HOUSE OR NOT?

A          NO, SIR, BUT SHE DID HAVE SOME.

Q          DO YOU SEE ANY OTHER ITEMS THAT YOU CAN POSITIVELY
IDENTIFY?

A          YES, SIR, THESE --THIS WAS SOME OF HER JEWELRY.

Q          OKAY, THE SMALL --

A          IT'S AN OPAL NECKLACE IN HERE, AND A --ALSO A GOLD
NECK CHAIN.

Q          AND THAT BELONGED TO YOUR MOTHER?

A          YES, SIR, IT DID.

Q          SHE --DID SHE KEEP THAT AT HER RESIDENCE HERE IN
LOWNDES COUNTY, MISSISSIPPI?

A          YES, SIR, SHE DID.

Q          WHAT ABOUT THE SILVERWARE IN THE --

A          OKAY, THIS WAS HER STAINLESS STEEL.

Q          DID THAT BELONG TO YOUR MOTHER?

A          YES, IT DID.

Q          WHERE WAS THAT KEPT?

A          IN THE KITCHEN CABINET.

Q          AT HER RESIDENCE HERE IN LOWNDES COUNTY,
MISSISSIPPI?

A          YES, SIR.

Q          ARE THERE ANY OTHER ITEMS IN THERE YOU CAN
RECOGNIZE OR IDENTIFY?

A          THIS BELONGED --MY FATHER HAD A LIGHTER LIKE THIS,
AND --

Q          LIKE THE ONE YOU'RE HOLDING IN YOUR HAND?

A          YES, SIR.

Q          AND YOU CAN IDENTIFY THAT?

A          YES, SIR.

Q          DO YOU KNOW WHERE THAT WAS KEPT IN THE HOUSE?

162        ANDERSON/DE

A      IT WAS IN THE LITTLE WOODEN BOX ON THE MANTLE.

Q      DO YOU SEE ANY OTHER ITEMS THAT YOU, YOURSELF, CAN IDENTIFY OR RECOGNIZE IN THAT BOX?

A      I KNOW THIS PERFUME; I'M NOT FAMILIAR WITH THIS ONE.

Q      WOULD YOU SHOW US WHICH ONE YOU'RE SPEAKING ABOUT WHERE WE CAN TELL, AND SO THE JURY CAN SEE IT?

A      (WITNESS HOLDS UP BOTTLE)  SHE HAD THIS ON THE MANTLE, AND IT'S AVON PERFUME.

Q      THE AVON PERFUME?

A      YES, SIR, AND I'M NOT FAMILIAR WITH THAT ONE.

Q      THE CHRISTIAN DIOR YOU DON'T --YOU'RE NOT FAMILIAR WITH THAT ONE?

A      NO, SIR.

Q      I'M GOING TO HAND YOU WHAT'S BEEN MARKED STATE'S EXHIBIT NO. 23 FOR IDENTIFICATION, AND I'LL ASK WHETHER OR NOT YOU CAN IDENTIFY THAT?

A      CAN I TAKE IT OUT?

Q      YES, MA'AM.

A      (WITNESS OPENS BAG AND REMOVES BOX)  THIS --THIS IS A METAL BOX THAT BELONGED TO MY FATHER, AND HE HAD IT IN A TRUNK, AND HE KEPT THE TRUNK IN THE HALL.

Q      AND AT WHAT RESIDENCE?

A      AT MY MOTHER'S HOUSE IN LOWNDES COUNTY.

Q      OKAY, AND THAT WOULD HAVE BEEN THE RESIDENCE OF MRS. LELA PATTERSON HERE IN LOWNDES COUNTY, MISSISSIPPI?

A      YES, SIR.

MR. HOWARD:

      YOUR HONOR, I DON'T BELIEVE THIS HAS BEEN FORMERLY INTRODUCED, AND I WOULD TENDER IT AS AN EXHIBIT TO THIS WITNESS'S TESTIMONY AT THIS TIME.

163                    J. ANDERSON/DE

THE COURT:

LET IT BE RECEIVED AND MARKED INTO EVIDENCE.


(COURT REPORTER MARKS PAPER BAG CONTAINING GRAY
METAL BOX AS STATE'S EXHIBIT NO. 49 IN EVIDENCE)

Paper Bag Containing Gray Metal Box

State's Exhibit No. 49 - Evidence

Testimony of Troy Patterson, Jr.


To Be Forwarded Upon Request

164                              J. ANDERSON/DE

Q        JANE, I'M GOING TO HAND YOU WHAT'S BEEN --A BOX --
OR OF A COMPOSITE EXHIBIT, AND WHAT IS CONTAINED STATE'S
EXHIBIT 30 INTO EVIDENCE, AND I'LL ASK IF YOU WILL LOOK AT THE
ITEMS IN THAT BOX, AND TELL THE LADIES AND GENTLEMEN OF THE
JURY WHETHER OR NOT YOU CAN IDENTIFY THOSE ITEMS?

A        (WITNESS EXAMINES CONTENTS OF BOX)  I CANNOT
IDENTIFY THE WATCHES NOR THIS BOX.  THIS WAS MY MOTHER'S.

Q        THAT'S AN ITEM OF JEWELRY?

A        YES, SIR.  ALL THIS WAS HERS.

Q        THAT'S ASSORTED JEWELRY THAT WAS FOUND IN THE WOODS,
IS THAT THE WAY IT'S LABELED?

A        YES, SIR.  I'M NOT FAMILIAR WITH THE GUN SHOT --

Q        THE SHOT GUN SHELL?

A        NO, SIR.  THIS WAS HERS AND I DON'T KNOW ABOUT
THIS.

Q        THE BROACH THAT YOU'RE SPEAKING ABOUT IN THAT
JEWELRY?

A        YES, SIR.  I'M NOT FAMILIAR WITH THAT PIN.

Q        DO YOU SEE ANYTHING ELSE IN THE BOX --

A        NO, SIR, I DON'T --YES, SIR.  OKAY, THIS WAS MY
MOTHER'S NECKLACE; IT'S TWO NECKLACES IN THIS, AND THIS WAS
HER RING --BOTH OF THESE RINGS.

Q        YOUR MOTHER'S RINGS?

A        YES, SIR.

Q        WHERE DID SHE KEEP THESE ITEMS OF JEWELRY ALONG
WITH THOSE RINGS?

A        UP IN THE CHINA CABINET --IN THE CORNER CABINET IN
THE DINING AREA.

Q        AT HER RESIDENCE?

A        YES, SIR.

Q        WHAT ABOUT THE OTHER ITEMS?

A      THIS IS ALL HER JEWELRY; THIS PIN HAS THE FIVE CHILDREN'S NAME --HER FIVE CHILDREN'S NAME ON IT.

Q      IS YOUR NAME INCLUDED AMONG THOSE?

A      YES, SIR.

Q      AND THAT BELONGED TO YOUR MOTHER?

A      YES, SIR.

MR. HOWARD:

     NOTHING FURTHER OF THIS WITNESS, YOUR HONOR.

THE COURT:

     YOU MAY CROSS-EXAMINE.

CROSS-EXAMINATION

MR. SAMS:

Q      MRS. ANDERSON?

A      UH-HUH.

Q      MOST OF THE ITEMS WHICH YOU HAVE IDENTIFIED HAVE BEEN THOSE OF JEWELRY AND PERSONAL EFFECTS, IS THAT NOT TRUE?

A      YES, SIR.

Q      AND NONE OF THESE WOULD BE CUSTOMARILY WORN BY YOUR MOTHER WHEN SHE HAD ON A NIGHT GOWN AND WAS PREPARING TO GO TO BED, WOULD THEY?

A      SHE WORE THE LITTLE GREEN NECKLACE WITH THE GREEN LITTLE JADE BEADS ALL THE TIME; SHE DIDN'T PULL IT OFF, AND ALSO ANOTHER GOLD NECKLACE CHAIN, JUST --

Q      ALL RIGHT, ·BUT I'M TALKING ABOUT, YOU KNOW, THE -- THE BRACELETS AND THOSE SORT OF THINGS WOULD NOT BE CUSTOMARILY WORN BY A LADY WHEN SHE WAS GOING TO BED, WOULD THEY?

A      NO, SIR.

MR. SAMS:

     NO FURTHER QUESTIONS; THANK YOU.

166

THE COURT:

    ANY RE-DIRECT?

MR. HOWARD:

    NO, YOUR HONOR, AND I DON'T ANTICIPATE CALLING ANY MORE WITNESSES AT THIS TIME, YOUR HONOR.

THE COURT:

    YOU MAY STEP DOWN, MRS. ANDERSON.

    MEMBERS OF THE JURY, BY GOING THIS LATE TONIGHT I ANTICIPATE WE WILL GET THROUGH TOMORROW. THIS IS A CAPITAL CASE, AND THE LAW REQUIRES THAT YOU BE SEQUESTERED. THE BAILIFFS WILL CARRY YOU OUT FOR YOUR EVENING MEAL, AND THEN TO YOUR MOTEL ROOM. IF YOU NEED THE BAILIFFS TO CALL ANYBODY TO NOTIFY THEM, I'LL LET YOU GO BACK IN THE JURY ROOM AT THIS TIME AND WRITE DOWN THE NUMBER YOU WANT CALLED. NOW, DO NOT DISCUSS THIS CASE WITH ANYONE, PERMIT ANYONE TO DISCUSS IT WITH YOU OR IN YOUR PRESENCE. DO NOT DISCUSS IT AMONG YOURSELVES; DO NOT LOOK AT ANY NEWSPAPER REPORT OF THE CASE OR IF ANYTHING COMES ON THE TV ABOUT IT, CUT IT OFF OR LEAVE THE ROOM, OR THE RADIO, AND THE BAILIFFS WILL HAVE YOU BACK UP HERE SO WE CAN START PROMPTY AT NINE O'CLOCK IN THE MORNING, AND I ANTICIPATE WE SHOULD GET THROUGH RATHER EARLY TOMORROW, SO I'LL ASK YOU TO GO INTO YOUR ROOM NOW, AND AS SOON AS YOU'RE READY THE BAILIFFS WILL CARRY YOU OUT. WRITE ANY MESSAGES YOU MIGHT HAVE AT THIS TIME, AND WE'LL TAKE CARE OF THOSE RIGHT NOW.

        (JURY OUT)

THE COURT:

    COURT WILL BE IN RECESS UNTIL NINE O'CLOCK IN THE MORNING.

167

FRIDAY, DECEMBER 5, 1980, ALL MEMBERS OF THE COURT, INCLUDING THE JUDGE, COURT REPORTER, ATTORNEYS, CLERK, BAILIFFS, AND DEFENDANT BEING PRESENT, THE FOLLOWING PROCEEDINGS WERE HAD PRIOR TO THE JURY RETURNING TO THE COURTROOM:

MR. SAMS:

COMES NOW THE DEFENDANT, AND MOVES THAT THE JUROR, MARY CASTLEBURY HOLLEY, BE EXCUSED AT THIS TIME AND ALTERNATE NO. 1 MOVED INTO THE JURY, AND IN SUPPORT THEREOF WOULD SHOW THAT DURING THE VOIR DIRE OF THE JURY IN THIS CAUSE THAT THIS COUNSEL ASKED THE PANEL IF ANY OF THEM WERE RELATED BY BLOOD OR MARRIAGE TO ANY MEMBER OF LAW ENFORCEMENT AT THIS TIME OR IN THE PAST IN ORDER THAT ANY AFFILIATION MIGHT BE ASCERTAINED FOR THE USE --COUNSEL'S USE IN EXERCISING PEREMPTORY INSTRUCTIONS OR CHALLENGES, I'M SORRY. THE DEFENDANT RESPECTFULLY WOULD SHOW THAT THIS PARTICULAR JUROR DID NOT RAISE HER HAND, AND THAT THEREBY PREJUDICING THIS DEFENDANT IN THE EXERCISE OF HIS PEREMPTORY CHALLENGES. FURTHER, THE DEFENDANT WOULD SHOW THAT THIS JUROR, ACCORDING TO HIS BEST INFORMATION AND BELIEF, IS THE FORMER WIFE OF ONE, JIMMY COVINGTON, A DEPUTY SHERIFF AT THIS TIME, AND FOR A CONSIDERABLE NUMBER OF YEARS IN THE PAST OF THE LOWNDES COUNTY SHERIFF'S OFFICE.

ADDITIONALLY, THIS JUROR'S FATHER, ELTON CASTLEBURY, IS A DEFENDANT IN A LAWSUIT BETWEEN HE AND ONE, G. B. GREEN, SR., NOW PENDING IN THE SUPREME COURT OF THE STATE OF MISSISSIPPI WHEREIN DEFENDANT'S COUNSEL REPRESENTS THE SAID G. B. GREEN, SR.

THIS CONCLUDES OUR MOTION, SIR.

THE COURT:

DOES THE STATE HAVE ANYTHING THEY WANT TO SAY ON

THE MOTION BEFORE YOU CALL THE JUROR OUT?

MR. MONTGOMERY:

YOUR HONOR, WE'D --FIRST, WE'VE BEEN ADVISED OF THIS MOTION, AND I'D LIKE TO TALK TO MR. COVINGTON, AND MAYBE PUT HIM ON, AND SEE IF SHE --WHEN HE WAS MARRIED TO THIS JUROR WHETHER OR NOT HE WAS IN LAW ENFORCEMENT OR WHETHER WE CAN --

THE COURT:

ONE OF YOU BAILIFFS GO DOWN AND TAKE HIS PLACE UNTIL HE CAN COME UP HERE AND TESTIFY.

JIMMY COVINGTON,

DEPUTY SHERIFF, HAVING BEEN DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

MR. HOWARD:

Q        WOULD YOU STATE YOUR NAME FOR THE RECORD, PLEASE?

A        JIMMY L. COVINGTON.

Q        WHAT IS YOUR JOB OR OCCUPATION, JIMMY?

A        I'M A SERGEANT WITH THE LOWNDES COUNTY SHERIFF'S DEPARTMENT.

Q        AND FOR HOW LONG HAVE YOU BEEN EMPLOYED WITH THE SHERIFF'S DEPARTMENT?

A        A LITTLE OVER FOUR YEARS.

Q        AND HOW LONG HAVE YOU BEEN IN LAW ENFORCEMENT OVER ALL?

A        A LITTLE OVER FOUR YEARS.

Q        THE WHOLE TIME YOU'VE BEEN WITH THE LOWNDES COUNTY SHERIFF'S DEPARTMENT IS THE ONLY TIME YOU'VE BEEN IN LAW ENFORCEMENT?

A        YES, SIR.

Q       JIMMY, DO YOU KNOW A MARY CASTLEBURY HOLLEY?

A       YES, SIR, I DO.

Q       AND IS SHE RELATED BY BLOOD OR MARRIAGE TO YOU?

A       NO, SIR.

Q       WAS SHE AT ONE TIME?

A       YES, SIR, AT ONE TIME SHE WAS MY WIFE; WE ARE
DIVORCED.

Q       AND HOW LONG AGO WAS IT YOU WERE DIVORCED?

A       A LITTLE OVER FIVE YEARS AGO.

Q       WERE --WERE YOU EVER AFFILIATED OR ASSOCIATED WITH
LAW ENFORCEMENT IN ANYWAY WHILE YOU WERE MARRIED TO MARY
CASTLEBURY HOLLEY?

A       ABOUT THREE MONTHS I WAS ON THE AUXILIARY --NO, I
WAS ON THE MOUNTED PATROL WITH SHERIFF M. C. EDWARDS, BUT
NOTHING SINCE THEN.

Q       YOU WEREN'T A DEPUTY SHERIFF --

A       NO, SIR.

Q       --OR ANYTHING?

A       NO, SIR, I WAS NOT SWORN IN; I WAS JUST ON THE
MOUNTED PATROL WAS ALL.

Q       ARE YOU A WITNESS IN THE CASE OF THE STATE OF
MISSISSIPPI VERSUS MACK ARTHUR KING?

A       NO, SIR, I AM NOT.

Q       DO YOU KNOW ANYTHING ABOUT THE FACTS CONCERNING THE
CASE OR ANYTHING ABOUT IT?

A       NO, SIR, I DON'T.

Q       WHAT ARE YOUR DUTIES WITH THE SHERIFF'S DEPARTMENT
NOW?

A       I'M IN CHARGE OF CIVIL PROCESS, AND IN CHARGE OF
THE COURTS.

Q       YOU ARE ALSO A BAILIFF IN THE COURTS?

170                                    COVINGTON/DE/CE

A          YES, SIR, CHIEF BAILIFF.

Q          HAVE YOU BEEN A BAILIFF IN --TO THIS JURY IN THE
STATE OF MISSISSIPPI VERSUS MACK ARTHUR KING?

A          NO, SIR.

Q          ARE YOU PRESENTLY DOWNSTAIRS WITH JUDGE SAMS IN
ANOTHER TRIAL?

A          YES, SIR.

MR. HOWARD:

          I CAN'T THINK OF ANYTHING ELSE, JUDGE.

                    CROSS-EXAMINATION

MR. SAMS:

Q          MR. COVINGTON?

A          YES, SIR.

Q          YOU STATED THAT YOU WERE A MEMBER OF THE MOUNTED
PATROL DURING THE TIME THAT YOU WERE MARRIED TO MRS. MARY
CASTLEBURY HOLLEY?

A          YES, SIR, FOR ABOUT THREE MONTHS; I WAS NOT A SWORN
DEPUTY; WE WERE ON, SAY, LIKE SOMEONE WAS LOST OR SOMETHING
WE WOULD BE CALLED OUT.

Q          I UNDERSTAND THAT. NOW, TO THE MARRIAGE BETWEEN YOU
AND MARY CASTLEBURY, WERE THERE ANY CHILDREN BORN?

A          YES, SIR.

Q          AND THOSE ARE YOUR CHILDREN --

A          YES, SIR.

Q          --AND HER CHILDREN?

A          YES, SIR.

Q          AND DO YOU PAY CHILD SUPPORT AND SEE THE CHILDREN
AND VISIT WITH THEM, AND --

A          YES, SIR.

Q          --THEY CAN VISIT WITH YOU?

A          YES, SIR.

171                                    Covington/CE

Q        And were --the case that you are in downstairs,
did that commence this morning?
A        Yes, sir.
Q        And all during yesterday were you in and out of the
courtroom?
A        Yes, sir.
Q        And did you take this jury or any members thereof
to supper last night or to the Ramada Inn or Holiday Inn
wherever they stayed?
A        Yes, sir.
Q        And you were therefore associated with them, were
you not?
A        Yes, sir.
Q        And how many children were born of the marriage
union?
A        Two boys.
Q        Two boys, and she has custody of them?
A        Yes, sir.
Q        And you do pay child support and see the boys, is
that correct?
A        Yes, sir.
Q        Now, were you present when the jury was voir dired
yesterday?
A        No, sir.
Q        You were not?  Are you familiar with G. B. Green,
Sr.?
A        Yes, sir.
Q        Is he a next door neighbor of your father-in-law?
A        Yes, sir.
Q        And are you aware of any litigation between the two
of them?

172                    COVINGTON/CE

A        NOT UNTIL ABOUT THREE WEEKS AGO, AND YOU HAD MENTIONED SOMETHING ABOUT IT.

Q        AND YOU WEREN'T DOWNSTAIRS IN THE CHANCERY COURT WHEN --

A        YES, SIR, I THOUGHT THAT WAS ALL OVER WITH.

Q        YOU THOUGHT IT WAS ALL OVER WITH?

A        YES, SIR.

Q        BUT YOU CAN --YOU CAN VERIFY HERE THAT THERE WAS A LAWSUIT BETWEEN G. B. GREEN, SR. AND ELTON CASTLEBURY?

A        YES, SIR.

Q        AND YOU WILL ADMIT THAT ELTON CASTLEBURY IS THE FATHER OF MARY CASTLEBURY HOLLEY?

A        YES, SIR.

MR. SAMS:

         NO FURTHER QUESTIONS.

THE COURT:

         ALL RIGHT, LET THE WITNESS STEP DOWN. ALL RIGHT, YOU'VE GOT EVERYTHING YOU WANT IN THE RECORD?

MR. SAMS:

         I --UNLESS IT'S DISPUTED THAT SHE DID NOT RAISE HER HAND YESTERDAY AND IDENTIFY HERSELF, AND IF YOUR HONOR WANTS PROOF ON THAT I'LL CALL HER OUT BECAUSE THE ONE PERSON THAT ANSWERED THAT QUESTION --THERE WERE TWO THAT ANSWERED, ONE HAD A HUSBAND RETIRED, A WHITE FEMALE ON THE REGULAR VENIRE, AND I DON'T REMEMBER HER NAME; AND THE OTHER THAT ANSWERED WAS A YOUNG WHITE FEMALE WHO IDENTIFIED HERSELF AS A GRADUATE STUDENT, SAID HER FATHER WAS A POLICEMAN IN NEW YORK, AND THOSE ARE THE ONLY TWO THAT RAISED THEIR HAND AND ANSWERED. THOSE ARE THE ONLY TWO THAT I VOIR DIRED.

THE COURT:

         I WILL KEEP IT UNDER ADVISEMENT, AND BEFORE I RULE

I WILL GIVE YOU AN OPPORTUNITY TO CALL HER OUT.

THE COURT:

LET THE JURY COME OUT.

(JURY IN)

DR. BEN MARTIN,

A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

MR. HOWARD:

Q        WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT YOUR NAME IS, PLEASE?

A        I'M BEN F. MARTIN.

Q        AND WHAT DO YOU DO FOR A LIVING, DR. MARTIN?

A        I'M A PHYSICIAN, A PATHOLOGIST.

Q        AND WHERE IS YOUR PRACTICE LOCATED?

A        HERE IN COLUMBUS.

Q        WOULD YOU GIVE THE COURT AND THE LADIES AND GENTLEMEN OF THE JURY THE BENEFIT OF YOUR TRAINING, EDUCATION AND EXPERIENCE IN THE FIELD OF MEDICINE, PLEASE?

MR. SAMS:

WE'LL STIPULATE THAT DR. BEN F. MARTIN IS A DULY LICENSED MEDICAL PRACTIONER, BOARD CERTIFIED IN THE FIELD OF PATHOLOGY, AND AN EXPERT IN HIS PARTICULAR FIELD.

THE COURT:

HE WILL BE ACCEPTED AS AN EXPERT IN THE FIELD OF PATHOLOGY.

Q        DR. MARTIN, WOULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY EXACTLY WHAT PATHOLOGY IS?

A        IT'S A MULTI DISCIPLINE FIELD OF --OF MEDICINE; WE EXAMINE TISSUE SPECIMENS FROM SURGERY; WE ARE RESPONSIBLE FOR

174                          MARTIN/DE

THE LABORATORY WORK THAT GOES ON IN HOSPITALS AND DOCTORS'
CLINICS AND SO FORTH, BLOOD AND URINE TESTS AND SO FORTH, AND
WE ALSO DO AUTOPSIES, AND THAT TYPE OF THING.

Q        AND DURING THE COURSE OF THESE AUTOPSIES DO YOU
MAKE DETERMINATIONS OF CAUSES OF DEATH?

A        YES, SIR.

Q        DR. MARTIN, I'LL ASK IF YOU HAD THE OCCASION TO
EXAMINE AND DO AN AUTOPSY ON A LADY BY THE NAME OF LELA
PATTERSON?

A        YES, SIR.

Q        WHEN WAS THIS CONDUCTED, DR. MARTIN?

A        ON AUGUST THE 4TH, 1980.

Q        DID YOU PEFORM YOUR STANDARD AUTOPSY ON MRS.
PATTERSON?

A        YES, SIR.

Q        I'LL ASK YOU WHETHER OR NOT YOU MADE ANY NOTES OR
DIAGRAMS FROM YOUR EXAMINATION AND FINAL REPORT OF THAT
EXAMINATION?

A        YES, SIR, I DID.

Q        DR. MARTIN, WOULD YOU TELL THE LADIES AND GENTLEMEN
OF THE JURY WHAT YOUR VISUAL EXAMINATION OF THE PATIENT FIRST
REVEALED INSOFAR AS ANY UNNATURAL APPEARANCES OF THIS PERSON?

A        ALL RIGHT, SIR, IT'S A LITTLE BIT COMPLICATED, AND
IF I COULD I'D LIKE TO GO THROUGH IT KIND OF SYSTEMATICALLY.

Q        PLEASE.

A        THERE WERE SIGNIFICANT FINDINGS RELATED TO TRAUMA
AND IF I MIGHT I'LL GO THROUGH THESE KIND OF IN A --IN A
SYSTEMATIC FASHION.

Q        WOULD YOU TELL US WHAT TRAUMA IS, DR. MARTIN?

A        TRAUMA IS --IS PHYSICAL DAMAGE TO A --TO A HUMAN
BEING.

175                    MARTIN/DE

Q          WOULD YOU TELL US SYSTEMATICALLY THEN WHAT YOUR
VISUAL EXAMINATION, AND YOUR EXAMINATION ITSELF REVEALED?
A          ALL RIGHT, SIR, WE EXAMINE A BODY FIRST BY LOOKING
AT THE EXTERNAL SURFACE, AND THEN BY EXAMINING THE INTERNAL
ORGANS. WHEN I EXAMINED THIS LADY'S HEAD I FOUND TWO
SIGNIFICANT THINGS, THE FIRST OF WHICH WAS A LACERATION ON THE
RIGHT POSTERIOR PORTION OF THE HEAD ABOUT A HALF AN INCH IN
LENGTH WHICH EXTENDED DOWN TO THE BONE OF THE SKULL. THE
SECOND WAS A LARGE AREA OF SWELLING AND BRUISING SURROUNDING
THE LEFT EYE WHICH COMPLETELY CLOSED THE EYELIDS, AND MADE
THEM DIFFICULT TO SEPARATE TO EXAMINE THE EYE. THE SECOND
THING THAT I--I MEAN THE THIRD THING I NOTICED ABOUT THE HEAD
THAT WAS SIGNIFICANT WAS THAT BLOODY FROTHY FLUID WAS FLOWING
KIND OF FREELY FROM BOTH THE NOSE AND THE MOUTH. NEXT, WHEN I
OPENED THE --THE MOUTH I FOUND A SMALL LACERATION OF THE
TONGUE ON THE RIGHT; THEN SIGNIFICANTLY I FOUND THAT THE
VISIBLE NECK VEINS WERE DISTENDED WHICH IS --HAS SOME
SIGNIFICANCE THAT I'LL EXPLAIN IN A MINUTE. ALSO, AND VERY
NOTICEABLE WAS AN EXTENSIVE AREA OF HEMORRHAGE OR BRUISING --
SUBCUTANEOUS HEMORRHAGE THAT EXTENDED ACROSS THE UPPER CHEST
AND LARGE PORTION OF THE LOWER --LOWER PORTION OF THE NECK.
WHEN I EXAMINED HER EXTREMITIES OR HER ARMS SHE HAD BRUISING
OF THE LEFT UPPER ARM, AND THE RIGHT FOREARM WITH SOME
SIGNIFICANT FINDINGS IN THAT THERE WERE RIDGES WHICH APPEARED
TO, IN MY OPINION, BE --COULD HAVE BEEN CAUSED BY SQUEEEZING
AND FINGER MARKS ACTUALLY IN THE --IN THE SOFT TISSUES
ESPECIALLY ON THE RIGHT FOREARM.
Q          WERE THESE VISIBLE?
A          YES, SIR.
Q          TO YOU?

176                    MARTIN/DE

A        AND PALPABLE; YOU COULD FEEL THEM WITH EASE, AND
SEE THEM, ALSO.

Q        HOW LARGE WERE THESE BRUISED AREAS ON BOTH OF HER
ARMS?

A        THE ONE ON HER RIGHT FOREARM WAS APPROXIMATELY
THREE BY FOUR INCHES; THE ONE ON THE RIGHT --LEFT UPPER ARM
WAS APPROXIMATELY TWO BY FOUR INCHES. SHE ALSO HAD A SMALL
AREA OF BRUISING ABOUT AN INCH AND A HALF BY AN INCH AND A
HALF ON HER RIGHT --UPPER SURFACE OF HER RIGHT HAND. THERE
WERE OTHER AREAS OF BRUISING ON THE INNER SURFACE OF BOTH
THIGHS, SMALLER, I'D SAY HALF AN INCH BRUISES --MULTIPLE SMALL
BRUISES ON THE INNER SURFACE OF BOTH THIGHS, THOUGH. THESE
WERE THE --THE EXTERNAL FINDINGS ON THE BODY. THE NEXT STEP
IN THE AUTOPSY IS TO EXAMINE THE INNER SURFACES OF THE BODY,
SO WE OPEN THE CHEST AND WE OPEN THE ABDOMEN. IN --IN DOING
AN AUTOPSY YOU REFLECT THE SKIN OF THE CHEST UPWARDS, AND I
DID THIS IN THIS LADY TO DEMONSTRATE THE --OR TO EXAMINE THE
MUSCLES OF THE NECK AND AS THEY ATTACH TO THE CHEST, IN THE
AREA WHERE THERE WAS A GREAT DEAL OF BRUISING AS I DESCRIBED
BEFORE, AND IN THESE SO-CALLED STRAP MUSCLES OF THE NECK
THERE WAS VISIBLE HEMORRHAGE.

Q        WHAT DO YOU MEAN BY THAT, BLEEDING INTO THE
TISSUES?

A        BLEEDING INTO --INTO THE MUSCLES THEMSELVES THAT
YOU COULD SEE. SIGNIFICANT FINDINGS OF INTERNAL ORGANS
INCLUDED THE LUNGS --WHEN YOU EXAMINE THE LUNGS IN A NORMAL
ADULT THEY ARE PILLOWY AND SOFT; IN THIS LADY WHEN YOU --WHEN
WE SECTIONED THE LUNGS WITH A KNIFE BLOODY FLUID RAN FROM THE
SURFACE OF THE LUNGS WHICH TO --WHICH MEANS TO A PATHOLOGIST
THAT THERE IS EXCESS FLUID IN THE AIR SACS OF THE LUNGS WHICH
WAS BORN OUT MICROSCOPICALLY, BUT I'LL DESCRIBE THAT IN JUST A

MINUTE. THE OTHER INTERNAL ORGANS WERE GROSSLY WITHIN NORMAL
LIMITS EXCEPT FOR THE BRAIN. WHEN WE --WHEN I REMOVED THE
BRAIN IN EXAMINING --IN -- IN REMOVING THE BRAIN YOU REFLECT
THE SCALP; YOU MAKE AN INCISION AND PULL THE SCALP BACK, AND
IN THE AREA WHERE THE LACERATION WAS ON THE POSTERIOR SURFACE
OF THE SKULL, THERE WAS SIGNIFICANT SUBCUTANEOUS HEMORRHAGE
UNDERLYING THE SKIN OVERLYING THE BONE OF THE SCALP --I MEAN
OF THE SKULL. THERE WAS NO FRACTURE OF THE SKULL; THE
PRACTICE THEN IS TO REMOVE THE SKULL CAP, AND TO EXAMINE THE
BRAIN AS IT LIES IN THE HEAD. THERE WAS EVIDENCE OF CEREBRAL
EDEMA OR CEREBRAL SWELLING WHICH IS CAUSED BY FLUID LEAKING
INTO THE BRAIN AS EVIDENCED BY CHANGES ON THE SURFACE OF THE
BRAIN WHICH INCLUDES --IF --YOU'VE PROBABLY ALL SEEN PICTURES
OF THE BRAIN, BUT THERE --IT HAS CONVOLUTIONS, BUT THEY GET
SQUEEZED TOGETHER AND THIS IS EVIDENCE OF --OF SWELLING OF
THE BRAIN.

Q          HOW SEVERE WAS THIS ON THIS PARTICULAR INDIVIDUAL?

A          IT WAS, IN MY OPINION, VERY SIGNIFICANT. THERE
WAS --THERE IS AT THE BASE OF THE BRAIN A --AN OPENING ABOUT
THIS SIZE WHERE THE SPINAL CORD LEAVES THE BRAIN AND GOES DOWN
INTO THE VERTEBRAL COLUMN. THE BRAIN HAS VERY LITTLE ROOM
INSIDE THE SKULL ITSELF, SO WHEN YOU GET ANY SWELLING AT ALL
IT TENDS TO PUSH THESE TISSUES DOWN INTO THIS HOLE CALLED THE
FORAMEN MAGNUM, AND IT CAUSES INDENTATIONS TO BE MADE ON
PORTIONS OF THE BRAIN AND IN THIS AREA ARE VITAL CENTERS SUCH
AS THE CENTER WHICH CONTROLS THE HEART BEAT.

Q          WHAT WOULD CAUSE THIS EDEMA OR SWELLING OF THE
BRAIN, DR. MARTIN?

A          A SIGNIFICANT BLOW TO THE --TO THE SKULL. THERE
WAS OTHER EVIDENCE OF A SIGNIFICANT BLOW IN THAT THERE WAS
SOME HEMORRHAGE OVER THE SURFACE OF THE BRAIN IN THIS AREA

WHICH IS EXACTLY OPPOSITE THE AREA WHERE THE LACERATION WAS ON
THE POSTERIOR PORTION OF THE SKULL, AND THIS, IN MY OPINION,
WAS WHAT'S CALLED A CONTRACOUP LESION. YOU-- YOU --THE HEAD
IS STRUCK HERE, BUT THE BRAIN BEING ALMOST FLUID VIBRATES
INSIDE THE SKULL, AND THE DAMAGE IS DONE EXACTLY OPPOSITE TO
THE PORTION OF --I MEAN TO THE AREA WHERE THE BLOW IS STRUCK.

Q        AND WHAT OTHER FINDINGS DID YOU DO, DOCTOR?

A        THE NEXT ORGAN THAT WAS EXAMINED WAS THE --THE
TRACHEA WHICH IS THE --PRODUCES YOUR ADAM'S APPLE, AND IN CASES
OF MANUAL STRANGULATION QUITE OFTEN THERE'S A FRACTURE OF
THESE CARTILAGES  WHICH MAKE UP THE TRACHEA. THE TRACHEA WAS
REMOVED CAREFULLY AND FIXED IN FORMALDEHYDE BEFORE IT WAS
EXAMINED WHICH IS THE ACCEPTED PRACTICE. THERE WAS INDEED A
FRACTURE OF THE THYROID CARTILAGE WHICH IS THIS PROMINENT
CARTILAGE IN YOUR NECK AND SOME SURROUNDING HEMORRHAGE WHICH
SUGGESTS THAT THE CARTILAGE WAS FRACTURED AT THE TIME OF
MANUAL STRANGULATION.

Q        DID YOU MAKE ANY OTHER EXAMINATIONS AND FINDINGS,
DOCTOR?

A        YES, SIR, THESE TISSUES WERE SUBMITTED FOR
MICROSCOPIC EXAMINATION, AND SIGNIFICANT CHANGES WERE FOUND
IN THREE AREAS. THE SKELETAL MUSCLES OR THE STRAP MUSCLES OF
THE NECK SHOWED MICROSCOPICALLY HEMORRHAGE THAT WE SAW
GROSSLY WHICH CONFIRMED THAT THERE WAS HEMORRHAGE IN THESE
MUSCLES. THE TISSUES OF THE BRAIN THAT WE EXAMINED CONFIRMED
THE EDEMA OR THE SWELLING OF THE BRAIN WHICH WAS OF A
SIGNIFICANCE THAT INCLUDED SOME HEMORRHAGE OR BLOOD ESCAPING
FROM SMALL VESSELS IN THE BRAIN. IN ADDITION, EXAMINATION OF
THE LUNGS SHOWED SOMETHING THAT I CONSIDERED A MARKED
SIGNIFICANCE IN THAT THE LUNGS WERE NOT TERRIBLY HEAVY WHICH
YOU FIND IN --IN CASES OF HEART FAILURE, LOTS OF FLUID BACKS