179                    MARTIN/DE

UP IN THE LUNGS, BUT MICROSCOPICALLY THERE WAS FLUID IN THE AIR SACS OR ALVEI OF THE LUNGS, AND THERE WAS DAMAGE MICROSCOPICALLY TO THE TISSUES OF THE LUNG WHICH DOES NOT OCCUR IN CASES OF HEART FAILURE WHERE YOUR OWN BODY FLUIDS BACK UP INTO THE LUNGS, AND IN MY OPINION THIS WAS EVIDENCE THAT THE PATIENT OR THE LADY HAD ASPIRATED WATER INTO HER LUNGS.

Q        OKAY, AND WHAT DO YOU MEAN BY ASPIRATED WATER INTO HER LUNGS?

A        LUNGS HAD --I MEAN HER --HER --IN AN EFFORT TO BREATHE SHE HAD MADE THE INSPIRATORY MOTION, BUT AT THAT TIME ONLY --THE ONLY THING AVAILABLE TO HER WAS WATER. IN OTHER WORDS, SHE WAS BREATHING WATER OR IN ESSENCE DROWNING AT THE TIME.

Q        DOCTOR, BASED ON ALL OF THESE EXAMINATIONS THAT YOU PERFORMED, BOTH THE INJURY TO THIS PATIENT'S HEAD, TO THE NECK AND THROAT AREA, AND TO THIS WATER IN THE LUNGS, DID YOU MAKE A DETERMINATION OF THE PRIMARY CAUSE OF DEATH?

A        WELL, I THINK THIS LADY HAD SEVERAL THINGS WHICH COULD HAVE KILLED HER. I --IN MY REPORT I ISSUED I CALLED THE IMMEDIATE CAUSE OF DEATH MANUAL STRANGULATION BECAUSE THERE WAS SIGNIFICANT DAMAGE IN THAT AREA, AND I FELT THAT THIS WAS PROBABLY THE PRIMARY CAUSE OF DEATH, BUT THE CEREBRAL EDEMA OR BRAIN SWELLING THAT WAS PRESENT WAS OF A DEGREE SIGNIFICANT ENOUGH TO KILL THIS LADY.

Q        THEN EITHER THE TRAUMA TO HER HEAD OR THE NECK STRANGULATION COULD HAVE CAUSED THE DEATH?

A        YES, SIR, AND THE FINDING OF --OF WHAT I CONSIDERED WATER IN THE LUNGS RATHER THAN BODY FLUIDS SUGGESTS THAT THAT MAY HAVE BEEN THE FINAL INSULT TO THIS LADY WHICH --

Q        THAT SHE WAS HELD UNDER WATER?

A        OR BEING UNCONSCIOUS; I CAN'T SAY THAT SHE WAS HELD UNDER WATER, BUT SHE COULD HAVE EITHER BEEN HELD UNDER WATER OR COULD HAVE BEEN UNCONSCIOUS. I WAS TOLD SHE WAS FOUND IN A BATH TUB, AND WAS SHOWED PICTURES OF HER IN A BATH TUB. SHE COULD HAVE BEEN UNCONSCIOUS AND SLIPPED UNDER THE SURFACE OF THE WATER THOUGH THERE WAS NO WATER IN THE TUB I UNDERSTAND WHEN SHE WAS FOUND.

MR. HOWARD:

        MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:

        YOU MAY.

Q        DOCTOR, I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT 33 INTO EVIDENCE, AND I'LL ASK IF YOU WOULD TO LOOK AT THAT AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT THAT PARTICULAR PHOTOGRAPH IS?

A        (WITNESS LOOKS AT PHOTOGRAPH) THIS WAS TAKEN AT THE TIME OF AUTOPSY, AND IS AN EXAMINATION OR PICTURE OF THE POSTERIOR SURFACE OF THIS LADY'S HEAD ILLUSTRATING THE LACERATION WHICH I'VE DESCRIBED.

Q        I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT 32 INTO EVIDENCE, AND I'LL ASK IF YOU WILL EXAMINE THAT AND TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT THAT PHOTOGRAPH DEPICTS?

A        (WITNESS LOOKS AT PHOTOGRAPH) THIS IS A PHOTOGRAPH TAKEN FROM THIS LADY'S RIGHT SIDE WHICH SHOWS THE EXTENSIVE AREAS OF BRUISING AND --AND SUBCUTANEOUS HEMORRHAGE WHICH EXTENDED FROM THIS LADY'S UPPER NECK ALL THE WAY ACROSS THE UPPER PORTIONS OF HER CHEST WHICH IN MY OPINION WERE INJURIES THAT WERE SUSTAINED AT THE TIME SHE WAS STRANGLED.

Q        DOCTOR, WOULD A PERSON WHO IS DECEASED OR ALREADY DEAD HAVE THIS SWELLING AND THIS EDEMA OF THE BRAIN AND

181                    MARTIN/DE

SWELLING?

A        NO, SIR. FOR THE PULMONARY EDEMA --I MEAN FOR THE CONGESTION OR EDEMA OF THE BRAIN AND FOR ONE OF THE OTHER MINOR DIAGNOSIS I LISTED HERE, THE CONGESTION OF THE LIVER AND SPLEEN --FOR THESE CHANGES TO TAKE PLACE THE BODY HAS TO --I MEAN THE PERSON HAS TO BE STILL ALIVE, BUT IN AN AGONAL STATE; IN OTHER WORDS, A TERMINAL STATE, BUT STILL ENOUGH HEART BEAT TO PUMP BLOOD BECAUSE THESE FLUIDS ARE BODY FLUIDS THAT CAUSE THE BRAIN TO SWELL AND THE LIVER AND SPLEEN TO SWELL, SO FOR --FOR THESE CHANGES TO TAKE PLACE THERE MUST BE A PERIOD OF AT LEAST MINUTES --FIFTEEN OR TWENTY MINUTES AND PROBABLY A LITTLE BIT LONGER EVEN FOR THESE SIGNIFICANT SWELLINGS TO TAKE PLACE.

Q        THEN EVEN WITH ALL --MOST OF THESE SEVERE BLOWS SHE DID LIVE FOR SOME PERIOD OF TIME BEFORE SHE WAS TERMINATED?

A        YES, SIR, BETWEEN THE TIME SHE WAS FIRST DAMAGED OR ASSAULTED AND THE TIME OF DEATH I WOULD SAY THERE WAS --THERE WAS A SIGNIFICANT PERIOD OF TIME.

Q        YOU TESTIFIED AS TO A BLOW OR --OR TRAUMA TO THE LEFT ORBITA REGION OR THE LEFT EYE REGION; WHAT DAMAGE WAS THAT, DOCTOR?

A        MAINLY IT WAS SUBCUTANEOUS OR HEMORRHAGE UNDERNEATH THE SKIN. THE TISSUES SURROUNDING THE EYE ARE VERY SOFT; THE SKIN IS VERY LOOSE ESPECIALLY IN AN ELDERLY PERSON, AND A BLOW IN THIS AREA WOULD CAUSE DAMAGE TO SMALL BLOOD VESSELS, AND BLOOD AND BLOOD FLUIDS WOULD OOZE OUT INTO THE AREA QUICKLY, AND CAUSE THAT. THERE WAS NO DAMAGE TO THE EYE ITSELF OR NO FRACTURE OF THE SKULL JUST SIGNIFICANT SOFT TISSUE DAMAGE AS FROM A BLOW.

Q        WERE THE BRUISES THAT YOU FOUND ON THE ARMS, THE ONES YOU TESTIFIED TO THAT HAD THE IMPRESSIONS IN THE ARMS,

273

182                              MARTIN/DE

WERE THEY FAIRLY DEEP BRUISES OR DOWN INTO THE --INTO THE
MUSCLE TISSUE ITSELF?

A         YES, SIR, AS I TESTIFIED THERE --THERE WERE STILL
RIDGES OR CREASES IN THE SKIN, AND I PUT MY HANDS ON THESE
AREAS AND THEY CORRESPONDED IN SIZE PRETTY MUCH TO --TO MY
FINGERS, AND IN MY OPINION THEY WERE --THEY WERE CAUSED BY
SQUEEZING WITH SOME FAIRLY GREAT STRENGTH BY SOMEONE'S TWO
HANDS ON --ON THIS LADY'S ARMS.

Q         DID --OR WAS ANY OF THE SKIN AROUND THE EYE WHERE--
WHERE THIS SWELLING WAS AROUND THE EYE, WAS ANY OF THAT BROKEN
OR ACTUALLY --

A         NO, SIR.

Q         --OPEN?

A         NO, SIR.

Q         AND ON THE SKULL ITSELF, THE LACERATIONS OF THE
REAR OF THE SKULL WAS THE --THE ONLY OPEN ACTUAL WOUND THAT
YOU FOUND ON THIS WOMAN?

A         YES, SIR.

Q         DOCTOR, DO YOU HAVE AN OPINION BASED ON YOUR
EXAMINATION OF MRS. LELA PATTERSON, AND BASED ON YOUR
EXPERIENCE AS A PATHOLOGIST AS TO THE CAUSE OF THIS LADY'S
DEATH?

A         YES, SIR.

Q         AND WHAT IS THAT OPINION?

A         THERE WERE, IN MY OPINION, MULTIPLE CAUSES INCLUDING
STRANGULATION WHICH CUT OFF THIS LADY'S OXYGEN SUPPLY; THERE
WAS TRAUMA TO THE HEAD WHICH PRODUCED CEREBRAL EDEMA WHICH WAS
OF A DEGREE SIGNIFICANT ENOUGH TO CAUSE PRESSURE ON THE VITAL
CENTERS IN HER BRAIN FOR BREATHING AND HEART, AND PROBABLY,
AND IN MY OPINION MOST PROBABLY THERE WAS ASPIRATION OF WATER
INTO THE LUNGS WHICH IN ITSELF COULD HAVE CAUSED DEATH, SO

183                          MARTIN/DE

THERE --THERE ARE THREE THINGS IN MY OPINION THAT COULD HAVE BEEN BY THEMSELVES CAUSES OF DEATH, AND ACTING IN CONCERT KILL THIS LADY.

Q          DID YOU ACTUALLY REMOVE THESE PHARYNGEAL CARTILAGES THAT YOU TESTIFIED ABOUT?

A          YES, SIR, I REMOVED THE LARYNX IN TOTO OR THE TOTAL LARYNX.

Q          AND DID YOU FIND THE --ANY DAMAGED AREA THERE?

A          YES, SIR, FRACTURED CARTILAGE, BROKEN CARTILAGE, AND HEMORRHAGE AROUND THE AREA WHICH MEANS THAT THE --THE FRACTURES TOOK PLACE WHILE THIS LADY'S HEART WAS STILL BLEEDING, AND BLOOD COULD OOZE FROM THESE DAMAGED TISSUES.

Q          DR. MARTIN, HOW --HOW IS A PERSON BROUGHT ABOUT -- HOW IS THEIR DEMISE BROUGHT ABOUT FROM --FROM STRANGULATION; WHAT ACTUALLY CAUSES THE DEATH OF THE PERSON FROM STRANGULATION?

A          WELL, IT'S --THE DEATH IS CAUSED BY DEPRIVATION TO THE BODY OF --OF OXYGEN WHICH, OF COURSE, IS VITAL TO --TO LIFE, AND YOU BY MANUALLY STRANGLING SOMEONE BLOCK THE --THE TRACHEA WHICH IS THE MAIN AIR TUBE TO THE LUNGS, AND CUT OFF THE OXYGEN SUPPLY WHICH CAUSES INITIALLY UNCONSCIOUSNESS, AND IF CARRIED TO ITS EXTREME WILL CAUSE THE HEART TO FAIL, AND DEATH TO ENSUE.

Q          AND HOW LONG A PERIOD OF TIME WOULD THIS TAKE IN YOUR OPINION, DOCTOR?

A          WELL, IF MANUAL STRANGULATION IS CARRIED OUT FROM-- WITHOUT REMISSION --IN OTHER WORDS, IF --IF SOMEONE IS STRANGLED AND NO PRESSURE IS REMOVED FROM THE TRACHEA IT WOULD STILL TAKE MINUTES FOR A PATIENT TO --FOR A PERSON TO DIE BECAUSE THE BODY CAN STORE ENOUGH OXYGEN THAT IF THE TRACHEA IS COMPLETELY OCCLUDED THEY CAN LIVE FOR SIX OR SEVEN MINUTES

184                    MARTIN/DE/CE

AND THEN IF THE BLOCKAGE IS REMOVED CAN BE BROUGHT BACK TO
LIFE WITH NO EVIDENCE OF BRAIN OR --OR KIDNEY OR HEART DAMAGE,
SO MINUTES AT LEAST BETWEEN INITIATION OF STRANGULATION AND
DEATH.

Q        DOCTOR, IF A PERSON IS STRANGLED BY MANUAL
STRANGULATION WOULD UNCONSCIOUSNESS OCCUR FOR SOME PERIOD OF
TIME BEFORE ACTUAL DEATH?

A        YES, SIR.

Q        COULD THAT PERSON REVIVE AGAIN AFTER THAT
UNCONSCIOUSNESS?

A        THEY COULD IF --IF BRAIN DAMAGE HAS NOT BEEN
SIGNIFICANT.

MR. HOWARD:

        NOTHING FURTHER OF THIS WITNESS, YOUR HONOR.

THE COURT:

        YOU MAY CROSS-EXAMINE.

                CROSS EXAMINATION

MR. SAMS:

Q        DR. MARTIN, I HAVE ONLY A FEW QUESTIONS. WITH
REFERENCE TO THE LAST FEW ANSWERS YOU GAVE DEALING WITH THE
CONSCIOUS OR UNCONSCIOUS STATE, IN THIS PARTICULAR PATIENT
WITH THE EXTENT OF BRAIN DAMAGE WOULD YOU BE COMFORTABLE IN
ASSERTING AN OPINION THAT SHE PROBABLY NEVER REVIVED
CONSCIOUSNESS?

A        IT DEPENDS ON WHEN THE TRAUMA TO THE HEAD TOOK
PLACE; IF THE MANUAL STRANGULATION TOOK PLACE FIRST THEN SHE
COULD WELL HAVE REGAINED CONSCIOUSNESS; IF THE TRAUMA TO THE
SKULL TOOK PLACE FIRST THEN --AND THEN THE STRANGULATION THEN
POSSIBLY SHE NEVER DID. I WOULD HAVE TO --

Q        IT WOULD BE SPECULATION THEN, WOULD IT NOT?

A        IT WOULD BE SPECULATION.

MR. SAMS:

    NO FURTHER QUESTIONS.

THE COURT:

    YOU MAY BE EXCUSED, DOCTOR.

        BARBARA JORDAN,

    A WITNESS FOR THE STATE OF MISSISSIPPI, HAVING BEEN DULY SWORN BY DEPUTY CLERK, JOHN WIGGINS, TESTIFIED AS FOLLOWS:

        DIRECT EXAMINATION

MR. MONTGOMERY:

Q    WOULD YOU STATE YOUR NAME TO THE JURY, PLEASE? WILL YOU TELL THE JURY WHAT YOUR NAME IS, BARBARA?

A    MY NAME IS BARBARA JORDAN.

Q    OKAY, BARBARA, WOULD YOU EASE UP AND GET CLOSE TO THE MICROPHONE AND SPEAK UP LOUD SO EVERYONE CAN HEAR YOU, PLEASE. HOW OLD ARE YOU FOR THE RECORD, BARBARA?

A    I AM TWENTY-FOUR YEARS OLD.

Q    OKAY, AND WHERE ARE YOU LIVING NOW?

A    I LIVE AT ROUTE 8, BOX 5.

Q    I WANT TO ASK YOU IF YOU KNOW THE DEFENDANT IN THIS CASE, MACK ARTHUR KING?

A    YES, I DO.

Q    IS HE IN THE COURTROOM TODAY?

A    YES.

Q    DO YOU SEE HIM?

A    YES.

Q    WOULD YOU POINT HIM OUT FOR THE JURY AND FOR THE COURT?

A    (WITNESS POINTS TO DEFENDANT) RIGHT THERE.

Q    IS THAT THE BLACK MAN WITH THE RED AND WHITE STRIP SHIRT ON?

186                                   JORDAN/DE

A       YES, IT IS.

MR. MONTGOMERY:

        YOUR HONOR, WE'D ASK THAT THE RECORD REFLECT THAT
THIS WITNESS HAS INDICATED THE DEFENDANT.

THE COURT:

        THE RECORD WILL SO REFLECT.

Q       BARBARA, HOW LONG HAVE YOU KNOWN MACK ARTHUR KING?

A       EVER SINCE DECEMBER THE 7TH.

Q       OF WHAT YEAR?

A       '79.

Q       AND WHAT IS YOUR RELATIONSHIP WITH MACK ARTHUR KING;
HOW DO YOU KNOW HIM?

A       WELL, HE JUST MY BOYFRIEND.

Q       ALL RIGHT, BACK IN AUGUST OF THIS YEAR WHERE WERE
YOU LIVING AT THAT TIME, BARBARA?

A       IN AUGUST?

Q       UH-HUH.

A       WITH MACK ARTHUR.

Q       AND WHERE DID YOU LIVE; DO YOU KNOW THE ADDRESS?

A       YES, I DO; ROUTE 8, BOX 132.

Q       AND I ASK YOU IF YOU WERE LIVING WITH HIM ON
AUGUST THE 2ND AND THE 3RD AND THE 4TH AND 5TH, AND THE 6TH
OF AUGUST?

A       YES.

Q       DIRECTING YOUR ATTENTION BACK TO SATURDAY, ON
AUGUST THE 2ND, DID YOU HAVE THE OCCASION TO SEE MACK ARTHUR
KING ON THAT DAY?

A       YES, I SAW HIM THAT DAY.

Q       AND SPECIFICALLY THAT AFTERNOON WHAT TIME DID YOU
SEE HIM?

A       THAT AFTERNOON?

187            JORDAN/DE

Q      SATURDAY AFTERNOON?

A      THE LAST TIME I SAW HIM?

Q      UH-HUH.

A      THE LAST TIME I SAW HIM WAS ABOUT THREE IN THE AFTERNOON.

Q      AND THAT WAS SATURDAY AFTERNOON?

A      YES, IT WAS.

Q      AND THEN WHEN WAS THE NEXT TIME THAT YOU SAW HIM?

A      EARLY THAT SUNDAY MORNING.

Q      DID YOU SEE HIM ANYTIME SATURDAY NIGHT?

A      NO, I DIDN'T.

Q      WHERE DID YOU GO SATURDAY NIGHT, AUGUST THE 2ND, BARBARA?

A      I WENT TO A PARTY.

Q      WHO WENT WITH YOU?

A      MY LITTLE BOY AND HIS COUSINS.

Q      DID MACK ARTHUR GO TO THE PARTY?

A      NO.

Q      HE WASN'T THERE?

A      NO.

Q      BARBARA, I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT NO. 27 INTO EVIDENCE, AND ASK YOU TO LOOK AT THESE ITEMS AND --TO SEE IF YOU CAN IDENTIFY THOSE FOR THE JURY AND THE COURT, PLEASE?

     (WITNESS EXAMINES EXHIBIT)

Q      CAN YOU IDENTIFY ALL THOSE ITEMS?

A      YES, SIR.

Q      I HAND YOU A BALLPOINT PIN, AND ASK YOU TO TELL THE JURY IF YOU'VE EVER SEEN THAT ITEM BEFORE?

A      YES, I HAVE.

188               JORDAN/DE

Q     AND WHERE DID YOU FIRST SEE THAT ITEM, AND WHERE DID YOU GET THAT ITEM FROM, BARBARA?

A     I GOT THIS ITEM FROM MACK ARTHUR KING.

Q     AND WHERE WERE YOU WHEN YOU GOT THAT ITEM?

A     AT HOME.

Q     AND WHEN DID YOU RECEIVE THAT ITEM?

A     LET'S SEE --THAT TUESDAY, AUGUST THE 5TH.

Q     IT WAS ON A TUESDAY?

A     I BELIEVE SO.

Q     AND DID YOU ASK MACK ARTHUR ANYTHING ABOUT THAT PIN?

A     YES.

Q     WHAT DID YOU ASK HIM?

A     I ASKED HIM WHERE DID HE GET IT.

Q     AND WHEN DID YOU ASK HIM THIS?

A     AUGUST THE 6TH.

Q     WHAT DID HE SAY?

A     HE DIDN'T SAY ANYTHING.

Q     WHAT DID YOU DO WITH THAT PIN WHEN --WHO DID YOU GIVE THAT PIN TO?

A     I GAVE IT TO THE POLICE.

Q     YOU GAVE IT TO THE POLICE WHEN THEY CAME TO YOUR HOUSE?

A     NO.

Q     DO YOU REMEMBER WHAT POLICEMAN YOU GAVE IT TO?

A     I BELIEVE I GAVE IT TO MIKE MORDECAI.

Q     MIKE MORDECAI?

A     I THINK SO.

Q     OKAY, BARBARA, I'M GOING TO HAND YOU ANOTHER ITEM AND IT'S BEEN MARKED AS STATE'S EXHIBIT 27 INTO EVIDENCE, AND ASK YOU TO LOOK AT THAT AND SEE IF YOU CAN IDENTIFY THAT FOR

189       JORDAN/DE

THE COURT?

A  YES, I CAN.

Q  ALL RIGHT, WHAT IS THAT?

A  THIS IS A COIN --A FIFTY-FIVE COIN.

Q  YOU NEED TO SPEAK UP FOR THE JURY; THEY --EVERYONE NEEDS TO HEAR YOU, OKAY?

A  THIS IS A 1955 COIN.

Q  AND WHERE DID YOU GET THAT COIN FROM?

A  FROM MACK ARTHUR KING.

Q  AND WHERE --WHEN DID HE GIVE IT TO YOU?

A  ON THE 6TH.

Q  AND WHERE WERE YOU WHEN --WHEN HE GAVE IT TO YOU?

A  AT HOME.

Q  DID YOU ASK HIM WHERE HE GOT IT?

A  YES, I DID.

Q  AND WHAT DID HE SAY?

A  AND HE JUST SAID IT WAS A GOOD LUCK --GOOD LUCK CHARM, AND HE JUST GAVE IT TO ME.

Q  WOULD HE TELL YOU WHERE HE GOT IT FROM?

A  NO.

Q  AND WHAT DID YOU DO WITH THAT GOOD LUCK CHARM; WHO DID YOU GIVE IT TO?

A  I GAVE IT TO THE POLICE.

Q  OKAY, BARBARA, I HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT 27 INTO EVIDENCE, AND ASK YOU TO LOOK AT THIS AND SEE IF YOU CAN IDENTIFY THAT?

A  (WITNESS EXAMINES EXHIBIT)  YES, I CAN.

Q  WOULD YOU TELL THE JURY WHAT THAT IS?

A  THIS IS A PEARL HANDLE KNIFE.

Q  AND WHERE DID YOU GET THAT PEARL HANDLE KNIFE?

A  FROM MACK ARTHUR KING.

Q          AND DO YOU REMEMBER WHEN HE GAVE IT TO YOU?

A          HE GAVE THIS TO ME ON THE 6TH, TOO --THAT TUESDAY, ON THE 6TH.

Q          FINALLY, I HAND YOU A NECKLACE THAT'S BEEN MARKED AS STATE'S EXHIBIT 27 IN EVIDENCE, AND ASK IF YOU COULD IDENTIFY THAT?

A          (WITNESS EXAMINES NECKLACE)  YES, I CAN.

Q          AND WHERE DID YOU GET THAT NECKLACE FROM?

A          FROM MACK ARTHUR KING.

Q          AND DID HE GIVE IT TO YOU --WHEN DID HE GIVE IT - THAT NECKLACE TO YOU?

A          HE GAVE THIS TO ME ON THE 6TH, TOO.

Q          DID YOU ASK HIM WHERE HE GOT THE NECKLACE; DID YOU QUESTION HIM ABOUT THE NECKLACE?

A          YES.

Q          WHAT DID YOU ASK HIM?

A          I ASKED HIM WHERE DID HE GET IT, AND HE DIDN'T TELL ME.

Q          WHAT EXACTLY DID HE SAY, AND HOW DID HE ACT?

A          HE JUST, YOU KNOW, JUST ACT LIKE HE DIDN'T WANT TO TALK ABOUT IT.

Q          WHERE WERE YOU --WHERE WAS THAT NECKLACE WHEN THE POLICE CAME; WHERE WAS THAT NECKLACE?

A          I HAD IT AROUND MY NECK.

Q          DID HE PUT IT ON YOUR NECK OR DID YOU PUT IT ON YOUR NECK?

A          I PUT IT ON.

Q          AND DID YOU GIVE THAT TO THE POLICE?

A          YES, I DID.

Q          BARBARA, I WANT YOU TO TELL THE JURY EXACTLY WHAT YOU DID SATURDAY AFTERNOON WHEN YOU WENT TO THE PARTY, AND WHEN

YOU --WHAT TIME YOU CAME HOME AND EXACTLY WHAT HAPPENED WHEN
MACK ARTHUR CAME BACK THE NEXT MORNING; WOULD YOU JUST TELL THE
JURY IN YOUR OWN WORDS WHAT --WHAT HAPPENED?

A        STARTING WITH SATURDAY NIGHT?

Q        YES.

A        THE SATURDAY NIGHT WHEN WE WAS AT THE PARTY, THE
PARTY END --STARTED ABOUT SIX-THIRTY AND ENDED ABOUT NINE --
ABOUT NINE-FIFTEEN, AND IT WAS ABOUT A QUARTER TO TEN WHEN I
GOT HOME.

Q        WHAT KIND OF PARTY WAS IT, BARBARA?

A        IT WAS A CHILDREN --A CHILDREN'S PARTY.

Q        A CHILDREN'S PARTY?

A        UH-HUH, AND AFTER I GOT HOME IT WAS ABOUT A QUARTER
TO TEN, AND WHEN I GOT HOME I UNLOCKED THE DOOR --IT WAS --IT
WASN'T ANYBODY THERE, AND I UNLOCKED THE DOOR, AND I WENT
INSIDE, AND I GOT THE BABY DRESSED FOR BED, AND I GOT READY TO
GO TO BED AND WE GOT IN THE BED, AND I LAID THERE FOR AWHILE
AND I WAS WORRIED ABOUT MACK ARTHUR BECAUSE, YOU KNOW, HE
DON'T USUALLY STAY OUT LATE AWAY FROM ME, AND SO I WAS REAL
WORRIED ABOUT HIM, AND IT WAS ABOUT TWO IN THE MORNING WHEN HE
CAME HOME.

Q        HOW DO YOU KNOW; WHERE WERE YOU AT TWO IN THE
MORNING?

A        I WAS IN BED, AND --

Q        AND WHAT DID YOU DO OR HOW DID YOU KNOW HE CAME
HOME?

A        I PULLED THE CURTAIN BACK --I PULLED THE CURTAIN
BACK, AND IT JUST LOOKED LIKE IT WAS ABOUT TWO. I DIDN'T LOOK
AT NO CLOCK OR NO WATCH OR ANYTHING. I WAS JUST ESTIMATING THE
TIME, AND WHEN HE GOT TO THE HOUSE HE KNOCKED ON THE DOOR, AND
HE CALLED ME AND I GOT UP AND OPENED THE DOOR, AND I --I GOT

BACK IN THE BED, AND HE DIDN'T GET IN THE BED; HE LAID AT THE FOOT OF THE BED, AND HE GOT A PILLOW, AND HE SAID HE WAS GOING TO GET UP ABOUT 3:30 AND GO OVER TO THIS FATHER'S HOUSE, AND I ASKED HIM WHY, AND HE SAID, "WELL, CAN'T I GO OVER TO MY FATHER'S HOUSE," AND SO I DIDN'T SAY ANYTHING ELSE TO HIM, AND HE --

Q        WAS THIS UNUSUAL FOR HIM TO GET UP EARLY LIKE THIS?

A        YES.

Q        DID HE DO IT BEFORE?

A        UNLESS HE WAS GOING TO WORK HE DIDN'T DO IT.

Q        AND THIS WAS ON A SUNDAY?

A        UH-HUH, AND --

Q        AND HE DIDN'T WORK ON SUNDAY, DID HE?

A        NO, NOT --WELL, AND --

Q        EXCUSE ME.

A        --AND HE DIDN'T GET UP AT 3:30; HE --HE SLEPT AWHILE, AND IT WAS ABOUT 5:30 WHEN HE GOT UP, AND HE GOT UP, AND HE LEFT; HE TOLD ME TO FASTEN THE DOOR, AND I GOT UP AND I CLOSED THE DOOR AND I GOT BACK IN THE BED, AND I WENT BACK TO SLEEP, AND HE CAME BACK AND IT WAS GOOD DAY, AND HE KNOCKED ON THE DOOR, AND HE CALLED ME AND I GOT UP AND OPENED THE DOOR, AND I GOT BACK IN THE BED, AND HE WAS SITTING ON THE PORCH, AND I WAS KIND OF WAKING UP AND I HEARD HIM TALKING TO SOMEONE, AND IT WAS HIS UNCLE.

Q        ALL RIGHT, WHAT HAPPENED AFTER THAT?

A        AND I WENT BACK TO SLEEP, AND I SLEPT FOR AWHILE, AND I WOKE UP AND HE WAS IN THE KITCHEN WHEN I WOKE UP, AND I GOT UP, AND I WENT TO THE KITCHEN AND HE WAS IN THE KITCHEN, AND HE ASKED ME WAS I GOING TO GO COOK, AND I TOLD HIM, "YEAH," AND MY BABY WAS STILL ASLEEP, AND I WENT TO COOKING, AND I LEFT MY BABY IN BED, AND WHEN I GOT BACK MY BABY WAS UP; HE

WAS WOKE, AND I WENT ON IN THE HOUSE AND HE STARTED TO SHOWING
ME FORKS AND SPOONS, AND STUFF LIKE THAT.

Q       CAN YOU REMEMBER EXACTLY WHAT ALL HE WAS SHOWING
YOU WHEN YOU WERE COOKING --AFTER YOU STARTED COOKING BREAK-
FAST; WHAT ALL DID HE SHOW YOU?

A       AFTER I GOT THROUGH COOKING--AFTER I GOT BACK, I
WENT OVER TO HIS AUNT'S HOUSE TO COOK, AND AFTER I GOT BACK HE
STARTED SHOWING ME FORKS AND KNIVES AND SPOONS, AND --

Q       WHAT DID YOU ASK HIM ABOUT THESE, IF ANYTHING?

A       I ASKED HIM WHERE DID HE GET THEM FROM, AND HE TOLD
ME IT WAS SOME THINGS THAT HE LEFT OVER TO HIS FATHER'S AWHILE
BACK.

Q       DO YOU REMEMBER EXACTLY WHAT HE SHOWED YOU BESIDE
THE FORKS AND SPOONS?

A       AND HE SHOWED ME TWO ELECTRIC BLANKETS.

Q       BARBARA, I HAND YOU WHAT'S BEEN MARKED AS STATE'S
EXHIBIT 12, STATE'S EXHIBIT 11 IN EVIDENCE, AND ASK YOU IF
THESE ARE THE ELECTRIC BLANKETS THAT HE SHOWED YOU?

A       (WITNESS LOOKS AT BLANKETS)  YES --YES, IT IS.

Q       WHAT ELSE DID HE SHOW YOU, BARBARA?

A       LET'S SEE, A PINK SHEET.

Q       A PINK SHEET?

A       UH-HUH.

Q       WHAT ELSE DID HE SHOW YOU BESIDE A PINK SHEET?

A       LET'S SEE --

Q       PARDON?

A       THAT'S ALL I CAN REMEMBER THAT HE SHOWED ME THAT
DAY.

Q       OKAY.  BARBARA, I'LL HAND YOU A BOX THAT'S BEEN
MARKED AS STATE'S EXHIBIT 26 INTO EVIDENCE, AND ASK YOU IF YOU
WOULD JUST LOOK THROUGH THIS BOX, AND TELL ME IF YOU CAN

IDENTIFY ANY OF THOSE ITEMS IN THAT BOX?

A        (WITNESS LOOKS AT ITEMS IN BOX) I CAN REMEMBER EVERYTHING HERE EXCEPT THIS.

Q        OKAY, WOULD YOU TELL THE JURY CONCERNING THE PINK SHEET WHERE YOU SAW THE PINK SHEET?

A        WELL, HE BROUGHT IT FROM THE BACK ROOM, AND SHOWED IT TO ME.

Q        WHAT ABOUT THE OTHER ITEMS HERE; WHAT ABOUT THIS ITEM HERE, WHERE DID YOU SEE THIS, AND WOULD YOU TELL THE COURT WHAT THAT IS?

A        THIS IS WOMEN'S COLOGNE.

Q        WHEN DID HE GIVE YOU --DID HE GIVE THOSE TO YOU OR WHAT?

A        YES, AND I PUT THEM ON THE SHELF; IT WAS --HE GAVE--

Q        WHAT DID HE SAY WHEN HE GAVE THEM TO YOU?

A        HE JUST SAY, "HERE'S YOU SOME COLOGNE, SO YOU CAN STOP USING MINE."

Q        WHEN DID HE GIVE YOU THE COLOGNE, DO YOU REMEMBER?

A        LET'S SEE, I BELIEVE IT WAS ON TUESDAY.

Q        WHAT ABOUT THE --THESE ITEMS; CAN YOU RECOGNIZE THESE FOR THE COURT?

A        UH-HUH.

Q        WHAT ARE THOSE?

A        WOMEN'S SCARVES.

Q        DID HE GIVE THOSE TO YOU?

A        YES.

Q        HOW DID YOU FEEL WHEN HE WAS GIVING YOU ALL THESE ITEMS?

A        I FELT FUNNY, AND I TOLD HIM.

Q        OKAY, BARBARA, YOU SAID THAT YOU FELT FUNNY, AND YOU TOLD HIM, WHAT DID YOU TELL HIM?

195                                    JORDAN/DE

A        I TOLD HIM --I SAID --I ASKED HIM --FIRST, I ASKED HIM WHERE DID HE GET THESE ITEMS FROM, AND HE TOLD ME IT WAS SOME THINGS THAT HE HAD LEFT OVER TO HIS FATHER'S AWHILE BACK, AND I SAID, "MACK," --I SAID --I ASKED HIM WAS HE IN ANY KIND OF TROUBLE THAT TUESDAY, AND I DID --I JUST COME ON OUT AND ASKED HIM DID HE KILL MRS. PATTERSON THAT TUESDAY BECAUSE I HEARD IT THAT MONDAY ON THE NEWS, AND I JUST COME ON OUT, AND I JUST ASKED HIM BECAUSE I WAS REAL SUSPICIOUS.

Q        WHY WERE YOU SUSPICIOUS?

A        BECAUSE I SAW ALL OF THESE THINGS THAT HE HAD BOUGHT.

Q        WHAT ABOUT THE --

A        AND I KNOW HE WASN'T WORKING NO WHERE.

Q        BARBARA, I'M GOING TO SHOW YOU TWO PHOTOGRAPHS -- WELL, I'LL SHOW YOU ONE PHOTOGRAPH AND ASK YOU TO LOOK AT THAT AND SEE IF YOU CAN IDENTIFY THAT?

A        (WITNESS EXAMINES PHOTOGRAPH) YES, THESE ARE PICTURES I HAD UP BESIDE THE WALL.

Q        AND WHOSE WALL IS THAT?

A        THE --THIS IS --THIS IS OUR WALL; WE WAS LIVING AT THE HOUSE AND THIS IS THE SHELF, AND THAT'S MY CAMERA, AND MY THINGS ON THE SHELF.

Q        ARE THESE BOTTLES OF COLOGNE?

A        UH-HUH; THOSE BOTTLES OF COLOGNE THAT I GAVE TO THE POLICE.

Q        AND WHOSE ROOM IS THAT?

A        THAT'S OUR ROOM.

Q        AND DOES THAT PHOTOGRAPH ACCURATELY DEPICT OR PORTRAY THE CONDITION OF THAT AREA OF YOUR ROOM AS IT WAS ON AUGUST THE 4TH; THAT WOULD BE THE MONDAY?

A        UH-HUH.

196                                    JORDAN/DE

Q       WHO PUT THOSE ITEMS UP THERE ON THOSE SHELVES?

A       MACK GAVE THEM TO ME AND I SET THEM UP THERE.

MR. MONTGOMERY:

        YOUR HONOR, WE WOULD MOVE TO INTRODUCE THIS

PHOTOGRAPH --

THE COURT:

        HAS OPPOSING COUNSEL SEEN IT?

        (PHOTOGRAPH IS HANDED TO DEFENSE COUNSEL FOR

EXAMINATION)

MR. SAMS:

        NO OBJECTION.

THE COURT:

        ALL RIGHT, LET IT BE RECEIVED AND MARKED.


        (COURT REPORTER MARKS PHOTOGRAPH OF WALLS IN
         DEFENDANT'S HOUSE AS STATE'S EXHIBIT NO. 50 IN
         EVIDENCE)

State's Exhibit No. 50 - Evidence /s/KHB 12-5-80

289

Q        BARBARA, I HAND YOU ANOTHER PHOTOGRAPH AND ASK YOU
TO LOOK AT THAT AND SEE IF YOU CAN TELL THE COURT AND JURY
WHAT THAT IS, PLEASE?

A        (WITNESS LOOKS AT PHOTOGRAPH)  THIS IS THE --THIS
IS OUR BACK ROOM.

Q        WOULD YOU SPEAK UP, PLEASE?

A        THIS IS OUR --THE BACK ROOM OF THE HOUSE, AND IT'S
SOME BLANKETS --IT'S THE BLANKETS THAT HE BOUGHT IN.  IT'S --

Q        IS THAT THE SAME BLANKETS THAT'S MARKED AS STATE'S
EXHIBITS 11 AND 12 INTO EVIDENCE --

A        YES.

Q        --THAT YOU JUST PREVIOUSLY TESTIFIED ABOUT?

A        YES, IT IS.

Q        WHO PUT THOSE BLANKETS THERE?

A        MACK ARTHUR.

Q        DOES THAT PHOTOGRAPH TRULY AND ACCURATELY
REPRESENT THE CONDITION AND THE ITEMS THAT WERE PRESENT IN
THE BACK ROOM OF THE HOUSE THERE?

A        YES, IT DO.

Q        ON AUGUST THE 4TH WHICH WAS A MONDAY?

A        YES.

MR. MONTGOMERY:

        YOUR HONOR, WE WOULD MOVE TO INTRODUCE THIS INTO
EVIDENCE AT THIS TIME.

THE COURT:

        LET IT BE RECEIVED AND MARKED.

        (COURT REPORTER MARKS PHOTOGRAPH SHOWING BLANKETS,
        ETC. LOCATED IN BACK ROOM OF THE DEFENDANT'S
        HOUSE AS STATE'S EXHIBIT NO. 51 IN EVIDENCE)



State's Exhibit No. 51 - Evidence /s/KHB    12-5-80

291

198                    JORDAN/DE

Q        BARBARA, DID YOU HAVE THE OCCASION ON EITHER MONDAY OR TUESDAY TO SEE SOME RIFLES THERE AT THE HOUSE?

A        YES, I DID.

Q        SOME GUNS?

A        YES, I DID.

Q        WOULD YOU TELL THE JURY ABOUT THAT, AND WHEN --WHEN YOU SAW THEM AND WHO HAD THEM AND SO FORTH?

A        THAT MONDAY AFTER WE GOT BACK MACK --HE --HE WENT INSIDE THE HOUSE, AND HE GOT THESE GUNS --IT WAS LATE THAT AFTERNOON, AND HE STARTED SHOOTING, AND I TOLD HIM I WAS REAL SCARED AND, YOU KNOW, I TOLD HIM NOT TO POINT THE GUNS TOWARDS THE HOUSE, AND HE JUST KEPT ON SHOOTING AND I ASKED HIM WHERE HE GOT THEM FROM, AND HE DIDN'T SAY ANYTHING, AND HE JUST KEPT ON SHOOTING, AND I GRABBED MY BABY --I WENT BACK IN THE HOUSE, AND I GOT MY BABY AND I GRABBED HIM UP IN MY ARMS, AND I WAS REAL SCARED BECAUSE I THOUGHT HE WAS GOING TO SHOOT IN THE HOUSE.

Q        WHAT DID HE DO WITH THE GUNS AFTER HE WAS SHOOTING, BARBARA?

A        HE BROUGHT THEM -- HE --HE BROUGHT THE GUNS IN THE HOUSE, AND HE PUT THEM UP IN THE ATTIC BY THE CHIMNEY.

Q        BARBARA, ARE THESE THE GUNS WHAT'S BEEN MARKED AS STATE'S EXHIBIT 29 AND STATE'S EXHIBIT NO. 28, ARE THESE THE GUNS THAT YOU SAW HIM WITH?

A        (WITNESS LOOKS AT GUNS)  YES.

Q        YOU'VE SEEN THESE GUNS BEFORE COURT STARTED, RIGHT?

A        YES.

Q        BARBARA, YOU SAID THAT HE --THAT YOU WOULD ASK HIM WHERE HE GOT THESE ITEMS FROM, AND HE --WHAT WOULD HE SAY, AND HOW WOULD HE ACT?

A        HE WOULD --HE WOULD GET MAD, AND --

292

199                                    JORDAN/DE

MR. KESLER:

> OBJECT, YOUR HONOR, THIS IS REPETITIVE; BEEN OVER THIS SEVERAL TIMES.

THE COURT:

> IT IS REPETITIVE; I'LL LET HER ANSWER THIS TIME.

MR. MONTGOMERY:

> YOUR HONOR, THERE ARE DIFFERENT TIMES AND DIFFERENT REACTIONS.

THE COURT:

> I THINK WE'VE BEEN OVER THEM, BUT I'LL PERMIT HER TO ANSWER.

Q    GENERALLY HOW WOULD HE ACT WHEN YOU WOULD ASK HIM ABOUT WHERE HE GOT THESE ITEMS; WHAT WOULD HE DO?

A    HE WOULD GET REAL MAD, AND SNAPPY AT ME.

Q    DID HE TELL YOU WHERE HE GOT THESE ITEMS FROM?

A    HE --HE JUST TOLD ME THAT HE LEFT --IT WAS SOME THINGS HE LEFT WHEN HE --LEFT OVER TO HIS FATHER'S AWHILE BACK; THAT'S WHAT HE TOLD ME WHEN I ASKED HIM ABOUT IT.

Q    NOW, YOU TESTIFIED THAT HE LEFT YOUR HOUSE AROUND FOUR O'CLOCK --THREE OR FOUR O'CLOCK SATURDAY AFTERNOON, AND YOU DIDN'T SEE HIM UNTIL SOMEWHERE AROUND TWO O'CLOCK THE NEXT SUNDAY MORNING, IS THAT CORRECT?

A    THAT'S CORRECT.

Q    WHEN HE CAME UP TO THE DOOR?

A    UH-HUH.

Q    WOULD YOU TELL THE JURY, BARBARA, WHERE YOU HAD BEEN SATURDAY WITH HIM BEFORE HE LEFT?

A    WELL, WE WENT SHOPPING; I WENT TO PICK MY BABY UP FIRST, IT WAS AROUND NOON, AND WE WENT SHOPPING, AND AFTER WE GOT BACK IT WAS ABOUT THREE WHEN WE GOT HOME.

Q    BARBARA, WOULD YOU TELL THE JURY WHAT --WOULD YOU

DESCRIBE HIS CLOTHES THAT HE WAS WEARING ON THAT SATURDAY WHEN HE LEFT AT APPROXIMATELY FOUR O'CLOCK?

A        HE HAD ON A PAIR OF GREEN PANTS AND A YELLOW SHIRT.

Q        AND WHEN HE CAME BACK HOME AROUND TWO O'CLOCK AND HE KNOCKED ON THE DOOR WHAT WAS HE WEARING?

A        A PAIR OF GREEN --GREEN PANTS AND A YELLOW SHIRT.

Q        AND WHEN HE WAS ARRESTED--DO YOU KNOW THE DAY THAT HE WAS ARRESTED?

A        YES.

Q        WHEN WAS HE ARRESTED, BARBARA?

A        AUGUST 6.

Q        WHAT WAS HE WEARING WHEN HE WAS ARRESTED?

A        HE WAS WEARING A PAIR OF GREEN PANTS, AND A YELLOW SHIRT,

Q        WAS IT THE SAME GREEN PANTS THAT HE HAD ON SATURDAY AND SUNDAY?

A        YES.

Q        BARBARA, I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS STATE'S EXHIBIT 45 INTO EVIDENCE AND ASK YOU IF YOU WOULD TO TAKE THESE --THIS ITEM OUT AND TO LOOK AT IT REAL CLOSE.

         (WITNESS EXAMINES EXHIBIT)

Q        BARBARA, CAN YOU IDENTIFY OR DO YOU RECOGNIZE THIS ITEM THAT'S BEEN MARKED AS STATE'S EXHIBIT 45 IN EVIDENCE?

A        YES, I DO.

Q        WHAT IS THIS?

A        THIS IS --THAT IS THE PAIR OF GREEN PANTS THAT MACK ARTHUR WAS WEARING.

Q        IS THIS THE SAME PAIR OF GREEN PANTS?

A        YES, IT IS.

Q        IS THIS THE SAME PAIR OF GREEN PANTS THAT HE HAD ON WHEN HE CAME BACK AROUND 2:00 O'CLOCK SUNDAY MORNING?

201                          JORDAN/DE

A        YES.

Q        WHEN YOU LIVED THERE WITH HIM --HOW LONG DID YOU LIVE WITH HIM?

A        ABOUT THREE MONTHS.

Q        DID YOU TAKE CARE OF THE HOUSE CLEANING AND --

A        YES, I DID.

Q        --WASH HIS CLOTHES FOR HIM?

A        YES, I DID.

Q        DID YOU KNOW ABOUT HIS CLOTHES?

A        YES.

Q        WOULD YOU TELL THE JURY HOW MANY PAIR OF GREEN PANTS THAT HE HAD?

A        JUST ONE; THIS ONE PAIR THAT I KNOW OF.

Q        ALL RIGHT, ON MONDAY DID YOU HAVE THE OCCASION TO SEE THE DEFENDANT DO ANYTHING WITH THOSE PANTS?

A        THAT MONDAY?

Q        OR WAS IT TUESDAY?

A        IT WAS TUESDAY.

Q        ALL RIGHT, WOULD YOU TELL THE JURY WHAT YOU SAW THE DEFENDANT DO WITH THE PANTS THAT'S BEEN MARKED AS STATE'S EXHIBIT 45 IN EVIDENCE?

A        WELL, THAT TUESDAY HE WASHED THEM HISSELF. I ASKED HIM DID HE WANT ME TO WASH THEM, AND HE SAID, NO, HE DIDN'T WANT ME TO WASH HIS CLOTHES, SO I JUST WENT AHEAD AND WASHED MINE, AND SO HE TOOK THEM OVER TO HIS AUNT'S HOUSE, AND HE WASHED THEM.

Q        HOW DID HE WASH THEM; WOULD YOU --DID YOU SEE HIM WASH THEM?

A        I SAW HIM WENT ON THE BACK AND HE GOT THE TUB AND THE RUB BOARD.

Q        AND HOW WAS HE WASHING THEM?

202                                    JORDAN/DE

A        AND HE WASHED THEM ON THE RUB BOARD.
Q        HAD YOU DURING THE PERIOD THAT YOU LIVED WITH HIM
EVER SEEN HIM WASH HIS CLOTHES BEFORE; HAD YOU ALWAYS WASHED
HIS CLOTHES?
A        I ALWAYS WOULD WASH HIS CLOTHES.
Q        AND WHEN YOU ASKED HIM IF YOU COULD WASH THE
CLOTHES WHAT DID HE DO, AND HOW DID HE ACT?
A        HE JUST GOT REAL SNAPPY, AND SAID, "NO, NO, I DON'T
WANT YOU TO WASH MY CLOTHES."
MR. MONTGOMERY:
        NOTHING FURTHER, YOUR HONOR.
THE COURT:
        YOU MAY CROSS-EXAMINE.
MR. KESLER:
        YOUR HONOR, AT THIS TIME COULD WE HAVE A VERY
SHORT RECESS?
THE COURT:
        ALL RIGHT, THE BAILIFF WILL SHOW THE JURY INTO THE
        JURY ROOM.

                        (JURY OUT)

THE COURT:
        COURT WILL BE RECESS FOR TEN MINUTES.

                        (RECESS)

        FOLLOWING A TEN MINUTE RECESS, ALL MEMBERS OF THE
COURT, INCLUDING THE JUDGE, COURT REPORTER, ATTORNEYS, CLERK,
BAILIFFS, AND THE DEFENDANT BEING PRESENT, THE FOLLOWING
PROCEEDINGS WERE HAD:

THE COURT:
        BRING THE JURY BACK.

                        (JURY IN)

203                                    JORDAN/CE

## CROSS-EXAMINATION

MR. KESLER:

Q       BARBARA, I BELIEVE YOU TOLD THE JURY THAT YOU WERE MACK ARTHUR'S GIRLFRIEND, IS THAT RIGHT?

A       YES, THAT'S RIGHT.

Q       AND YOU'VE KNOWN HIM FOR ABOUT A YEAR NOW?

A       YES.

Q       HOW OLD IS MACK ARTHUR KING?

A       HE'S ABOUT TWENTY-ONE.

Q       AND YOU WERE HOW OLD?

A       TWENTY-FOUR.

Q       DO YOU KNOW A GOOD BIT ABOUT MACK ARTHUR KING?

A       NO.

Q       HOW DID YOU MEET HIM?

A       I MET HIM --HE --HE CAME OVER TO MY HOUSE ONE NIGHT, ONE FRIDAY NIGHT; IT WAS DECEMBER THE SEVENTH WITH MY BROTHER.

Q       ARE YOU FROM COLUMBUS AND LOWNDES COUNTY?

A       YES.

Q       HAD YOU KNOWN OF HIM PREVIOUS TO THAT MEETING?

A       NO.

Q       DID NOT KNOW ANYTHING ABOUT HIM?

A       I DIDN'T KNOW HIM THEN; NO.

Q       I BELIEVE YOU STATED THAT MACK ARTHUR GAVE YOU SEVERAL OF THESE ITEMS THAT ARE OUT HERE ON THE FLOOR, THAT'S-- IS THAT RIGHT?

A       YES; YES.

Q       HE NEVER TOLD YOU WHERE HE GOT THEM?

A       HE --HE TOLD ME ONCE THAT HE GOT THEM --IT WAS SOME THINGS THAT HE GOT FROM HIS FATHER'S HOUSE AWHILE BACK.

Q       DID HE TELL YOU ANYTHING OTHER THAN THAT?

A        No.

Q        Barbara, do you know of your own personal knowledge now Mack Arthur's educational background?

A        No.

Q        Do you know how far he went in school?

A        No.

Q        Don't know anything about that?

A        No.

Q        I'm going to turn your attention back to that Saturday night when you went to the party.

A        Yes.

Q        You said you got home about a quarter till ten?

A        Yes, that's right.

Q        Went ahead and got ready for bed?

A        Yes.

Q        So, about what time was it when you actually went to bed?

A        It was about --about ten.

Q        About ten?

A        Yes.

Q        Now, you --you said you were worried?

A        That's right because he hadn't got home.

Q        Okay, did you go on to sleep though, you and the baby?

A        The baby was already asleep, and I laid there for awhile and then I dozed off.

Q        Then you dozed off?

A        Uh-huh.

Q        About what time was it when you dozed off, if --if you remember?

A        I don't know.

Q        YOU DON'T KNOW?

A        NO.

Q        AND WOULD YOU SAY THAT YOU SLEPT SOUNDLY OR LIGHTLY
DURING --

A        LIGHTLY.

Q        LIGHTLY, AND HE CAME HOME SOMETIME LATER?

A        YES.

Q        YOU SAID YOU THOUGHT IT WAS ABOUT TWO O'CLOCK?

A        YES.

Q        BUT YOU DIDN'T LOOK AT A CLOCK OR ANYTHING?

A        NO.

Q        YOU SAID IT LOOKED LIKE IT WAS TWO O'CLOCK?

A        THAT'S RIGHT.

Q        NOW, WERE YOU FULLY AWAKE WHEN HE GOT THERE?

A        NO.

Q        YOU WERE ABOUT HALF ASLEEP?

A        THAT'S RIGHT.

Q        OKAY, AND YOU --YOUR POWERS OF OBSERVATION WEREN'T
WHAT THEY WOULD BE OR SAY AS GOOD AS THEY'D BE RIGHT HERE
TODAY, ARE THEY?

A        YES.

Q        YES OR NO?

A        I DIDN'T UNDERSTAND THE QUESTION.

Q        OKAY; YOU WEREN'T NOTICING THINGS AS WELL BEING HALF
ASLEEP AS YOU COULD SAY RIGHT NOW, COULD YOU?

A        NO.

Q        YOU'VE TESTIFIED TO A NUMBER OF THINGS TO THE
DISTRICT ATTORNEY HERE CONCERNING THIS SPECIFIC TIME INTERVAL,
IS THAT RIGHT?

A        THAT'S RIGHT.

Q        AND IS YOUR MEMORY CLEAR OR IS IT A LITTLE BIT

206                                    JORDAN/CE

FOGGY?

A        WELL, I CAN'T REMEMBER WELL --TOO WELL.

Q        YOU CAN'T REMEMBER TOO WELL?

A        NO, IT'S BEEN AWHILE.

Q        AND IT WAS DURING THAT PERIOD THAT I BELIEVE YOU
TESTIFIED HE TOLD YOU SOMETHING ABOUT GOING OVER TO HIS
DADDY'S HOUSE OR SOMETHING, WAS THAT RIGHT?

A        THAT'S RIGHT.

Q        WERE YOU ABOUT HALF ASLEEP WHEN THAT HAPPENED WHEN
HE SAID THAT?

A        YES, I WAS ABOUT HALF ASLEEP.

Q        ARE YOU SURE AND POSITIVE THAT HE EVEN MADE THAT
STATEMENT; COULD YOU HAVE BEEN DREAMING?

A        NO, HE --HE SHOOK ME, AND HE TOLD ME HE WAS GOING
TO LEAVE; HE WAS LEAVING ABOUT THREE-THIRTY, BUT HE LAID BACK
DOWN, AND HE WENT TO SLEEP.

Q        HE --HE DIDN'T LEAVE AT THAT TIME?

A        NO.

Q        I BELIEVE YOU ALSO TESTIFIED THAT THE NEXT DAY YOU
HEARD MACK ARTHUR OUT IN THE FRONT OF THE HOUSE TALKING TO
SOMEBODY, IS THAT RIGHT?

A        YES, I DID.

Q        YOU SAID THAT WAS HIS UNCLE?

A        UH-HUH.

Q        WHAT WAS HIS NAME?

A        WILLIE PORTER.

MR. KESLER:

         I BELIEVE THAT'S ALL, YOUR HONOR.

THE COURT:

         ANY RE-DIRECT?

300