IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

MACK ARTHUR KING                                    PETITIONER

VS.                                                 NO. 1:10CV7-SA

CHRISTOPHER EPPS, ET AL                             RESPONDENTS

## PETITIONER'S BRIEF

Of Counsel:

Merrida Coxwell
Coxwell & Associates, PLLC
500 North State Street
Jackson, MS 39201
Phone: (601) 948-1600
Fax: (601) 948-7097
Email: merridac@coxwelllaw.com

Stacy Ferraro
P.O. Box 708
Flora, MS  39701
Phone: (601) 853-8331
Fax: (601) 853-8331
Email: stacy@watervalley.net

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .......................................................................................i-ii

PROCEDURAL HISTORY .................................................................................. 1-2

STATEMENT OF THE FACTS........................................................................ 3-24

ARGUMENT

POINT ONE ...................................................................................................... 24-44

PETITIONER'S RIGHT TO THE DUE PROCESS AND
FUNDAMENTAL FAIRNESS GUARANTEED BY THE
EIGHTH AND FOURTEENTH AMENDMENTS WERE
VIOLATED WHEN THE STATE COURT DENIED
FUNDING FOR A PATHOLOGIST.

POINT TWO ...................................................................................................... 44-71

PETITIONER WAS DENIED HIS RIGHTS GUARANTEED
BY THE FEDERAL CONSTITUTION TO PRESENT
EVIDENCE REGARDING HIS DEATH ELIGIBILITY,
MITIGATION OF PUNISHMENT, AND REBUTTAL OF
THE STATE'S CASE FOR DEATH

POINT THREE ................................................................................................ 71-113

GROUNDS C AND D: PETITIONER IS MENTALLY
RETARDED AND INELIGIBLE FOR THE DEATH
PENALTY UNDER THE EIGHTH AMENEDMENT AND
PETITIONER WAS DENIED DUE PROCESS OF LAW
WHEN THE STATE COURTS REFUSED TO GIVE HIM AN
INDEPENDENT, QUALIFIED EXPERT IN MENTAL
RETARDATION OR AN EVIDENTIARY HEARING
BEFORE THE COURT OR JURY ON THE ISSUE OF
MENTAL RETARDATION

POINT FOUR ............................................. 113-143
       THE PETITIONER WAS DENIED HIS RIGHT TO THE
       EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION
       OF THE SIXTH AND FOURTEENTH AMENDMENTS.

POINT FIVE ............................................. 143-163
       JURY    INSTRUCTION    ERRORS  -  THE
       UNCONSTITUTIONALLYL  VAGUE  AGGRAVATING
       CIRCUMSTANCE "ESPECIALLY HEINOUS, ATROCIOUS
       OR CRUEL," COUPLED WITH THE LACK OF EVIDENCE
       TO  SUPPORT  THIS  INSTRUCTION  VIOLATES  THE
       EIGHTH AND FOURTEENTH AMENDMENT

POINT SIX .............................................. 163-176
       PETITIONERS RIGHTS GUARANTEED BY THE SIXTH,
       EIGHTH, AND FOURTEENTH AMENDMENTS WERE
       VIOLATED WHEN THE TRIAL COURT IMPROPERLY
       EXCLUDED  A  JURORS  FOR  CAUSE  AND  THE
       MISSISSIPPI SUPREME COURT AFFIRMED

POINT SEVEN ............................................ 177-178
       IMPROPER  AND  PREJUDICIAL  VICTIM  IMPACT
       EVIDENCE WAS INTRODUCED DURING THE TRIAL
       THEREBY DENYING MR. KING FUNDAMENTALLY
       FAIR SENTENCING HEARING AND INTRODUCING
       ARBITRATRY  AND  CAPRICIOUSNESS  INTO  THE
       SENTENCING HEARING. THIS VIOLATED THE EIGHT
       AND FOURTEENTH AMENDMENTS TO THE UNITED
       STATES CONSTITUTION.

POINT EIGHT ........................................... 178-180
       PETITIONER WAS DENIED HIS RIGHTS GUARANTEED
       BY  THE  SIXTH,  EIGHTH,  AND  FOURTEENTH
       AMENDMENTS DUE TO THE CUMULATIVE EFFECT OF
       THE ERRORS AT HIS TRIAL.

CONCLUSION ............................................ 180

CERTIFICATE OF SERVICE ............................... 181

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**MACK ARTHUR KING**                                        **Petitioner,**

**versus**                                              **No. 2:07-cv-49-HTW**

**CHRISTOPHER EPPS, COMMISSIONER,**
**MISSISSIPPI DEPARTMENT OF**
**CORRECTIONS; JIM HOOD, ATTORNEY**
**GENERAL**                                                **Respondents**

### <u>Petitioner's Brief in Support of the Petition for Writ of Habeas Corpus</u>

## PROCEDURAL HISTORY

Mack Arthur King was convicted of capital murder of Lela Patterson in 1980 and was sentenced to death. On October 27, 1982, the Mississippi Supreme Court affirmed both the conviction and the sentence. *King v. State,* 421 So.2d 1009 (Miss. 1982). King filed a petition for writ of *Error Coram Nobis* and the Mississippi Supreme Court ordered the trial court to conduct an evidentiary hearing regarding King's claim of ineffective assistance of counsel. *See King v. Thigpen,* 441 So.2d 1365 (Miss. 1983); *King v. Thigpen,* 446 So.2d 600 (Miss. 1984). The trial court conducted a hearing and denied relief. The Mississippi Supreme Court affirmed the trial court's denial of relief. *King v. State,* 503 So.2d

271 (Miss. 1987). On August 25, 1993, the Fifth Circuit Court of Appeals vacated the sentence of death and remanded the case with instructions to return it to the state court for reconsideration of the sentence of death finding that the unlimited "especially heinous, atrocious or cruel" jury instruction was unconstitutionally broad. *King v. Puckett,* 1F.3d 280 (5th Cir. 1993). The Mississippi Supreme Court vacated the sentence of death and remanded for a new sentencing trial. *King v. State,* 656 So.2d 1168 (Miss. 1995). On April 9, 1998, King was again sentenced to death. King appealed and the Mississippi Supreme Court reversed the death sentence and remanded for a new sentencing hearing on the ground that the trial Court had erred in instructing the jury to disregard sympathy in its deliberations. *King v. State,* 784 So.2d 884 (Miss. 2001). King was again sentenced to death in 2003. The Mississippi Supreme Court affirmed the conviction of capital murder and sentence of death on May 31, 2007. *King v. State,* 960 So.2d 413 (Miss. 2007).

Thereafter King filed an application for leave to seek post-conviction relief in the trial court pursuant to *Mississippi Code Annotated, Section 99-39-5.* King filed supplemental petitions on August 8, 2008 and September 19, 2008. Exhibits from the Petition and Supplemental Petition are included with this brief. The Mississippi Supreme Court denied Post-Conviction relief on September 24, 2009 and denied rehearing on January 7, 2010.

## STATEMENT OF FACTS

Mack Arthur King grew up as an African American in rural Mississippi in abject poverty and was reared by neglectful, alcoholic parents who were often violent with each other. The family lacked resources to obtain adequate and nutritional food, clothes, and hygiene supplies. The family depended upon the donations by family members and members of the community. *See* Post-Conviction Exhibits 25, 27. Mississippi Department of Human Service Records report the family had no regular income, no car, and the family received food stamps. Habeas Exhibit 2, Lowndes County DHS Records at DHS-LC 0012.

Mack King's parents Teavell and Minnie Pearl King as a habit or way of life abused alcohol prior to and after his birth. *See* Post-Conviction Exhibits 22, 27. Mack's mother Minnie Pearl drank far more than her husband. On weekends the children were left unattended while their mother went drinking and their father worked. Minnie Pearl regularly left on Friday nights and returned on Sunday evening. *See* Post-Conviction Exhibits *25, 27.*

Mack Arthur witnessed violence between his parents including an episode where his mother stabbed his father in the back of his right leg. After this violent incident Mr. King had to be taken to the hospital. *See* Post-Conviction Exhibits 25, 27.

Mack's younger brother Jake is severely disabled. With the help of Lowndes

County Department of Human Services Jake was placed in Ellisville State School for the Mentally Retarded on Sept. 22, 1970, at the age of 8. Habeas Exhibit 2 Lowndes County DHS Records at DHS-LC 0013. Psychological testing performed at Ellisville found that Jake scored at the level of profound Mental Retardation with a reported IQ score of 3 and 5. Habeas Exhibit 3 at ESS019, ES0021. Social history taken at Ellisville notes the Kings had five children that died in their first year from pneumonia with high fever and convulsions. Habeas Exhibit 3 at ES0017.

Mack Arthur King is mentally retarded and suffers from brain damage. Mack King has taken three IQ tests over the last twenty-five years and has scored in the mentally retarded range on each test. School records show Mack King received the lowest possible conduct mark of "5" on a scale of 1 to 5 (Five being the lowest) on every conduct category: "assumes responsibility," " initiative," "leadership," "personal grooming" and "works well with others." Post-Conviction Exhibit 23.

**The Crime**

Mack King initially denied any involvement in the offence. Mr. King's questioning began at 8:30 am on August 06, 1980, where he denied any involvement in the crime. Exhibit 1- 1980 Tr. 166-172; Tr. 494-497. At 1:00 a.m. on August 07, 1980, Mr. King gave his second (2nd) statement where he admitted

going with his uncle Willie Porter to the home of Mrs. Lela Patterson to burglarize Mrs. Patterson's home. According to Mr. King, he went inside Mrs. Patterson's home while Willie Porter served as his "look-out." Mr. King went inside and took some household goods and items, including food from the freezer. After Mr. King finished he went outside to where Willie Porter was waiting Mr. Porter had been drinking all afternoon. Mr. King told his uncle Willie Porter that he had gotten things from the house. Willie Porter went inside Mrs. Patterson's house and Mr. King left and went home, failing to serve as a "look-out" for his uncle. Mrs. Patterson was alive when Mr. King left and he does not know if Willie Porter killed her or not. Exhibit 1 - 1980 Tr. 157-189; Tr. 499 -503. Mr. King unequivocally stated he did not kill Mrs. Patterson. Mr. King went home and went to bed.

Ms. Barbara Jordan shared a dilapidated home with Mr. King. The home had no electricity or running water. Barbara Jordan confirmed that Mr. King came in about 2:00 a.m. Sunday, August 3rd, 1980 and went to bed. He got up later at about 5:30 a.m. and went outside to sit on the porch. Barbara Jordan heard Mr. King talking to someone who Mack King said was his uncle Willie Porter. Exhibit 1 - 1980, Tr. 284; Barbara Jordan, 1980 Statement, Exhibit 2. Willie Porter had come by and wanted to know why Mr. King did not wait on him, obviously making a reference to Willie Porter serving as "look out" for Mr. King, but Mr.

King left Mrs. Paterson's house and did not serve as "look out" for Mr. Porter. Exhibit 1-1980, Tr. 182. When interviewed by law enforcement in 1980 Willie Porter denied any knowledge of the crime. Willie Porter, 1980 Statement, Exhibit 3.

## 1980 Trial

The offense in this case took place on August 3, 1980. The indictment was recorded and a capias issued on August 21, 1980. Mr. King was charged with a capital murder. The indictment alleged Mr. King committed a burglary during which a murder occurred. The underlying indictment failed to charge the essential elements of burglary. For this reason the indictment was fatally defective.

The trial began four (4) months later on December 4, 1980 and concluded with a sentence of death one (1) day later on December 5, 1980. Mack King's defense has been consistent since 1980.

During the course of Mr. King's 1980 trial his counsel brought out before the jury the second statement of Mr. King to law enforcement wherein Mr. King denied having any connection with Mrs. Patterson's death. There were fingerprints found belonging to Mr. King on items burglarized from Mrs. Patterson's house but there were also fingerprints found in the bathroom where Mrs. Patterson died that did not belong to Mr. King and were never identified. Tr. 511. During the cross-examination of Barbara Jordan, Mr. King's counsel brought out that Willie Porter

came over to Mr. King's home in the early morning hours after the burglary of Mrs. Patterson's home. Exhibit 1- 1980, Tr. 300. In the state's closing the prosecutor argued against the theory that Willie Porter was involved in the crime. The State's argument was based on the lack of physical evidence that Willie Porter was present. Exhibit 1 - 1980 Tr. 236. During closing for Mr. King his defense counsel argued Willie Porter was the likely cause of Mrs. Patterson's death and therefor an alternative theory for her death. Exhibit 1- 1980 Tr. 333-338. Under either theory Mr. King could have been found guilty of capital murder due to his involvement in the underlying offense as an accomplice. The state offered and was granted instructions which stated Mr. King could be guilty of the capital murder of Mrs. Patterson if he was "acting alone, *or in conjunction with another or others . . .*" during the commission of the crime of burglary and "*with or without the design to effect the death . . ..*" Exhibit 1-1980, Tr. 362, 367; Instruction S-2A, Instruction S-2. The jury verdict in 1980 did not contain findings that Mr. King actually killed, attempted to kill, intended to kill, or contemplated the use of lethal force. The case *of Enmund v. Florida*, 458 U.S. 782 (1982) was decided after this case was tried in 1980.

### *Error Coram Nobis* Hearing

The Mississippi Supreme Court ordered an Error Coram Nobis hearing on the issue of trial counsel's ineffective representation. Mr. King's counsel hired Dr.

Robin King, a psychologist in private practice in Jackson, MS to evaluate Mack King. On April 15, 1983, Dr. Robin King administered the Wechsler Adult Intelligence Test-Revised (WAIS-R) and found Mr. King to have a full-scale IQ of 71. Tr. 612. Dr. King later found an error in his scoring and found Mr. King's full-scale IQ to be 69. Tr. 615.

On June 23, 1983, at the request of the State, Mr. King was tested by Dr. Michael Whelan. Dr. Whelan used the Wechsler Adult Intelligence Test (WAIS), which was outdated and had been replaced by the WAIS-R. Dr. Whelan determined Mack King's full-scale IQ to be 71. Tr. 679. Dr. Whelan noted Mr. King's test profile showed subtest scatter. Tr.683. Dr. Whelan explained that a split between verbal and performance abilities could indicate brain damage caused by a stroke or head trauma or a learning disability. Tr. 680- 683.

**2003 Re-sentencing**

The 2003 Sentencing Jury *did not* have the benefits of the1980 arguments since that jury did not hear the guilt phase evidence that the 1980 jury heard when Mack King was convicted of capital murder. In the 1980 trial the State considered accomplice liability and proceeded to obtain a judgment of conviction for capital murder with the accomplice liability theory before the jury. All of counsel's efforts in the 1980 where on guilt or innocence and little to nothing were established as mitigating evidence. In the 2003 re-sentencing trial King's attorney's efforts were

directed toward contesting the intent factors set forth in E*nmund* and establishing mitigating factors or contesting aggravating factors.

Counsel for Mr. King attempted to confirm the same facts brought out in 1980 during the 2003 Sentencing Hearing but Barbara Jordan claimed to have no present recall of who was on the porch in the early morning hours after the burglary and murder of Mrs. Patterson. Tr. 558-560. In 2003 Mr. King attempted to prove Willie Porter had no alibi for the night of the crime. The state objected to King's Counsel questioning a deputy about Willie Porter's alibi. Mr. Porter had committed prior crimes and blamed then on Mr. King. Tr. 525, 564; R.E. 48. Mr. King wanted to prove that his fingerprints were not found in Mrs. Patterson's bedroom. He also attempted to show that the 1980 forensic investigation was incomplete. Tr. 565. The trial judge also prohibited the introduction of evidence that there was no transfer of fibers between Mr. King and Mrs. Patterson. Tr. 518-519. Exhibit 13 and 14 to the Petition for Post-Conviction Relief.

In 2003 Mr. King moved *in limine* to prevent the State from bringing into evidence that some type of blood was on Petitioner's pants. C.P. 261-266. DNA was not conducted in 1980. Petitioner wanted to DNA test the pants but the pants were the single piece of evidence lost by the State. The Court did not grant the motion *in limine* and instead allowed the state to bring out evidence of the blood but King was not allowed to rebut the evidence. Tr. 20. In closing arguments

Petitioner was prohibited from arguing relevant issues due to rulings by the trial court. In addition the Trial Court refused a circumstantial evidence instruction. DSP-19, C.P. 446, Tr. 785. In this instance the court failed to understand that when Mr. King was contesting that he killed Mrs. Patterson, he was not contesting the jury's right to find him guilty of capital murder under an accomplice theory, he was doing what he was constitutionally permitted to do and challenging that he did not "actually kill, intend to kill, attempt to kill, or contemplate the use of lethal force." *Enmund, Id.* He was also putting before the jury relevant and admissible mitigating evidence. *Lockett v. Ohio,* 438 U.S. 586 (1978).

In the 2003 resentencing Mr. King filed a Motion for funds to obtain expert assistance. Mr. King requested funds for four experts including a pathologist, a psychologist, and an expert in mental retardation. The Motion for funds was taken up *ex parte* and *in camera.* C.P. 217. It was unsealed by counsel for Petitioner. Motion for Funds to Obtain Expert Assistance, Tr. 305-341; Transcript of Hearing under Seal, Tr. 342-407.

The assistance of a pathologist was critical to contesting the aggravating evidence the State would elicit. Specifically, the State sought to prove that the offense was especially heinous, atrocious, and cruel as it had done in prior proceedings. The State relied on expert testimony to establish that aggravating circumstance. The state built its case for the heinous, atrocious or cruel

aggravating circumstance based on the testimony of Dr. Martin. Tr. 728-730. During the closing arguments the State spoke extensively to the jury about the injuries described by Dr. Martin and how Mrs. Patterson suffered. Tr.799-802. Mr. King set forth in detail the basis for his need for an expert pathologist in his motion. An expert would be able to refute the State's contention that the crime was "heinous, atrocious or cruel." The Mississippi Supreme Court had in a previous opinion involving Mr. King wrote a published opinion stating this was a "crucial issue." *King v. State*, 784 So.2d 884 (Miss. 2001).

Mr. King provided the affidavit of Dr. Leroy Riddick, an expert in forensic pathology to establish there were genuine issues of fact that were disputed from his examination of Dr. Martins' autopsy. Affidavit of Dr. Riddick, Exhibit B to the Motion for Funds to Obtain Expert Assistance. Tr. 328-330. Dr. Riddick would have provided relevant testimony that Mrs. Patterson did not suffer as Dr. Martin testified.

Dr. Riddick has a detailed affidavit of his testimony and his costs. These issues were presented to the trial judge *in camera*. Tr. 393-397. During the hearing the trial court stated he thought the defense could use some help, but he felt the money was too high. At one point the trial judge opinioned that maybe he was just *old and behind the times*. Tr. 401-407. The court took the issue under advisement and overruled the motion. C.P. 224.

During Mr. King's 2003 re-sentencing Mr. King offered the precise instruction recommended by the Mississippi Supreme Court to define the aggravating circumstance "heinous, atrocious or cruel". DSP-2, C.P. 435; R.E. 178. The State offered an instruction which varied from the instruction demanded by the Mississippi Supreme Court and one which was inadequate in terms of guiding the jury. (SSP-5, C.P. 411. Mr. King objected to the State's instruction but the trial court overruled the objection. Tr. 753, R.E. 96; Tr. 754, 756-58; R.E. 97, 990-1001.

The testimony from the State's pathologist was unclear whether Mrs. Patterson lost consciousness immediately. Tr. 458-62. In the first trial in 1980 the testimony was more beneficial to Mr. King. The State's pathologist actually leaned more toward the State in the 2003 trial. The State relied on the fact ice cream was left out of Mrs. Patterson's freezer on the night of the burglary and murder. Tr. 801, 806, 841.

In the Sealed Motion for Funds to Obtain Expert assistance filed on Sept. 25, 2002, counsel also requested experts necessary to present mitigation evidence. *Sealed Ex Parte Motion for Funds To Obtain Expert Assistance* at 305-327. In this motion trial counsel asked for a mental retardation expert and a licensed psychologist. *Sealed Ex Parte Motion for Funds To Obtain Expert Assistance* at 306. Trial Counsel specifically asked for the appointment of Caroline Everington,

Ph.D., an Associate Dean of the Richard Riley College at Winthrop University who has published extensively in the field of mental retardation and criminal justice. Dr. Everington is eminently qualified to assess mental retardation. C.P. 324-337. After an *ex parte* hearing in chambers the Court denied the request for funding. C.P. 196. One of the most important issues in this case centered on Mr. King's adaptive functioning and Dr. Everington was specially qualified in that area. No other expert in all of these proceeding over the many years had ever adequately studied or reported on adaptive functioning as required by the *American Association on Intellectual and Developmental Disabilities*, formerly the *American Association on Mental Retardation.* Without an expert of his own Petitioner lacked a qualified expert witness who could interpret prior testing, determine if additional testing was required, and do a complete and thorough assessment of adaptive functioning. Petitioner could not present relevant evidence establishing that he was mentally retarded and ineligible for the death penalty.

Petitioner was forced to rely on Dr. Robin King who was subpoenaed by the State and who  admitted he was an unqualified witness when it came to making an assessment of mental retardation. Tr. 599. Mr. Robin King had not spoken to trial counsel or examined Mack King in 20 years. Tr. 598. Dr. King was not an expert in mental retardation or the administering and evaluating of tests. For the fifteen years prior to the re-sentencing hearing Dr. King was practicing in the sub-

specialty of the treatment of mood disorders, anxiety, obsessive/compulsive disorder, and severe depression. Tr. 611. Dr. King was unprepared to serve as a witness. He was unable to recall the details of his evaluation of Mack King. *Id.* It had been so long that Dr. King did any work in the mental retardation field he could not even explain elementary matters regarding the IQ test and was easily discredited by the prosecution.

Additionally, Dr. King's 1983 evaluation was not even close to being adequate to assess mental retardation. Although he administered an IQ test Dr. King conducted no assessment for limitations in adaptive functioning. Prior to the 2003 resentencing proceeding Dr. King did nothing to address that shortcoming and was not qualified to make that type of assessment.

The only other psychologist who conducted an evaluation was Michael Whelan, Ph.D., who testified for the State. Dr. Whelan gave an outdated version of an IQ test and never took into account aging norms or test obsolescence. Dr. Whelan never undertook a thorough evaluation of adaptive functioning. Dr. Whelan found certain discrete items that Petitioner performed better than expected, but mental retardation cannot be excluded simply because a low intellectually functioning individual has certain relative strengths. An individual may be found to have deficits in adaptive functioning if he has at least two areas of deficits despite having relative strengths in other areas. Dr. Everington pointed out that Dr.

Whelan's expert testimony was problematic in at least two respects:

> First, Dr. Whelan should not have simply relied on other trial testimony in making his assessments of Mr. King's mental capacity. Second , Dr. Whelan's conclusions were incomplete without a proper and thorough assessment of Mr. King's adaptive skills, which is necessary to make an accurate diagnosis of mental retardation.

C.P. 322, Affidavit of Caroline Everington.

Both Dr. King and Dr. Whelan testified Mack King had a Full-Scale I.Q. below 75. Dr. King originally found Mr. King's Full-Scale IQ to be a 71, but after correcting for a scoring error, he determined it to be a 69. Tr. 615. Dr. Whelan testified Mr. King had a Full-Scale IQ of 71. Tr. 679. All prior IQ tests (especially if adjusted to account for aging norms of the testing) placed Mack King in the mentally retarded range of functioning, yet Mr. King was not afforded the minimum resources necessary which would have allowed him to present witnesses, have a qualified expert, or challenge the conclusions of Dr. Whelan.

The proceedings in front of the jury were equally inadequate. Petitioner presented the same unqualified and unprepared witness, Dr. King. Because Dr. King was both unqualified and had not spoken to trial counsel in 20 years, he was totally unprepared. Petitioner had no meaningful opportunity to challenge the State's unqualified witness. Moreover, the Circuit Court denied the proffered jury instruction on mental retardation and the jury had no guidance to make a determination. Tr. 771. No instruction given to the jury contained a definition of

mental retardation or informed the jury that mental retardation was anything more than one mitigating circumstance to consider. This is morally and constitutionally inadequate when the ultimate penalty if at stake.

Despite the fact trial counsel recognized the need for a complete social history investigation and investigation into Mr. King's adaptive deficits counsel conducted little investigation. At the hearing on the Motion for Funds in Chambers counsel acknowledged that the defense team could conduct investigation on their own and had in fact done some investigation in 1998 but that was four years ago and "there is probably more out there we could have found and presented to the jury." Sealed Transcript of in chambers hearing on Sept. 25, 2002 at 398.

Very little mitigation evidence was presented. Trial counsel called only 3 witnesses: Sammy Townsend, Ethel Conner, and Robin King. Sammy Townsend was the principal of New Hope Elementary from 1974 to 1998. Mack King did not attend New Hope during the time Mr. Townsend was principal. Tr. 569. As the records custodian for New Hope Elementary, Mr. Townsend identified Mack King's school records. Tr. 570. Mr. Townsend did not have any personal knowledge of Mack King. He could only testify to the records. Mr. Townsend did not know whether the teacher that taught Mack King second grade the first time was the same teacher that taught Mack King the second time. Tr. 578. Mr.

Townsend did not know what "family problems" Mack King's third grade teacher was referring to when she noted "A family problem is his handicap" on the school records. Tr. 580. The second witness called, Dr. Robin King, had not spoken to trial counsel in approximately 20 years. Tr. 589. Dr. King had evaluated Mack King in 1983. *Id.* In 2003 Dr. King's practice was radically different than the practice he maintained in 1983. In 2003 Dr. King was specializing almost exclusively in the treatment of mood disorders and was not in the practice of administering intellectual measurements. Dr. King had difficultly remembering many of the details of his evaluation. Tr. 611. He was primarily called because he had administered an IQ test to Petitioner, but it had been so long since Dr. King worked in the mental retardation field, he could not even explain elementary matters regarding the IQ test and was easily discredited by the prosecution. The third witness, Ethel Connor, Mack King's older sister was the only witness that could offer a glimpse into Mack King's life. Tr. 695-709.

The trial court also refused Mr. King's jury instructions DSP-1. C.P. 427; R.E. 180; Tr. 759 and DSP-3, C.P. 436; R.E. 181; Tr. 767, R.E. 110. These instructions informed the jury in clear and unequivocal terms that it may sentence Mr. King to life even if there are no mitigating circumstances. The State's instruction led the jury to believe that death was the conclusion if the mitigating circumstances did not outweigh the aggravating circumstances. SSP-4A, C.P. 408,

R.E. 183. The State offered SSA-4A (3) (b), C.P. 409, R.E. 184. Mr. King's counsel made an objection to the confusing nature of the instructions. Tr. 749-50.

The State's Instructions are also contradictory and confusing. In SSP-4A (2) it requires the aggravators to outweigh the mitigating circumstances. In SSP-A4 (3) (a) it states that the mitigating circumstances do not outweigh the aggravators. Then in SSA-4A (3) (b) this instruction uses the language that the aggravators do not outweigh the mitigating circumstances. C.P. 407-9; R.E. 182-84. The jury experienced considerable confusion as unequivocally shown by the fact the jury returned a verdict that did not include any of the *Enmund* factors. Tr. 848-49, R.E. 52-53.

Before a person may be sentenced to death for a capital crime the jury must find that he/she committed the killing, attempted the killing, intended the killing take place, or contemplated the use of lethal force. *Enmund v. Florida*, 458 U.S. 782 (1982). In this case the jury returned a verdict without finding any of the *Enmund* factors. Tr. 848-49, R.E. 52-53. Instead of imposing a life sentence the trial court instructed the jury that their verdict was deficient in form. C.P. 397, Tr. 851-61, R.E.186, 154-64. Mr. King objected the trial court's actions. Tr. 854, 856, 862, R.E. 58, 60, 66.

Mr. King also objected to the granting of the instruction concerning the aggravating circumstance that the offense was committed for the purpose of

avoiding arrest. Tr. 740-743. This particular aggravating instruction was not granted during the 1980 capital murder trial. Exhibit 1, 1980 trial. The instruction was offered in 1998 but withdrawn by the State. Tr. 740-741.

The 2003 jury that sentenced Mr. King was heavily pre-disposed toward the death penalty. Ten (10) of the twelve (12) jurors with strongly or mildly agreed with the death penalty. C.P. 1648- 1778. The trial court was quick to remove jurors for cause who expressed a reservation against the death penalty, but would not remove for cause Juror 19, Mr. Cook, who had a strong disposition for death and who would require the accused to offer a good reason not to be put to death.

However, the trial court improperly excluded two (2) jurors who never said they would refuse or fail to follow the law. Juror number 25 was Shellie Stewart. She was excused for cause over the objection of Mr. King's counsel. Tr. 366-374. Juror questionnaires were filled out by the jury. Ms. Stewart indicated that she "mildly disagreed" with the death penalty. R.E. 129-130. During the jury selection Ms. Stewart stated that she was personally against the death penalty she would vote to impose it depending on the circumstances. Tr. 258-59. She could not think of any circumstances "right now" that she could impose it. At the time Ms. Stewart had not heard any aggravating or mitigating circumstance. Tr. 261.

The trial judge granted a challenge for cause to Ms. Stewart without a proper legal basis. The State sought to remove Ms. Stewart not because of her opinion on

the death penalty, because her opinions were similar to other jurors who stayed on the panel. The State sought to remove Ms. Stewart because of her opinions on mitigating evidence. Ms. Stewart indicated a willingness to listen to and accept Mr. King's mental illness as a mitigating factor. Tr. Tr. 261-62.

The trial court also removed for cause over objection Barbara Tucker, juror 30. Tr. 369. The responses of Ms. Tucker did not reflect that she would fail or refuse to follow the instructions of the court. Instead they showed a juror that would use her conscience and apply the law as given by the court. Tr.272-75.

In 2003 Mr. King filed a motion to change venue prior to his sentencing hearing. C.P. 134-67, R.E. 189-222. Attached were numerous broadcasts from media outlets in Lowndes County. Tr. 148-167. R.E. 203-21. The motion was in conformity with *Mississippi Code Annotated*, Section 99-15-35 (2005). Mr. King called witness and met his burden. R.E.372-75. The filing of the sworn motion and presentation of testimony met the presumption that a fair trial could not be obtained in Lowndes County. The State presented no evidence at all to rebut the presumption. The State did not call witnesses or introduce any testimony.

Mr. King's case has a lengthy history in Lowndes County. Mr. King had an initial trial in 1980. He had a later *Error Coram Nobis* hearing. Mr. King has two (2) reversals and each time the case was retried in Lowndes County. The 2003 Sentencing hearing was the fourth (4) time Mr. King had been to trial. There had

been substantial media coverage about Mr. King. C.P. 149-67, R.E. 203-20. The articles covered the graphic details of Mrs. Patterson's death and Mr. King's race. The articles called one of the reversals a "technicality."

During the Course of the trial the daughter of Mrs. Lela Patterson testified about the impact of her mother's death on the family. The State went far beyond the evidence permitted by law. Tr. 408-26. Mr. King moved for a mistrial and it was denied by the Court. The testimony concerned Mrs. Patterson physical appearance, favorite clothing, church attendance, hobbies, family ties and relationships, and living habits. Mrs. Anderson talked about the family's opinion of the crime, how tragic her death was and how hard that was on the entire family. The sole purpose of the testimony was to inflame the jury and divert their attention from the issues of the crime and the defendant.

**Post-Conviction Litigation**

Post-Conviction Counsel hired Dr. Zimmerman (Ph.D.), an expert in the field of assessing mental retardation, in the administration and interpretation of tests, and in the evaluation of persons for the purposes of determining mental retardation to conduct an evaluation of Mack King. On May 30, 2008, Dr. Zimmermann administered the Wechsler Adult Intelligence Test-III (WAIS-III) to Mack King. On the WAIS-III Mack King's full-scale IQ was a 67. After a complete and detailed examination Dr. Zimmerman gave an opinion to a

reasonable degree of psychological certainty that Mack King has sub-average intellectual functioning and satisfies the first criterion for a finding of mental retardation. It was Dr. Zimmermann's opinion that King was not malingering on the WAIS-III. *See* Post-Conviction Exhibit 20.

Dr. Zimmermann found Mack King to have adaptive deficits in several areas including functional academics as evidenced by school records and achievement tests. Mack King failed the first, second, and third grades. Dr. Zimmermann points out that achievement tests given to Mack King while in school consistently show him as functioning at the first grade level in vocabulary, reading and language. *See* Post-Conviction Exhibits 21, 23. During Mack King's sentencing hearing it was posited by the prosecution that Mack King did poorly in school because he did not attend, but that position puts the "cart before the horse." Mack King had sub-intellectual functioning and did dismal in school and due to his performance and family life he also missed school frequently.

Dr. Zimmermann also noted Mack King had deficits in daily living and vocational abilities and that King was unable to access community and unable to effectively deal with money. *See* Post-Conviction Exhibit 21. As noted by individuals who knew him well Mack Arthur had "trouble learning to tie his shoes" *See* Post-Conviction Exhibit 22; his clothing often did not match, *and his* hair was never groomed or cut. *See* Post-Conviction Exhibit 25. Mack King did not learn

the alphabet until he was 7 or 8 years old *See* Post-Conviction Exhibit 22, and he was best described as "*not smart*," or that "*special child*" and slow. *See Post-Conviction Exhibits 25, 26, and 27.* Mack King was easily misled. *See* Post-Conviction Exhibit 24 *and* could only perform jobs involving "muscle" that did not require him to use his brain. *See* Post-Conviction Exhibits 24, 26. Mr. King's father had to make sure he awoke on time to get to work. *See* Post-Conviction Exhibit 24. Mack King was unable to read or follow directions and could only follow simple instructions. *See* Post-Conviction Exhibit 26. Mack King was unable to access community resources because he could not leave the neighborhood. *See* Post-Conviction Exhibit 24, 26. Mr. King was unable to effectively handle money. *See* Post-Conviction Exhibit 26. Based on this historical information and his own evaluation Dr. Zimmermann found King to satisfy the second criteria for a diagnosis of mental retardation.

Dr. Zimmermann also administered to Mr. King the full battery of the *Luria Nebraska Neuropsychological Battery* and the *Test of Memory Malingering* (TOMM). The results of the TOMM, a 37 on trial 1 and a 50 on trial 2 indicate a very low probability that Mr. King was malingering. *Id.* The testing of the clinical scales showed three scales- Rhythm, Intellectual Process and Arithmetic- above the Critical Level which demonstrate neurological impairment. *Id.* The neuropsychological tests revealed dysfunction in the Intellectual Process scale and

23

a pervasive/global dysfunction which is often associated with mental retardation. *Id.* Dr. Zimmermann concluded "to a reasonable degree of scientific certainty that Mr. King suffers from neurological impairments." *Id.*

A fair reading of the totality of the facts, when placed in context of constitutional law, proves without doubt that Mr. King did not receive a fundamentally fair sentencing hearing.

## POINT ONE:
## GROUND E OF THE PETITION FOR WRIT OF HABEAS CORPUS

## PETITIONER'S RIGHT TO THE DUE PROCESS AND FUNDAMENTAL FAIRNESS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS WERE VIOLATED WHEN THE STATE COURT DENIED FUNDING FOR A PATHOLOGIST.

Mack Arthur King was entitled to an expert forensic pathologist in order to rebut the State's evidence that the crime was "heinous, atrocious, or cruel," an aggravating factor under Mississippi's capital sentencing statute. *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Miss. Code Ann.* § 99-19-101(5) (h) (2005). *Ake* reaffirmed the longstanding principle that poverty should not deprive defendants of access to the "raw materials integral to the building of an effective defense." *Id.* at 77. Fundamental fairness "entitles indigent defendants to 'an adequate opportunity to present their claims . . . within the adversary system." *Id.* Moreover, the "basic tools" of an adequate defense must be provided to "those defendants who cannot afford to pay for them." *Id.* Because indigent defendants may need the help of an

expert to marshal their defense, an expert must be provided at state expense upon a preliminary showing that the subject of expert testimony is a "significant factor" at trial or at sentencing. *Ake*, 470 U.S. at 83.

Mr. King required funds for a pathologist to assist his attorneys in presenting evidence that would be critical in contesting the aggravating evidence the State would elicit. At the 2003 resentencing the State planned to call Dr. Ben Martin who conducted the autopsy to provide testimony in support of the "especially heinous, atrocious or cruel" aggravating circumstance. As he did in prior proceedings, Dr. Martin testified regarding the attack and death of the victim, Lela Patterson, opining that she may have remained conscious while she was strangled and drowned. Tr. 455, 457, R.E. 155, 157.

Mr. King moved for expert assistance to challenge Dr. Martin's methods and conclusions, attaching an affidavit from Dr. Leroy Riddick, an expert pathologist, who conducted a preliminary assessment of Dr. Martin's autopsy report. (*Motion for Funds to Obtain Expert Assistance*, Tr. 305-41; Affidavit of Dr. Riddick, attachment to the *Motion for Funds to Obtain Expert Assistance*.) (Tr. 328-330). Dr. Riddick also identified additional evidence he needed to review to reach definitive and reliable conclusions.

Initially, the trial judge remarked that Mr. King seemed entitled to expert assistance. (Transcript of Hearing under Seal, Tr. 407). Furthermore, in a previous

opinion the Mississippi Supreme Court recognized that whether Mrs. Patterson was conscious during the strangulation and drowning was a "significant question" in determining whether the crime was heinous, atrocious or cruel. *King v. State*, 784 So.2d 884, 888 (Miss. 2001). Nevertheless, or in spite of this clear comment by the Mississippi Supreme Court, the trial court denied expert assistance.

The Mississippi Supreme Court affirmed the denial of funding, finding that (1) Mr. King failed to provide concrete reasons as to why he needed an expert, and (2) because Dr. Martin admitted during cross-examination anything is possible, Dr. Martin's testimony "directly rebutted the State's argument and aided in his defense." *King*, 960 So.2d at 422.

The Mississippi Supreme Court unreasonably applied *Ake* in several respects. First, because Dr. Riddick articulated flaws in Patterson's autopsy King demonstrated how Dr. Riddick's assistance was both necessary and valuable, thus satisfying the preliminary showing under *Ake*. Second, the Mississippi Supreme Court failed to genuinely account for the importance of the heinous, atrocious, or cruel aggravator to the sentencing proceeding and furthermore disregarded how extensively the state relied on Dr. Martin. These factors are relevant to whether Mr. King demonstrated sufficient need for an expert and the court unreasonably excluded them from its analysis. Third, the Mississippi Supreme Court demanded a more rigorous showing than contemplated in *Ake*. Finally, the Mississippi

Supreme Court should not have weighed Dr. Martin's cross-examination against King's preliminary showing of need. *Ake* makes clear that cross-examination cannot substitute for competing expert opinion and a contrary conclusion contradicts the due process principles on which *Ake* stands. For these reasons, Mr. King is entitled to habeas relief.

### A. King's Motion for Expert Assistance, Supported by Dr. Riddick's Affidavit, Clearly Satisfy the "Preliminary Showing" Required by *Ake*.

#### i. The Preliminary Showing

Due process and fundamental fairness demand defendants have access to an expert upon a preliminary showing the subject of expert testimony constitutes a "significant factor" in the case. *Ake*, 470 U.S. at 83. To determine whether an issue is significant and thus merits the help of a defense expert *Ake* directs courts to focus on three factors: (1) the private interest that will be impacted; (2) the governmental interest that will be affected if the expert is provided; and (3) the probable value of the services sought and the risk of erroneous deprivation absent expert assistance. *Id.* at 77.

In a death penalty case both the defendant and the state have a "compelling interest in fair adjudication at the sentencing phase" and this interest cannot be overcome by monetary considerations. *Id.* at 83-84. Thus in the context of a capital sentencing proceeding a defendant's right to a state-funded expert largely

expert hinges on the third factor, the "probable value" of the expert and the "risk attendant in its absence." *Id.* at 84. Though the lower courts have refined this standard in various ways the central question remains the same: has the defendant shown that an expert is "important enough" to require state funding. *Id.* at 77. Thus, most courts require the defendant to show some degree of necessity for expert assistance.

*Ake* recognized a defendant may be entitled to expert assistance if the State relies on expert testimony to establish an aggravating circumstance. In *Ake* the state relied on expert testimony that the defendant posed a threat of continuing criminal violence which is an aggravating factor under Oklahoma's capital sentencing scheme. In such circumstances the court reasoned "the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State [is] so slim" that it would be fundamentally unfair to deny a poor defendant the services of an expert. *Id.* at 84. While *Ake* left the states some leeway to implement its standard the Supreme Court also defines a set of circumstances in which an expert is both necessary and valuable. Specifically, when the state presents psychiatric evidence of future dangerousness the issue becomes a "significant factor" meriting help from a defense expert. *Id.* at 86.

### ii. Mack Arthur King's Motion for an Expert Pathologist

In support of his motion Mr. King noted during his first two trials the state's pathologist, Dr. Martin, testified the victim may have regained consciousness while under water. Indeed, at the 2003 resentencing the state primarily relied on this testimony and the State spoke extensively to the jury about injuries described by Dr. Martin and how Mrs. Patterson suffered. (Tr. 799-802). Based on these facts King argued he required expert testimony not only to rebut the state's opinions, but to affirmatively make its case about the exact nature and extent of the victim's injuries. (Tr. 324)

Mr. King submitted the affidavit of Dr. Leroy Riddick who disputed the soundness of Dr. Martin's autopsy. Affidavit of Dr. Riddick, attachment to *Motion for Funds to Obtain Expert Assistance.*. Tr. 328-330. Specifically, Dr. Riddick declared:

> [F]irst, although the state pathologist testified that the victim suffered certain injuries, there appears to be insufficient evidence of some of those injuries. Second, some of the procedures performed during the autopsy were not the proper procedures to be followed. Third, although the state asserted that the victim was conscious for a long period of time, that statement does not appear to be supported by the record . . . Fourth, the investigation of the crime scene appears to have been inadequate, and could have in fact caused, post-mortem, some of the victim's injuries, injuries which the state claimed the victim suffered in the attack.

29

Tr. 229-330. Dr. Riddick added that a complete assessment required access to the original crime scene photographs and the autopsy slides. In closing Mr. King specified the anticipated cost[1] and amount of time Dr. Riddick would need to provide meaningful assistance.

Although "undeveloped assertions" of helpfulness fall short of the *Ake* showing, *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1 (1985), Dr. Riddick's affidavit clearly and specifically develops how his services would be valuable to King's defense and identifies the additional information he required to reach a reliable conclusion. By revealing flaws in both the methods and results of the autopsy, Dr. Riddick's testimony could have raised "in the jurors' minds questions about the State's proof of an aggravating factor." *Ake*, 470 U.S. at 84. Dr. Riddick specifically contested that Mrs. Patterson was conscious for a long period of time. Furthermore Dr. Riddick believed Mrs. Patterson did not suffer as the state claimed since her injuries could have been caused post-mortem during the investigation. In sum, Dr. Riddick's affidavit developed King's assertions of helpfulness entitling him to an expert under *Ake*. The Mississippi Supreme Court found that King presented nothing more than "undeveloped assertions" in support of the request for expert assistance. *King v. State,* 960 So. 2d 413, 423 (Miss. 2007). The Mississippi Supreme Court's mischaracterization of King's submission, including

---

1 The total cost for retaining Dr. Riddick was $5,000. (*Motion for Funds to Obtain Expert Assistance*, Tr. 325).

Dr. Riddick's affidavit, was objectively unreasonable finding of fact based on the state court record. 28 U.S.C. § 2254(d) (2). *Alexander v. Cockrell,* 294 F.3d 626, 630-31 (5th Cir. 2002); *Guidry v. Dretke,* 397 F.3d 306, 3328 (5th Cir. 2005) (granting relief in capital case where state court's decision was based on factual finding that ignored countervailing record evidence); *Rolan v. Vaughan,* 445 F.3d 671, 681 (3rd Cir. 2006) (state court finding was "objectively unreasonable" because it was not supported by the record).

### B. The Mississippi Supreme Court Unreasonably Overlooked the Importance of the Heinous, Atrocious, or Cruel Aggravator to the Sentencing Proceeding and Furthermore Disregarded the Extent of the Government's Reliance on Dr. Martin.

The Mississippi Supreme Court unreasonably failed to give proper weight to the critical nature of the heinous, atrocious, or cruel, aggravating factor. *Ake* demonstrates a defendant's need for an expert *depends* in part on how significant a given issue may be to the defendant's case and furthermore hinges on how extensively the government relies on expert testimony.

In *Ake* the Court recognized the defendant's need for expert assistance to rebut the State's evidence in support of the aggravating factor of future dangerousness. 470 U.S. at 86. Thus *Ake* demonstrates a defendant's *need* for an expert cannot be analyzed separately from the *importance* of an issue. *Id.* at 86.

*Little v. Armontrout,* 835 F.2d 1240 (8th Cir. 1987) illustrates how the importance of a given issue directly relates to the defendant's need of an expert.

There the Court of Appeals found a hypnosis expert was necessary partly on the ground that the only issue at trial was witness identification and the state's main witness had undergone hypnosis. A critical factor, notes the court, is "how important the scientific issue is in each case." See also *U.S. v. Fazzini*, 871 F.2d 635, 637 (7th Cir. 1989) (noting that the utility of the expert to the defense corresponds to the importance of the defendant's mental condition in a particular case).

What makes the Mississippi Supreme Court's decision particularly unreasonable is that it recognized the significance of the aggravating circumstance at the resentencing. In quoting from a prior opinion involving Mr. King the Mississippi Supreme Court recognized that "[*t*]*he crucial issue* here was whether the crime was heinous, atrocious, or cruel. Thus, whether Patterson was conscious during the strangulation and drowning becomes *a significant question.* Certainly, this is a *"crucial issue"* within the meaning we have given that term." *King v. State*, 960 So. 2d 413, 422 (Miss. 2007) (emphasis added). Given the state court's acknowledgment of the significance of this factual issue along with its awareness that the State relied heavily on Dr. Martin to establish facts in support of the aggravator, it was objectively unreasonable under *Ake* for the state court to deny Petitioner expert assistance.

## C. The Mississippi Supreme Court Demanded a Showing that was Unreasonably Rigorous, Contradicting either the Principles of Fundamental Fairness Embodied in Ake, and Basic Notions of a Preliminary or Threshold Showing.

### i. The Standard Imposed by the Mississippi Supreme Court Was Fundamentally Unfair Because an Exhaustive Assessment by Dr. Riddick was not Feasible.

"[A]n indigent prisoner who needs expert assistance . . . should not be required to present proof of what an expert would say when he is denied access to an expert." *Williams v. Martin*, 618 F.2d 1021, 1026-27 (4th Cir. 1980). Because defense counsel cannot fill the shoes of an expert they cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987). See also *State v. Moore*, 321 N.C. 327, 345 (N.C. 1988) ("[t]o require as a condition precedent to acquiring an . . . expert that the defendant discredit the state's expert testimony stands at odds with the general 'threshold' showing of need required in other cases").[2] Yet this was essentially what the Mississippi Supreme Court required of Petitioner when it unreasonably deemed his motion and supporting documentation as "undeveloped assertions." *King*, 960 So. 2d at 423.

Mr. King sought funds for an expert pathologist because as an indigent defendant he could not hire one to perform an exhaustive analysis. Furthermore, Dr. Riddick lacked access to crime scene photographs and autopsy slides, evidence

2 In that case, the State argued that the defendant must show a particularized basis for questioning the accuracy of the state's fingerprint evidence.

that was necessary to formulate his final expert opinion. Thus by holding Mr. King to a showing that was unattainable without funds and access to evidence the state court unreasonably required Mr. King to "possess already the expertise of the witness sought." Such a rigorous showing is inconsistent with the basic principles of "meaningful access to justice" and fundamental fairness that *Ake* represents. *Ake*, 470 U.S. at 77.

### ii. The Mississippi Supreme Court Required a Showing that Contradicts the Plain Meaning of a Preliminary, Threshold, or Prima Facie Standard.

The standard imposed by the state supreme court also surpassed general conceptions of a prima facie, or threshold showing. Under *Ake* a defendant must merely show that an expert is necessary to his case, or necessary to rebut the State's case in support of an aggravating factor. *Ake*, 470 U.S. 68. The U.S. Supreme Court intended this showing to be "preliminary," and assumed that a comprehensive analysis by the expert was too onerous, given the financial constraints faced by indigent defendants. *Id* at 74.

This view is consistent with the plain meaning of "threshold" or "prima facie," which imply a "burden that is less rigorous than the standard applied by the Mississippi Supreme Court." *Simon v. Epps*, No. 11-70015, slip op. at 4 (5th Cir. May 25, 2011). For example, in the context of an *Atkins v. Virginia* claim, a prima facie showing of mental retardation "is simply a sufficient showing of possible

merit to warrant a further exploration by the . . . court." *In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006). Furthermore, this burden is distinct from that which the defendant must bear in proving his claim. *Id.* at 415. Likewise, to present a "substantial threshold showing" that a petitioner is incompetent to be executed, the evidence must "rationally support an inference" of incompetency. *Simon*, No. 11-7005, slip op. at 4. A petitioner is not required to present conclusive proof.

In *Panetti* v. *Quarterman*, 551 U.S. 930, 950, 970 (2007), a threshold showing of incompetency was met even though (as the dissent pointed out) there were no attached medical records, no diagnosis of any medical condition, and the examining doctor did not discuss whether Panetti understood why he was being executed. The burden imposed by the Mississippi Supreme Court was far more onerous. By requiring Dr. Riddick to explain his conclusions in detail the court essentially demanded Mr. King carry a burden normally reserved for his defense at trial.

In sum, the showing imposed by the state court was unreasonably rigorous and does not comport with *Ake's* goal of ensuring that indigent defendants receive a fundamentally fair trial.

### D. The Mississippi Supreme Court Unreasonably Applied *Ake* by Considering the Fact that the State's Expert Witness, Dr. Martin, was Cross-Examined.

The Mississippi Supreme Court also upheld the denial of funds because on cross-examination Dr. Martin testified it was possible Mrs. Patterson never regained consciousness after being hit on the head. *King,* 960 So. 2d at 422. The Court favorable cited is prior opinion finding the denial of expert funds harmless because counsel secured Dr. Martin's acknowledgment that his conclusions may be inaccurate. This aspect of the state court's opinion is objectively unreasonable because subsequent cross-examination of the state's expert has no bearing on whether Mr. King satisfied the threshold showing Ake envisions. Counsel's unassisted cross-examination is no substitute for a defense expert witness who could not only present a competing theory but who could also assist the defense in preparing a fuller, more effective cross-examination. Moreover, Dr. Martin's admission confirms there was a genuine factual dispute regarding circumstances bearing on the aggravating circumstance; as a result King should have had expert assistance.

> **i. Since *Ake* Contemplates a Threshold Showing Based on the Facts Available to the Trial Judge, the Mississippi Supreme Court Should Not Have Considered the Effect of Dr. Martin's Cross-Examination.**

In determining the reasonableness of the trial court's refusal to provide expert assistance a reviewing court should consider "only the facts available to the trial judge when he made a ruling on the particular motion." *Conklin v. Schofield,* 366 F.3d 1191, 1208 (11th Cir. 2004). See also *Dunn v. Roberts,* 963 F.2d 308,

313 (10th Cir. 1992) (Courts should focus on "the information before the state trial judge when he denied [the] motion for funds"). Essentially, the court should consider "all the facts and circumstances known to it at the time the motion was made." *North Carolina v. Gambrel*, 318 N.C. 249, 256 (N.C. 1986).

The trial judge had no way of knowing how well or how poorly Mr. King's lawyers would cross-examine Dr. Martin. Certainly a trial judge cannot rule on a motion based on events that have yet to transpire. If anything Dr. Martin's cross-examination responses highlight the need for an expert. If, as Dr. Martin conceded, the victim could have been rendered unconscious quickly and never regained consciousness, then the defense was entitled to expert assistance to establish its case and to challenge the reliability of Dr. Martin's methods. Without expert assistance it would not be surprising if the jury found the aggravating circumstance beyond a reasonable doubt despite Dr. Martin's concession that there was a remote possibility that he could be wrong. The State, however, may not have been able to carry its burden of proof if the defense had assistance in challenging Dr. Martin's methods and conclusions. Because the Mississippi Supreme Court focused on the subsequent testimony and not the defense's preliminary showing its decision involved an unreasonable application of *Ake*. Its failure to give appropriate weight even to Dr. Martin's acknowledgment of a dispute over this crucial issue also resulted in an unreasonable decision.

### ii. Even if Post-Motion Events bear on the Showing of Necessity, King's Need for an Expert Pathologist Was in No Way Diminished by the Unassisted Cross-Examination of Dr. Martin.

*Ake* assumes that cross-examination by a defense lawyer, unaided by an expert, is no substitute for the assistance an expert can bring in preparing to cross-examine the State's expert witness. Without an expert, "the defendant cannot offer a well-informed . . . opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor." *Ake*, 470 U.S. at 84. Furthermore, the fact that *Ake* envisions that the expert will assist in *preparing* the cross-examination forecloses any argument that cross-examining the state's pathologist reduces Mr. King's need. *Id.* at 83.

Other courts recognize that an expert's role is to help prepare the defense, including preparing for the cross-examination of experts retained by the government. See *Powell v. Collins*, 322 F.3d 376, 390 (6th Cir. 2003); *U.S. v. Fazinni*, 871 F.2d 635 (7th Cir. 1989); *U.S. v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985); *U.S. v. Byers*, 740 F.2d 1104, 1114 (D.C. Cir. 1984); *Buttrum v. Black*, 721 F.Supp. 1268, 1312 (N.D. Ga., 1989) (noting that *Ake* contemplates an expert "who will work closely with the defense"); *State v. Gambrell*, 318 N.C. 249, 259 (N.C. 1986); *Smith v. McCormick*, 914 F.2d 1153, 1159 (9th Cir. 1990) ("the only effective rebuttal of psychiatric opinion testimony is contradictory opinion testimony"); *De Freece v. State*, 848 S.W. 2d 150, 160 (Tex. Crim. App., 1993)

("that counsel did an 'admirable' job in cross-examining . . . does not mean he could not have done an even more effective job with the aid of an expert to interpret the voluminous data"); *People v. Lawson;* 163 Ill.2d 187, 229 (Ill. 1994).

The Fifth Circuit likewise has found the need for a defense expert to be justified when the State presents expert testimony on a contested issue. *White v. Johnson,* 153 F.3d 197 (5th Cir. 1998); *Goodwin v. Johnson,* 132 F.3d 162 (5th Cir. 1997). As *Goodwin* notes, "psychiatric testimony offered on behalf of the defendant is *uniquely* capable of 'uncovering, recognizing, and taking account of . . . shortcomings in predictions made by the state's psychiatrists." *Id.* at 189. Likewise, the testimony of Dr. Riddick would have been uniquely capable of presenting to the jury flaws in Dr. Martin's procedures. Thus merely cross-examining Dr. Martin did not diminish King's need for an expert.

Courts often recognize the difficulties faced by defense lawyers when paired against an expert. In *Little v. Armontrout,* 835 F.2d 1240 (8th Cir. 1987), the Eight Circuit concludes that Little's lawyer was no substitute for a hypnosis expert. There, "the expert could have presented the limitations of hypnosis, and explained theories of memory. This would probably have had far more impact on the judge . . . and jury . . . than Little's lawyer's attempts at impeaching the state's expert by reading from one of the psychology textbooks found at the college library." *Id.* at

1244. Since the state called an expert pathologist to testify at King's sentencing *Little* makes clear that only competing expert testimony would suffice.

Similarly in *Cowley v. Stricklin*, 929 F.2d 640 (11th Cir. 1991), the State relied on a psychiatrist during the defendant's competency hearing who testified that he found no evidence of schizophrenia. In holding the psychiatrist failed to provide adequate assistance under *Ake*, the Court of Appeals notes, "Dr. Habeeb did not assist in Cowley's trial preparation and *obviously could not have assisted Cowley in his own cross-examination.*" *Id.* (emphasis added). Clearly, Dr. Martin could not assist Mr. King's lawyers or prepare them for his own cross-examination and therefore King's need for an expert pathologist persisted. See also *Williamson v. Reynolds*, 904 F.Supp. 1529, 1652 (E.D. Okla. 1995).

In sum these cases recognize the limits of an unassisted defense lawyer in cross-examining an expert witness. Because a defense attorney may not "recognize misrepresentations or errors in methodology," Mr. King's lawyer was no match for Dr. Martin. *Williamson v. Reynolds*, 904 F.Supp. 1529, 1652 (E.D. Okla. 1995). Without an expert forensic pathologist King could not cast doubt on that Dr. Martin's results. Moreover, because "scientific evidence received from an expert is impressive to a jury," *Cade v. State*, 658 So.2d 550, 554 (Fla. Dist. App. 1995), King's defense was disadvantaged as soon as the State called Dr. Martin to testify. Thus Mrs. King needed an expert despite Dr. Martin's cross-examination

and the Mississippi Supreme Court applied *Ake* unreasonably by concluding otherwise.

## II. Denying Mr. King Access to an Expert Forensic Pathologist Rendered King's Sentencing Proceeding Fundamentally Unfair, and Thus the *Ake* Error was not Harmless.

According to the Mississippi Supreme Court, because King's lawyers cross-examined Dr. Martin, "the error, if present, was harmless." *King*, 960 So. 2d at 422 (quoting *King*, 784 So. 2d 884, 889 (Miss. 2001)). This conclusion is an unreasonable application of *Ake*, which firmly states that once the defendant makes a preliminary showing of need, the "State must at a minimum assure the defendant access to a competent [expert] who will conduct an appropriate examination and *assist in the evaluation, preparation, and presentation of the defense." Ake*, 470 U.S. at 83 (emphasis added). Furthermore, as discussed in the previous section Dr. Martin's concession about the possibility of the victim not regaining consciousness confirms the prejudicial impact of the denial of an expert. Finally, since an expert would have refuted any argument that the victim experienced prolonged suffering, erroneously denying Mr. King an expert pathologist irreparably prejudiced his case.

Certainly, Dr. Martin's concession weakened the State's claim that the crime was heinous, atrocious, or cruel. However, this weakness rendered the power of responsive expert testimony all the more potent. Competing expert testimony was

*more* likely to influence the jury than if Dr. Martin had remained firm in his conclusions. Responsive testimony might ultimately have swayed the jury to find that the crime was not especially heinous, atrocious or cruel.

Moreover, the error could not have been harmless because there was little, if any, other probative evidence to support the aggravating circumstance.[3] *Compare White v. Johnson,* 153 F.3d at 205 (*Ake* error harmless because of "tremendous amount" of non-expert testimony about future dangerousness). Instead of a "foregone conclusion" in the minds of the jurors Dr. Martin's testimony was susceptible to challenges by another pathologist. Thus as in *Williams,* 618 F.2d at 1026, the Mississippi Supreme Court should have reversed because a pathologist could have "question[ed] the accuracy of [the] autopsy" and may have raised a reasonable doubt concerning the extent of suffering.

Denying King an expert to refute claims that Mrs. Patterson suffered unnecessarily was prejudicial. Prolonged suffering and torture is essential to whether a crime is especially heinous, atrocious or cruel. *King,* 960 So. 2d at 440. Several reviewing courts have rejected the HAC aggravator when faced with unclear evidence as to the victim's suffering. In *Patrick v. State,* 247 Ga. 168, 170 (Ga. 1981), a medical examiner testified that a victim died from three blows to the head, any one of which would have been fatal, but that the perpetrator also dealt

---

3 The State also relied on the fact that ice cream was left out of Mrs. Patterson's freezer on the night of the burglary and murder. (Tr. 801, 806, 841).

three non-lethal blows. Since it was impossible to determine the sequence of blows it was also impossible to conclude that the killing was "outrageously or wantonly vile, horrible or inhuman." *Id.* at 169. *See also Williams v. State*, 37 So. 3d 187, 200 (Fla. 2010) (since victim could have been rendered unconscious by the first blow, the examiner's testimony did not support a finding of HAC); *Zakrzweski v. State*, 717 So. 2d 488, 493 (Fla. 1998) (concluding that the trial court's finding of HAC was error, because medical testimony was offered that the victim may have been rendered unconscious almost immediately, and as a result, she was unaware of her impending death); *Armstrong v. State*, 399 So. 2d 953, 963 (Fla. 1981) (finding insufficient evidence to support the HAC aggravator since "[t]he testimony of the pathologist makes clear . . . that his conclusions as to the direction of fire and the positions of the victims when shot were equivocal at best").

These cases show that when a victim loses consciousness quickly the killing is not unnecessarily torturous. *Clark v. State*, 443 So. 2d 973, 977 (Fla. 1983). Based on Dr. Martin's testimony, the evidence was unclear whether Mrs. Patterson was conscious for more than a few seconds. Dr. Martin testified that if strangulation preceded the blow to the back of the head the victim may have regained consciousness while under water. *King v. State*, 421 So. 2d 1009 (Miss. 1982). Yet Dr. Riddick's testimony may have raised reasonable doubt in the minds of the jurors about whether Mrs. Patterson experienced prolonged torture. As such

denying Mr. King's motion for expert assistance irreparably harmed his defense. *See Tuggle v. Netherland*, 516 U.S. 10, 13 (1995) ("*Ake* error prevented petitioner from developing his own [expert] evidence to rebut the Commonwealth's evidence and to enhance his defense in mitigation"). In finding the error harmless despite recognition of the existence of a factual dispute regarding a central issue at the resentencing, the Mississippi Supreme Court's decision was contrary to or involved an unreasonable application of *Ake*, and, therefore, Petitioner is entitled to have the writ of habeas corpus issue on his behalf.

## POINT TWO:
## GROUND A OF THE PETITION FOR WRIT OF HABES CORPUS

## PETITIONER WAS DENIED HIS RIGHTS GUARANTEED BY THE FEDERAL CONSTITUTION TO PRESENT EVIDENCE REGARDING HIS DEATH ELIGIBILITY, MITIGATION OF PUNISHMENT, AND REBUTTAL OF THE STATE'S CASE FOR DEATH

### INTRODUCTION

This is a relatively straightforward issue of paramount constitutional importance. The trial court ruled Petitioner could not present evidence regarding his level of culpability even though such evidence could have made him ineligible for the death penalty, or at least provided an additional reason for the jury to find that mitigation evidence outweighed the aggravating circumstances. The Mississippi Supreme Court, relying on *Oregon v. Guzek,* 546 U.S. 517 (2000),

affirmed the trial judge's ruling, finding that Petitioner was trying to re-litigate his guilt. The state Supreme Court misapplied at least three lines of clearly established precedent determined by the United States Supreme Court.

First, every person on trial for a capital offense has the right under *Enmund v. Florida*, 485 U.S. 782 (1982) to put before the fact finder any evidence that is relevant to whether the accused "actually killed, attempted to kill, intended to kill, or contemplated the use of lethal force." *Enmund, supra.* See also: *Tison v. Arizona,* 481U.S. 137 (1987). This is a right protected by the 8th and 14th Amendments to the U. S. Constitution. This is often referred to as the "how" of the crime or offense, not the "whether" the crime or offense occurred. There is a critical constitutional distinction between the "how" a crime occurred and the "whether" a crime occurred. It is important because the principle of *res judicata* may prevent a convicted defendant from introducing evidence during the sentencing phase of a bifurcated trial which challenges "whether" the crime occurred or "whether" he did it. This is logical because the guilty verdict is *res judicata* and has settled that issue. What the guilty verdict has not settled and what is not *res judicata* is "how" the crime occurred in relation to the *Enmund* factors. For example, a person can be found guilty of capital murder under a felony-murder statute, yet the fact-finder might not find the existence of one of the *Enmund* factors and therefor the accused cannot be sentenced to death. *See, e.g., White v.*

*State,* 532 So. 2d 1207, 1221 & n.2 (Miss. 1988). (This actually happened in Petitioner's case and the trial court improperly sent the jury back to find an *Enmund* factor. C.P. 448-449; Tr.848-862.

Second, the trial court and the Mississippi Supreme Court violated a clearly establish constitutional right by failing to apply the constitutional principles found in *Lockett v.* Ohio, 438 U.S. 586 (1978). This well established constitutional right permits the introduction mitigating evidence, including facts regarding the circumstances of the offense, offered by the accused. This would include both statutory mitigating circumstances and non-statutory mitigating circumstances. See *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1995)

Third, the Mississippi Supreme Court violated Mr. King's clearly established constitutional right to rebut or explain the State's case in support of the aggravating circumstances and the death penalty. *See Simmons v. South Carolina*, 512 U.S. 154 (1994); *Gardner v. Florida*, 430 U.S. 349 (1977). The trial court tied Mr. King's hands and allowed the prosecutor to flail away at Mr. King. The Mississippi Supreme Court unreasonably affirmed this unconstitutional action. State death penalty laws must allow the fact-finder to give complete consideration to the mitigating circumstances. *Smith v. Texas*, 543 U.S. 37 (2004); *Penry v. Johnson*, 532 U. S. 782 (2001); *Penry v. Lynaugh*, 492 U.S. 302 (1989). <u>*McKay v.*</u>

*North Carolina*, 494 U.S. 433, 441 (1990).

## Facts Essential to an Understanding of the Constitutional Issues[4]

The offense in this case took place on August 3, 1980. The indictment was recorded and a capias issued on August 21, 1980. The trial began four (4) months later on December 4, 1980 and concluded with a sentence of death one (1) day later on December 5, 1980. Petitioner has always maintained he did not kill the victim. Petitioner denied any involvement in the offense when he was first questioned at 8:30 a.m. on August 06th, 1980. Exhibit 1 – 1980, Tr. 166-172; Tr. 494-497. At 1:00 a.m. on August 07th, 1980 Mr. King gave his second (2nd) statement where he admitted to going with his uncle Willie Porter to the home of Mrs. Lela Patterson to burglarize Mrs. Patterson's home. According to Mr. King he went inside Mrs. Patterson's home while Willie Porter served as his "look-out." Mr. King went inside and took some household goods and items, including food from the freezer. After Mr. King finished he went outside to where Willie Porter was waiting. Mr. Porter had been drinking alcohol all afternoon. Mr. King told his uncle Willie Porter that he had gotten things from the house. Willie Porter went inside Mrs. Patterson's house and Mr. King left and went home. Mrs. Patterson was alive when Mr. King left and he does not know if Willie Porter killed her. Exhibit 1 – 1980, Tr. 157-189; Tr.499-503. Mr. King unequivocally stated he did

---

4 The 1980 transcript is attached to the *Petition for Writ of Habeas Corpus* as an exhibit and labeled "Exhibit 1 – 1980". When "Tr" appears after Exhibit 1-1980, it refers to the pages in the 1980 trial transcript.

not kill Mrs. Patterson. Mr. King went home and went to bed.

Ms. Barbara Jordan shared a ramshackle home with Mr. King. The home had no electricity or running water. Barbara Jordan confirmed in her testimony that Mr. King came in at about 2:00 a.m. Sunday, August 3rd, 1980. Mr. King went to bed and got up later at about 5:30 a.m. and went outside. Barbara Jordan saw Mr. King sitting on the porch talking with his uncle Willie Porter. Exhibit 1–1980, Tr. 284. During the 2003 Sentencing Hearing Barbara Jordan testified that now she could "not recall" who was on the porch with Mr. King. TR. 559. Statement of Barbara Jordan given to law enforcement in 1980, Exhibit 2 to *Petition for Writ of Habeas Corpus*. In his second statement to law enforcement Mr. King admitted his Uncle Willie Porter came over and said he too had taken items out of the home of Mrs. Patterson. Exhibit 1-1980, Tr. 181. Willie Porter wanted to know why Mr. King did not wait on him, obviously making reference to Willie Porter serving as a "look out" for Mr. King, but Mr. King left Mrs. Patterson's house and did not serve as a "look out" for Mr. Porter. Exhibit 1-1980, Tr. 182. Mr. King is mentally retarded and did not finish the fourth grade in elementary school. He served as manually laborer during his life when he could work. Walking off and leaving his Uncle is classic for someone unable to comprehend the full ramifications of his behavior.

During the course of Mr. King's 1980 trial his counsel brought out before

the jury the second statement of Mr. King to law enforcement wherein Mr. King denied having any connection with Mrs. Patterson's death. In the cross-examination of Barbara Jordan, Mr. King's live-in girlfriend, Petitioner's counsel brought out that Mr. Willie Porter came over to Mr. King's home in the early morning hours after the burglary of Mrs. Patterson's home. Exhibit 1 – 1980, Tr. 300. Counsel for Mr. King attempted to confirm the same facts in the 2003 Sentencing Hearing but as stated above Barbara Jordan claimed to have no present recall of who was on their porch in the early morning hours after the burglary and murder of Mrs. Patterson.

The fact Barbara Jordan gave a statement and gave prior testimony in 1980 that she saw Willie Porter at the home she and Mr. King occupied in the early morning hours of the day of the crime was corroborative of Mr. King's second statement. It was also corroborative of his theory of defense that he was an accomplice to a burglary but he did not "actually kill Mrs. Patterson, intend to kill, attempt to kill, or contemplate the use of lethal force." *Enmund.*

There were fingerprints found belonging to Mr. King on items burglarized from Mrs. Patterson's home, but there were also prints found in the bathroom where Mrs. Patterson died that did not belong to Mr. King and were never identified. Tr. 511. Petitioner claimed his defense that he did not kill Mrs. Patterson was corroborated by Mississippi Crime Lab Reports. Exhibit 13 to the

49

*Petition for Post-Conviction Relief.* The crime lab report showed there was no transfer of fibers between Mrs. Patterson and Mr. King. *Id.* There was also a statement taken from two (2) of Mrs. Patterson's neighbors describing an old blue car with a loud muffler that passed by multiple times on the night of her death. The neighbor believed the car may have "belonged to blacks" who had been working at Mrs. Patterson's house for a week. Exhibit 14 to the *Petition for Post-Conviction Relief.* None of this evidence was presented to the jury in the 2003 Sentencing Hearing.

During closing for Mr. King his counsel argued Willie Porter was a reasonable, alternative theory for her death. Exhibit 1-1980, Tr. 333-338. Under either theory Mr. King could have been found guilty of capital murder under Mississippi's felony-murder laws due to his involvement in the underlying burglary offense as an accomplice.

It is clear Mr. King's defense in 1980 was that he did not kill Mrs. Patterson and he did not know if his uncle Willie Porter killed Mrs. Patterson. Mr. King was disputing his "intent" or "knowledge." Based on the evidence at the 1980 trial the State offered and was granted instructions which stated Mr. King could be guilty of the capital murder of Mrs. Patterson if he was "acting alone, or in conjunction with another or others…" during the commission of the crime of burglary and "with or without the design to effect the death…." Exhibit 1-1980, Tr. 362, 367; Instruction

S-2A and Instruction S-2.

At the time of this offense *Enmund* had not reached the U.S. Supreme Court and the question of whether Mr. King "actually killed, intended to kill, attempted to kill, or contemplated the use of lethal force" was not presented to the fact-finder. It was not disputed in either 1980 or the sentencing hearing in 2003 that Mr. King burglarized the home of Mrs. Patterson. Mr. King admitted to burglarizing her home. It was his defense that her death may have been caused by his uncle, Willie Porter. The State naturally contested this issue but accepted it as a reasonably believable defense, otherwise the state would not have offered to the fact-finder an accomplice instruction in 1980. When put into context it is obvious that in the 1980 trial Mr. King's counsel was raising as *the defense* the fact Mr. King committed a burglary, but he did not commit a murder. In other words, Mr. King was an accomplice and the facts did not prove one (1) of the *Enmund* factors *and* as an accomplice he played a minor role in the capital murder offense. (Statutory Mitigating Circumstance found in *Mississippi Code Annotated*, § 99-19-101(6) (d)). The State Court's refusal to allow Petitioner to present this type of evidence at his 2003 resentencing was objectively unreasonable and the state Supreme Court's ruling upholding this action was an unreasonable application of federal law.

(1)   **A Defendant Has A Well-Established Constitutional Right Under the 8th and 14th Amendments to Contest Evidence Produced by the Prosecutor of the Four (4) Enmund Factors or to Introduce Evidence Himself that He Did Not Actually Kill, Attempt to Kill, Intend to Kill, or Contemplate The Use of Lethal Force.**

At the 2003 resentencing the State filed a *Motion in Limine* to stop Mr. King from presenting evidence he did not kill Mrs. Patterson. C.P. 348. The trial Court granted the motion under the misunderstanding that Mr. King was "re-litigating the issue of guilt." A fair reading of the record at all pertinent parts reflects that Petitioner's counsel repeatedly made it clear they were not contesting felony-murder guilt. Petitioner was convicted and that adjudication was not at issue. Check this. Tr. 8-20. (*Opening Statement*, Tr. 399-401; 402-404, Petitioner's counsel was prevented from giving a proper opening explaining *Enmund* in relation to the facts; *Cross-Examination* of Roy Grinder, counsel prevented from proving *Enmund* factors and mitigating factors; Tr. 517-519, 525-527; *Motion for Mistrial,* Tr. 564-567; *Renewal of all motions*, Tr. 733-735; *Motion for New Trial*, Tr. 871-879; C.P. 456-467).

Mr. King was constitutionally guaranteed the right to prove he did not "actually kill, attempt to kill, intend that a killing take place, or contemplate that lethal force would be used," and to rebut any efforts by the prosecutor to prove these factors. *Enmund v. Florida,* 485 U.S. 782 (1982); *Branch v. State,* 882 So.

2d 36, 71 (Miss. 2004). The trial court repeatedly refused Mr. King his constitutionally guaranteed right to present evidence establishing his ineligibility for the death penalty.

The United States Supreme Court has been clear a criminal defendant cannot re-litigate *whether* the crime committed actually occurred at the sentencing phase, or put another way he cannot re-litigate his Judgment of Conviction. However, the Court is equally clear on the distinction and importance given between *how* the crime was committed as opposed to *whether* the crime was committed. *Oregon v. Guzek*, 546 U.S. 517, 518 (2006). This is a critical distinction violated in Petitioner's Sentencing hearing and the denial rules afoul of the *Enmund* decision. A capital defendant has the constitutional right to present evidence at the sentencing phase as to *how* the crime was committed and to present evidence that may *mitigate* the sentence of death. The fact-finder ***must*** find one of the *Enmund* factors or the defendant cannot be sentenced to death. *Id*. Therefore, any factor that must be resolved by the fact-finder is subject to proof. A person on trial with his life at stake has the constitutional right to contest proof by the prosecution of the *Enmund* factors. Showing *how* the crime was committed and *mitigating* against the ultimate penalty of death does not re-litigate the Judgment of Conviction for capital murder-it deals with the sentence! The Judgment of Conviction stood firm and Mr. King sought only to *mitigate* and *contest* the State's position on the

*Enmund* factors. This was made poignantly clear by Petitioner's counsel throughout the Sentencing Hearing. Tr. 8-20. Mr. King had the unfettered and absolute constitutional right to present evidence at the sentencing phase regarding the details of the burglary. This guaranteed right was denied by the trial court and federal law was not honored by the Mississippi Supreme Court. The prosecutor unwittingly acknowledged this fact during a motions conference right before voir dire yet he still objected and convinced the trial court to prohibit *Enmund* evidence. Tr. 30.

The details Mr. King sought to present did not challenge the Judgment of Conviction. The jury had been informed the case was being tried as a Sentencing Hearing not a guilt trial. Tr. 76-77. There was absolutely no confusion on that issue during voir dire. Therefor the prosecutor's argument Petitioner was attempting to re-litigate guilt was specious and designed simply to gain a death sentence at the cost of federal constitutional law.

It was Mr. King's theory during the 1980 trial the he was an accessory to a burglary with his uncle, Willie Porter. Mr. King did not know if Willie Porter killed Mrs. Patterson. This theory was *adopted* by the State in its offered and granted jury accomplice instruction which advised the fact-finder that Mr. King would be guilty and should be convicted of capital murder even if his role was as an accessory to his uncle, Willie Porter. Exhibit 1-1980, Tr. 362, 367; Instruction

S-2A and Instruction S-2.

In retrospect we have no way of knowing if the 1980 jury convicted Mr. King as the one who actually killed or if he was an accessory to a burglary and therefor liable under Mississippi's felony-murder statute. In 2003 Mr. King had a constitutional right to present and contest the factors in *Enmund* because they are required to be found by a jury. Mr. King had the absolute right to cross-examine the evidence the State produced at the Sentencing Hearing that was relevant to mitigating evidence. Thus, the trial court erred in violation of clearly established constitutional rights and misapplied the facts to federal law. The Mississippi Supreme Court unreasonably applied this well-established law to clear, uncontroverted facts.

The U.S. Supreme Court in *Guzek, supra,* ruled that the State had the power to regulate through exclusion the introduction of the defendant's **guilt** evidence at sentencing. *Id.* The important distinction between *Guzek* and Petitioner's case is that the defendant in *Guzek* was offering *alibi* evidence which only went to *whether* the crime was actually committed by Guzek. *Id.* The Court held "the evidence attacks a previously determined matter in a proceeding at which, in principle, that matter is not at issue." *Id.*

It is clear the United States Supreme Court has permitted States to refuse to allow the issue of guilt to be re-litigated at the sentencing phase. The *Guzek*

decision did not overrule or alter *Enmund v. Florida*. *Guzek* did not overrule any of the federal law on mitigating circumstances evidence or the necessity that the fact-finder make a "particularized finding" whether each defendant charged in an offense "actually killed, intended to kill, attempted to kill, or contemplated the use of lethal force." *Enmund*.

The Mississippi Supreme Court unreasonably found Mr. King's claim barred by *Guzek*. Mr. King's fact pattern is not similar to that in *Guzek*. Mr. King *was not* collaterally attacking the guilty verdict. This was made clear by his counsel at every stage of the trial. See: Tr. 8-20; 397-407. Mr. King was attempting to present evidence under *Enmund* that "he did not actually kill, attempt to kill, intend to kill, or intend the use of lethal force." He was also seeking to show that he had a minor role in the offense and he was only an accomplice. Tr. 518-519; 521-526. *Miss. Code Ann.* § 99-19-101 (6) (d). By offering evidence that he was an accomplice to the burglary Mr. King was not seeking to escape the effects of the Judgment of Conviction for capital murder nor was he arguing "residual doubt." Mr. King was not arguing to the 2003 Sentencing jury that he was not present; rather he was presenting relevant evidence going to the *Enmund* factors. This evidence is a requirement before the jury can impose the death penalty and it is not attacking the Judgment of Conviction for capital murder.

The Mississippi Supreme Court also relied upon *Holland v. State*, 705 So. 2d 307 (Miss. 1991). The defendant in *Holland* was <u>expressly</u> asking to re-litigate guilt of the underlying felony of rape and <u>expressly</u> sought to present whimsical or residual doubt. *Holland*, at 323. In *Holland* there was no evidence at all of anyone being involved in the crime except Holland. In Mr. King's case you have evidence that he was an accomplice and forensic testimony which supports that defense.

The distinction that makes the difference for Mr. King is the accomplice theory, the accomplice instruction, and verdict in 1980. It is a distinction of the most important kind. Had Mr. King been tried in 1980 as the *sole* person involved in the murder of Mrs. Patterson and if an accomplice instruction had *not* been given, then there would indeed be a strong argument against Mr. King's evidence. But those are not the facts. Mr. King was guaranteed the constitutional right to present to the fact-finder the "how" of the offense and to contest the prosecution's evidence that he "actually killed, attempt to kill, intend to kill, or contemplated the use of lethal force." Mr. King had the right to introduce evidence Willie Porter had responsibility for the *Enmund* factors and Mr. King's role in the offense did not encompass any of the *Enmund* factors.

The Mississippi Supreme Court incorrectly applied Federal Law and over-looked their prior analysis in *Holland*. In *Holland* the court cited *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) for the principle that residual doubt is not a

mitigating factor because it does not go to the defendant's character, record, or circumstances of the offense." This was certainly true in *Holland*-he was the only perpetrator of the crime. The Mississippi Supreme Court went on to write "We must not confuse what is valid, relevant mitigating evidence with evidence utilized to attack the prior verdict and affirmance of guilt" and "the distinction here is between introducing mitigating evidence in the sentencing phase and introducing evidence that challenges the guilty verdict of the original jury." *Holland*, at 327. The Mississippi Supreme Court clearly knew the correct federal law and standard on mitigating evidence but they failed to reasonably apply it to the facts. At every point possible during the trial it was made clear by Mr. King that he was not attacking his guilty verdict. None of the evidence offered by him attacked the guilty verdict. Instead it went to the circumstances of the offense and his role as an accomplice which is a valid mitigating circumstance under federal law and Mississippi law.

The points above are amply illustrated by the case of *Tison v. Arizona*, 481 U.S. 137 (1987). In *Tison* the defendant brought loaded guns into a prison and then argued he had not intent to kill. Important to that case was the fact Tison actually brought some of the guns himself. Though he claimed he had not intended to kill anyone his delivery of loaded guns into a prison was an act of extreme reckless indifference. There are two critically important points to acknowledge in

Petitioner's case which distinguish it from *Tison*. First, it is not known from the 1980 verdict whether Petitioner was convicted for the murder or as an accomplice to the murder. The mere fact Petitioner was convicted of felony-murder is not a determinative bar to evidence of "how" the crime was committed, because *Enmund* directs juries to determine "how attenuated" a defendant's responsibly is from the crime. Committing a house burglary where a death occurs qualifies the principles and accomplices to be convicted under Mississippi's felony-murder statute, but it does not mean each defendant qualifies for the death penalty under the dictates of *Enmund*. This is a fact neither the prosecutor nor the trial judge understood, and one which the Mississippi Supreme Court ignored or failed to correctly apply.

In *White v. State*, 532 So. 2d 1207 (Miss. 1988), the Mississippi Supreme Court clearly recognized the distinction between evidence supporting a capital murder conviction and evidence regarding eligibility for the death penalty. The state supreme court found the State carries "a definite and stringent burden" of showing by "specific and credible evidence" that one of the factors identified in *Mississippi Code Annotated*, § 99-19-101(7) exists. The proof must be beyond a reasonable doubt and § 99-19- 101(7) (d) requires more than tort foreseeability. *Id.*

The Mississippi Supreme Court recognized in *White* this important constitutional distinction but ignored and failed to apply the constitutional rule set out in *Enmund* to the clear facts in Mr. King's case. In the *White* case, *supra*, there

was evidence the defendant carried a gun and was involved in some capacity in a robbery. Nevertheless the Mississippi Supreme Court found insufficient evidence to support a finding that any of the *Enmund* or statutory factors of § 99-19-101(7) (d) were met.  The Court found the evidence presented "sufficient to undergird a conviction of capital murder" under the felony-murder statute, *Miss. Code Ann. §* 97-3-19(2) (e) (Supp. 1987) *Id.* at 1221, but the Court noted the crucial distinction between a defendant's guilt of capital murder and his eligibility for death pursuant to *Enmund*:

> The crucial distinction is that intent was not required before White was guilty of capital murder. It was enough that he was an active participant in the robbery of Poo-Nannie's Cafe in the course of which Lewis was killed by one of the participants. Our legislature has directed, however, that greater culpability be required before the penalty of death may be inflicted.

*Id.* at 1221, n. 2.

The evidence and argument that King sought to present at his resentencing was consistent with Mississippi law which was passed following the dictates of *Enmund.*  The evidence presented at the 1980 trial supported a finding of guilt regardless of whether King participated in the actual killing. Mr. King could have been just a "look-out" and been guilty of capital murder under the felony-murder law.  However, more is required for him to be eligible for the death penalty under the Eighth Amendment Fourteenth Amendments.

**a. The Consistent Recognition of Other Jurisdictions of the Distinction Between a Conviction of Capital Murder and Death Eligibility Under *Enmund* and *Tison* Confirms the Unreasonability of the Decision of the Mississippi Supreme Court.**

Other jurisdictions have recognized the obvious distinction between evidence supporting a conviction and evidence establishing a defendant's eligibility for the death penalty. For example, in *State v. Nichols,* 195 P.3d 207 (Ariz. App. 2008) the Arizona Court of Appeals noted the distinction between introducing evidence that goes to the defendant's participation as an accomplice and evidence relevant to a sentencing determination. Evidence regarding a defendant's level of participation (or even presence at the murder scene) may be consistent with guilt *and* be relevant for a reliable determination of the sentence.

In *Nichols,* the State argued that *Oregon v. Guzek* mandated a different conclusion. The Arizona Court of Appeals distinguished *Guzek*, writing:

> [t]he United States Supreme Court in *Guzek* implicitly determined that whether evidence supports a conclusion 'directly inconsistent with the jury's finding of guilt' is material to its admissibility at sentencing. **But a defendant can be convicted of first-degree murder based on both accomplice liability and felony murder theories, so evidence that a defendant was not present at a crime scene *is not, as a matter of law, directly contrary or inconsistent with a guilty verdict.***

*Nichols*, 195 P.3d at 213 (emphasis added).

The *Nichols* case highlights the error that existed in the mind of the trial judge in this case and that was perpetuated by the Mississippi Supreme Court. The

*Nichols* case is not the only other state appellate court that has understood and properly construed *Guzek* and *Enmund* together.

In *Downs v. State,* 572 So. 2d 895 (Fla. 1990), the Florida Supreme Court recognized that evidence showing a defendant is not the triggerman is relevant to the *circumstances* of the defendant's participation in the crime and therefore should be admitted during the penalty phase. *Downs*, 572 So.2d at 899. The facts in *Downs* established that he was convicted of first-degree murder and conspiracy to commit first-degree murder and sentenced to death. During a resentencing proceeding Downs sought to introduce prior sworn testimony of his grandmother claiming it was admissible as mitigating evidence. Downs argued the evidence was also relevant to corroborate the testimony of Downs and others who said Downs was not the triggerman, and to impeach one of the other conspirators whom Downs alleged did the actual killing. The trial court barred the testimony (in which the grandmother claimed Downs was with her the night the murder occurred) as relevant only to the issue of guilt and not to the issue of penalty. *Id.* at 899.

The Florida Supreme Court reversed the trial court finding that the testimony should have been admitted, even though it was "inextricably entwined with evidence of guilt." *Id.* at 899. In a footnote the court added, "Even if the primary focus of [the grandmother's] testimony . . . had been guilt, the fact at issue here would have been valid mitigating evidence, which Downs was constitutionally

62

entitled to present." *Id.* at 899, n. 4. Despite finding that the evidence should have been admitted the Florida Supreme Court affirmed the death sentence determining the trial court's error harmless. In making the harmless error analysis the Florida Supreme Court noted that Downs "succeeded in presenting his theory of penalty defense, and he supported it with various witnesses whose testimony contradicted Johnson's [the co-conspirator's] version of the killing in a manner not inconsistent with Michael's [the grandmother's] perpetuated testimony." *Id.* at 899.

Although the Court affirmed the trial court's decision in *Downs*, Petitioner King's situation is different because of the limitations placed on the evidence that he was allowed to present going to the level of his participation. He was not allowed to cross-examine in regards to his participation in the offense. The state was permitted to introduce all the guilt evidence it choose and any *Enmund* evidence, yet Petitioner was barred from contesting much of the prosecution's evidence or presenting statutory and federal constitutionally protected mitigation evidence.

The California Supreme Court also addressed the scope of evidence relevant to a fact-finder's determination of the defendant's culpability in the context of an ineffective assistance of counsel claim in *In re Hardy*, 41 Cal. 4th 977, 1031 (Cal. 2007). Hardy alleged his trial attorney was ineffective for not introducing evidence during the penalty phase showing he was not the actual killer. The

Supreme Court of California found such evidence admissible "to show the circumstances of the crimes and allow the jury to consider whether petitioner's participation in the offenses, *which rendered him legally culpable for the murders, also justified imposition of the harshest penalty.*" *In Re Hardy*, 41 Cal. 4th at 1031 (emphasis added). The State asserted *Guzek* barred the admission of such evidence and trial counsel could not have been ineffective for not attempting to present it. The California Supreme Court disagreed:

> "Unlike in *Guzek*, petitioner's evidence that Boyd [a third party] was the actual murderer and petitioner merely a co-conspirator, is relevant to *how,* and not *whether,* petitioner is guilty. Evidence of the Boyd connection also 'sheds light on the *manner* in which he committed the crime for which he has been convicted.'" *Id.* at 1031 n. 17 (Citing *Guzek).*

After finding that this evidence would have been admissible the California Supreme Court found that counsel's failure to present this evidence was prejudicial with respect to punishment and vacated the death sentence.

These decisions, though not binding, consistently note the difference between the level of culpability necessary to be found guilty of felony-murder *and* the eligibility for the death penalty and support the correction position that the Mississippi Supreme Court's opinion denying relief was contrary to or involved an unreasonable application of clearly established law from the opinions of *Enmund v. Florida, supra, Lockett v. Ohio, supra,* and *Oregon v. Guzek, supra.*

(2)    **The trial Court erred by prohibiting constitutionally permissible mitigating evidence and by limiting Mr. King from challenging the State's aggravating evidence.**

The United States Supreme Court has held that the Eighth and Fourteenth Amendments require an individualized sentencing determination made through a full consideration of all evidence the defendant offers in mitigation. *Locket v. Ohio,* 438 U.S. 586 (1978); *Mississippi Code Annotated,* § 99-19-101 (5) and (6) (2005) lists the aggravating and mitigating circumstances. A person on trial for his life is not limited to state statutory mitigating circumstances but may introduce a wide and diverse repertoire of evidence. *Skipper v. South Carolina*, 476 U.S. 1, 5 n. 1 (1986); See: *Eddings v. Oklahoma*, 455 U. S. 104 (1982); *Roberts v. Louisiana*, 431 U. S. 633 (1977). *McKoy, supra*; *Boyde v. California*, 494 U.S. 370, 377-378.

The U.S. Supreme Court has held the threshold for finding mitigating evidence relevant and admissible is "low." *Tennard v. Dretke,* 542 U.S. 274, 285 (2004). And "a State cannot bar 'the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death.'" *Id.* (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990)).

Petitioner had the constitutional right to present and have the sentencing jury consider any relevant evidence concerning his background or the circumstances of the offense. *Lockett, supra; Eddings, supra.* Furthermore, under Mississippi law

he should have been allowed to present evidence that he "was an accomplice in the capital offense committed by another person and his participation was relatively minor." *Miss. Code Ann.* § 99-19-101(6) (d). Finally, Mr. King had the right to have the jury consider this or other mitigating circumstances regarding the circumstances of the offense *even if* there was evidence to support a finding of an *Enmund* factor.

Mr. King repeatedly attempted to establish this line of mitigating evidence during the sentencing hearing. For example, on cross-examination the State objected to Mr. King questioning an investigation about Willie Porter's alibi. Tr. 525. The defense wanted to establish that Mr. King was a minor participant in the offense and he acted under the influence of his uncle Willie Porter. Mr. King by the State's psychological evaluation is borderline mentally retarded and someone with that low of a level of functioning could easily be misled and abused. Despite the obvious constitutional relevance of this evidence the trial court prohibited its presentation. Oddly the court stated "you can argue that, but this witness (ex-deputy Ray Grinder) cannot testify to that. Tr. 525-527. But argument without supporting evidence carries no weight with a jury charged with weighing aggravating and mitigating evidence. The trial judge's ruling reflected a deep unawareness of the important federal guaranteed rights regarding mitigating evidence.

In *Le v. State,* 913 So. 2d 913, 944-45 (Miss. 2005) the Mississippi Supreme Court acknowledged the Mississippi sentencing scheme allowed a defendant to produce evidence and show his minor role in the offense. When Petitioner brought this issue before the Mississippi Supreme Court it failed to follow its prior decisions implementing U.S. Supreme Court decisions on mitigating evidence. The trial court also denied Mr. King the opportunity to prove he acted under extreme duress or under the substantial domination of another person. *Mississippi Code Annotated,* § 99-19-106 (6) (e).

The trial judge prohibited the introduction that there was no transfer of fibers between Mr. King and Mrs. Patterson. Tr. 518-519. Exhibits 13 and 14 to the *Petition for Post-Conviction.* Petitioner also tried to offer mitigating evidence that he was under the influence of his older uncle Willie Porter who was a heavy drinker and who had in the past <u>blamed</u> Petitioner for crimes Willie Porter had committed. He was again stopped by the trial court. Tr. 526-527. This was the point where the trial court stated Mr. King could argue the point but *not* introduce any evidence to support it. The position of not allowing evidence in support of an issue you are permitted to argue and which is a valid mitigating circumstance is nonsensical. The state court's decision affirming the trial court's barring evidence pertaining to the circumstances of the offense was contrary to or involved an unreasonable application of clearly established law regarding the introduction of

67

mitigating evidence.

**(3)     The trial judge's ruling precluding Petitioner the right to present evidence of another person's involvement in the offense also denied Petitioner the constitutional right to rebut or explain the State's case in aggravation of punishment.**

"The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Simmons v. South Carolina,* 512 U.S. 154, 161 (1994) (quoting *Gardner v. Florida,* 430 U.S. 349, 362 (1977).  The State offered evidence that: 1) the offense was committed during the course of a burglary; 2) the crime was committed in order to avoid arrest; and 3) the crime was especially heinous, atrocious, or cruel. In the presentation of its case the prosecution argued at length that the manner of Mrs. Patterson's death was especially heinous, atrocious or cruel. Tr. 398.  By showing that Willie Porter may have killed Mrs. Patterson, Petitioner would have been able to demonstrate the last two statutory aggravating circumstances were not applicable to him. Rebutting statutory aggravating evidence is a clearly established right. *See, e.g., Simmons, supra.*

The State also had to present evidence to prove beyond a reasonable doubt that Mr. King had the *requisite mental intent* as set out in the four (4) *Enmund* factors.  If the State could introduce evidence of the requisite mental intent as set in *Enmund,* basic constitutional principles of fundamentally fairness allowed Mr.

King the constitutional right to *rebut* that evidence. The State moved to introduce all the evidence from the guilt phase into evidence. Tr. 563. If the State could introduce all the evidence from the 1980 guilt phase into evidence, and in 1980 Petitioner had raised the defense that Willie Porter may have done the killing and he (Mr. Kings) was only an accomplice to burglary, then Petitioner should have been permitted to raise again the same evidence that he was only an accomplice. This evidence would not have allowed him to escape liability to capital murder because an accomplice can be liable for capital murder, but would have allowed him to counter the State's evidence relevant to *Enmund* factors. The 1980 jury heard the accomplice evidence but *Enmund* did not exist. Now that *Enmund* does exist the new jury must have been permitted to hear the accomplice defense. The trial repeatedly ruled that Mr. King was litigating "residual" doubt which reflected a misunderstanding of the basic constitutional principles of *Enmund*. Tr. 400-01.

As noted previously Mr. King attempted to prove Willie Porter had no alibi for the night of the crime. Mr. Porter had committed prior crimes and blamed them on Mr. King. Tr. 525, 564. Mr. King wanted to prove his fingerprints were not found in Mrs. Patterson's bedroom. He also attempted to show that the 1980 forensic investigation was incomplete. Tr. 565. Mr. King was denied the right to contest this evidence by cross-examining Ray Grinder to show that no skin, hair or fibers were found where Mrs. Patterson drown that connected Mr. King to the

murder. Tr. 519; 522-523; 525. Mr. King also moved in *Limine* to prevent the State from bringing into evidence that some type of blood was on the Petitioner's pants. C.P. 261-266. DNA was not conducted in 1980. The Petitioner wanted to DNA test the pants but they were the single piece of evidence lost by the state. The court did not grant the *Motion in Limine* and instead allowed the State to bring out evidence of the blood but Petitioner was not allowed to rebut the evidence. Tr. 20.

At every turn the state court handcuffed and hobbled Mr. King's attempts to contest the State's proof. Contesting statutory aggravating facts or establishing mitigating factors is not as the State claimed in 2003 *re-litigating guilt*. By showing that another person was responsible for actually killing Mrs. Patterson, Mr. King could have convinced the jury that the especially heinous, atrocious or cruel aggravating circumstance was not applicable to him. He could be guilty of felony-murder without having actually killed. It is fundamental that evidence may be inadmissible for one purpose but wholly admissible for another. Tr. 19; Tr. 450-51; 456; 466; 509-511; 513-519. As shown earlier in this Petition, Mr. King was prohibited from arguing in opening against the aggravating factors sought by the State. Tr. 402-404.

Throughout the entire re-sentencing transcript the State was permitted to pursue their theory of the statutory aggravating factors and present evidence concerning its theory of the offense. The State was not limited in the proof it was

permitted to introduce. Mr. King was prohibited and forbidden from contesting the statutory aggravating factors and from introducing relevant mitigating evidence or from providing the jury with evidence relevant to the circumstances of the offense under the false legal theory that Mr. King's evidence was re-litigating guilt. From the beginning of the trial to the Motion for a New Trial, Mr. King presented a clear Federal constitutional basis for the evidence he offered. C.P. 456. The denial of all the evidence offered during the 2003 re-sentencing hearing resulted in a fundamentally unfair Sentencing Hearing, and the state court's decision preventing Petitioner from rebutting the prosecutor's case for death was contrary to or involved an unreasonable application of clearly established law. For these reasons, Petitioner is entitled to habeas corpus relief.

## POINT THREE:
## GROUNDS C AND D OF THE PETITION FOR WRIT OF HABEAS CORPUS

**GROUNDS C AND D: PETITIONER IS MENTALLY RETARDED AND INELIGIBLE FOR THE DEATH PENALTY UNDER THE EIGHTH AMENDMENT AND PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE STATE COURTS REFUSED TO GIVE HIM AN INDEPENDENT, QUALIFIED EXPERT IN MENTAL RETARDATION OR AN EVIDENTIARY HEARING BEFORE THE COURT OR JURY ON THE ISSUE OF MENTAL RETARDATION**

### a. Introduction

Mack Arthur King is mentally retarded and ineligible for the death penalty under the Eighth Amendment. In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court held that the execution of mentally retarded individuals violates the Eighth Amendment. Mack Arthur King has consistently tested within the range of mental retardation. In his petitions for writ of *error coram nobis* from his first death sentence in 1983-84, Mr. King, through his post-conviction attorneys, asserted that Mr. King's trial counsel were ineffective for failing to tell the jury about this condition.[5] As part of the *error coram nobis* litigation on April 15, 1983, Dr. Robin King administered the Weschsler Adult Intelligence Test-Revised (WAIS-R) and found Mr. King to have a Full Scale I.Q. Of 71. However, Dr. King later found an error in his scoring and found Mr. King's Full Scale I.Q. to be 69. Tr. 615. On June 23, 1983. Mr. King was tested by Dr. Michael Whelan using the Weschsler Adult Intelligence Test (WAIS), which was outdated and had been replaced by the WAIS-R. Dr. Whelan determined Mack King's full-scale I.Q. to be 71. Tr. 679. On review from the evidentiary hearing, the Mississippi Supreme Court accepted that Mack Arthur King's intelligence testing placed him within the range for mental retardation, but found that the facts available to trial counsel were

---

5See *King v. State*, 441 So. 2d 1365 (Miss. 1983) (petition dismissed without prejudice); *King v. State*, 446 So.2d 600 (Miss. 1984) (granting evidentiary hearing on ineffectiveness claims). Notably, the assertion that Mr. King was mentally retarded was made before the U.S. Supreme Court, in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002), held that the execution of persons with mental retardation violated the Eighth Amendment. Indeed, the contention that Mr. King is a person with mental retardation was made and supported even before the Supreme Court first considered – and repudiated – such a categorical bar to capital punishment in *Penry v. Lynaugh*, 492 U.S. 302, 106 S. Ct. 256 (1989).

insufficient to place them on notice to investigate mental retardation as a mitigating circumstance. *See King v. State*, 503 So. 2d 271, 274 (Miss. 1987) (two separate IQ scores at or below 71).

Despite this lengthy history, the State of Mississippi has <u>never</u> provided Mr. King funds for the investigative and expert assistance necessary to investigate and present evidence in support of his assertion of mental retardation. Nor have the Mississippi Courts provided any evidentiary hearing at which Mr. King could prove, to either judge or a jury, that he is mentally retarded.

The denial of expert and investigative assistance is sadly consistent with Mississippi's historic antipathy to the requirements of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087 (1985). At the same time, the denial of an evidentiary hearing is inconsistent with Mississippi's procedure for handling claims brought under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2003). Under Mississippi's procedure, announced in *Chase v. State*, 873 So. 2d 1013 (Miss. 2004), an evidentiary hearing is required to adjudicate an *Atkins* claim where the defendant produces preliminary expert testimony demonstrating the possibility that the defendant may be found to be mentally retarded.6

---

6 *Chase* pre-dated Mr. King's 2003resentencing trial, but had been decided before Mr. King's appeal from that trial.

This is therefore a case, like *Wiley v. Epps*, 625 F. 3d 199, 207 (5th Cir. 2010) and *Hughes v. Epps*, 694 F.3d 533, 543 (N.D. Miss. 2010), where the state courts utterly failed to provide due process with respect to Mr. King's *Atkins* claim.

### b. The 2002-03 Pre-Trial Proceedings

Nearly twenty years after the mental retardation examinations conducted for the 1983-84 *error coram nobis* hearing, but for the first time after *Atkins*, Mr. King's lawyers sought funds necessary for expert and investigative assistance to present Petitioner's mental retardation anew to the trial court and/or resentencing jury. On September 25, 2002, counsel filed the *Motion for Funds to Obtain Expert Assistance,* seeking funds to engage Dr. Caroline Everington, Ph.D., an expert in the field of mental retardation at the Richard Riley College of Education, Winthrop University, Rock Hill, South Carolina. Dr. Everington's *curriculum vitae* indicated that she has published extensively on the subject of mentally retarded persons in the legal system. The Ex Parte Motion also sought funding for a social

worker/investigator7 to find evidence on the issue of adaptive functioning deficits.8

In the Ex Parte Motion, counsel gave specific reasons justifying the necessity of these services. First, counsel discussed, in detail, the evidence from the prior *error coram nobis* hearing and the prior sentencing trials indicating that Mr. King might be mentally retarded, and therefore ineligible for the death penalty under *Atkins*. Given this evidence, there was a reasonable necessity for the defense to have an expert in mental retardation to supervise testing and interviews of adaptive functioning witnesses, and a social worker to locate and interview adaptive functioning witnesses. C.P. 314-17, ¶¶17-20. Second, the Ex Parte Motion argued that even if Mr. King were not mentally retarded, these services were necessary to present low intellectual functioning as a mitigating circumstance to be weighed in sentencing. C.P. 317-21, ¶¶21-26. The proposed order attached to the Ex Parte Motion sought $7,500 for the mental retardation expert, and $2,500 for the social worker/investigator.

---

7 The Mississippi Supreme Court has since accepted the importance of social workers in the development and presentation of mitigation evidence in a capital murder case. *Fulgham v. State*, 46 So. 2d 315, 334-37 (Miss. 2010). Notably, the social worker in *Fulgham* was funded by the Mississippi Office of Capital Defense Counsel, which represented Ms. Fulgham at trial. Where that Office represents defendants subject to the death penalty, the scenario in Mr. King's case would rarely, if ever, recur.

8 The Motion for Funds to Obtain Expert Assistance (C.P. 305-27) Dr. Everington's Affidavit (C.P. 322-338) These materials, filed *ex parte* in the state courts, were unsealed so that the respondents and this Court could respond to Petitioner's claims.

The affidavit from Dr. Everington, presented with the Ex Parte Motion, first listed the relevant portions of the prior trial and hearing records that had been reviewed by the expert.9  Dr. Everington concluded:

> Based on my experience and my review of the record to date, it is my preliminary opinion that there could be a basis to conclude that Mr. King is mentally retarded. Initially, I note that both experts testified that Mr. King scored 71 on the WAIS intelligence tests, which is within the margin of error for a diagnosis of mental retardation. However, those scores were obtained without a complete social history and using out of date testing procedures. With a complete social history and the use of the most current intelligence tests, we can more accurately ascertain whether Mr. King is mentally retarded or otherwise suffers from any cognitive deficiencies.

Affidavit of Caroline Everington, Ph.D., at ¶6 C.P. 322.

Next, Dr. Everington discussed two flaws which undermined the basis for Dr. Whelan's opinion:

> Although the State's expert testified that Mr. King was not mentally retarded, the state's expert testimony was problematic in at least two respects.  <u>First</u>, Dr. Whelan should not have simply relied on other trial testimony in making his assessments of Mr. King's mental capacity. <u>Second</u>, Dr. Whelan's conclusions were incomplete without a proper and thorough assessment of Mr. King's adaptive skills, which is necessary to make an accurate diagnosis of mental retardation.

Affidavit of Dr. Everington, ¶7, C.P. 322

---

9 This included (a) the *error coram nobis* hearing testimony of Dr. Robin King and Dr. Michael Whelan, (b) the intelligence tests administered to Mr. King before that hearing, (c) the testimony of Mr. King's family members in the prior hearings and trials, (d) Mr. King's school records, (e) the records from the Mississippi State Hospital at Whitfield, and (f) the records from the Mississippi State Penitentiary at Parchman.  Everington Affidavit at ¶5 (C.P. 267-338).

Finally, Dr. Everington described in detail the work necessary to prepare an

opinion on Mr. King's intellectual abilities:

> In order to provide an accurate diagnosis of Mr. King's mental capacity, a licensed psychologist must be retained to do the following: (a) administer new intelligence tests. The WAIS-R, which was previously administered to Mr. King, is out of date. The new test, the WAIS-III, is a more accurate test; (b) conduct an assessment of Mr. King's adaptive skills, which includes the administration of achievement tests and interviews with individuals from Mr. King's life; (c) examine evidence of developmental delays, which will require an investigation of Mr. King's past, including interviews with people who knew him and an examination of relevant records. These interviews must go back to Mr. King's youth, prior to his turning eighteen. In addition to the above, other background information must be compiled to develop a complete social history for Mr. King.

> The effort required to compile this social history will require (a) financial resources for a psychologist and an investigator; and (b) sufficient time to conduct the tests, locate and interview the relevant witnesses, find and assemble the relevant records, and evaluate all of the information in order to provide an assessment.

Affidavit of Caroline Everington, Ph.D., ¶¶8-9 C.P. 323.

The Ex Parte Motion was brought on for hearing on September 25, 2002 .Tr.

389-405. Mr. Rocap made a detailed presentation commensurate with the Ex Parte

Motion. However, he indicated that he would be willing to use an investigator or

social worker recommended by the Mississippi Office of Capital Defense Counsel

to reduce costs. Tr. 399. Mr. Rocap also stated that Dr. Everington, and any other

out-of-state expert, would be asked not to bill for travel time and expense, to put them on the same footing as in-state experts. Tr. 401.

The trial judge stated "I think y'all are entitled to some help" Tr. 403, but that he might inquire from other sources about what the anticipated costs would be for similar services if provided by in-state experts, and cap the allowable fees at that amount. Tr. 403-05. Mr. King's lawyers stated that they would not expect to have a problem with the notion of a fee cap for the experts. *Id.*

But on November 24, 2002, the trial court denied the Ex Parte Motion for Funds. C.P. 196. There was no discussion from the trial court concerning the cost-containment measures discussed at the September 25 hearing, nor did the trial court explain how it decided that Mr. King was not, after all, "entitled to some help."

On March 20, 2003, three days before the commencement of trial, counsel for Mr. King filed Defendant's Motion to Determine Mental Retardation and to Preclude the Imposition of the Death Penalty and Memorandum in Support Thereof.10 The Motion noted that "the Mississippi courts have not yet addressed how the Supreme Court's mandate in Atkins is to be affected." Motion at 1. Citing post-Atkins decisions in Louisiana, Ohio, Florida, and Illinois, Mr. King's

---

10 This motion was Post-Conviction Exhibit 28

lawyers suggested that a pre-trial evidentiary hearing should be conducted, at which the trial court could decide whether the defendant is mentally retarded.11

Counsel for Mr. King was clear, however, that the denial of the Ex Parte Motion severely prejudiced Mr. King's ability to present evidence at such a hearing:

> This Court, of course, denied the defendant's motion for funds to retain expert assistance in order to test Mr. King's mental capacity. See Order Denying Funds to Retain Expert Assistance, dated Nov. 24, 2002. If this Court had granted that motion, the defendant believes that he would have additional evidence to present during his resentencing trial to show that he is mentally retarded.

Motion at 1-2. The point was repeated at the end of the motion:

> Nothing in this motion should be read as waiver of Mr. King's objections to, to his right to appeal an adverse verdict based on, this Court's earlier ruling that Mr. King was not entitled to funds for expert assistance to prove his claim of mental retardation.

Motion at 5.

On March 25, the morning before the third day of *voir dire* at trial, the motion was heard by the Court in chambers. Tr. 221-31. No live evidence was heard by the trial court. Mr. King's lawyers again noted the difficulty of proving Petitioner's entitlement to *Atkins* relief in light of the court's prior denial of the Ex Parte Motion:

---

11 That was ultimately the procedure suggested by the Mississippi Supreme Court in *Chase* and its progeny.

> In this proceeding, as Your Honor knows, we had
> previously requested expert assistance to assist us in
> making a presentation with respect to Mr. King's mental
> retardation. The Court denied that motion. We feel it's
> important to at least put before the Court the evidence
> that we'd have with respect to mental retardation and ask
> for a ruling on that matter.

Tr. 223.

Counsel proceeded to submit the transcribed testimony of the two experts in

the 1984 error coram nobis hearing, Dr. Robin King[12] and Mr. Michael Whelan,

together with Mack Arthur King's school records. Tr. 223-24. The State

submitted a psychiatric examination of Mr. King at Parchman in 1983. Tr. 225.

District Attorney Allgood stated:

> I think presenting it to the Court is the correct procedure.
> I perceive this to be somewhat of an issue of mixed law
> and fact, not unlike the suppression of a search warrant or
> the suppression of a confession given to a law
> enforcement officer. I would agree with counsel. I think
> the correct procedure is to present this to the Judge for a
> determination prior to any jury trial on the issue.

Tr. 226. The prosecutor continued:

> *Atkins,* and I will be blunt because I don't know *Atkins*, is
> a miserably written opinion. It gives us very little
> guidance. . . . I don't pretend to know everything there is
> to know in the wake of *Atkins versus Virginia.* I think
> it's a crazy world and I do think that it should be a
> pretrial condition and a ruling made by the Court.

Tr. 227.

---

12 Dr. Robin King, a Jackson psychologist, is not related to Mack Arthur King.

Defense counsel noted, and the prosecutor acknowledged, that the 1983 psychiatric opinion proffered by the State was not based on any testing for mental retardation whatsoever. Tr. 228. Psychologist Daniel H. Grant agrees that this document in no way proves that Mack King is not retarded. In fact, Dr. DiGaetano's diagnosis indicates that she needs additional information before making a determination:

> I have reviewed Dr. Delores DiGaetano's Psychiatric Evaluation of Mack Arthur King. This is a mental status report that was done on July 10, 1984, at the Mississippi State Penitentiary at Parchman. This mental status exam obtains the information from an interview with no age normed comparison and is therefore a subjective opinion. The "Rule out mental retardation" indicates that there is a possibility that Mack Arthur King is mentally retarded and that a final determination could not be made without further assessment. ¶ 20 Brief in Support of Petition for Writ of Habeas Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

The Court then ruled, basing its decision on Mr. King's eligibility for execution on the hearsay comment of one teacher in the school records:

> From what I can find and from what I see, you know, it's an amazing thing sometimes when you look through these records and – of course, I'm married to a retired school teacher and these school teachers sometimes are real observant and it amazes me what they glean sometimes. We have all this testimony from psychologists and we have a psychiatrist report and all these things, and on one of the reports, one of the teachers made a permanent record and said, "Mack Arthur missed almost half of the days. I see no reason to retain. He could do his work if he attended regularly."

81

> Now, to me, that teacher was saying, and this was back in
> '71 and it is something to kind of reach down and have
> some meaning to me, that what she was saying was this
> child, if he were in school, he has the ability to learn.
> She didn't say, you know, that he had a high ability to
> learn or whatever, but she indicates to me that she was
> saying if he attended school on a regular basis, if he were
> here for his classes, he would be all right. I put some
> weight on that. Y'all might say of all things, but tht had
> some meaning to me.

Tr. 230. The Court then denied the motion, without any discussion of the three-

part standard in Atkins and the mental retardation literature:

> So the Court being required to make a finding as to
> retardation before we go forward, and I'm not saying this
> is the last time this could be addressed, but I think it's
> something that has conditioned precedent to us going on
> with the trial, and I'm going to define that he is not
> mentally retarded under Atkins and we will bore ahead.
> Okay?

Tr. 231.

The Court failed to take into account the more significant part of the

comment the fact the teacher noted 14 year old Mack King was still in third grade

and embarrassed to be in class with the younger children. Dr. Daniel H. Grant

points out that an evaluator assessing for adaptive functioning would not rely on an

isolated ambiguous comment to the exclusion of other evidence of adaptive

functioning.

> The trial judge relied on one comment by a school
> teacher on a school record to determine that Mr. King
> was not retarded. The comment from a third grade
> teacher read: "Mack Arthur King missed almost half of

the days. I see no reason to retain. He could do the work
if he attended regular. A family problem is his handicap.
I think he is 14 year old seem to be imbarrassed (sic) of
age. I don't see any hope." From this isolated comment it
is unclear what the teacher meant. Does she mean that a
14 year old Mack Arthur King could do third grade
work? Or does she mean he could do work at his
academic level which is first grade if he attended school
regularly? An evaluator assessing adaptive functioning
would not rely on an isolated comment to the exclusion
of other evidence pertaining to adaptive functioning.
One ambiguous comment regarding academic
performance or effort will rarely be conclusive in
reaching a conclusion about a deficit in functional
academics, and such a comment provides no basis for a
determination about other domains of adaptive
functioning. ¶ 17, Brief in Support of Writ of Habeas
Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

### c. 2003 Trial

At this point – after the Court's ruling that Mack Arthur King was not

mentally retarded under *Atkins* – District Attorney Allgood revealed that he had

Dr. King subpoenaed to attend the trial, and would object to the use of the 1984

prior testimony. Tr. 231-32. Recall that this occurred on the third day of *voir dire*,

and, as it turned out, only a matter of hours before opening statement. Having

denied funds to conduct more recent, and more valid, mental retardation testing of

Mack Arthur King, and having denied funds to allow a social worker or

investigator to locate and prepare lay witnesses on adaptive functioning deficits,

the trial court required the defense to use, live and unprepared, a witness who had

last tested the defendant almost twenty years earlier. Tr. 471. Trial Counsel had

already determined that Dr. King was not qualified in 1998 and he had no intention

of presenting an unqualified witness to the jury.

> In connection with the 1998 proceeding, we filed a motion requesting expert assistance of a psychiatrist or psychologist, an investigator/social worker, a prison adaption expert and a pathologist. All requests for funding were denied. In preparing to file this motion, I attempted to contact Dr. King to determine if he could appear as an expert witness. Through his office, Dr. King informed me that he no longer considered himself qualified to provide assistance because he did not practice in the field of mental retardation. As a result, we were forced to ask the Circuit Court to permit us to read the 1984 testimony of Dr. King. We did so subject to our objections that this procedure was a completely inadequate substitute for the expert assistance that was constitutionally required. ¶ 6, Brief in Support of Petition for Writ of Habeas Corpus Exhibit 2, Affidavit of James E. Rocap, III.

> A portion of the information that I intended to present to the 2003 jury was the 1984 testimony and findings of Dr. King. I had no intention, however, of calling Dr. King to testify as a fact or expert witness; instead, I sought the court's permission to read Dr. King's 1984 testimony to the jury, as had been done in the 1998 sentencing hearing. As noted, I understood from the message from his office in 1998 that Dr. King did not consider himself qualified to perform a mental retardation evaluation. Therefore, I did not contact him in advance of the 2003 hearing. During the 2003 resentencing hearing, I learned that the state had subpoenaed Dr. King to testify at the sentencing hearing. The state explained it had done so to prevent me from arguing that Dr. King was "unavailable"

under the rules. The circuit court made clear that it preferred live testimony. Accordingly, I was faced with the dilemma of (1) not presenting any evidence of the 1983 IQ testing results or (2) calling Dr. King live. As noted, I had not spoken to Dr. King in 20 years. Given this choice, out of an abundance of caution I felt that I had no option but to call Dr. King as a fact witness to report the results of his 1983 IQ testing of Mr. King. I tried to make the record clear that Dr. King had not worked on or thought about this matter for twenty years and that his testimony was essentially a reiteration of his assessments in 1983. Not surprisingly, Dr. King had very limited information to provide on direct examination other than the content of his prior testimony, and he fared poorly on cross-examination because, as he admitted, his practice no longer involved intelligent level assessments. In addition, he had no prior meaningful opportunity to consult with me in order to prepare for anticipated lines of cross.

¶ 13, Brief in Support of Writ of Habeas Corpus Exhibit 2, Affidavit of James E. Rocap, III

Ultimately, when Dr. King was called as a witness, it became clear that there had been no preparation for his testimony:

Q:    [by MR. ROCAP]: Dr. King, other than our brief chat out in the hallway, it's been quite a while since you and I have seen each other, is that right?

A:    [by DR. KING]:    Yes, sir.

Q:    When was the last time that you recall us talking to each other approximately or seeing each other?

A:    It would have been 20 something years ago.

Q:    Sometime back in 1983?

A:     Yes, sir.

Tr. 598.

Dr. king was not an expert in mental retardation or the administering and evaluating of tests. In fact, for the fifteen years prior to the re-sentencing hearing, Dr. King was practicing in the sub-specialty of the treatment of mood disorders, anxiety, obsessive/compulsive disorder, and severe depression. Tr. 611. Moreover, Dr. King was unprepared to serve as a witness. He was unable to recall the details of his evaluation of Mack King. *Id.* Dr. King admitted making mistakes in scoring the WAIS-R which resulted in a change in the overall Full Scale I.Q. from 71 to 69. Tr. 615. Indeed, Dr. King made 6 glaring errors in scoring.

> I have reviewed Dr. King's data and found at least 6 additional glaring scoring errors on the Verbal Scale which resulted in a corrected IQ score of 69. After accounting for the additional errors the corrected verbal IQ score is 72 and the corrected Full Scale IQ score is 69. ¶ 13 Brief in Support of Writ of Habeas Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

Prior to the State's calling of Dr. Whelan, counsel for Mr. King objected again to the denial of funds for a defense expert on mental retardation:

> BY MR. ROCAP:   We have another motion, Your Honor, and that is another motion for a mistrial and/or for continuance.    Your Honor, if you recall, back in September we asked for funds to obtain an expert in this whole area.  We do not have an expert in this whole area. We do not have a consultant.  I believe Mr. Allgood is

> going to call Dr. Whelan. I saw him out in the hallway. I
> don't know who else he intends to call, but we are not in
> a position to respond to any of this information because
> of the Court's decision to deny us the funds for expert
> assistance in this area.

> BY THE COURT: Your motion is overruled.

Tr. 653. Trial counsel was hamstrung again by being denied the assistance of an expert.

> In addition, the State called Michael Whelan, who had
> conducted an IQ test on Mr. King in 1983, in rebuttal to
> Dr. King's testimony. Had the state provided expert
> funds for a mental retardation specialist, that specialist
> would have assisted me in preparing my cross
> examination of Michael Whelan. In fact, I had asked Dr.
> Everington to comment on Michael Whelan's 1983
> findings in her affidavit, which she did. I expected that,
> if the court provided expert funds, Dr. Everington would
> have continued to provide expert assistance in assessing
> and demonstrating the fallacies in Dr. Whelan's opinions.
> ¶ 14, Exhibit 2, affidavit of James E. Rocap, III

A defense expert would have provided a great deal of assistance as there

were many problems with Dr. Whelan's assessment.

> Both Dr. Robin King and Dr. Whelan found Mack King
> to have an IQ score in the mentally retarded range. Dr.
> Whelan administered the WAIS, a test normed in 1955,
> and found Mack King to have a full-scale IQ of 71. Dr.
> Whelan did not administer the WAIS-R, which was
> normed in 1981 and would have been the current most
> recently normed Wechsler scale available, and he did not
> account for obsolescence of test norms in his 2003
> testimony. When an older version of the WAIS is
> administered, the evaluator should account for the
> obsolescence of test norms. As observed by Flynn, the
> norm of a test increases by approximately 0.33 points per

year. When basing an assessment of intellectual functioning on an older test, the evaluator must correct for the age of the norms. Because the WAIS had been normed 26 years before Dr. Whelan administered it to Mr. King, the score obtained by Dr. Whelan likely overstated Mr. King's intellectual functioning by as much as 8.7 points due to the age of the norms. This would indicate that Mack Arthur King's true IQ on the WAIS administered by Dr. Whelan would be closer to 62 than the 71 Dr. Whelan reported. Dr. Whelan reported he chose the outdated WAIS because of it's statistical correlation to the Halstead-Reitan Neuropsychological Test Battery but this was confusing since he did not administer any neuropsychological tests to Mack King. In its ethical standards the American Psychological Association states a psychologist should administer the most current edition of a test instrument. This is especially true when the difference of one IQ point means a life is hanging on the difference.

Dr. Whelan testified that there was scatter or split between Mack King's Verbal and Performance IQ scores. However, anyone trained in interpreting tests would know that a 10 point split between the Verbal and Performance Scales is found in 37 percent of the individuals who take the test. A split between Verbal and Performance scores is generally not considered significant for interpretation unless the split is at least 15 points. There is also a phenomena noted as practice effects or gain scores which occurs when a test is repeated within several weeks or several months after the first administration of the test as was the case here. One of the reasons for the gain scores is the individual's familiarity with the task the second time indicating the tasks are only 'novel' the first time they are administered. The examinees obviously remember the strategies they used to solve the item even if they don't recall specific items. The impact of this practice effect on interpretation is to anticipate higher IQs on a retest simply because of the effects of practice, not because of real gains in

intellectual functioning. In their books, *Essentials of WAIS-III Assessment, 1999* and *Assessing Adolescent and Adult Intelligence Third Edition, 2002*, Dr. Alan Kaufman and Dr. Elizabeth Lichtenberger talked about having to be careful not to interpret a Performance - Verbal split that was related to gain scores. The second testing results in higher scores, gain scores, and for the WAIS-R for individuals who are between the age of 16 and 29 the average gain score is 6 Full Scale points. Practice effect or gain scores are especially large on the Performance Scale. The impact of the practice effect on interpretation is to anticipate higher IQs on the retest simply because of effects of practice, not because of real gains in intellectual functioning. Another by-product of the gains concerns the differential practice effects for Verbal and Performance IQs. Because the Performance IQ is expected to improve more than the Verbal IQ on a retest, examiners can easily be misled by the magnitude of a person's discrepancy on a retest as noted in the scores of Mack Arthur King. It is important to note in the first administration of the WAIS-R Mack Arthur King's Verbal IQ was higher than his Performance IQ. This was reversed in his performance on the WAIS three months later with his Performance IQ higher than his Verbal. This reversal can be explained by the Performance IQ being more affected by practice effect. Research has shown the Verbal Scale can gain as much a 2 or 3 points but the Performance IQ can increase by as much as 9 or 10 points on a retest. The Verbal – Performance IQ discrepancy on the retest is totally misleading and does not accurately portray the person's true difference between verbal and non verbal abilities.

1 saw no indication that Dr. Whelan accounted for the practice effect or gain scores even though he gave the WAIS only three months after Dr. King gave the WAIS-R.

The practice effect on IQ scores, including sub-scores, is well known. It is the standard of care for assessing

mental retardation to refrain from giving the WAIS shortly after it had already been given, or at least account for the practice effect when interpreting the results of the second test. Because Dr. Whelan failed to consider the practice effect, his interpretation of test results falls below the standard of care for psychologists conducting assessments for mental retardation. ¶ 9- 13 Brief in Support of Petition for Writ of Habeas Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

Dr. Whelan ruled out mental retardation in part based on a review of certain documents allegedly produced by Mr. King in the Lowndes County Detention Center. There are several problems with his conclusion. First, the actual origin of these written documents did not appear to be established. Even if Mr. King actually wrote the documents, he may have had assistance with preparing them. I have worked for a number of years in prisons and am aware that individuals obtain assistance from writ writers and may have access to sample documents that can be copied. Also inmates frequently copy a document in their own hand writing that was written by another inmate. Second, these documents appear for the most part to be copied out of a law book, and individuals with mental retardation may have the ability to copy relevant material. Finally, it falls below accepted standards of professional practice to rule out mental retardation based solely on one isolated factor without conducting any assessment of any other domain of adaptive functioning. An individual may meet the criteria for deficits in adaptive functioning even if he is relatively strong in a particular area of functioning. In addition, the DSM-IV-TR diagnostic manual allows an individual to meet the diagnostic criteria for mental retardation with academic performance up to the sixth grade level. 16 Brief in Support of Petition Writ of Habeas Corpus Exhibit 1, Affidavit ¶of Daniel H. Grant Ed.D.

Dr. Zimmermann agrees with Dr. Grant that these documents would not change his assessment that Mack King is mentally retarded. Exhibit 3 – Affidavit

of Marc L. Zimmermann, Ph.D., M.P. - Brief in Support of Petition for Writ of Habeas Corpus.

At the close of the evidence, Petitioner's counsel renewed the motion to determine that Mr. King is mentally retarded. Without taking argument from the State or making any additional findings from the pre-trial ruling, the Court denied the motion. Tr. 735. And that ruling was the last one on *Atkins* at the resentencing trial, because the Court denied the jury instruction proposed by the defense, which would have required the jury to return a sentencing verdict of life imprisonment if it found that Mack Arthur King was mentally retarded. Tr. 771.

### d. The Direct Appeal Opinion

By the time the 2003 sentencing trial reached the Mississippi Supreme Court, *Chase v. State,* 873 So. 2d 1013 (Miss. 2004) had been decided, requiring an evidentiary hearing where the defendant proffered an expert affidavit showing that there was a likelihood that he would be found mentally retarded after full evaluation and hearing. The *Chase* Court held that any prisoner tried before *Chase* would have the benefit of its procedures. *Chase*, 873 So. 2d at 1029.

> *Chase* provided very specific protections for prisoners seeking *Atkins* hearings in Mississippi courts. First, the opinion requires an expert who is "a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons,

for purposes of determining mental retardation." *Chase*, 873 So. 2d at 1029.

As the affidavit of Daniel H. Grant clearly outlines neither Dr. King nor Dr. Whelan are qualified experts. King admitted he was not an expert in the field and that he made a mistake scoring the test. Dr. Grant found "at least 6 additional glaring errors on the Verbal scale which resulted in a corrected IQ of 69." Dr. Grant pointed out that Whelan used an outdated test, failed to account for test obsolescence, failed to account for practice effect or gain scores, and misinterpreted the practice effects as split or scatter. Neither Dr. King or Dr. Whelan did an assessment of adaptive functioning or consulted collateral sources outside the school records. ¶ 7, 9- 14 Brief in Support of Petition for Writ of Habeas Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

In addition, the Mississippi Supreme Court provided that at a pre-trial hearing, **"the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation."** *Chase*, 873 So. 2d at 1013 (emphasis added). The *Chase* Court also held, "The factors to be determined by the trial court are the expert opinions offered by the parties, and other evidence of limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in *Atkins*." Id.

All of these protections were thrown overboard as the state court held that the chambers hearing – consuming ten pages of transcript – was "close enough" to qualify as a *Chase* hearing. In the first place, the Mississippi Supreme Court held that it was not error to deny Mr. King funds for investigative and expert assistance, relying on its prior case law on the subject:

> After reviewing the evidence in the record and Dr. Everington's affidavit, we find that King has not shown the "substantial need" required to obtain funds for an independent expert.

*King v. State*, 960 So. 2d 413, 423 (Miss. 2007)

> King is not entitled to relief from the denial of funds for expert assistance, as he has not shown a substantial need for assistance under Harrison and Holland.

*King v. State,* 960 So.2d at 424. The Court then concluded that the proceedings in the trial court were the functional equivalent of what was later required in *Chase:*

> Here, both sides presented expert testimony and other evidence regarding King's mental retardation claim. After hearing all the evidence, which was substantial, the trial judge outlined the evidence that he had considered and gave his reasons for concluding that King was not mentally retarded.
>
> *Chase* merely affords a defendant a hearing if that defendant fulfills certain requirements. King fulfilled those requirements and had his hearing. For these reasons, we find that King was afforded a hearing on his mental retardation claim in satisfaction with the procedures outlined in Chase. Therefore, we find no error with regard to this issue.

*King v. State*, 960 So. 2d at 428.

The state court completely ignored the fact that: (1) Dr. Everington stated precisely why the Court could <u>not</u> rely on the 1984 evaluations to decide if Mr. King was mentally retarded; (2) no funding had been allowed to find witnesses or evidence of adaptive functioning deficits; (3) Dr. King was <u>not</u> an expert "for" the

defendant, where that expert was dragooned into Court after trial had already begun, with no new testing, no preparation, and no funding for adaptive functioning evaluations; (4) the only "reasons" given by the trial judge for finding Mr. King not to be mentally retarded were made before trial, not after any "substantial evidence" had been presented, and involved the stray hearsay comment of one teacher on school records – hardly the evidence required to be adduced by the *Chase* opinion; and (5) the jury was not instructed that they were required to return a verdict of life imprisonment if they fund Mr. King was mentally retarded. It also reached the patently absurd result that Mr. King fulfilled "certain requirements" for a hearing, but failed to show "substantial need" for an expert.

A different result obtained in *Wells v. State*, 903 So. 2d 739, 741 (Miss. 2005), where the Mississippi Supreme Court remanded the case for an evidentiary hearing under *Chase*. In the original (pre-*Atkins*) trial of Mr. Wells, both the defense and the State agreed that Wells was mentally retarded, and the trial judge even so noted on the "Report of Trial Court Judge" that is required when a death sentence is imposed. Despite this, the Mississippi Supreme Court did not require the State to be bound by its prior representations or by pre-*Atkins* evaluations, but and remanded for a full evidentiary hearing before the trial judge, before which

new evaluations would be conducted. After the evaluation by the Mississippi State

Hospital, the State conceded that Wells was mentally retarded.

The same result obtained in *Neal v. State*, 873 So. 2d 1010 (Miss. 2004).

Mr. Neal was tried originally in 1982, long before *Atkins*. After *Atkins*, Mr. Neal

pointed out that the uncontested evidence in 1982 proved that he was mentally

retarded. As the Mississippi Supreme Court noted:

> Testimony at trial by Neal's expert indicated that Neal's
> IQ was 54; the State's experts testified that on their tests,
> his IQ was assessed at 60. Although Neal raised on direct
> appeal the issue that the Eighth Amendment barred the
> execution of the mentally retarded, this Court rejected
> that argument. Subsequently, Atkins was decided by the
> United States Supreme Court, and Neal has renewed his
> Eighth Amendment argument.

*Neal*, 873 So. 2d at 1012.

One would assume that this recorded testimony about pre-*Atkins* evaluations

would be sufficient to bar Mr. Neal's execution. Not so. In a decision that was

released the same day as *Chase*, the Mississippi Supreme Court held:

> We conclude that Atkins and the new standards set forth
> today in *Chase v. State*, 873 So.2d 1013, (Miss.2004),
> require Neal be granted leave to present the issue of his
> mental retardation to the trial court. There he, as well as
> the State, shall be afforded the opportunity to put on
> evidence in the manner set forth in Chase. The trial court
> shall then make the determination, by a preponderance of
> evidence, whether Neal is mentally retarded for Eighth
> Amendment purposes.

*Id.* at 1012-13. The State was allowed new testing of Mr. Neal, after which he was determined to be mentally retarded. *Neal v. State*, 27 So. 3d 460 (Miss. 2009).13

Like King, Kevin Scott presented evidence of his IQ in the mentally retarded range at trial before *Chase* was decided. *Scott v. State*, 878 So. 2d 933, 945-948 (Miss. 2004). Clinical psychologist Dr. Tetlow testified for the defense that based on the Wechsler Adult Intelligence Test he administered, Scott obtained an IQ of 60. *Scott*, So 2d. at 946. Dr. William Criss Lott testified for the state that he had given Scott the Wechsler Adult Intelligence Test and Scott had scored an IQ of 73. *Id.* Scott also submitted a record of a prior IQ test he took at age 14 as part of a Social Security evaluation and scored a 48. *Scott*, So. 2d. at 945. Scott submitted that "the uncontroverted testimony showed serious limitations in adaptive skills." *Scott*, So 2d. at 947. The Mississippi Supreme Court held that on the record presented on direct appeal Scott had not established that he was entitled to a *Chase* hearing. *Scott*, So 2d.at 948. The Mississippi Supreme Court also ruled that Scott would be entitled to a *Chase* hearing should he provide "an appropriate affidavit that complies with the requirements of *Chase*." *Id.* In post-conviction, Scott attached two affidavits one from Dr. Tetlow and one from Dr. Zimmermann which stated there was a reasonable basis to conclude that upon further testing Scott would be found mentally retarded and he was granted a *Chase* hearing. *Scott v.*

---

13 *Bobby v. Bies*, 129 S. Ct. 2145, 2153 (2009) (recognizing difference between mental retardation as a mitigator and mental retardation under *Atkins*; under former, counsel often did not have incentive to pursue aggressively because it could be double-edged)

*State*, 938 So. 2d 1233, 1237-1238 (Miss. 2006). *See Bishop v. State*, 882 So. 2d 135, 151 (Miss. 2004) (permitting defendant to re-file affidavit where defendant supplied school records and affidavits of family members, but no expert opinion).

It would appear, then, that only Mr. King is bound by his 1984 proceedings in the post-Atkins, post-Chase context. Neither the State, nor Mr. Wells or Mr. Neal, or Mr. Scott were required to rely upon twenty-year old testing, experts dragged to Court in the middle of trial without preparation, and no adaptive functioning investigation. "Close only counts" when the State of Mississippi wants it to count.

### e. Post-Conviction Proceedings

In his Post-Conviction Petition, Mack King presented the Mississippi Supreme Court with an affidavit of Dr. Marc, Zimmerman, a licensed psychologist qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation. Dr. Zimmerman reviewed Mack King's school records, tests administered by Dr. Robin King, sentencing phase trial testimony of Dr. Robin King, Dr. Michael Whelan, Sammy Townsend, Ben Martin, M.D., Ethel Conner, Carshena Conner, Tion Conner, Claressa King medical records from the Mississippi State Hospital,

97

and Records from Delores DiGaetano, Mississippi Department of Corrections. Dr. Zimmermann also reviewed affidavits from Caroline Everington Ph.D, Dr. Robin King, Thomas Gilchrist, M.D., Robert Bluitt, Edward Johnson, Claressa King, Sammy Conner, and Ethel Conner. On May 30, 2008, Dr. Marc Zimmermann administered the Weschsler Adult Intelligence Test-III (WAIS-III) to Mack King. On the WAIS-III Mack King's full-scale I.Q. was a 67. It was Dr. Zimmermann's opinion that King was not malingering on the WAIS-III. *See* Post-Conviction Exhibit 21.

In his affidavit Dr. Zimmerman stated:

> It appears that Mr. King meets all the criteria to be diagnosed as Mentally Retarded. All measures of I.Q. have placed his intellectual abilities at a score of less than 75. He has deficits in his adaptive functioning/activities of daily living. His academic abilities clearly are deficient as measured by his academic record and testing by Dr. King. Further his vocational abilities are deficient as attested to by two individuals who have known him since school. He is unable to access the community as he could not leave his neighborhood. And he was unable to effectively deal with money. Based on the above, to a reasonable psychological certainty, Mr. King meets the definitions of mental retardation as defined by the DSM-IV-TR and the AAMR and accepted by the federal and state courts in *Atkins* and *Chase*. Exhibit 21, Petition for Post-Conviction Relief.

On post-conviction review, Mr. King's new lawyers argued that the failure of the State to provide expert and investigative resources and the failure to hold an

evidentiary hearing violated due process under *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842 (2007). The post-conviction petition also specifically noted that in *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007), the Fifth Circuit expressly applied *Panetti*'s teachings to the *Atkins* context.

    *Panetti* addressed the language in *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595 (1986), that the States would be allowed to construct procedures by which a death-sentenced prisoner could prove that he was incompetent to be executed. The Supreme Court decided that the procedures applied by the State of Texas to Panetti's claim of incompetence did not meet the demands of fundamental due process:

> It is uncontested that petitioner made a substantial showing of incompetency. This showing entitled him to, among other things, **an adequate means by which to submit expert psychiatric evidence** in response to the evidence that had been solicited by the state court. And it is clear from the record that the state court **reached its competency determination after failing to provide petitioner with this process**, notwithstanding counsel's sustained effort, diligence, and compliance with court orders.

*Panetti*, 551 U.S. at 948, 127 S. Ct. at 2855 (emphasis added). The Court went on to define the minimal standards of *Ford*:

> As an example of why the state procedures on review in Ford were deficient, Justice Powell explained, the determination of sanity "appear[ed] to have been made solely on the basis of the examinations performed by state-appointed psychiatrists." Id., at 424, 106 S.Ct. 2595.

> "Such a procedure invites arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even from explaining the inadequacies of the State's examinations."

> Justice Powell did not set forth "the precise limits that due process imposes in this area." Id., at 427, 106 S.Ct. 2595. He observed that a State "should have substantial leeway to determine what process best balances the various interests at stake" once it has met the "basic requirements" required by due process. Ibid. **These basic requirements include an opportunity to submit "evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination."** Ibid.

*Panetti*, 551 U.S. at 949-50, 127 S. Ct at 2856 (emphasis added).

The Mississippi Supreme Court, however, refused to reconsider its affirmance of the truncated procedure used in Mr. King's 2003 resentencing trial. Instead, after a lengthy discussion of its direct appeal opinion, the state court held:

> Accordingly, King is procedurally barred from reasserting this issue. See Miss.Code Ann. § 99-39-21(3) (Rev.2007). Further, King fails to offer any evidence sufficient to overcome the procedural bar as required by Mississippi Code Section 99-39-21(6).

*King v. State*, 23 So. 3d 1067, 1076 (Miss. 2010).

Miss. Code Ann. §99-39-21(3), the statute cited in the post-conviction opinion, applies the doctrine of res judicata to post-conviction proceedings: "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." As the U.S. Supreme Court has expressly held, res judicata is not a state grounds for decision that bars federal habeas review. "When

a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review," *Cone v. Bell*, 129 S. Ct. 1769, 1781 (2009).

The state post-conviction opinion would be a non-event for purposes of this Court's review, but for Justice Kitchens' dissent. Justice Kitchens perceived the twin deficiencies with the 2003 resentencing – the lack of funds for expert and investigative assistance and the failure to provide Mr. King with an evidentiary hearing at which to prove his claim to be ineligible for the death penalty.

First, on the funding issue, Justice Kitchens set forth the importance of the interplay between *Ake v. Oklahoma* and *Atkins v. Virginia*:

> On direct appeal, the State argued that *Ake* was limited to cases in which the defendant raised an insanity defense or the State planned to present psychiatric evidence at sentencing. *King I*, 960 So.2d at 420. Although this Court quoted *Ake* at length, it did not decide whether the State's argument was valid. *Id.* at 420-21. What the Court did do was apply the "abuse of discretion" standard appropriate for reviews of funding denials for consultants or investigators, concluding, "[a]fter reviewing the evidence in the record ... we find that King has not shown the 'substantial need' required to obtain funds for an independent expert." *Id.* at 423 (*quoting Holland v. State*, 705 So.2d 307, 333 (Miss.1997)).
>
> *King I* did not fully develop the important interplay between *Atkins* and *Ake*. Under *Ake*, when a defendant's mental condition is a critical factor, the Fourteenth Amendment's due process guarantees require the State to provide an indigent criminal defendant with expert assistance. 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53.

> As *Ake* makes clear, "[t]his Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Id.* at 76, 105 S.Ct. 1087. **Because, under *Atkins*, a successful showing that he is mentally retarded would foreclose the penalty of death, King most certainly demonstrated "a substantial need" to trigger his constitutional right to a mental health expert's assistance.**

*King*, 23 So. 3d at 1077-78 (emphasis added).

Second, with respect to whether the 2003 chambers hearing was sufficient to provide fundamental due process to Mr. King under *Atkins* and *Panetti*, or even meet the state court's own requirements in *Chase*, Justice Kitchens wrote:

> [W]hile evidence of mental retardation was presented during his resentencing hearing, the trial judge had concluded that King was not mentally retarded prior to trial. This ruling took place in chambers, following brief oral arguments, and without a full evidentiary hearing. During this proceeding, no witnesses were called to testify, and only one document was received into evidence. ***Chase* requires that the "the matter should proceed as other evidentiary hearings on motions," 873 So.2d at 1029 (emphasis added); but what actually occurred in this instance was nothing more than oral argument by counsel.**

*King v. State*, 23 So. 3d at 1078 (emphasis added).

### f. Mack Arthur King Was Denied Due Process of Law

The State Court's truncated (if not sham) proceedings on the weighty issue of whether Mack Arthur King is ineligible for the death penalty under the Eighth

Amendment and *Atkins* clearly violated the Fourteenth Amendment's Due Process Clause guarantee. While *Atkins*, like *Ford*, left to the States the discretion to develop procedures to implement the Eighth Amendment prohibitions announced in those cases, they did not give the States *carte blanche*. As the Eleventh Circuit has taught, Atkins' reservation of procedure-making to the state courts "did not give the states unfettered authority to develop procedures that nullify the Eighth Amendment's prohibition on the execution of the mentally retarded." *Hill v. Schofield*, 608 F.3d 1272, 1277-78 (11th Cir. 2010).

The Mississippi Supreme Court has consistently granted evidentiary hearings on *Atkins* claims where the petitioner has submitted an expert affidavit as specified in *Chase,* even if there was other evidence in the record contradicting the claim of mental retardation. *See Carr v. State*, 873 So. 2d 991, 1001 (Miss. 2004) ("Notwithstanding the [contrary] evidence which is before this Court regarding Carr's claim of mental retardation, we determine that under *Atkins* and the new standards set forth today in *Chase v. State*, we cannot constitutionally deny him the opportunity to present the issue of his possible mental retardation to the trial court."); *Snow v. State,* 875 So 2d 188, 191 (Miss. 2004) (by presenting an expert affidavit that he is mentally retarded, the defendant "has minimally met his burden on this issue so as to be entitled to an evidentiary hearing"); *Smith v. State*, 877 So. 2d 369, 385-86 (Miss. 2004) (defendant presented evidence that his "IQ has been

found in the mentally retarded range," including an IQ score of 75, and therefore "under *Atkins* and *Chase* we cannot constitutionally deny him the opportunity to present the issue" in an evidentiary hearing).

This Court and the Fifth Circuit have previously considered cases in which the Mississippi Supreme Court has deviated from its *Chase*-announced procedure in a way that denies the basic protections of due process as required by *Atkins*, *Ake*, and *Panetti*. In William Wiley's case, the District Court granted a full evidentiary hearing on *Atkins* despite the holding by the Mississippi Supreme Court that Mr. Wiley had not made a threshold showing sufficient to allow such a hearing. At the Federal evidentiary hearing, the District Court found Mr. Wiley to be mentally retarded. On appeal, the Fifth Circuit affirmed. The State court's denial of due process was central to the Court of Appeals' holding:

> [W]hen a petitioner makes a prima facie showing of mental retardation, **a state court's failure to provide him with an opportunity to develop his claim** deprives the state court decision of the deference ordinarily due under the AEDPA. *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir.2007). As we explained in *Rivera*, even though *Atkins* left to the states the job of implementing procedures for determining who is mentally retarded, "it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence." Id. That jurisprudence included *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), which required a hearing in accord with fundamental fairness and procedural procedural due process for defendants who make a showing of ineligibility for a death sentence due to insanity. *Id. (citing Ford*, 477 U.S. at 424, 106

S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment)).

*Wiley v. Epps*, 625 F. 3d 199, 207 (5th Cir. 2010) (emphasis added). The Court explained:

> We held in *Rivera* that the Texas Court of Criminal Appeals acted unreasonably by failing to conduct a full and fair evidentiary hearing in light of the petitioner's prima facie case of mental retardation. Id. at 357-58. We were guided by the Supreme Court's decision in *Panetti*, where the Court held that after a petitioner made a substantial showing of incompetency the state court's failure to provide the procedures elaborated on in *Ford* constituted an unreasonable application of clearly established federal law. *Panetti*, 551 U.S. at 948, 127 S.Ct. 2842. Moreover, the state court's error deprived its decision of AEDPA deference. See id. ("As a result of this error, our review of petitioner's underlying incompetency claim is unencumbered by the deference AEDPA normally requires.").

*Id.* at 207. The Fifth Circuit noted that "[a] survey of the Mississippi case law shows that the Mississippi Supreme Court has routinely granted evidentiary hearings as long as the *Chase* requirements are met even in the face of weak or controverted evidence," *Wiley*, 625 F.3d at 210 n.8. The Court concluded:

> Therefore, faced with the threshold question of whether to allow Wiley's claim to proceed to a hearing, it was an unreasonable application of clearly established federal law for the Mississippi Supreme Court to deny Wiley's *Atkins* claim without a hearing, and the district court correctly concluded that it was not bound to afford the state court's decision deference. See *Rivera*, 505 F.3d at 357; see also *Panetti*, 551 U.S. at 948, 127 S.Ct. 2842.

*Wiley*, 625 F.3d at 213.

In *Wiley*, the Court of Appeals relied in part on this Court's decision in *Hughes v. Epps*, 694 F.3d 533, 543 (N.D. Miss. 2010). *See Wiley*, 625 F. 3d at 212 n.9. In Hughes, like Wiley, the state court purported to decide on the pleadings and prior proceedings that the prisoner was not mentally retarded. This Court, like the Fifth Circuit, found that the failure to allow Mr. Hughes to develop his claim in an evidentiary hearing denied due process:

> The Fifth Circuit has held that "[a] prima facie showing of mental retardation is simply a sufficient showing of possible merit to warrant a fuller [exploration] by the district court." *In re Henderson*, 462 F.3d 413, 415 (5th Cir.2006). In this instance, the Mississippi Supreme Court essentially required that Hughes be able to prove his ultimate claim as a precondition to a hearing on the issue. *See Hall v. Quarterman*, 534 F.3d 365 (5th Cir.2008) (emphasizing need for "full and fair hearing ... where such a hearing would bring out facts which, if proven true, support habeas relief.").

> Petitioner presented the Mississippi Supreme Court with an expert opinion that he meets the definition for mental retardation in accordance with the procedure as set forth in *Chase*.

> . . . .

> Petitioner made a prima facie showing of mental retardation in state court. **The state's failure to provide him with the due process opportunity to develop his claim** deprives the decision of deference normally due under 28 U.S.C. § 2254(d). *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir.2007).

*Hughes v. Epps*, 694 F.3d 533, 543 (N.D. Miss. 2010) (emphasis added).

In this case, the deprivation of due process is underscored by the state court's antecedent denial of expert and investigative funding – which prevented Mr. King from having the opportunity "to fully develop his claim." As noted in Justice Kitchens' dissent in the post-conviction opinion, the Mississippi Attorney General has long opined that, as to capital murder cases, *Ake v. Oklahoma* only requires state courts to provide funds for experts on issues related to sanity (the precise issue in *Ake*). In his article on capital murder cases in the Encyclopedia of Mississippi Law, Assistant Attorney General Marvin L. White, Jr., the head of the Capital Litigation Division, interprets *Ake* as a very narrow holding that "[i]f there is no reliance on the defense of insanity during the guilt phase of a capital murder trial, there is no right to an independent mental health examination." J. Jackson and M. Miller, eds., ENCYCLOPEDIA OF MISSISSIPPI LAW §27:10 (September 2010). Mr. White goes on to assert that:

> Three of the possible mitigating factors in the Mississippi capital sentencing statute can involve factors that could, under the proper circumstances, entitle a capital defendant to the assistance of mental health experts. However, when the state does not present mental health experts during the sentence phase to establish the future dangerousness of the defendant, there is no absolute right to the assistance of independent mental health experts.

*Id.* 14

---

14 It is not clear when this "future dangerousness" proviso would occur, since (unlike Texas, Oregon and Virginia) the term does not exist in the Mississippi capital sentencing statute. See Miss. Code Ann. §99-19-101 et seq.

The Mississippi trial and appellate courts have clearly followed this guidance: a review of the decisions of the Mississippi appellate courts considering claims that trial courts had wrongly denied or constricted funds for expert and investigative assistance shows that such claims are routinely denied. Out of 36 reported decisions considering the issue, 34 held that the trial court did not violate *Ake* in denying funds for expert or investigative assistance. See Appendix A. Moreover, neither of the two cases which held the denial of funds to be error involved mental health experts. *See Richardson v. State*, 767 So. 2d 195, 199 (Miss. 2000) (DNA expert); *Harrison v. State*, 635 So. 2d 894, 900-03 (Miss. 1994) (forensic odontologist).

The Mississippi Supreme Court noted soon after *Ake v. Oklahoma* was decided that the opinion "clearly left it to the states to decide how to implement this right." *In re Hill*, 467 So. 2d 669, 671 (Miss. 1985). The state court has forthrightly acknowledged that it has used this latitude to deny most funding motions brought under *Ake*. "The State of Mississippi does not summarily grant these requests," *Townsend v. State*, 847 So. 2d 825, 828-29 (Miss. 2003). The state court has gone so far as phrasing the *Ake* holding in a way that becomes the exact opposite of the Supreme Court's command:

> As his only meaningful authority, he cites *Ake v. Oklahoma*," wherein the United States Supreme Court **refused to acknowledge** that an indigent defendant has a constitutional right to a psychologist or psychiatrist of his

> choosing or for funds to pay for such even where he has
> demonstrated that his sanity is at issue.

*Jackson v. State*, 684 So. 2d 1213, 1221 (Miss. 1996) (emphasis added). Of

course, *Ake* did not "refuse to acknowledge" rights, but instead affirmatively

recognized a due process right to expert assistance. It is no stretch to say that the

state courts have treated *Ake* claims with derision:

> Pinkney also argues that the denial of his motion for
> funds to hire a private investigator constitutes error. The
> argument seems to be that a private investigator would
> have been helpful.

*Pinkney v. State*, 538 So. 2d 329, 343 (Miss. 1988). And again:

> This claim is based on the assumption that Ake v.
> Oklahoma requires the appointment of "defense" mental
> experts of Jackson's choice.

*Jackson v. State*, 860 So. 2d 653, 669 (Miss. 2003) (quotation marks in original).

In short, the state court has evinced a determination to decide cases

"contrary to" or via an "unreasonable application of" *Ake*'s guarantee of a criminal

defendant's due process right to expert and investigative assistance:

> [T]here can conceivably be instances when the State in
> fairness should be required to pay the cost of an expert
> needed by the defense to insure a fair trial for an indigent
> accused must be conceded. Those cases can only be left
> to the discretion of the trial court, and **they will be rare**.

*Griffin v. State*, 557 So. 2d 542, 551 (Miss. 1990) (emphasis added).

Against this backdrop, the denial of expert and investigative assistance to

Mack Arthur King was no mere oversight. The state court's crimped and

parsimonious interpretation of *Ake v. Oklahoma* virtually guaranteed that it would decide cases "contrary to" or via an "unreasonable application" of this long-established Federal constitutional decision.

There can be no straight-faced argument that Dr. Everington's affidavit, two prior test results consistent with mental retardation, school records documenting abysmal academic performance, and defense counsel's multiple, repeated assertions of the need for expert assistance were not sufficient to create a prima facie showing of the need for expert and investigative assistance and an evidentiary hearing on Mr. King's *Atkins* claim. Even the trial judge, at the hearing on the Ex Parte Motion, stated "I think y'all are entitled to some help." Tr. 403. Rather, both as to the denial of an evidentiary hearing, and as to the denial of investigative and expert services, the state courts violated the Eighth and Fourteenth Amendments as established in *Ake v. Oklahoma, Atkins v. Virginia,* and *Panetti v. Quarterman.* As discussed in the Fifth Circuit's opinions in *Rivera* and *Wiley,* and this Court's opinion in Hughes, no deference is due the state court opinions on these issues.

Neither Dr. King nor Dr. Whelan was qualified to make an assessment of whether Mack King is mentally retarded and both experts performed inadequate evaluations. Daniel H. Grant, Ed.D, a licensed psychologist qualified in the field of assessing mental retardation and further qualified as an expert in the administration and interpretation of tests and the evaluation of person for the

purposes of determining mental retardation reviewed the testimony of Dr. King

and Dr. Whelan and the raw data from King's evaluation and concluded that both

doctors failed to provide an evaluation that conformed to prevailing norms:

> In my professional opinion, which I hold to a reasonable degree of psychological certainty, neither the evaluation by Dr. King nor the evaluation by Dr. Whelan conformed to prevailing professional standards necessary to make a reliable assessment of intellectual disability or mental retardation. As explained in greater detail below, neither expert conducted an assessment of adaptive functioning, which was necessary given that Mr. King's IQ scores indicated subaverage general intellectual functioning. Moreover, there is no indication that either expert sought collateral information, with the possible exception of some school records, either from other institutions or individuals who knew Mr. King. Dr. Whelan administered an outdated instrument to measure intellectual functioning and did not account for test obsolescence. Dr. King misscored portions of the WAIS-R, and acknowledged his limited professional competence to interpret test scores and assess for intellectual disability. Neither Dr. King nor Dr. Whelan sought reliable information to confirm onset prior to age 18. (¶ 7, Brief in Support of Writ of Habeas Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

> It is my professional opinion, that I hold to a reasonable degree of psychological certainty, that Dr. King's and Dr. Whelan's evaluations are incomplete and can neither reliably classify Mr. Mack Arthur King as either mentally retarded or not mentally retarded. Their assessments can only note their IQ scores meet the first prong of the 3 prongs of the diagnostic criteria for diagnosing an individual with mental retardation. The other 2 prongs, Adaptive Behavior and the disability has to occur prior to the age of 18 years of age, were not assessed. Moreover, it is my professional opinion, which I hold to a

> reasonable degree of psychological certainty, that the test results and materials available to Dr. King and Dr. Whelan are consistent with findings of mental retardation. ¶ 23, Brief in Support of Writ of Habeas Corpus Exhibit 1, Affidavit of Daniel H. Grant Ed.D.

Because the state courts violated Mack Arthur King's Eighth and Fourteenth Amendment rights, the writ of habeas corpus should issue, vacating Mr. King's sentence and allowing the State of Mississippi a reasonable time to commence re-sentencing proceedings that comport with *Ake*, *Panetti*, and *Atkins*.

In the alternative only, this Court should, as a consequence of the Fourteenth Amendment violations set forth herein, review Mr. King's substantive *Atkins* claim *de novo*, without the benefit of Section 2254 deference. "The state's failure to provide him with the due process opportunity to develop his claim deprives the decision of deference normally due under 28 U.S.C. § 2254(d)." *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir.2007). *Accord*, *Hughes v. Epps*, 694 F.3d 533, 543 (N.D. Miss. 2010), As the Wiley Court concluded:

> The Supreme Court has recognized, however, that a state court's unreasonable application of federal law, as a predicate for adjudicating a defendant's claim, may undermine the AEDPA deference given to the state court adjudication. *See Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

*Wiley v. Epps*, 625 F. 3d 199, 207 (5th Cir. 2010). It cannot be doubted that the same result obtains here.

**POINT FOUR:**
**GROUND B OF THE PETITION FOR WRIT OF HABEAS CORPUS**

**THE PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.**

The United States Supreme Court adopted a two-prong standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984). First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. Second, the defendant must show there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

James Rocap first began representing Mack Arthur King 1982. (*See Post-*Conviction Exhibits 18 & 19 Affidavits of James Rocap). During that time his representation was continuous and uninterrupted until the Mississippi Office of Capital Post-Conviction Counsel was appointed to represent him on September 25, 2007. (*See* Post-Conviction Exhibit 18*).

State Court Post-Conviction was the first opportunity that Mr. King has had to raise his ineffective assistance of counsel claims against his Mr. Rocap. *Wiley v.*

113

*State*, 750 So. 2d 1193, 1198 n.1 (Miss. 1999) (citing *Woodward v. State,* 635 So.2d 805, *807-08 (Miss.1993)).* "Where the same counsel represents the defendant at trial and on direct appeal, the claim [of ineffective assistance of counsel] is procedurally viable on application for post-conviction relief." *Woodward v. State,* 635 So. 2d 805, 807-08 (Miss.1993). All of these issues were raised for the first time in post-conviction proceedings.

## A.  TRIAL COUNSELWAS INEFFECTIVE FOR NOT INVESTIGATING AND DEVELOPING MITIGATION EVIDENCE

At the sentencing hearing, trial counsel called 3 witnesses: Sammy Townsend, Ethel Conner, and Robin King. Only one of those witnesses had personal knowledge about Mack King and his upbringing. Sammy Townsend was the principal of New Hope Elementary from 1974 to 1998. Mack King did not attend New Hope during the time that Mr. Townsend was principal. Tr. 569. As the records custodian for New Hope Elementary, Mr. Townsend identified Mack King's school records. Tr. 570. Mr. Townsend did not have any personal knowledge of Mack King. He could only testify to the records. Mr. Townsend did not know whether the teacher that taught Mack King second grade the first time was the same teacher that taught Mack King the second time. Tr. 578. Mr. Townsend did not know what "family problem" Mack King's third grade teacher was referring to when she noted "A family problem is his handicap" on the school records. Tr. 580.

114

The second witness called, Dr. Robin King, had not spoken to trial counsel in approximately 20 years. Tr. 589. Dr. King had done a limited evaluation of Mack King in 1983 in connection with *error coram nobis* proceedings. *Id*. In 2003, Dr. King's practice was radically different than the practice he maintained in 1983. In 2003, Dr. King was specializing almost exclusively in the treatment of mood disorders and was not in the practice of administering intellectual measurements. In 1983, Dr. King did not obtain information from collateral sources, nor did he conduct assessment to determine Petitioner's adaptive functioning. Dr. King did nothing more on the case prior to his testimony at the 2003 resentencing. Due to the passage of time and his complete lack of involvement in the case for nearly twenty years, Dr. King could not remember many of the details of his evaluation. Tr. 611. He was primarily called because he had administered an IQ test to Petitioner, but it had been so long that Dr. King did any work in the mental retardation field, he could not even explain elementary matters regarding the IQ test and was easily discredited by the prosecution.

The third witness, Ethel Connor, Mack King's older sister was the only witness that could offer a glimpse into Mack King's life. Tr. 695-709.

An adequate investigation would have revealed that Mack Arthur King grew up in poverty and was raised by alcoholic parents who were often violent with each other. The family lacked resources to obtain food, clothes and hygiene

supplies. The family depended upon the donations by family members and members of the community. *See* Post-Conviction Exhibits 25, 27. Mississippi Department of Human Service Records report that the family had no regular income and no car and that he family received food stamps. Habeas Exhibit 2 Lowndes County DHS Records at DHS-LC 0012.

Mack King's parents, Teavell and Minnie Pearl King, abused alcohol prior to and after his birth. *See* Post-Conviction Exhibits 22, 27. Mack's mother Minnie Pearl drank far more than her husband. On weekends, the children were left unattended while their mother went drinking and their father worked. Minnie Pearl left on Friday nights and returned on Sunday evening. *See Post-Conviction Exhibits 25, 27.*

Severe intellectual disabilities run in Mack's family. His younger brother Jake is severely disabled. With the help of Lowndes County Department of Human Services, Jake was placed in Ellisville State school for the Mentally Retarded on Sept. 22, 1970 at the age of 8. Habeas Exhibit 2 Lowndes County DHS Records at DHS-LC 0013. Psychological testing performed at Ellisville found that Jake scored at the level of profound Mental Retardation with a reported IQ score of 3 and 5. Habeas Exhibit 3at ESS019, ES0021. Jake's impairments are significant because mental retardation is often found to run in families due to an inherited genetic disorder or from subtle undiagnosed problems caused by prenatal,

perinatal, or postnatal etiologies. Post-Conviction Exhibit 21, Affidavit of Dr. Marc Zimmermann. Social history taken at Ellisville notes that the Kings had five children that died in their first year from pneumonia with high fever and convulsions. Habeas Exhibit 3 at ES0017.

Mack Arthur witnessed violence between his parents including an episode where his mother stabbed his father in the back of his right leg. After this incident, the father had to be taken to the hospital. *See* Post-Conviction Exhibits 25, 27.

Counsel was well aware that Mack King had suffered trauma growing up with violent, alcoholic parents. Tr. 699. 701-704. Counsel was also aware that Mack King performed poorly in school and had a low IQ. Tr. 570-573; Tr. 612-616. Despite these indications that Petitioner likely suffered brain dysfunction, trial counsel did not even seek neuropsychological testing. Counsel filed a motion asking for several experts but he never asked for a neuropsychological evaluation. Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 305-327. Trial Counsel admitted that he was aware that brain dysfunction was powerful mitigation and that he did not independent investigation into the possibility that Mr. King suffers from brain dysfunction:

> I understand that evidence of brain dysfunction is a powerful mitigating circumstance. However, I did not affirmatively look for this type of evidence in this case because I was not provided the professional tools to do so. If I had been provided the expert assistance I requested, I would have expected the expert to inform me

> of the potential for any relevant mental deficiency,
> including but not limited to the possibility of brain
> dysfunction. Paragraph 17, Exhibit 1 Affidavit of James
> E Rocap, III

Mr. King does indeed suffer from brain dysfunction. Post-Conviction Exhibit 28 affidavit of Marc Zimmermann. A full scale Luria Nebraska Neuropsychological Battery (LNNB) was given to Mr. King on October 24, 2008. Dr. Zimmermann administered to Mr. King the full battery of the Luria Nebraska Neuropsychological Battery and the Test of Memory Malingering (TOMM). The results of the TOMM, a 37 on trial 1 and a 50 on trial 2 indicate a very low probability that Mr. King was malingering. *Id.* On three clinical scales, Rhythm, Intellectual Process, and Arithmetic, King scored above the Critical Level indicating neurological impairment. *Id.* The neuropsychological tests revealed dysfunction in the Intellectual Process scale and a pervasive/global dysfunction which is often associated with mental retardation. *Id.* Dr. Zimmermann concluded "to a reasonable degree of scientific certainty that Mr. King suffers from neurological impairments." *Id.* Evidence of brain dysfunction is powerful mitigating evidence that should have been presented to the jury. For these reasons, Petitioner is entitled to Habeas Corpus relief.

**1. Counsel's performance was deficient.**

This abject poverty coupled with a history of family alcoholism, violence and neglect and brain dysfunction clearly affected Mack King and is precisely the kind of evidence that should have been investigated and presented to the jury.

Mack King's trial counsel provided ineffective assistance of counsel due to counsel's failure to adequately investigate, failure to develop a consistent and credible theme to make the case for life, and failure to adequately present mitigating evidence in the 2003 re-sentencing capital trial.

In determining whether trial counsel provided ineffective assistance of counsel, pursuant to the Sixth and Fourteenth Amendments, this Court must apply the standards set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). The *Strickland* standard is satisfied if a petitioner establishes both that his attorney's representation "fell below an objective standard of reasonableness," 466 U.S. at 688, and that the petitioner was "prejudiced" by his attorney's substandard performance, *id.* at 692.

In determining whether "counsel's representation fell below an objective standard of reasonableness" counsel's conduct must be judged under "prevailing professional norms," *id.* at 688, "when the representation took place," *Bobby v. Van Hook*, 130 S. Ct. 13, 16 (2009). "Prevailing norms of practice as reflected in American Bar Association standards and the like, are guides to determining what is

reasonable." *Strickland*, 466 U.S. at 688-89. In evaluating a claim that counsel failed to adequately investigate, *Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

The *Strickland* "standard is necessarily a general one," *Bobby v. Van Hook*, 130 S. Ct. 13, 16 (2009), but the Court explained it more fully in *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, in reviewing the assertion of ineffective assistance of counsel for failing to prepare and present mitigation evidence, the Court defined the preliminary issue as a determination of "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." 539 U.S. at 523 (emphasis in original). In terms of the "prevailing professional norms" for the scope of a reasonable investigation, "the standards for capital defense work articulated by the American Bar Association (ABA)" provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases Guideline 11.4.I(C) (1989)) (emphasis added). The Court referred to the ABA Guidelines not just as "guides" but as "well-defined norms" for counsel's performance. *Id.* (citing

the Guidelines again). Counsel's conduct "fell short of the professional standards" required of capital counsel because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." *Wiggins*, 539 U.S. at 524. *See also Williams v. Taylor,* 529 U.S. 362, 396 (2000) ("[C]ounsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . , because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background"); *Porter v. McCollum,* 130 S. Ct. 447, 453 (2009) (Even if the defendant is "fatalistic or uncooperative, . . . that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation").

"*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. Likewise, counsel is not required to look "for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Rompilla v. Beard*, 545 U.S. 374, 388 (2005). Nonetheless, a decision not to investigate "must be directly assessed for reasonableness in all the circumstances," *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691), and "an attorney must look into readily available sources of evidence," *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

With respect to sentencing, counsel must determine what evidence to present to allow for "the particularized consideration of relevant aspects of the character and record" of the individual defendant. *Woodson v. North Carolina,* 428 U.S. 280, 303 (1976). In the mitigation presentation, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina,* 476 U.S. 1, 5 (1986) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604 (1978)).

At bottom, the sentencer must be allowed to consider any "compassionate or mitigating factors stemming from the diverse frailties of humankind," *Woodson*, 428 U.S. at 304, which will "humanize [the defendant] or allow them to accurately gauge his moral culpability," *Porter*, 130 S. Ct. at 454. Mitigation evidence that is simply "conclusional" or "skeletal testimony" is "wholly inadequate to present to the jury a true picture." *Lewis v. Dretke*, 355 F.3d. 364, 368 (5th Cir. 2003). Expert evidence is generally required to explain "how . . . events had affected [the defendant] psychologically." *Ross v State*, 954 So. 2d 968,1006 (Miss. 2007).

Before counsel can make a valid strategic decision of what evidence to present in mitigation, counsel must fulfill the "duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. For example, the Court applied the *Strickland* standard in *Williams, supra*, and found counsel to be ineffective for failing to uncover and present voluminous mitigating evidence at sentencing. In doing so, the Court held that counsel's conduct "could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396).

Likewise, in *Wiggins*, the Court examined the scope of the duty to investigate and the interplay between reasonable investigation and reasonable strategic decisions. Trial counsel in *Wiggins* did not retain "a forensic social worker to prepare a social history, even though the State made funds available for that purpose." *Id.* at 517. Counsel "explained that he and [co-counsel], well in advance of trial, decided to focus their efforts on 'retry[ing] the factual case and disputing Wiggins' direct responsibility for the murder." *Id.* In these circumstances, the Court, after discussing the *Strickland* standards, noted:

> In light of these standards, our principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]," is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was **itself reasonable**.

*Id.* at 522-23 (emphasis in original).

123

The investigation of mitigation in *Wiggins* was limited to counsel arranging for a psychologist to test Wiggins and obtaining a presentencing investigation report (PSI) and his social services (DSS) records. Prior to sentencing, counsel filed a motion to bifurcate sentencing so they could present evidence in the first phase that Wiggins was not directly responsible for the murder (a finding required by state law for death eligibility) and in the second phase could present mitigation. The court denied the motion. In opening statements, counsel argued both issues and said that Wiggins had a difficult life and no prior convictions. Counsel did not, however, present any life history evidence during mitigation. Before closing arguments, counsel preserved the bifurcation issue and argued that, if bifurcation had been granted, counsel would have presented psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacity, the absence of aggressive behavior, and his desire to function in the world.

In *Wiggins*, the Court held that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed "in Maryland in 1989," because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." *Id.* at 524." "Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we have referred as 'guides to determining what is

reasonable.'" *Id.* (quoting *Strickland*, 466 U.S. at 688; *Williams*, 529 U.S. at 396).

Applying these standards, the Court found that, "[d]espite these well-defined

norms, . . . , counsel abandoned their investigation of petitioner's background after

having acquired only rudimentary knowledge of his history from a narrow set of

sources." *Id.* (citing the ABA standards again). The Court found that "[t]he scope

of their investigation was also unreasonable in light of what counsel actually

discovered" in the records available to them because

> any reasonably competent attorney would have realized that pursuing
> these leads was necessary to making an informed choice among
> possible defenses, particularly given . . . . [that] counsel uncovered no
> evidence in their investigation to suggest that . . . further investigation
> would have been fruitless. . . .

*Id.* at 525 (citation omitted).

> In assessing the reasonableness of an attorney's investigation, . . . , a
> court must consider not only the quantum of evidence already known
> to counsel, but also whether the known evidence would lead a
> reasonable attorney to investigate further. Even assuming [counsel]
> limited the scope of their investigation for strategic reasons,
> *Strickland* does not establish that a cursory investigation automatically
> justifies a tactical decision with respect to sentencing strategy.
> Rather, a reviewing court must consider the reasonableness of the
> investigation said to support the strategy.

*Id.* at 527.

In *Wiggins*, "counsel chose to abandon their investigation at an unreasonable

juncture, making a fully informed decision with respect to sentencing strategy

impossible." 539 U.S. at 527-28. "[C]ounsel were not in a position to make a

reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's conduct was deficient because the trial record revealed that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526. The trial record also reflected that "[f]ar from focusing exclusively on petitioner's direct responsibility, . . . , counsel put on a halfhearted mitigation case. . . ." *Id.* In the final analysis, the Court held:

> Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form. While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive. Moreover, given the strength of the available evidence, a reasonable attorney may well have chosen to prioritize the mitigation case over the direct responsibility challenge, particularly given that Wiggins' history contained little of the double edge we have found to justify limited investigations in other cases.

*Id.* at 535. Thus, the "strategic decision" the state courts had found to be reasonable was rejected because it "resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 527-28.

The sentencing phase is "the most critical phase of a death penalty case," *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004), because "avoiding execution [may be] the best and only realistic result possible," *Florida v. Nixon*, 543 U.S. 175, 191 (2004). The sentencing body's possession of the fullest information

possible concerning the defendant's life and characteristics is, therefore, highly relevant, if not essential, to the selection of the appropriate sentence. *Lockett v. Ohio*, 438 U.S. 586 (1978). If the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). *See, e.g., Tokman v. State*, 564 So. 2d 1339, 1342 (Miss. 1990) ("It is critical that mitigating evidence be presented at capital sentencing proceedings").

### 2. Counsel's deficient performance prejudiced Mack King

Once the defendant asserting ineffective assistance of counsel has established counsel's failure to comply with the prevailing professional norms, he must affirmatively prove that this deficiency has prejudiced him. Specifically:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. This Court must "evaluate the totality of the evidence–'both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding[s].'" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98).

The test is not whether the sentencer could have heard all available mitigating evidence and still decided on a death sentence. In other words, "[t]he

result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694. Thus, "a defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693 (emphasis added).

The Court must determine whether the undiscovered "mitigating evidence, taken as a whole, might well have influenced the jury's appraisal" of the defendant's culpability. *Rompilla*, 545 U.S. at 376 (quoting *Wiggins*, 539 U.S. at 538. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398. Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 539 U.S. at 537 (emphasis added).

In this case, Defense Counsel only called 3 witnesses one of which he had not planned to call and only made the decision to call after the state subpoenaed the witness. In short, the evidence presented in sentencing "was wholly inadequate to present to the jury a true picture" of Mack King. *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003).

If counsel had adequately investigated and presented the evidence, the jury would have learned that Mack King grew up in abject poverty in a home filled with

violence and that Mack King suffered from brain damage in addition to being mentally retarded. In short, counsels' inept performance undoubtedly prejudiced Mr. King because "[m]itigating evidence . . . may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

The evidence of Mack King's low intellectual functioning and neurological impairments alone is extremely mitigating. *See Sears v. Upton*, 130 S. Ct. 3259 (2010) (Finding prejudice from counsel's failure to present Sear's "significant frontal lobe abnormalities"). *See also Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (Evidence of mental retardation and brain damage "is exactly the sort of evidence that garners the most sympathy from jurors," according to "available empirical evidence as to juror attitudes"; *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) ("while juries tend to distrust claims of insanity, they are more likely to react sympathetically when their attention is drawn to organic brain problems"); *Frierson v. Woodford*, 463 F.3d 982, 991 (9th Cir. 2006) (Counsel ineffective where he "ignored the red flag of possible brain damage"); *Anderson v. Sirmons*, 476 F.3d 1131, 1143 (10th Cir. 2007) (Counsel ineffective, in part, for failing to have the petitioner evaluated to ascertain whether the petitioner "suffered from neurological or other deficits that would mitigate his moral culpability").

Several Circuits have found prejudice in sentencing proceedings where

counsel failed to present pertinent evidence of mental history and mental capacity. *See Stephens v. Kemp,* 846 F.2d 642, 652-55 (11th Cir.1988), ("the resulting prejudice is clear"); *Blanco v. Singletary,* 943 F.2d 1477,1505 (11th Cir.1991) (prejudice requirement "clearly met" by counsel's failure to present evidence of epileptic seizures and organic brain damage); *Loyd v. Whitley,* 977 F.2d 149, 159-60 (5th Cir.1992), (failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome"). 3. U.S.C. § U.S.C. § 2254(d) does not preclude the grant of relief because the state court did not adjudicate the merits

Counsel for Mack Arthur king raised this ineffective assistance of counsel in the Second Supplement to To Petition for Post-Conviction Relief with Exhibits filed September 19, 2008. In support of this claim, post-conviction counsel submitted an affidavit of Dr. Marc Zimmermann (Post-Conviction Exhibit 21in which Dr. Zimmermann gives the opinion to a reasonable degree of psychological certainty that Mack King Meets the definition of mental retardation as defined by the DSM-IV-TR and the AAMR. Dr. Zimmermann also reports that Mack King's performance on the Luria-Nebraska Neuropsychological battery indicates that he will be found to have significant neuropsychological deficits if administered the full Luria -Nebraska Neuropsychological battery. Paragraph 10, Post-Conviction Exhibit 21, Affidavit of Marc Zimmermann. Post-Conviction Counsel also relied

on affidavits from Mr. King's sister Ethel Conner, childhood friend Robert, Bluitt ,

family friend Lizzie Walker, classmate Edward Johnson, and Aunt Mary Smith.

(Post Conviction Exhibits 22, 24, 25, 26, and 27 which were submitted with the

supplement to Petition for Post-Conviction Relief with Exhibits. In addition, Dr.

Zimmermann provided a third affidavit with the Reply to the State's Response to

Application for Post-Conviction Relief. This third affidavit provided the results of

the full Luria Nebraska Neuropsychological battery and described Mack King's

neurological impairments. Post-Conviction Exhibit 29, Affidavit of Marc

Zimmermann. The Mississippi Supreme Court addressed several other grounds

challenging counsel's performance, such as the failure to challenge the sufficiency

of the indictment, to preserve the issue of residual doubt, to challenge the

constitutionality of Mississippi's lethal injection protocol, to raise *Panetti v.*

*Quarterman* on rehearing, and to properly litigate mental retardation at trial and on

appeal. *King*, 23 So. 3d at 1072-1073. Counsel's ineffectiveness for not

investigating and developing mitigation evidence by failing to investigate King's

social history and brain dysfunction was not addressed by the Mississippi

Supreme Court. *King v. State,* 23 So. 3d 1067 (Miss. 2009). Because the state

court did not adjudicate the ground for relief, the limitations on the grant of habeas

relief set out in 28 U.S.C. § 2254(d) do not apply. *See Cullen v. Pinholster*, 131 S.

Ct. 1388, 1401 (§ 2254(d) "applies only to claims 'adjudicated on the merits in

state court proceedings'") (quoting 28 U.S.C. § 2254(d)); *Everett v. Beard*, 290 F.3d 500, 507-08 (3rd Cir. 2002) (reviewing ineffective assistance of counsel claim *de novo* because state court failed to consider it and granting habeas relief). For these reasons, Petitioner is entitled to habeas corpus relief.

**B.    PRIOR COUNSEL WAS INEFECTIVE FOR FAILING TO PROPERLY INVESTIGATE AND LITIGATE PETITIONER'S MENTAL RETARDATION CLAIM.**

Facts Relevant to this Ground for Relief:

James Rocap was lead counsel for the re-sentencing hearing of Mack King. Since 1984, Mr. Rocap had been presenting evidence of Mack King's subaverage intellectual functioning in court proceedings.    In 1983, Rocap hired Dr. Robin King to evaluate Mack King as part of error coram nobis proceedings. On April 15, 1983, Robin King evaluated Mack King and found that he tested in the mentally retarded range. Tr. In February 2002, Rocap filed a *Motion For Permission to Proceed Ex Parte on Application for Funds to Retain Expert Assistance.* (C.P. 68-79). Rocap requested four experts to assist in Petitioner's defense: 1) a mental retardation expert, along with a licensed psychologist, 2) a social worker/investigator who can assist in the development of factual evidence in mitigation; 3) a pathologist; and 4) a prison adaption expert. (Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 305-327).    In the Motion Counsel acknowledged the need for "an evaluation of adaptive skills" and    "an

evaluation of developmental delays" both of which would require conducting interviews with individuals who knew Mr. King. (Sealed Ex Parte Motion for Funds To Obtain Expert Assistance at 316). The Motion also notes a need for a "social history, going back to Mr. King's youth." *Id.* At the hearing on the Motion for Funds in Chambers, Counsel acknowledged that the defense team could conduct investigation on their own and had in fact done some investigation in 1998 but that was four years ago and "there is probably more out there we could have found and presented to the jury." (Sealed Transcript of In Chambers hearing on Sept. 25, 2002 at 398).

Despite the fact that trial counsel recognized the need for a complete social history investigation and investigation into Mr. King's adaptive deficits, Mr. Rocap conducted little investigation. Counsel did not need an expert to locate and interview lay witnesses. Counsel admitted he was planning on relying on an expert to direct the necessary investigation.

> In preparation for the 1998 sentencing hearing, with the assistance of unpaid volunteers, we also conducted an investigation of Mr. King's family, schooling and employment background, and we presented evidence regarding the same at the sentencing hearing. Because we had been denied funds for expert assistance, however, the investigation was not directed or informed by a qualified mental health professional, and no such professional evaluated the evidence with respect to Mr. King's level of intellectual functioning (including his adaptive functioning), or the onset date of the limitations on his intellectual functioning, or the impact of his low-level intellectual functioning on his judgment, impulse control and the like. Paragraph 6, Exhibit 1, Affidavit of James E. Rocap, III.

In March 2003, I filed Defendant's Motion to Determine Mental
Retardation and to Preclude the Imposition of the Death Penalty and
Memorandum in Support Thereof and again raised the issue of the
need for expert assistance to develop evidence of mental retardation.
The circuit court again denied the request for expert assistance. As in
1998, this meant that the background investigation that had been done
at that time, and the updated investigation that was done in 2002-03,
was not directed by, and could not be assessed by, a qualified
professional with respect to Mr. King's level of intellectual
functioning, including his adaptive functioning or onset date. No one
on the defense team, including myself, was qualified to make those
assessments. Paragraph 11, Exhibit 1, Affidavit of James E. Rocap,
III.

*See Winston v. Kelly*, --F. Supp. 2d -- 2011; 2011 WL 1838844 at 8 (W.D.

Va.) (Holding that capital trial counsel cannot outsource their fundamental

responsibilities.) After being denied an investigator/social worker, Rocap relied on

the information obtained from Mr. King's sister Ethel Connor and the school

records. The denial of funds for an investigator did not relieve Mr. Rocap of his

duty to investigate the case. Regardless of whether counsel retained a mitigation

investigator or a social worker to prepare the social history report and present

testimony, the accepted standard is that "investigation should comprise efforts to

discover all reasonably available mitigating evidence. . . ." *Wiggins*, 539 U.S. at

523 (quoting Guideline 11.4.1C). *See also Jells v. Mitchell*, 538 F.3d 478, 495 (6th

Cir. 2008) (even if counsel has no "specific obligation to employ a mitigation

specialist, they [do] have an obligation to fully investigate the possible mitigation

evidence available"); *Marquez-Burrola v. State*, 157 P.3d 749, 768 (Okla. Crim. App. 2007) ("the real issue is whether defense counsel understands what kind of mitigation evidence can make a difference, what kind of mitigation evidence is available, and whether counsel makes reasonable efforts to obtain it").

Counsel also requested an inadequate jury instruction on mental retardation. Defense's instruction, D-6 read: "As one of the mitigating factors in this case, you may consider the Defendant's intelligence and mental capacity. If you conclude that the defendant is mentally retarded, you must return a sentence of life." C.P. 439 This instruction does not contain a definition of Mental Retardation and is no help to the jury. In fact the prosecutor pointed out the failings of the instruction: ". . . Even if this instruction purports to dadgum make it a jury issue, there's no definition of what mental retardation is. . ." Not surprising, this instruction was denied. Tr. 773. Without the instruction, the jury was unable to make a determination whether Mack King was mentally retarded.

A complete social history and adaptive deficit investigation would have revealed that Mack King had many adaptive deficits. Mack Arthur had "trouble learning to tie his shoes." (*See* Post-Conviction Exhibit 22, Affidavit of Ethel Conner). His clothing often did not match. *Id.* His hair was never groomed or cut. *See* Post-Conviction Exhibit 25 Affidavit of Lizzie Walker. He did not learn the alphabet until he was 7 or 8 years old. *See* Post-Conviction Exhibit 22, Affidavit

of Ethel Conner. He was described as "not smart," "special child" and slow. (*See* Post-Conviction Exhibits 25, Affidavit of Lizzie Walker, 26, affidavit of Edward Johnson and 27 Affidavit of Mary Smith. Mack King was easily misled. *See* Post-Conviction Exhibit 24. Mack King could only perform jobs involving "muscle" that did not require him to use his brain. *See* Post-Conviction Exhibits 24, affidavit of Robert Bluitt, 26, affidavit of Edward Johnson.Mr. King's father had to make sure he awoke on time to get to work. *See* Post-Conviction Exhibit 24, affidavit of Robert Bluitt. Mack King was unable to read or follow directions and could only follow simple instructions. *See* Post-Conviction Exhibit 26, affidavit of Edward Johnson. Mack King was unable to access community resource because he could not leave the neighborhood. *See* Post-Conviction Exhibit 24, affidavit of Robert Bluitt, Exhibit 26 affidavit of Edward Johnson. Mr. King was unable to effectively handle money. *See* Post-Conviction Exhibit 26, affidavit of Edward Johnson*)*. All of these witnesses were available and willing to testify. See Exhibit 24, affidavit of Robert Bluitt, Exhibit 25, affidavit of Lizzie Walker, Exhibit 26, Affidavit of Edward Johnson, Exhibit 27, affidavit of Mary Smith. All of these facts if they had been presented at trial would have illustrated Mack King's adaptive deficits and supported a diagnosis of mental retardation or at least supported a motion to retain an expert to assist in the development of evidence of mental retardation.

Although these witnesses were available, Rocap did not ask that they be called at a hearing before the trial court, and he did not call or elicit this information during the resentencing proceeding. Additionally, Rocap did not present this type of evidence in support of his motion for an expert to establish that King was mentally retarded. Rocap had no strategic reason for not developing and presenting evidence of deficits in adaptive functioning to supplement the evidence of King's subaverage intellectual functioning or for not presenting this type of evidence in support of the motion for expert assistance. Petitioner was prejudiced by counsel's deficient performance. There is at least a reasonable probability that the trial court would have granted funds for an expert if Rocap had developed some evidence of deficits in adaptive functioning or that the results of the resentencing proceeding would have been different. There is also a reasonable probability that the adaptive deficit witnesses would have affected at least one juror. For these reasons, Petitioner is entitled to Habeas Corpus relief.

On Direct Appeal, Petitioner challenged the procedures followed at his trial to determine his mental retardation. the Mississippi Supreme Court, in an unreasonable application of Federal law, found that King was afforded an adequate hearing on the issue of his mental retardation. *King v. State*, 960 So 2d at 428. In post-conviction proceedings, King asserted that he was in fact mentally retarded and renewed his objection to the constitutional inadequacies of what passed for a

hearing at the time of his resentencing. In the alternative, King challenged the effectiveness of his trial counsel's handling of the issue of his mental retardation, including the failure to conduct an adequate investigation of deficits in adaptive functioning. Even though Counsel's effectiveness in presenting the mental retardation claim had not been previously raised, and could not have been raised because appellate counsel was the same as trial counsel,[15] the Mississippi Supreme Court found the issue procedurally barred. *King v State*, 23 So. 3d 1067, 1073 (Miss. 2009). Because post-conviction proceedings were the first opportunity for King to raise this challenge to counsel's effectiveness, the Mississippi Supreme Court should have reached the merits of the claim. Because the state failed to address this claim, the limitations on the grant of habeas relief set forth in 28 U.S.C. § 2254(d) do not apply to this claim. *See Pinholster, supra; Wiggins*, 539 U.S. at 534 ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* [*v. Washington,* 466 U.S. 668 (1984)] analysis"); *Rompilla v. Beard*, 125 S. Ct. 2456, 2467 (2005) (same); *Everett v. Beard*, 290 F.3d 500, 507-08 (3rd Cir. 2002)

---

15 *Lynch v. State*, 951 So. 2d 549, 551-52 (Miss. 2004); *Archer v. State,* 986 So. 2d 951 (Miss. 2008) (finding it "absolutely inappropriate" for trial counsel to raise an ineffectiveness claim on direct appeal).

### C. MACK ARTHUR KING RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS PRIOR COUNSEL FAILED TO CHALLENGE THE SUFFICIENCY OF THE INDICTMENT IN A TIMELY FASHION.

Mack Arthur King was indicted on August 3, 1980. His indictment read in relevant part:

> Mack Arthur King late of the County aforesaid, on or about the 3rd day of August in the year of our Lord, 1980, did then and there willfully, unlawfully, and feloniously and of his malice aforethought kill and murder a human being Lela Patterson without authority of law and not in necessary self-defense, while he, the said Mack Arthur King was then and there engaged in the commission of the crime of burglary in violation of Section 973-19(2)(E) of the Mississippi Code of 1972 as amended contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.
> (C.P. 9)

Mr. King's indictment was legally insufficient because it failed to properly charge the underlying offense of burglary. *State v. Berryhill*, 703 So. 2d 250, 256 (Miss. 1997). In *Berryhill*, the defendant was indicted for "capital murder while engaged in the commission of a burglary, attempted kidnaping [sic] of a child, possession of a firearm by a convicted felon, and as an habitual offender." *Berryhill*, 703 So. 2d at 252. The trial court quashed the indictment and allowed the defendant to plead guilty to simply murder. *Id*. The State appealed the trial court's ruling quashing the indictment, and on appeal this Court held that trial court correctly quashed the capital murder portion of the indictment. *Id*.

The Court in *Berryhill* specifically held:

> [W]e hold that capital murder indictments that are predicated on burglary are required to state the underlying offense to the burglary. The reasons that we find this to be the better rule are twofold, and both arise out of the purposes of the indictment generally. First, as Justice Lee noted in *Lambert,* an indictment that fails to give notice to a defendant of the charges to which he has been hailed into court to defend will fail to provide him an opportunity to prepare a defense. We have repeatedly held that an indictment must give notice of the nature and cause of the charges, although a reasonably concise statement of the crime will suffice. *Williams v. State,* 445 So.2d 798, 804 (Miss.1984) (concise statement of crime will serve purpose of indictment to provide description of charge which will enable accused to prepare defense); *Bullock v. State,* 391 So.2d 601, 606 (Miss.1980) (indictment gives accused fair notice of crime charged). In the context of capital murder, this Court has further held that a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient. *Mackbee v. State,* 575 So.2d 16, 35 (Miss.1990).
>
> . . . . . . . . . . . . . . . . . . . . .
>
> The second reason that we hold that murder indictments made capital must specify the nature of the underlying burglary is predicated upon the well-settled law that a defendant cannot be put in jeopardy for crimes except those which a grand jury of his peers has presented. As the trial court noted below in its bench opinion, only a grand jury can advise a defendant of what he is to be charged with. *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273-74, 4 L.Ed.2d 252 (1960) ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."); 41 Am.Jur.2d

> *Indictments and Informations* § 1 (1995) ( "An indictment can be made only by a grand jury, and no court or prosecutor can make, alter, or amend an indictment returned by a grand jury.").

*State v. Berryhill*, 703 So.2d at 255-57.

On September 23, 2002, Petitioner filed a *Motion to Exclude Death Penalty as a Sentencing Option Under State v. Berryhill and Memorandum in Support Thereof*. (C.P. 188-193). The Motion was denied. (C.P. 216) This issue was raised by King in his direct appeal from his 2003 sentencing trial. The Court, found the issue time-barred because King did not raise it within the applicable statute of limitations. *King v. State*, 960 So.2d 413, 431 (Miss. 2007).

Had Mr. Rocap filed the appropriate pleadings before 2000, relief would have been granted to King regarding this issue because of the plain and unambiguous language of *Berryhill*. Indeed, in its brief on direct appeal, the State, citing *Lambert v. State*, 41 So. 2d 804 (Miss. 2006), admitted that *Berryhill* likely constituted an intervening decision. Appellee's Brief, *King v. State*, 2005-DP-00419-SCT, page 56, n.11. Thus, Mr. Rocap clearly rendered ineffective assistance of counsel by not raising *Berryhill* and seeking to quash the indictment in a timely fashion. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387 (1985). For these reasons, Petitioner is entitled to Habeas Corpus relief.

Petitioner raised this issue in his Post-Conviction Petition. Post-Conviction was the earliest opportunity to raise this issue because prior to September 2007, James Rocap represented King continuously. The Mississippi Supreme Court found the issue procedurally barred. *King v State*, 23 So. 3d 1067, 1072 (Miss. 2009). This procedural rule is not enforceable because it has not been consistently applied. *Johnson v. Mississippi*, 486 U.S. 578, 588 (1988); *Lowe v. Scott*, 48 F.3d. 873.876 (5th Cir. 1995). In a 2010 decision, the Mississippi Supreme Court reversed and remanded a case holding that the substantive deficiencies in a 1979 indictment, insofar as they implicated his fundamental constitutional rights to due process, were excepted from time and successive-writ procedural bars of the Uniform Post-Conviction Collateral Relief Act (UPCCRA). *Jackson v. State*, -- So.3d.-- (Miss. 2010) WL 1239528. In the decision reversing and remanding Jackson's case, the Mississippi Supreme Court acknowledges that Mack King was held to be time barred when he presented the very same issue to the Court. *Jackson* at 10.

**D. APPELLATE COUNSEL WAS INEFFECTIVE IN VIOLATION OF PETITIONER'S 14TH AMENDMENT RIGHTS DUE TO APPELLATE COUNSEL'S MISHANDLING OF THE CHALLENGE TO THE UNCONSTITUTIONAL RESTRICTIONS ON HIS RIGHT TO PRESENT RELEVANT AND COMPELLING EVIDENCE IN MITIGATION OF PUNISHMENT AND AS REBUTTAL EVIDENCE TO THE STATE'S CASE REGARDING 99-19-101(1)(7) AND STATUTORY AGGRAVATING CIRCUMSTANCES.**

As argued in Point 1, King was denied his constitutional right to present mitigating evidence of his limited role in the crime to rebut the State's evidence regarding aggravation. To the extent that the Court might find any part of that claim procedurally barred, Petitioner asserts that his prior counsel was ineffective in failing to properly preserve, litigate, and/or appeal the claim. *Strickland v. Washington,* 466 U.S. 668 (1984); *Evitts v. Lucey,* 469 U.S. 387 (1985). For these reasons, Petitioner is entitled to Habeas Corpus relief.

**POINT FIVE:**
**GROUND F, G AND H OF THE PETITION FOR WRIT OF HABEAS CORPUS**

**JURY INSTRUCTION ERRORS**

**THE UNCONSTITUTIONALLYL VAGUE AGGRAVATING CIRCUMSTANCE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL," COUPLED WITH THE LACK OF EVIDENCE TO SUPPORT THIS INSTRUCTION VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENT**

### I. The State Supreme Court Unreasonably concluded that the Facts were Legally Sufficient to Warrant an Especially Heinous, Atrocious or Cruel Jury Instruction.

The Mississippi Supreme Court unreasonably concluded the facts in Mr. King's case warranted a jury instruction on whether the crime was "especially heinous, atrocious or cruel*.*" *Miss. Code Ann.* 99-19-101(5) (h)(2005). To serve as "a meaningful basis for distinguishing the few cases in which the [death] penalty is imposed," *Godfrey v. Georgia*, 446 U.S 420, 433 (1980), the heinous, atrocious

or cruel (HAC) aggravator must be limited to those murders involving prolonged suffering, torture, and a lack of consciousness or pity. *Manning v. Epps*, 695 F.Supp. 2d 323 (N.D. Miss. 2009); State *v. Hamlet*, 321 S.E.2d 837, 845-46 (N.C. 1984); *Herzog v. State*, 439 So. 2d 1372, 1380 (Fla. 1983); see also *Ex Parte Kyzer*, 399 So. 2d 330 (Ala. 1981); *Whittington v. State*, 313 S.E.2d 73, 82 (Ga. 1984). Evidence of prolonged suffering was absent since Patterson may have been rendered unconscious immediately. Furthermore, the record contained no evidence that the crime was conscienceless or pitiless.

To support its conclusion that the HAC aggravator was properly presented to the jury the Mississippi Supreme Court looked to the testimony of the State's pathologist, Dr. Martin. *King v. State*, 960 So. 2d 413, 441 (Miss. 2007). Dr. Martin testified that Mrs. Patterson's death resulted from either strangulation, a blow to the head, or drowning, and that she had bruises on her upper body. During cross-examination Dr. Martin admitted that he could not specify the order in which the injuries occurred and that Mrs. Patterson may have lost consciousness from the blow to the back of her head. In the alternative the strangulation could have rendered Mrs. Patterson unconscious within 30 seconds according to Dr. Martin. Despite Dr. Martin's equivocal testimony as to the victim's suffering the Mississippi Supreme Court held the HAC aggravator was properly presented to the jury, reasoning that the victim's ability to remain conscious "has [no] relevance

to this issue." *King v. State*, 960 So. 2d at 441.

This conclusion is unreasonable since the HAC aggravator focuses on the infliction of <u>prolonged</u> suffering sufficient to constitute torture.16 "Pain and suffering is an inevitable byproduct of any murder." *Whittington*, 313 S.E.2d at 82. Thus the HAC aggravating circumstance is only permissible "when the level of brutality involved exceeds that normally found in first degree murder." *Hamlet*, 321 S.E.2d at 846.

Reviewing courts frequently hold that a murder does not involve unnecessary suffering and torture if the victim was unconscious. According to *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985), "'torture' means the infliction of severe physical or mental pain upon the victim *while he or she remains alive and conscious*." (emphasis added). Furthermore, in Arizona, "cruelty" requires proof "beyond a reasonable doubt that the victim was conscious at the time of death." Thus *Hamlet*, 321 S.E.2d at 846, rejected the HAC aggravator because the "victim was rendered unconscious by the first shot that struck him and thereafter was completely unaware of the additional shots and suffered no pain."

Various Courts have also found the HAC aggravator inappropriate when faced with unclear evidence of consciousness. *Williams v. State*, 37 So. 3d 187,

---

16 At King's resentencing, the state trial court instructed the jury that "an especially heinous, atrocious, or cruel murder is one accompanied by such additional acts as to set the homicide apart from other murders; a conscienceless or pitiless crime which is unnecessarily torturous to the victim." SSP-5, C.P. 441

200 (Fla. 2010) rejected the HAC aggravator since victim *could have* been rendered unconscious by the first blow despite fact that victim was struck five times in the head and was also bound and gagged. See also *Herzog*, 439 So. 2d at 1380 ("The actual period of unconsciousness is unclear. However, she was in this state at least during the period of time between the pillow incident and the act that caused her death"); *Armstrong v. State*, 399 So. 2d 953, 963 (Fla. 1981); *Zakrzweski v. State*, 717 So. 2d 488, 493 (Fla. 1998); *Patrick v. State*, 274 S.E.2d 570, 572 (Ga. 1981).

As in the above cases the testimony from the State's pathologist was unclear whether Mrs. Patterson lost consciousness immediately. (Tr. 458-62). Had she lost consciousness quickly she would not have experienced the prolonged suffering that renders an HAC instruction appropriate. Nor would she have been aware of her impending death. Furthermore, the struggle indicated by the evidence did not bear any of the hallmarks of a calculated attempt to inflict pain over an extended period of time. See *Whittington*, 252 Ga. at 179 ("For there to be torture, there must be evidence that the torture was deliberate"). To the contrary it would appear the killer sought to subdue his victim as quickly as possible by strangulation and blunt head trauma. Thus the killing was not "materially more atrocious than any other . . . homicide." *Ex Parte Kyzer*, 399 So. 2d 330 (Ala. 1981). .

The State emphasized the terrible experience of being strangled as a basis

for finding the HAC aggravator. Tr. 452, 800-1. However, strangulation does not set the killing apart from other murders and is legally insufficient to support giving an especially heinous, atrocious, or cruel instruction. *Taylor v. State*, 672 So. 2d 1246, 1275-76 (Miss. 1996). See also *State v. Snelling*, 225 Ariz. 182, 189 (Ariz. 2010) ("strangulations are not per se physically cruel absent specific evidence that the victim consciously suffered physical pain")

In *State v. Bowie*, 813 So.2d 377, 394 (La. 2002), the victim died by ligature strangulation, a death the medical examiner characterized as "agonizing." Yet the court rejected the HAC aggravator noting that the victim likely lost consciousness within two to three minutes. *Id.* According to the court, "No one could argue that this was a pleasant death or that it came without pain or the loss of great personal dignity for the victim. On the other hand, prolonged torture is not present." *Id.*

Finally, though *Lewis v. Jeffers*, 479 U.S. 764, 770 (1990) determined that the especially heinous aggravator was appropriate despite the victim's unconsciousness, the Court relied heavily on "the relish" with which the defendant committed the murder. There the defendant forced a witness to take pictures and then climbed on top of the victim calling her a "a bitch and a dirty snitch" while dealing blows to her face. *Id.* at 770. In Petitioner's case there was nothing on the record showing the attacker relished the crime. The State relied on the fact ice cream was left out in Mrs. Patterson's kitchen on the night of the crime to try to

show that the crime was conscienceless or pitiless. (Tr. 801, 806, 841). But there was no evidence to connect Mr. King to this food in any sense.

In sum the evidence in Mr. King's case was legally insufficient to warrant a jury instruction on whether the crime was especially heinous, atrocious or cruel. There was no evidence (aside from the ice cream) showing the attacker relished the murder. Furthermore, though some pain and suffering was inevitable Mrs. Patterson was not subjected to prolonged torture given that Patterson may have been rendered unconscious immediately. The Mississippi Supreme Court unreasonably neglected this fact as the victim's consciousness relates directly to whether the killing was unnecessarily torturous, the key aspect of the heinous, atrocious or cruel aggravator. Since there was no "meaningful basis" for distinguishing the crime as *especially* heinous in comparison to other capital murders, the HAC jury instruction was improper. *Godfrey*, 446 U.S. at 433. Habeas relief should issue based on the granting of this instruction.

## II. The Unconstitutionally Vague "Avoiding Arrest'* Aggravating Factor Instruction, Coupled With a Lack of Any Evidence that Mrs. Patterson was Killed So As to Avoid Arrest, Violated the Eighth and Fourteenth Amendments.

### Facts Relevant to This Ground for Relief

At the request of the State the trial court instructed the jury that it could weigh as an aggravating circumstance, whether "[t]he capital offense was committed for

the purpose of avoiding or preventing a lawful arrest." T.740-743. See *Miss. Code Ann*. §99-19-10 l (5) (d).

The judge gave the jury no further guidance in connection with this factor, although the prevailing case law limited the factor to cases where "there is evidence from which it may be reasonably inferred that a substantial reason for the killing or killings was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities." *Leatherwood* v. *State,* 435 So. 2d 645,651 (Miss. 1983).

King objected to this aggravating circumstance on two grounds: first, that the proof did not support the submission of "avoiding arrest" factor to the jury; second, that the instruction had not been offered in 1998 and therefore could not be offered now. Tr. 740-743.

## The State Court's Adjudication of the Claim

On direct appeal the State Court reviewed this claim on the merits. *King v. State, 960 So. 2d 413, 444-446.* The Court simply ignored any constitutional analysis holding in essence "...the trial court did not err in giving the instruction." *King*, at 445. The Court following its independent mandate under *Miss. Code Ann*. §99-19-105 (3) (b), held there were sufficient facts for the jury to find beyond a reasonable doubt that this aggravating circumstance existed. *King, at 445.*

The U.S. Supreme Court requires that statutory aggravating circumstances

appreciably narrow the class of defendants subject to the death penalty so as to avoid "the kind of open-ended discretion which was held invalid in *Furman v. Georgia*," *Maynard*, 486, U.S. at 362. The avoiding arrest aggravating circumstance satisfies this requirement because it has been interpreted narrowly "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." *Gray v. Lucas*. 677 F.2d 1086, 1110 (5th Cir. 1982). The aggravating circumstance is appropriate where a substantial reason for the killing was to conceal one's identity or cover one's tracks and so avoid arrest for a different crime, not where the defendant attempted to avoid arrest <u>after</u> the murder. *Holland*. 705 So. 2d at 355-56 (emphasis supplied); *Edwards*. 737 So. 2d at 312; *Chase v. State*. 645 So. 2d 829,856-58 (Miss. 1994). In the instant case there was insufficient evidence to support that aggravating circumstance. Its submission to the jury therefore constituted reversible error.

The State attempted to prove the avoiding arrest aggravating circumstance with evidence Mr. King initially lied to the police about his whereabouts the night of Mrs. Patterson's death. However, lying to the police alone does not constitute evidence that a murder was committed to avoid arrest. *Taylor,* 672 So. 2d at 1275. The State also stressed that Mrs. Patterson knew Mr. King and could have identified him, but that fact alone again did not prove that the purpose of the murder was to avoid arrest, particularly where Mr. King had argued and proffered evidence that he did not kill Mrs. Patterson. The State's evidence fell far short of

the quality and quantity of evidence necessary to prove beyond a reasonable doubt that the defendant committed murder to avoid arrest.17The avoiding arrest aggravator thus was submitted to the jury in error and Mr. King's sentence should be vacated.

### The State Court's Adjudication was An Unreasonable Application of the U.S. Supreme Court's Eighth Amendment Opinions in *Godfrey v. Georgia*, *Maynard v. Cartwright*, and *Clemons v. Mississippi*; and the State Court's Determination of the Facts Was Unreasonable in Light of the Evidence at the Trial

As a matter of logic every murder eliminates a witness to a crime. If the very fact a killing eliminated a witness were sufficient without more to constitute an aggravating factor, such an aggravating circumstance would not serve the purpose of distinguishing between those convicted of murder who receive the death penalty and those who do not. This is true even if another felony was committed in addition to the killing. *See Williamson* v. *Reynolds,* 904 F. Supp. 1529, 1574 (E.D. Okl. 1995) *(citing Maynard v. Cartwright,* 486 U.S. 356, 362 (1988)) ("The mere fact

---

17 See, e.g., *West v. State*, 725 So. 2d 872, 884 (Miss. 1998) (evidence and a confession to the effect that the murder was committed to eliminate witnesses); Edwards, 737 So. 2d at 312,320 (defendant burned a car connected to the crime in an attempt to destroy evidence and made statements indicating that he shot the victim to avoid being caught); *Hodges v. State.* No. 2002-DP-00337-SCT, 2005 Miss. Lexis 164, at * 133 (Miss. Mar. 10,2005) (defendant attempted to disguise himself, shot the victim when he was recognized anyway, hid the murder weapon, kidnapped another person and fled, and disposed of his disguise); *Chase.* 645 So. 2d at 856-58 (finding an inference that the defendant sought to avoid detection where he wore gloves to avoid fingerprints, eliminated tire tracks, and killed a victim where he had to do so to escape without detection, but could have simply escaped without committing the murder); *Thorson,* 895 So. 2d at 99,102 (the defendant confessed to killing the victim after not believing her statement that she would not report the underlying rape, tried to eliminate fingerprints and items tying him to the crime scene, attempted to disguise the crime scene to make it look like someone else was responsible, and shot the victim in the head when she screamed for help); *Scott* 878 So. 2d at 981 (the defendant traveled to another town where he was unknown, followed the victim home rather than commit robbery in a public place, attempted to avoid being seen while waiting, shot at a witness, planned from the beginning to avoid arrest, and fled the scene in a high-speed chase before ditching his car and hitching a ride home).

that a felony was committed in addition to murder does not warrant a finding that

the murder was committed to eliminate a witness").

Examining the open-ended nature of this instruction demonstrates how it runs

afoul of the Supreme Court's prohibition on the "arbitrary and capricious" imposition

of the death penalty in line with a series of cases starting with *Furman v. Georgia,*

408 U.S. 238, 92 S.Ct. 2726 (1972) and continuing through *Godfrey v. Georgia,* 446

U.S. 420,100 S.Ct. 1759 (1980), *Maynard* v. *Cartwright,* 486 U.S. 356,108 S.Ct.

1853 (1988), and *Clemons* v. *Mississippi,* 494 U.S. 738, 110 S.Ct. 1441 (1990).

The Eighth Amendment principle announced in these cases is that:

> Claims of vagueness directed at aggravating circumstances
> defined in capital punishment statutes are analyzed under
> the Eighth Amendment and characteristically assert that
> the challenged provision fails adequately to inform juries
> what they must find to impose the death penalty and as a
> result leaves them and appellate courts with the kind of
> open-ended discretion which was held invalid in *Furman.*

*Cartwright,* 486 U.S. at 361-62.

The effect of such an invalid aggravator was described by the Supreme Court

in a later case from Mississippi:

> When the sentencing body is told to weigh an invalid
> factor in its decision, a reviewing court may not assume it
> would have made no difference if the thumb had been
> removed from death's side of the scale.

*Stringer* v. *Black* 503 U.S. 222,232,112 S.Ct. 1130 (1992).

Recently the U.S. Supreme Court held a federal court on *habeas* review could

find an aggravating circumstance submitted in a capital case violated the Eighth Amendment under the following test:

> An invalidated aggravating factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

*Brown* v. *Sanders*, 546 U.S. 212,220,126 S.Ct. 884, 892 2006).

There is thus a two-part analysis for this Court to make:

(1)    Was the undefined "avoiding arrest" factor an improperly vague aggravator in violation of *Godfrey, Cartwright,* and *Clemons?*

(2)    Did the undefined "avoiding arrest" factor place a "thumb on death's side of the scale" by allowing King's jury to consider facts and circumstances that it otherwise would not have, in violation of *Clemons, Stringer* and *Sanders, supra.*

The answer to both questions is an unequivocal "yes." The Mississippi Supreme Court has recognized that this aggravating factor standing alone is overbroad and vague under the Eighth Amendment. It has pronounced a limiting definition of the avoiding arrest aggravating circumstance:

> If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance. *Chase* v. *State,*

645 So.2d 829, 858 (Miss. 1994) *(quoting Hansen* v. *State,*
592 So.2d 114,153 (Miss. 1991)).

*Wiley* v. *State,* 750 So. 2d 1193,1206 (Miss. 1999).

The State Court refused to require the trial courts to give this limited definition to the jury. The trial judge told King's jury that it could weigh in aggravation a finding that Patterson was killed to avoid arrest. Without any additional instruction to the jury that they were to determine whether a substantial reason for the killing of Patterson was to avoid arrest, the jury could not help but conclude that - like any homicide case - the murder made their apprehension less likely.

The jury was basically dealing with a blank slate-any killing would necessarily give rise to this aggravating circumstance and would not provide the jury with a basis to distinguish between those cases where the death penalty was merited and those in which it was not. Such an instruction necessarily creates a great "risk of wholly arbitrary and capricious action." *Maynard,* 486 U.S. at 362.

In evaluating King's argument on direct appeal the Mississippi Supreme Court did not in fact mention any United States Supreme Court cases in this discussion of the avoiding arrest aggravating factor. *King, at 445.* The Mississippi Supreme Court's discussion of the trial court's aggravating factor instruction is limited and lacks any depth or analysis. The Court did not explain how the instruction that a killing to avoid arrest provided the jury with any meaningful standards in which to determine whether a death sentence was merited in this particular case. For these

reasons, the State Court's evaluation of the first prong of the two-part analysis was an unreasonable application of the U.S. Supreme Court's opinions in *Godfrey, Maynard* and *Clemons.*

The second part of the analysis also turns in King's favor. Because the limiting definition of the "avoiding arrest" factor was not employed, the jury had nothing to consider but the death of Patterson. The only relevance of these facts would be their relation to covering up evidence of the murder. They in no way indicate that the killing was prompted to avoid arrest.

The avoiding arrest aggravating instruction clearly falls below constitutional standards as set forth in multiple United States Supreme Court cases. In addition, the lack of any evidence that the killing was undertaken so as to avoid arrest further made the jury determination arbitrary and capricious. As a result King's jury heard and considered evidence that was highly inflammatory and not relevant to the limited definition of the factor. Each of these reasons requires this Court to grant the habeas petition, as the instruction resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court in both *Maynard v. Cartwright* and, separately, *Cemons* v. *Mississippi.*

**2. The State Cannot Assert A New Aggravating Circumstance On Re Sentencing.**

At both Mr. King's 1980 sentencing and his 1998 re-sentencing, the jury was not

instructed on the avoiding arrest aggravating circumstance.. See King v. State. 421 So. 2d

1009, 1017 (Miss. 1982). In fact, at the 1998 re-sentencing, the State attempted to assert

the aggravating circumstance but then withdrew that request Tr. 741. As counsel for Mr.

King argued at the 2003 re-sentencing hearing the State cannot "improve its position by

asserting an aggravating circumstance that it failed to assert during previous sentencing

hearings." Tr. 740-41. Permitting the State to do so violates fundamental fairness under

the due process clause, See State v. Biegenwald. 542 A.2d 442,450 (N.J. 1988)

(contention that State cannot pursue new theory on which to gain a death sentence each

time an appeal is successful is "generally consistent with this State's fundamental fairness

jurisprudence.'*).

**The Trial Court's Instructions Misled The Jury That The Death Sentence Was
Mandatory If The Aggravating Circumstances Outweighed The Mitigating
Circumstances.**

A Mississippi jury may choose to sentence a defendant to life in prison despite

finding that the aggravating circumstances outweigh the mitigating circumstances or

that there are no mitigating circumstances. *Leatherwood v. State.* 435 So. 2d 645, 650

(Miss. 1983) (noting that the ability to return life in the absence of mitigating

circumstances allows Mississippi's death penalty statute to avoid the fatal defect of

mandating execution in violation of *Woodson v. North Carolina*, 428 U.S. 280

(1976)). Nevertheless, the trial judge refused instructions DSP-1, C.P. 427, Tr. 759,

and DSP-3, C.P. 436, Tr. 767, R.E. 110, both of which would have made this point of

law clear to the jury. Accordingly, the trial court failed to ensure "that the jury [was] fully and properly instructed on all issues of law relevant to the case," and Mr. King's death sentence was invalid. *Kolberg v. State*, 829 So. 2d 29, 46 (Miss. 2002).

Although under Mississippi law a trial court may refuse to give a mercy instruction,18 the trial court's failure to do so in this case was erroneous because the court approved and gave confusing instructions that failed to properly explain the weighing process to the jury. See *Scott*. 878 So. 2d at 976 ("The trial court should not grant instructions that do not provide a correct statement of law or provide improper comment on the weight to be given to particular evidence."); *Manning*,735 So. 2d at 351. Indeed, the instructions given here were tailored to mislead the jury and point them irrevocably toward death if they found that the mitigating circumstances did not outweigh the aggravating circumstances, despite the fact that a jury must always be permitted to choose life over death. After listing the aggravating and mitigating circumstances the instructions given to the jury stated:

> If... you find unanimously that the mitigating circumstances do not outweigh the aggravating circumstances, and that the death penalty should be imposed, your verdict should be returned on a separate sheet of paper.
> 3. Your verdict... should be returned on a separate sheet of paper, along with several findings of fact They should be in the following form:
> a. If you make the findings described above and unanimously find that the death penalty should be imposed, your verdict should be in the following form:

> [We find *Enmund* factors unanimously and beyond a reasonable doubt]

> [We find aggravating circumstances unanimously and beyond a reasonable

---

18 See, e.g. Edwards, 737 So.2d at 317.

doubt]

We the Jury, further unanimously find that after weighing the mitigating circumstances and aggravating circumstances that the mitigating circumstances do not outweigh the aggravating circumstances and mat the defendant should suffer the penalty of death.

SSP-4A ,C.P.408.

These instructions did not suggest that the phrase "and that the death penalty should be imposed" denoted an independent determination in addition to the weighing process, especially to the typical juror who is unfamiliar with the law's subtle nuances. Rather the instructions appeared to indicate that the death penalty automatically followed from a unanimous finding that the "mitigating circumstances do not outweigh the aggravating" ones. This instruction was hopelessly confusing, particularly considering the gravity of the decision facing the jury. Also, since the instructions gave no guidance on how to make this additional determination, in stark contrast to the detailed directions provided on the aggravating/mitigating balancing process, the jury likely did not recognize that it had to make the additional decision. The trial court's instructions for returning life at SSP-4A(3)(b), (C.P. 409), only exacerbated this confusion and further suggested to the jury that death must automatically follow from a finding that the mitigating circumstances do not outweigh the aggravators.19

In ostensibly straightforward language the instructions offered three

---

19 This point was made on the record during the hearing by Mr. King's counsel. Tr. 749-50.

possibilities under which the jury should "proceed to consider life without parole [rather than death]: failure to find *Enmund* factors; failure to find aggravating circumstances; or insufficient aggravating circumstances to equal or overcome the mitigating circumstances. C.P. 409. Although the option of life is always available to a jury these possibilities were stated as if they were exclusive and impliedly rejected any option to find life or life without parole where the jury had found *Enmund* factors and aggravators sufficient to outweigh the mitigating circumstance. This confusing language unmistakably directed jurors away from the option of life, a circumstance which constituted reversible error."[20] See *Stewart v. State,* 662 So. 2d 522,564 (Miss. 1995); *Jenkins v. State.* 607 So. 2d 1171, U 80 (Miss. 1992). Despite all of this confusion, the trial court declined to give a mercy instruction. Tr. 767,771.

As this Court has emphasized, "There is no justification to continue any practice which might create contusion for a jury expected to decide whether or not to impose a sentence of death." *Stewart* 662 So. 2d at 564. Here the jury instructions on the weighing process were impermissibly confusing and the trial court erroneously withheld from the jury two instructions DSP-1 and DSP-3 that

---

[20] The instructions also contradict themselves. At SSP-4A (2) they require the jury to find that the aggravators outweigh the mitigators. At SSP-4A (3) (a) that the mitigators do not outweigh the aggravators. And SSP-4A (3) (b) again discuss when the aggravators do not outweigh the mitigators. C.P. at 407-9, R.E. 182-84. These contradictory instructions likely confused the jury. This Court has reversed a conviction where two guilt-phase instructions contradicted one another, *Smith v. State.* 463 So. 2d 1028, 1029-30 (Miss. 1984), and a civil verdict where the "contradiction between [instructions] oreate[d] a clear potential for confusion.* *McCarv v. Caperton.* 601 So. 2d 866,869 (Miss. 1992). The same concerns are intensified in the context of capital proceedings. Nor is the danger of jury confusion idle speculation in the instant case. Here, the jury's failure to find an Bnmund factor. Tr. at 848-49, R.B. 52-53, demonstrated either that they could not understand the instructions or that they did not believe *Enmund* factors to be present. Either conclusion mandates reversal.

could have remedied the confusion. Relying on the flawed instructions the jury most certainly could have concluded, upon finding that the mitigating circumstances did not outweigh the aggravating circumstances, that no further deliberations were needed and that they were bound to return a sentence of death. When there are two reasonable interpretations, one proper and one improper, remand is required in any instance where "the jury <u>may</u> have rested its verdict on the 'improper' ground") (emphasis supplied); <u>Leatherwood.</u> 435 So. 2d at 650, (stating that instructions that fail to properly instruct the jury on the aggravating /mitigating weighing process mandate reversal).

## B.     The Trial Court's Instructions Improperly Directed The Jury To Find An *Enmund* Factor.

Under the United States Constitution and the law of Mississippi a jury must find that the defendant committed the killing, attempted the killing, intended the killing, or contemplated the killing before a death sentence may be returned. *Enmund v. Florida,* 458 U.S. 782 (1982); *Miss. Code Ann.* § 99-19-101(7). The jury in Petitioners' case returned a verdict that failed to find any of the *Enmund* factors. Tr. 848-49. When the jury returned a verdict without the *Enmund* findings it was a substantive finding not capable of modification by the prosecutor and Judge, any more than a "not guilty" finding could be modified to "guilty" finding. The trial court should have imposed a sentence of life in prison in accordance with Mississippi law. Instead, overruling multiple objections and a

motion for mistrial by defense counsel, Tr. 854,856, 862, the judge instructed the jurors that their verdict was deficient only in "form" and that they should return their verdict in a "form consistent with your finding." See C-20B. C.P. 397, Tr. 851-61. Under Mississippi law a jury must find an *Enmund* factor to impose the death penalty. *Miss. Code Ann.* § 99-19-101(7) (2005). Here, the jury did not find an *Enmund* factor. The jury only purported to find one after being instructed by the judge that its previous failure to find an *Enmund* factor was a mere formal deficiency. That is patently untrue. The *Enmund* factors, like the statutorily enumerated aggravating circumstances, are yet another embodiment of the substantive rule that only certain, particularly egregious crimes merit the death penalty. *Enmund. 458* U.S. at 782. Reversal is mandated here because the jury reasonably could have interpreted the trial court's supplemental instruction in a way that violated the law. The jury easily could have misunderstood the instruction to require only that they complete the form per the Judge's instructions, without substantive consideration of whether an *Enmund* factor was met. See *Mills.* 486 U.S. at 377-81; see *also Leatherwood.* 435 So. 2d at 650. It is thus entirely plausible that the jury levied a death sentence without ever substantively determining that issue. It should be remembered that while the trial court stymied Petitioner from proving the *Enmund* factors or from contesting the State's *Enmund* issues, the statement Petitioner gave to the police stated he did not kill Mrs. Patterson. The jury may have made the substantive finding of no *Enmund* factors.

A jury must make its decisions freely, not under pressure from a judge. This Court

has noted that "it is a matter of common knowledge that juror... are very susceptible to the influence of the judge," and that "we will not hesitate to reverse where the trial judge displays partiality."* *King.* 784 So. 2d at 890 (internal quotation marks and citations omitted).

Here, after lengthy deliberation the jury declined to rind any *Enmund* factors. The judge effectively ordered them to do so by instructing them that the *Enmund* factors were a mere formality. That de <u>facto</u> directed verdict by the trial court mandates the reversal of Mr. King's conviction. The Mississippi Supreme Court unreasonably applied federal constitution law by unholding the initial verdict which contained no *Enmund* factors.

## C.    The Trial Court Failed To Properly Instruct The Jury Regarding The Accomplice Mitigating Factor.

Mr. King has always maintained that his uncle, Willie Porter, played a role in the crime. Yet the trial court refused to instruct the jury on the potential mitigating circumstance that Mr. King was only "an accomplice in the capital offense committed by another person. C.P. 429, Tr. 759-61. This error was particularly egregious given that it is an enumerated statutory mitigating circumstance under *Miss. Code Ann.* § 99-19-101(6) (d) (2005). Mr. King's death sentence must be overruled, See *Smith v. State,* 724 So. 2d 280,300 (1998) (a trial court's denial of instruction on statutory mitigating circumstance constitutes reversible error); see *also Eddings v. Oklahoma,* 455 U.S. 104 (1982) (virtually unlimited mitigating evidence is necessary to fulfill the constitutional requirement of individualized

sentencing); *Edwards*, 737 So. 2d at 297 (same); *Thorson*, 895 So. 2d at 107 (a defendant is entitled to jury instructions that state his theory of the case). The Mississippi Supreme Court unreasonably applied federal law by holding that Mr. King was not deprived of his rights under *Eddings* and *Lockett* to establish mitigating evidence.

Petitioner has abandoned the point pertaining to the failure to give a circumstantial evidence instruction.

### POINT SIX:

### GROUND I OF THE PETITION FOR WRIT OF
### HABEASE CORPUS

### PETITIONERS RIGHTS GUARANTEED BY THE SIXTH, EIGHTH, AND
### FOURTEENTH AMENDMENTS WERE VIOLATED WHEN THE TRIAL
### COURT IMPROPERLY EXCLUDED A JURORS FOR CAUSE AND THE
### MISSISSIPPI SUPREME COURT AFFIRMED

The Mississippi Supreme Court determined that the trial court properly excused jurors Stewart and Tucker. This holding results in a decision based on "an unreasonable determination of the facts in light of the evidence presented." The Mississippi Supreme Court identified the correct governing legal principle but it has unreasonably applied the principle to the facts of this case.

Two venire people were struck from the panel by the trial judge over the objection of Petitioner. Neither of these jurors had views that permitted them to be excluded from the panel. They were qualified under the facts and relevant

constitutional law based on a balanced reading of their answers. Petitioner raised this issue in his direct appeal and the Mississippi Supreme Court made an unreasonable determination of the facts in light.

Each of the jurors in the panel was asked to answer a questionnaire. Based upon answers in the questionnaire the jurors were then put through individual voir dire out of the presence of the other jurors. The questionnaire asked the jurors how they felt about the death penalty and gave them options to choose from ranging from "strongly disagree" to "mildly disagree." CP. 1017-1026. Ms. Stewart answered "mildly disagree." CP. 1026. The next question asked if the juror could vote for the death penalty in spite of their feelings. Ms. Steward put a "check" by no. CP. 1026. Interestingly there was no question asking for those jurors who would automatically vote for the death penalty in the sentencing phase if the defendant was found guilty, or any other questions on jurors feeling about mitigation evidence. The questions did not accurately convey the opinions of Ms. Stewart. Yes and no questions never can in the complex area of death penalty questions because whether or not someone can vote for or against the death penalty always depends on the circumstances of the crime and the individual on trial. During the individual voir dire Ms. Stewart from the very beginning of the voir dire gave legally correct answers. The record reflects the following:

> Q (Prosecutor): And you also indicated that you
> could never vote for the death penalty on that

question; is that correct?

A. Did I indicate that on the questionnaire?

Q. That's what marked on the questionnaire.

A. Okay.

\*               \*               \*

A. I said no. It depends on the circumstances.

\*               \*               \*

Q. Can you vote for the death penalty, Ms.
Stewart?

A. I can. Like I said, it depends on the
circumstances. TR. 259

The prosecutor then asks Ms. Stewart what circumstances would allow her

to vote the death penalty. This was objected to by Petitioner's counsel because

there is no way jurors can be expected to list specific circumstances that might

influence their decision. Tr. 260. It then became obvious from the transcript that

Ms. Stewart was interested in hearing information about mitigating circumstances.

Tr. 260-263. It is clear from the record that counsel for both sides had discussed

statutory and mitigating circumstances earlier with the entire panel. Ms. Steward

did indicate that mental retardation could affect her decision for life, rather than

death. The prosecutor ended by asking:

Q. Is that what you would require, multiple deaths,
before you would ever vote for the death penalty?

A. No, not necessarily. Tr. 263.

One of the Petitioner's attorneys then carefully questioned Ms. Stewart and she stated that she could follow the law by the court, that she currently did not know what facts would be proven, and that she would listen to all the evidence. The colloquy ended as follows:

        *          *             *

Q. So in your view, all of this, whether death, life, or life without parole, really depends upon the circumstances that are going to be presented to you once you sit in the jury box; is that right?

A. Yes. Tr. 264

Q. And you don't have any preconceived notions that you are going to vote against the death penalty no matter what?

A. No. Tr. 264-265,

The prosecutor did not follow up with any questions nor did the trial court. These statements by Ms. Stewart did not meet the standard necessary to disqualify her as a juror under *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412,416 (1985).

In *Witherspoon* the Court stated that any conviction flowing from a jury in which venire men and women were removed "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" cannot stand as a valid conviction. *Witherspoon*, at 522-523.

The Court in *Wainwright* held any trial court which excuses a juror who expresses conscientious objections to capital punishment has violated the right to a fair and impartial trial as guaranteed by the Sixth and Fourteenth.

Ms. Stewart's testimony reflects what is commonly seen among experienced capital defenders; that is jurors who do not understand the process of statutory aggravating and mitigating circumstances and how those are to be weighed. When this was explained to Ms. Stewart it became clear that she could set aside the opinion from her questionnaire and fairly listen to both sides. The law of *Witherspoon* and W*ainwright* must be carefully and religiously followed otherwise the jury would always be composed of those people who favored the death penalty.

In *Balfour v. State*, 598 So. 2d 731, 755 (Miss. 1992) the Court made it clear beyond question that the exclusion of a juror such as Ms. Steward in violation of *Wainwright* is forbidden and requires that the conviction be vacated.

In the case of *Fuselier v. State*, 468 So.2d 45, 55 (Miss. 1985) the Court held that absent a **clear showing** that the venire person could not or would not discharge their duties, then they could not be excused from service merely because they had moral feelings against the death penalty. This is exactly what happened to Ms. Stewart. Ms. Stewart seemed surprised by her own answer to the death penalty question. Tr. 259. Upon questioning one thing appeared for certain with Ms. Stewart and that was this: When the death penalty was considered in the

167

abstract on a questionnaire she may have had some "general" disagreement with it. But when she was questioned by both sides it became poignant that Ms. Stewart would follow the law and carefully weigh the circumstances. In fact Ms. Stewart appeared to have problems because the prosecutor wanted her to *say in advance* what circumstances she wanted to hear, and that is the reverse of how a trial is conducted. Ms. Stewart needed to hear the circumstances in order to make a determination of the penalty. It should also be remembered that on the questionnaire Ms. Stewart only marked that she "mildly disagree(d)," not "strongly disagree(d)." This together with her actual answers shows the error of the trial court's decision to remove her.

In *Fuselier* the Court held it was error to excuse a juror who would not be pinned down because that juror wanted "… to hear the evidence before I could say for certain…." *Fuselier*, at 54. This is exactly what we expect of jurors in death penalty cases thought we all know that each side attempts to pin jurors down to a position as much as possible. The prosecutor attempted to do this so he could excuse Ms. Stewart and this was what she conscientiously stated:

> Q. (Mr. Allgood): So if the judge instructed you about the weighing-I was telling you about the weighing yesterday and about finding the aggravating and finding the mitigating circumstances. What you're telling me is that you would always, no matter what the Judge instructed you, you would always-if you found that one circumstance that he was of low I.Q., you wouldn't weigh any of those circumstances and you would

automatically vote for some sentence other than death; is that right?

A.     No, I would weigh it. I would weigh it. I would weigh the circumstances.

Q. (Mr. Allgood): You would weigh it?

A.     Yes. Tr. 262.

The trial court excused Ms. Stewart based on *Tanner v. State*, 764 So. 2d 385 (2000). *Tanner* stands for the principle that the trial court is entitled to deference when making juror qualification determinations, but that deference presupposes there is some dispute in the juror's answers that would lead a trial court to reasonably conclude the juror's beliefs would substantially impair the juror from performing their duty. There was no *clear* showing that Ms. Stewart would not follow her oath and all the instructions of the court. *Fuselier*, at 55.

An overall reading of the testimony of Ms. Stewart leads to the compelling conclusion that the prosecutor did not favor the response of Ms. Stewart indicating that she would listen to the mental health evidence of Mr. King. But the goal of the law and the demand of the constitution are to have jurors who are open to the aggravating and mitigating evidence. The trial court could not under the law excuse a juror because that juror stood ready and willing under his/her oath to consider a mitigating circumstance.

If this were the law then jurors would only be comprised of people who favored the death penalty. *Witherspoon*, at 522. While Petitioner acknowledges that the prosecutor may have been able to exercise a preemptory on Ms. Stewart, there was no basis from her answers to strike her for cause.

There were similarly situated people who felt strongly toward the death penalty and said they would demand the defendant show them a strong reason why he should not die. Tr. 158; 374-375. This juror's answers were on the opposite side from Ms. Stewart. His answers were far more severe and dramatic toward the imposition of the death penalty yet he was not excused by the court.

The other juror excused for cause was Barbara Tucker. Ms. Tucker likewise "mildly disagree(d)" with the death penalty, however in her questionnaire she stated that she could vote to impose it. CP. 1067-1076. Ms. Tucker was brought into individual voir dire based on her answers to questions before the entire pane. She expressed reservations about the death penalty "from her conscience." During examination by the prosecutor Ms. Tucker stated it would be hard for her to vote for the death penalty unless her conscience was right. Tr. 271-274.

During examination by Petitioner's counsel she was asked the basic

legal standard whether she could listen to all the evidence before making a decision and Ms. Tucker adamantly agreed she would have no problem weighing both sides. Tr. 277-280.The fact Ms. Tucker mildly disagreed with the death penalty and it might bother her conscience did not stop her from stating she could follow her oath and listen to both sides. Tr. 274. There was nothing in her answers that made a clear showing that her views would *substantially impair* her ability to serve as a fair and impartial juror any more than those jurors who said they would require strong mitigating reasons not to impose death. The error here was that the trial court confused the statements of Ms. Tucker that she would want to vote for life over death with her willingness to follow the law. This is highlighted by the following:

> Q: And if you're seated in the jury box and the state puts on its evidence of what it calls aggravating circumstances and the defendant puts on their evidence of what's called mitigating circumstances, would you fairly listen to all of that and take all of it into consideration before you made your determination?

> A.     Yeah, I could so that.

> A Would fairly listen to all the evidence and then make my determination. That's what you asked me right?

> A.     Yes, I would listen to all the facts. I could hear that, yeah. Tr. 276-278

171

Mrs. Tucker's statements are very similar to the juror in *Fuselier* who simply stated in regards to this sometimes difficult and complex inquiry that she would have to wait and hear the evidence before making up her mind. *Fuselier*, at 54. The record reflects Ms. Tucker had more difficulty with this topic than Ms. Stewart. Nevertheless, the record does not reflect that Ms. Tucker was unable to follow her oath as a juror. It was the state's clear burden to show Ms. Tucker was not capable of serving as a juror and this burden was not met. *Simon v. State*, 688 So. 2d 791, 798 (Miss. 1997). A person's mild disagreement with the death penalty and their general disagreement with it no more disqualify a juror than those who strongly favor the death penalty and insist on strong mitigation.

The Court in *Fuselier* cited *Adams v. Texas*, 448 U.S. 38, 50 (1980) for the guiding rule that "emotional involvement or inability to deny or confirm the effect of ones' feeling" is equivalent to being unable to serve as a juror. Having a juror that might have a hard time imposing a death sentence is not a basis to strike that juror for cause. There are jurors who have such a firm resolve that they may be struck for cause. Such a juror is found in *Williamson v. State*, 806 So. 2d. 1031, 1061 (Miss. 2002). The jury in *Williamson* said she would not impose the death penalty even if the victim were someone close to her.

The trial court stated that Ms. Tucker was excused because of her demeanor and how the judge recalled her responses. Tr. 369 Under the *Adams* case the juror's demeanor or uneasiness was not a valid basis. The answers given by Ms. Tucker expressed her moral compass and a slight uneasiness with the death penalty but at every occasion she agreed she could follow the law and weigh the circumstances before making a decision.

Every time Mrs. Stewart or Tucker was asked the proper legal questions they unequivocally stated they could follow the law and their personal views would not interfere. Even under the somewhat confusing questioning by the prosecution concerning the process these two jurors who had mild opposition to the death penalty but both agreed to listen to the evidence and weigh the aggravating and mitigating circumstances and follow the law. There was little or nothing to indicate that Mrs. Tuckers' or Stewarts' views would substantially impair their ability to serve as jurors.

United States Supreme Court case law states that reservations about the death penalty disqualify an individual from jury service in a capital case only if the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). A juror cannot be removed for cause simply because

the juror "voice[s] general objections to the death penalty or expresse[s] conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968); *Gray v. Mississippi*, 481 U.S. 648, 657 (1987).

The exclusion of venire members must be limited to those who are "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstance*s* that might emerge in the course of the proceedings, and to those whose views would prevent them from making an impartial decision on the question of guilt." *Id.* (emphasis added). "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

To allow potential jurors to be removed from service because of their reluctance to impose death, even though they can vote for it under the right circumstances, "unnecessarily narrows the cross section of venire members [and] 'stacks the deck against the [defendant].'" *Gray*, 481 U.S. at 658 (quoting *Witherspoon*, 391 U.S. at 523).

A truly representative jury would necessarily include individuals who are reluctant to impose the sentence of death:

> Millions of Americans oppose the death penalty. A cross
> section of virtually every community in the country

> includes citizens who firmly believe the death penalty is unjust, but who nevertheless are qualified to serve as jurors in capital cases. An individual's opinion that a life sentence without the possibility of parole is the severest sentence that should be imposed in all but the most heinous cases does not even arguably 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. . . . Moreover, an individual who maintains such a position, or even one who opposes the death penalty as a general matter, "may not be challenged for cause based on his views about capital punishment."

*Uttecht v. Brown*, 127 S. Ct. 2218, 2239 (2007) (Stevens, J., dissenting) (citing *Wainwright*, 469 U.S. at 420).

Further, it is improper for the trial court to require potential jurors to state in advance whether they could vote for the death penalty:

> [A] prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon*, 391 U.S. at 522 (emphasis in original).

The prosecutor was attempting to get a commitment from Mrs. Steward and Mrs. Tucker as to how they would vote on aggravating and mitigating circumstance which they had not yet heard. These two jurors were exactly the type of juror that the *Witherspoon* line of cases is in place to protect. *See also Adams v.*

*Texas*, 448 U.S. 38, 49 (1980) (potential jurors acknowledgment that the possible imposition of the death penalty would or might "affect" their deliberations was meant only to indicate that they would be more emotionally involved or would view their task "with greater seriousness and gravity).

Jurors Stewart and Tucker gave thoughtful answers to questions regarding the death penalty. The Mississippi Supreme Court upheld the strike of these two jurors because they gave "wavering answers." The test applied by the state court, determining whether the juror's responses were "unmistakably clear," was contrary to or involved an unreasonable application of clearly established federal law. Under *Witherspoon*, a juror is qualified even if he or she voices general objections to the death penalty. *Witherspoon*, 391 U.S. at 522. Likewise, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Neither Mrs. Steward or Mrs. Tucker "waivered" in their willingness to follow the law. They may have waived when it came to giving the commitment the prosecutor wanted, but that unwillingness to give a commitment did not cause them to be disqualified jurors under relevant federal law. Federal Habeas Corpus relief should issue.

## GROUND J OF THE PETITION FOR WRIT OF HABEAS CORPUS IS RELINQUISHED.

## POINT SEVEN:

## GROUND K OF THE PETITION FOR WRIT OF HABEAS CORPUS

## IMPROPER AND PREJUDICIAL VICTIM IMPACT EVIDENCE WAS INTRODUCED DURING THE TRIAL THEREBY DENYING MR. KING FUNDAMENTALLY FAIR SENTENCING HEARING AND INTRODUCING ARBITRATRY AND CAPRICIOUSNESS INTO THE SENTENCING HEARING. THIS VIOLATED THE EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### Treatment of this Issue by the Mississippi Supreme Court.

The Mississippi Supreme Court ruled that the evidence admitted by the state was within the permissible testimony approved in *Payne v. Tennessee*, 501 U.S. 808, (1991). It was not contemporaneously objected to at the time of admission but a motion for mistrial was made immediately after the testimony concluded. Tr. 426-27.

During the Course of the trial the daughter of Mrs. Lela Patterson testified about the impact of her mother's death on the family. The State went far beyond the evidence that is permitted by law. (Tr. 408-26). Mr. King moved for a mistrial and it was denied by the Court. The testimony concerned Mrs. Patterson physical appearance, favorite clothing, church attendance, hobbies, family ties and relationships, and living habits.

The State went far beyond the brief statement permitted by *Payne v. Tennessee*, 501 U.S. 808 (1991). Mrs. Anderson talked about the family's opinion of the crime, how tragic her death was and how hard that was on the entire family. The sole purpose of the testimony was to inflame the jury and divert their attention from the issues of the crime and the defendant. The Petitioner attempted to establish the lack of requisite intend under the *Enmund* factors. Petitioner was also prohibited from proving his mitigating circumstances defenses under the Mississippi Statutory Mitigating Circumstances Law and the almost unlimited mitigating circumstances permitted by *Lockett*, Id. By contrast the prosecutor was allowed unlimited right to present inflammatory victim impact evidence. Petitioner is therefore entitled to habeas corpus relief.

## POINT EIGHT:

## GROUND C OF THE PETITION FOR WRIT OF HABEAS CORPUS

## PETITIONER WAS DENIED HIS RIGHTS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS DUE TO THE CUMULATIVE EFFECT OF THE ERRORS AT HIS TRIAL.

Petitioner's constitutional right to a fair trial were violated because "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 278-79 (5th Cir.1985). Although each of the claims discussed above warrant the grant of

habeas corpus relief, the cumulative effect of these errors also justify setting aside Petitioner's convictions and death sentences. The Fifth Circuit Court of Appeals has held that habeas relief may be granted based on the cumulative effect of errors where "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (a petitioner may be entitled to relief if prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

Likewise, the United States Supreme Court has found that a reviewing court may consider the cumulative effect of other constitutional errors. *See Chambers v. Mississippi*, 410 U.S. 284, 288 (1973) (viewing denial of right of confrontation in conjunction with claim concerning right to call witnesses); *see also id.* at 290, n.3 ("His claim, the substance of which we accept in this opinion, rests on the cumulative effect of those rulings in frustrating his efforts to develop an exculpatory defense"); *Taylor v. Kentucky*, 436 U.S. 478, 487, n.15 (1978) ("the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness").

Furthermore, a reviewing court must also consider the cumulative effect of counsel's deficient performance. *See Williams v. Taylor*, 529 U.S. 362 (2000); *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999); *Henry v. Scully*, 78 F.3d 51 (2nd Cir. 1996); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995). Similarly, a reviewing court must assess the cumulative effect of the state's misconduct. *Kyles v. Whitley*, 514 U.S. 419 (1995).

When the constitutional deprivations are considered collectively, there is no doubt that Mack Arthur King is entitled to have the writ of habeas corpus issue on his behalf.

## CONCLUSION

Mr. King moves the Court to grant Habeas Corpus relief upon each and every claim set forth in the Petition for Writ of Habeas Corpus, less any issues specifically relinquished by the brief.

Respectfully submitted,

MACK ARTHUR KING

BY: *Merrida Coxwell*
MERRIDA COXWELL

CERTIFICATE OF SERVICE

    I certify that I have served a copy of the foregoing Motion on the following via the Court's ECF system on this the 27th day of July, 2011.

> Marvin L. White, Jr.
> Patrick J. McNamara, Jr.
> Office of the Attorney General
> P.O. Box 220
> Jackson, MS 39205-0220

> */s/ Merrida Coxwell*
> MERRIDA COXWELL