**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**MACK ARTHUR KING**                                                                 **PETITIONER**

**vs.**                                                                 **CIVIL ACTION NO.: 1:10CV7-A**

**CHRISTOPHER EPPS, ET AL.**                                                 **RESPONDENTS**

## OPINION AND ORDER

Petitioner, Mack Arthur King, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to challenge the otherwise final conviction of capital murder and sentence of death imposed on him by the Circuit Court of Lowndes County, Mississippi, for the August 1980 murder of Lela Patterson. Respondents concede, and the Court expressly finds, that Petitioner meets the definition for mental retardation as that term is understood by *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Chase v. State*, 873 So.2d 1013 (Miss. 2004) and is thus ineligible for execution. Accordingly, the Court vacates Petitioner's sentence of death.

### Facts and Procedural History

Eighty-four year old Lela Patterson was found dead in her bathtub at around 10:30 a.m. on August 3, 1980. Following an investigation by law enforcement, Petitioner was indicted in the Circuit Court of Lowndes County, Mississippi, for capital murder committed during the course of a burglary. At the conclusion of a jury trial in December 1981, Petitioner was convicted of capital murder and sentenced to death. His conviction and sentence were affirmed by the Mississippi Supreme Court on October 27, 1982, and his petition for rehearing was denied on December 1, 1982. *King v. State*, 421 So.2d 1009 (Miss. 1982). The United States Supreme

1

Court denied his petition for writ of certiorari on May 2, 1983. *King v. Mississippi*, 461 U.S. 919 (1983). Petitioner then filed an application for leave to petition the circuit court for writ of *error coram nobis*, and the Mississippi Supreme Court ordered the trial court to conduct an evidentiary hearing on Petitioner's claim that he was denied the effective assistance of trial counsel. *See King v. Thigpen*, 446 So.2d 600 (Miss. 1984).[1] The trial court subsequently held a hearing and determined that effective assistance had been rendered by Petitioner's trial counsel. The Mississippi Supreme Court affirmed the decision of the trial court. *See King v. State*, 503 So.2d 271 (Miss. 1987).

Petitioner next sought federal habeas relief, and his petition for writ of habeas corpus was denied by the United States District Court for the Northern District of Mississippi on July 2, 1991. *See King v. Presley*, No. 1:87cv126-S-D. On appeal, the Fifth Circuit vacated Petitioner's death sentence and instructed the Court to return the case to State court for reconsideration. *See King v. Puckett*, 1 F.3d 280 (5th Cir. 1993) (vacating death sentence and remanding with instructions to return it to the state court for reconsideration of death sentence based on unlimited "especially heinous, atrocious or cruel" jury instruction). The Court did so, and the Mississippi Supreme Court subsequently vacated Petitioner's death sentence and remanded the case for a new sentencing trial. *King v. State*, 656 So.2d 1168 (Miss. 1995).

Following a new sentencing trial, a jury resentenced Petitioner to death on April 9, 1998. On appeal, the Mississippi Supreme Court again reversed the case and remanded it for resentencing. *See King v. State*, 784 So.2d 884 (Miss. 2001) (reversing death sentence and

---

[1] Petitioner had previously filed an application for leave to file a petition for writ of *error coram nobis*, which was denied without prejudice. *See King v. Thigpen*, 441 So.2d 1365 (Miss. 1983).

remanding for new sentencing hearing on the ground that the trial court erred in instructing the jury to disregard sympathy in its deliberations). At Petitioner's March 2003 resentencing trial, which forms the basis for the instant petition, he was again sentenced to death. The Mississippi Supreme Court affirmed the conviction of capital murder and sentence of death on May 31, 2007. *King v. State*, 960 So.2d 413 (Miss. 2007), *cert. denied*, 522 U.S. 1190 (2008) ("*King I*"). Petitioner subsequently filed for post-conviction relief, which was denied by the Mississippi Supreme Court. *King v. State,* 23 So.3d 1067 (Miss. 2009) (rehearing denied January 7, 2010) ("*King II*"). Petitioner filed the instant petition for a writ of habeas corpus with the Court on October 8, 2010, challenging his 2003 death sentence by raising eleven separate grounds for relief. [2]

## Applicable Law

The instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows federal habeas review of a petitioner's claims alleging a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (holding the AEDPA applies to all federal habeas applications filed on or after April 24, 1996). The AEDPA precludes a federal court from granting a petition for a writ of habeas corpus on any claim "adjudicated on the merits in State court proceedings" unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

---

[2] Petitioner initially raised twelve grounds for relief but later abandoned one claim relating to the sufficiency of the indictment.

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011).

A decision is "contrary to" the applicable law when the conclusion reached by the state court is "opposite that reached by the Supreme Court on a question of law or if the court decides the case differently on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The "unreasonable application" clause allows a court to grant relief if the state court identifies the correct legal principle but unreasonably applies it to the facts of a petitioner's case. *Id.* Whether either of the § 2254(d) clauses is met is determined by assessing the record that was before the state court. *See Holland v. Jackson*, 542 U.S. 649, 652 (2004); *see also* 28 U.S.C. § 2254(d)(2). Factual determinations made by the state court are presumptively correct, and a petitioner bears the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003). This deference is afforded to both the express and implicit factual findings of the state court. *See, e.g., Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006).

The standards of the AEDPA are "highly deferential" and "demand[] that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1862 (2010) (internal citation and citation omitted). The federal habeas court's inquiry is not whether the decision of the state court is incorrect, but "whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Unless a petitioner can demonstrate that there is no reasonable basis for the state court decision denying relief, federal habeas relief is precluded. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770,

786 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Court now turns to a consideration of Petitioner's claims in light of the these standards.

### Petitioner's Conviction

Throughout the pleadings filed in this case, both Petitioner and Respondents state that Petitioner is challenging both his conviction and his death sentence. Petitioner's 2003 resentencing proceedings form the basis for the instant petition, and the Court construes all of Petitioner's claims to relate to the sentence imposed in this case, with the possible exception of his claim that trial counsel rendered ineffective assistance in failing to object to the sufficiency of the indictment at his resentencing trial. Specifically, Petitioner maintains that, prior to 2002, his counsel failed to challenge his1980 indictment on the ground that it did not specify the offense underlying the burglary charge as required by Mississippi law. *See State v. Berryhill*, 703 So.2d 250 (Miss. 1997).[3]

Prior to Petitioner's 2003 trial, defense counsel filed a motion to exclude the death penalty as a sentencing option based on the allegedly flawed indictment. (*See* Trial Tr. vol. 2,

---

[3] The indictment against Petitioner reads, in relevant part:
Mack Arthur King late of County aforesaid, on or about the 3rd day of August in the year of our Lord, 1980, did then and there willfully, unlawfully, and feloniously and out of his malice aforethought kill and murder a human being Lela Patterson without authority of law and not in necessary self-defense, while he, the said Mack Arthur King was then and there engaged in the commission of the crime of burglary in violation of Section 973-192(2)(E) of the Mississippi Code of 1972 as amended contrary to the form of the statute in such causes made and provided and against the peace and dignity of the State of Mississippi. (Trial Tr. vol. 1, 9).

5

188-193).[4]  The trial court denied the motion, and the issue was found time-barred on appeal because Petitioner failed to raise it within the applicable statute of limitations.  *King I*, 960 So.2d at 431 (holding that Petitioner's failure to raise the issue of the indictment's sufficiency prior to 2002 barred his complaint); *see also King II*, 23 So.3d at 1072 (considering issue in context of counsel's performance and finding it res judicata).  Assuming that Petitioner can properly raise a claim as it relates to his indictment at this point in the litigation of this case, Petitioner has nonetheless affirmatively abandoned his claim that his State court indictment was defective. (*See*, *e.g*., Pet. at 53; Pet. Memo at 176).  Given that Petitioner has conceded that the underlying, substantive claim does not warrant federal habeas relief, he cannot demonstrate any prejudice as a result of counsel's failure to raise the issue prior to proceedings in Petitioner's 2003 resentencing trial.  *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding that a defendant must demonstrate prejudice as a result of counsel's errors or he cannot sustain a claim of ineffective assistance); *Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (holding that counsel is not deficient in failing to present a meritless argument).  Therefore, the Court finds that, to the extent any claims are raised challenging Petitioner's conviction of capital murder, they do not warrant federal habeas relief.   Petitioner's conviction will not be discussed further herein.

---

[4]  The record in this case consists of eighteen separately bound volumes.  The first twelve volumes contain various State court papers, while the remaining six volumes contain the trial transcript.  Inasmuch as the volumes are sequentially numbered, the Court herein uses "Trial Tr. vol. __, ___" to cite to both.

## Mental Retardation[5]

The execution of a defendant with mental retardation is proscribed by the Eighth Amendment to the United States Constitution. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Whether an individual is mentally retarded within the meaning of *Atkins* is generally determined by the diagnostic criteria as set forth by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"). *See id.* at 317 and n.22. Under either of the professional standards, there are three components for a determination of mental retardation: (1) substantial limitations in intellectual functioning; (2) significant limitations in particular adaptive skill areas; and (3) manifestation of those limitations before age 18. *See id.* at 309 n.3 (noting the similarity between the professional standards); *Lewis v. Quarterman,* 541 F.ed 280, 283 (5th Cir. 2008); *see also Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006). While the *Atkins* Court cited the AAMR and APA standards with approval, it adopted no particular definition of mental retardation, leaving it to the individual states to adopt a means of enforcing "the constitutional restriction upon its execution of sentences." *Atkins*, 536 U.S. at 317; *Bobby v. Bies*, 556 U.S. 825, 831 (2009) ("Our opinion did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation" will fall within the protection of *Atkins*).

Mississippi adopted a definitive standard for how *Atkins* is applied in trial courts in *Chase*

---

[5] The American Association on Mental Retardation ("AAMR") is now the American Association on Intellectual and Developmental Disabilities ("AAIDD"), and it now uses the terminology "intellectual disability" instead of mental retardation. Although the body of case law informing this Court's decision uses now outdated terminology, the Court retains use of the term "mental retardation" and refers to the professional organization as the AAMR for purposes of continuity throughout the opinion, except when referencing the most recent definition manual, which it cites as "2010 AAIDD."

*v. State*, 873 So.2d 1013, 1028-29 (Miss. 2004). The Mississippi Supreme Court held that:

> [N]o defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
> 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
> 2. The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.
> ***
> Upon meeting this initial requirement to go forward the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.
>
> Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.
>
> At the conclusion of the hearing, the trial court must determine whether the defendant has established, by a preponderance of the evidence, that the defendant is mentally retarded. The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence [o]f limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in *Atkins*, and discussed above. Upon making such determination, the trial court shall place in the record its finding and the factual basis thereof.

*Id.* at 1029.

The court also determined that those offenders whose trials were final prior to *Chase* could obtain an evidentiary hearing by attaching to their petition an affidavit from a qualified psychologist "who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein." *Id.* A few months later, the court "expand[ed] on the procedure to be used in reaching a determination of mental retardation" by holding that the entire record would be considered before "deciding whether to grant an *Atkins* hearing." *Wiley v. State*,

890 So.2d 892, 897 (Miss. 2004). Shortly thereafter, the Mississippi Supreme Court noted that in cases already pending before the procedure in *Chase* was handed down, it had ordered a hearing without requiring an expert's affidavit where the record contains "a qualified opinion" that an offender is mentally retarded. *Scott v. State*, 878 So.2d 933, 948 (Miss. 2004).

In Petitioner's petitions for writ of *error coram nobis* from his first death sentence, he asserted that trial counsel were ineffective in failing to inform the jury that he suffers with mental retardation. As part of the litigation, psychologist, Dr. Robin King,[6] administered the Weschsler Adult Intelligence Test-Revised ("WAIS-R") to Petitioner on April 15, 1983, and found him to have a full-scale intelligence quotient ("FSIQ") of 69.[7] (Trial Tr. vol. 17, 615). On June 23, 1983, at the State's request, Petitioner was tested by psychologist, Dr. Michael Whelan, using the Weschsler Adult Intelligence Test ("WAIS"), and he determined Petitioner's FSIQ to be 71. (*Id.* at 679). On review from the evidentiary hearing, the Mississippi Supreme Court accepted that Petitioner's intelligence was subaverage but found the facts available to his attorneys at the time of trial insufficient to place them on notice to investigate mental retardation as a mitigating circumstance. *See King v. State*, 503 So. 2d 271, 274 (Miss. 1987).

*Atkins* was decided on June 20, 2002. *Atkins*, 536 U.S. 304 (2002). On July 25, 2002, as part of pretrial proceedings for the 2003 resentencing hearing, Petitioner's lawyers sought funds to obtain the assistance necessary to present Petitioner's claim of mental retardation and/or low intellectual functioning as a mitigating circumstance, citing the prior evidence indicating that

---

[6] Dr. King is of no relation to Petitioner.

[7] Dr. King initially concluded that Petitioner's full-scale IQ was 71, but he testified at Petitioner's 2003 resentencing trial that a scoring error had been made in 1983 that erroneously inflated the score. *See also King I*, 960 So.2d at 423.

Petitioner might be ineligible for the death penalty under *Atkins*. (*See, e.g.*, Ex. vol., unsealed per order of 4/3/2012).[8]  In support of his motion for funding, Petitioner attached the transcripts of the testimonies of Drs. King and Whelan from Petitioner's 1984 *error coram nobis* hearing, along with the affidavit of Dr. Caroline Everington, the Associate Dean of Richard Riley College of Education and expert in the fields of mental retardation and special education, who stated that further testing was required in order to make an accurate determination of Petitioner's capacities. (*See id.*).  The trial judge heard the motion ex parte in his chambers on September 25, 2002.  (*See id.*).  On November 24, 2002, the court denied the ex parte motion for funds without explanation. (*See* Trial Tr. vol. 2, 196).

On March 20, 2003, a few days before Petitioner's resentencing trial began, defense counsel filed "Defendant's Motion to Determine Mental Retardation and to Preclude the Imposition of the Death Penalty and Memorandum in Support Thereof."  (Trial Tr. vol. 2, 267-300; Trial Tr. vol. 3, 301-347).  In the motion, counsel noted that Petitioner's ability to fully present evidence of his mental retardation was prejudiced by the denial of funds to hire an expert. Counsel otherwise requested an evidentiary hearing on the basis of the historical evidence of Petitioner's limited intellectual functioning, which included the transcript of the 1984 *error coram nobis* hearing testimonies of Drs. King and Whelan, the affidavit of Dr. Everington, Petitioner's school records reflecting that Petitioner repeated each grade before apparently dropping out in the fourth grade, and a 1980 admission note created by the Mississippi State Hospital characterizing Petitioner as "simple, literal, concrete" and reflecting the examiner's initial impression that Petitioner possessed "dull" normal mental standards.  (*See id.*; *see also*

---

[8]  Petitioner sought four different categories of experts in total.

Trial Tr. vol. 13, 25-27). Counsel argued that Dr. King testified in 1984 that Petitioner's FSIQ was 71, plus or minus five points, and that he could have been mentally retarded. (*See* Trial Tr. vol. 13, 25).[9] Counsel noted that the State's expert, Dr. Whelan, also found Petitioner's FSIQ to be 71 and determined that his intellectual functioning was far below normal. (*Id.*).[10] He also argued that Petitioner's school records showed failing grades and social promotions each year before Petitioner quit school in the fourth grade. (*Id.* at 26). The school records also showed, counsel argued, that Petitioner received the lowest possible score in the skill areas of "assuming responsibility, for initiative, for leadership, for personal grooming, [and] for working well with others." (*Id.*).

The motion to find Petitioner mentally retarded and preclude the death penalty was heard in chambers on March 25, 2003, before the second day of voir dire at Petitioner's resentencing trial. (Trial Tr. vol. 14, 222).[11] Noting that there had not been a procedure yet established in Mississippi for *Atkins'* determinations, and that the defense's motion for funds for expert assistance had been denied, defense counsel requested that a determination be made by the trial court or the jury that Petitioner was not subject to the death penalty based on the holding in

---

[9] Dr. King later testified that he made a scoring error, and that testing results showed Petitioner's FSIQ was 69. (*See* Trial Tr. vol. 17, 615).

[10] The Court notes that Dr. Whelan testified that, in his opinion, Petitioner does not meet the clinical definition of mental retardation. (*See* Trial Tr. vol. 3, 305, 318).

[11] The trial transcript in this case indicates that the trial began on March 23, 2003. However, March 23, 2003, was a Sunday, and there is no indicator in the record of any activity occurring in the case on March 24, 2003. The trial judge's "Report of the Trial Judge Where Death Penalty is Imposed" to the Mississippi Supreme Court indicates that the trial began on March 24, 2003, and ended on March 28, 2003. (*See* DPQ vol. 1 of 1). The Court assumes that an error was made in the transcript, and that the trial began on March 24, 2003.

*Atkins*. (*See, e.g.*, Trial Tr. vol. 14, 222-23). In support of the motion, counsel first argued that Dr. King testified in 1984 that Petitioner was, at least, in the borderline mentally retarded range and quite possibly met the standard for a diagnosis of mental retardation. Counsel also noted that while Dr. Whelan, the State's expert, disagreed with Dr. King's determination, Dr. Whelan agreed that Petitioner's FSIQ was 71. (*See id.* at 223). Next, counsel noted that Petitioner's school records, which were introduced in Petitioner's 1998 resentencing, showed that Petitioner received social promotions each year until he quit school in the fourth grade. (*See id.* at 223-24). Counsel argued that the school records also indicated that Petitioner possessed adaptive limitations, and that they established that his condition was present prior to the age of eighteen. (*Id.* at 224-25). Counsel maintained that the court should find Petitioner mentally retarded and remove the death penalty as a sentencing option. (*Id.* at 225).

In response, the prosecutor submitted the results of a Mississippi Department of Corrections psychiatric evaluation of Petitioner on December 6, 1983, by psychiatrist, Dr. Delores DiGaetano. (*Id.* at 225). The prosecutor stated that Dr. DiGaetano's diagnostic impression was that "she ruled out on mental retardation," and the evaluation was introduced for purposes of the hearing. (*Id.*).[12] After additionally arguing that Dr. Whelan specifically testified that it was his opinion that Petitioner is not mentally retarded, the prosecutor asked that the trial judge determine that Petitioner is not mentally retarded as that term is understood by *Atkins*. (*Id.*

---

[12] Actually, Dr. DiGaetano's diagnostic impression was "[r]ule out mental retardation" – not that mental retardation had been excluded as a diagnosis. (*See* Vault Ex. vol., Case No. 2005-DP-00419-SCT). The Court also notes that Dr. DiGaetano's report contains incorrect facts concerning Petitioner's school performance. For instance, she notes that he was a C student who quit school in the eighth grade. (*See id.*). This finding is contradictory to Petitioner's school records, which establish that he failed each grade once and only finished the third grade. (*See, e.g.*, PCR Supp. Ex. 23).

at 225-27). No witnesses testified at the hearing.

Preparing to rule, the trial judge stated that he had spent several days reading every opinion and record that he could find relative to Petitioner's case. (*Id*. at 229). He then stated:

> From what I can find and what I see, you know, it's an amazing thing sometimes when you look through these records and-of course, I'm married to a retired school teacher and these school teachers sometimes are real observant and it amazes me what they glean sometimes. We have all this testimony from psychologists and we have a psychiatrist report and all these things, and on one of the reports, one of the teachers made a permanent record and said, "Mack Arthur missed almost half of the days. I see no reason to retain. He could do the work if he attended regularly."[13] Now, to me, that teacher was saying, and this was back in '71 and is something to kind of reach down and have some meaning to me, that what she was saying was that this child, if he were in school, he has the ability to learn. She didn't say, you know, that he had a high ability to learn or whatever, but she indicates to me that she was saying if he attended school on a regular basis, if he were here for his classes, he would be all right. I put some weight on that. Y'all might say of all things, but that had some meaning to me.
>
> ***
>
> So the Court being required to make a finding as to retardation before we go forward, and I'm not saying this is the last time this could be addressed, but I think it's something that has conditioned precedent to us going on with the trial, and I'm going to define that he is not mentally retarded under Atkins and we will bore ahead. Okay?

(Trial Tr. vol. 230-31).

At trial, Dr. King testified for the defense that Petitioner's testing scores show him to be in the mentally retarded range. (Trial Tr. vol. 17, 616).[14] On cross-examination, however, Dr.

---

[13] The note of Petitioner's third grade teacher also notes that Petitioner "seem to be imbarashed [sic] of age." (Supp. PCR Ex. 28). As Dr. Macvaugh notes in his report, the teacher's opinions lack credibility in light of her own limitations. (ECF no. 101, Macvaugh Report at 47).

[14] According to defense counsel, Dr. King no longer practiced in the field of mental retardation by the time of Petitioner's 1998 resentencing and declined to be a witness in the case at that time. (Pet. Memo Ex. 2, Aff. of James E. Rocap, III). In Petitioner's 2003 proceedings, defense counsel wanted to introduce the transcript of Dr. King's 1984 testimony, because his testimony involved twenty year old records in an area of psychology in which Dr. King no longer

King was presented with documents purportedly generated by Petitioner while he was incarcerated at the Lowndes County Jail, and he stated that it was unlikely that an individual with mental retardation could generate such documents. (*Id*. at 633-34). At a recess following Dr. King's testimony, defense counsel moved for a mistrial or a continuance. (*Id.* at 653). Defense counsel argued that the prosecution intended to call Dr. Whelan as a witness, and that because of the court's denial of the defense's motion for funds for expert assistance, counsel could not respond to the expert testimony. (*Id*.). The court overruled the motion, and Dr. Whelan testified that though Petitioner is significantly below average intellectually, he is not mentally retarded. (*See id.* at 677-694).

At the close of evidence, defense counsel renewed its motion to determine Petitioner mentally retarded, which the court denied. (Trial Tr. vol. 17, 735). The court also denied a jury instruction proposed by the defense that would have required the jury to return a sentence of life imprisonment if they determined that Petitioner was mentally retarded. (Trial Tr. vol. 18, 771). The jury subsequently returned a verdict of death. (*Id.* at 864-65).

Several months before Petitioner filed his direct appeal, *Chase v. State*, 873 So.2d 1013 (Miss. 2004) was decided. On appeal to the Mississippi Supreme Court, Petitioner argued that the trial court's denial of funds for an expert prevented him from proving his claim of mental retardation. *See King I*, 960 So.2d at 423. The court concluded that Petitioner failed to show a substantial need for funds to obtain an independent expert, and that he was not otherwise prejudiced in his ability to present his intellectual functioning as a mitigating circumstance. *Id.* at

---

practiced. (*See, e.g.*, Trial Tr. vol. 14, 231-33). Because he was an available witness, however, the State subpoenaed Dr. King to give live testimony. *(See id.*).

423-24.

Also on direct appeal, Petitioner argued that the procedures used to determine his *Atkins* claim were constitutionally inadequate, and that the evidence presented to the trial court was sufficient to warrant a hearing under *Chase*. *Id*. at 424. The court noted that the trial judge and attorneys were aware of *Atkins* at the time of Petitioner's resentencing, and that the trial court specifically made a determination that Petitioner was not mentally retarded. *Id.* at 426. The Mississippi Supreme Court noted "that considerable evidence was presented to the trial court before it made its determination as to [Petitioner]'s mental capacity. *Id.*[15] After reciting the evidence presented to the trial judge, the Mississippi Supreme Court found:

> [At Petitioner's hearing to determine mental retardation] both sides presented expert testimony and other evidence regarding King's mental retardation claim. After hearing all the evidence, which was substantial, the trial judge outlined the evidence that he had considered and gave his reasons for concluding that King was not mentally retarded.
>
> *Chase* merely affords a defendant a hearing if that defendant fulfills certain requirements. King fulfilled those requirements and had his hearing. For these reasons, we find that King was afforded a hearing on his mental retardation claim in satisfaction with the procedures outlined in *Chase*. Therefore, we find no error with regard to this issue.

---

[15] The Mississippi Supreme Court additionally found that the trial court, before it made a determination as to Petitioner's mental capacity, considered the testimony of Officer Jessie Brooks, a lieutenant at the Lowndes County Adult Detention Center who testified that Petitioner read books and generated inmate complaints while housed at the detention center; the testimony of Sammy Townsend, who testified as the custodian of Petitioner's school records; and the testimony of Petitioner's sister, Ethel Conner, regarding Petitioner's impoverished upbringing and school attendance. *See King I*, 960 So2d at 426-28. The Court notes, however, that this information was elicited during trial and was not before the trial court when it made the initial determination as to whether Petitioner meets the standard for mental retardation as the term is understood by *Atkins*.

*King I,* 960 So.2d at 428.

On post-conviction review, Petitioner again argued that he was denied due process when the trial court denied him funds for a mental health expert, thereby depriving him of the opportunity to fully develop his claim that his execution would violate the rule in *Atkins*. *See King II*, 23 So.3d 1067, 1071-72. In support of his claim, he presented the affidavit of psychologist, Dr. Marc Zimmermann, who evaluated Petitioner on May 30, 2008. (*See* PCR vol. 1, Supp. PCR Ex. 21, Aff. of Dr. Marc Zimmermann).[16] During the course of his evaluation, Dr. Zimmermann reviewed numerous documents and administered to Petitioner the Wechsler Adult Intelligence Test-III ("WAIS-III"), on which Petitioner obtained a FSIQ score of 67. (*See id.*). Dr. Zimmermann opined that Petitioner's testing results were not the product of malingering, and he opined, "to a reasonable degree of psychological certainty," that Petitioner meets the relevant clinical/legal definitions of mental retardation. (*Id.*). Also presented on post-conviction review were the affidavits of Petitioner's family, friends, and community members, attesting to Petitioner's difficulty learning and mastering skills, his poor hygiene, and the history of mental retardation in Petitioner's family. (*See id.*, Exs. 21-27). Noting that it had already determined on direct appeal that Petitioner failed to show a substantial need for the expert assistance, the court barred consideration of the claim based on the doctrine of res judicata. *Id.* at 1071. The court also determined that Petitioner had not made "a substantial threshold showing of mental

---

[16] Dr. Zimmermann actually submitted three separate affidavits during the course of Petitioner's post-conviction proceedings, and he conducted two separate evaluations of Petitioner during that time. (*See, e.g.*, PCR Ex. 20; Supp. PCR Ex. 21; 2nd Supp. PCR Ex. 28).

retardation" as necessary to overcome the bar. *Id.* at 1071-72.[17]

Petitioner also presented on post-conviction review the substantive argument that he is exempt from execution pursuant to the court's decision in *Chase*. *Id*. at 1073. The Mississippi Supreme Court held that *Chase* merely affords a defendant a hearing if he fulfills certain requirements, and it found that Petitioner "had his hearing." *Id*. at 1075. The court cited its previous determination that there was no error with regard to the issue, and it barred consideration of the claim. *Id*. at 1076.

Presented with these claims on federal habeas review, this Court ordered, over Respondents' objections, an evidentiary hearing. (*See, e.g.*, ECF nos. 68, 76). Because Petitioner's claim was rejected on the merits in State court, AEDPA deference would ordinarily limit the Court's consideration of the claim to the record that was before the State court at the time of its decision. *See, e.g., Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010). In this case, however, Petitioner presented the trial court with evidence of his intellectual limitations and history of suspected mental retardation and was denied funding for expert assistance. Petitioner nonetheless presented the Mississippi Supreme Court with an expert opinion that he meets the definition for mental retardation in accordance with the procedure as set forth in *Chase v. State* and its progeny and yet was denied a full and fair hearing. Persuaded that Petitioner was denied the minimum due process required to ensure that the constitutional restriction against executing those with mental retardation is enforced, the Court determined to review Petitioner's claim without the deference normally

---

[17] Petitioner also argued that counsel rendered ineffective assistance in failing to properly litigate his claim of mental retardation at trial and on appeal, but the court held the issue barred from consideration. *See King II*, 23 So.3d at 1073.

afforded under the AEDPA.[18]  *See* 28 U.S.C. § 2254(d); *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007); *see also Blue v. Thaler*, 665 F.3d 647, 657 (5th Cir. 2011) ("But if a state court dismisses a prima facie valid *Atkins* claim without having afforded the petitioner an adequate opportunity to develop the claim, it has run afoul of the Due Process Clause, and that due process violation constitutes an unreasonable application of clearly established federal law that is sufficient to deprive the state court's decision of AEDPA deference.").

After setting an evidentiary hearing in this case, the Court granted Petitioner's motion for funds to obtain expert assistance, and it granted Respondents' motion to allow Dr. Gilbert Macvaugh, III, a clinical and forensic psychologist, to conduct an evaluation of Petitioner.  (*See* ECF nos. 75, 83).  Dr. Macvaugh subsequently conducted an evaluation and determined that Petitioner meets the standard for mental retardation as that term is contemplated by *Atkins* and *Chase*.  (*See* ECF no. 101, "Macvaugh Report").  Respondents have submitted a notice confessing that Petitioner suffers from mental retardation and is exempt from execution.  (*See* ECF no. 100).

In light of Petitioner's submitted proof and Respondents' concession, it is unnecessary to engage in an exhaustive discussion of Petitioner's claim that he is exempt from execution due to mental retardation.  Rather, the Court finds that proof exists in the record to support a determination that Petitioner has demonstrated by a preponderance of the evidence that he meets the criteria for mental retardation as that term is contemplated by *Atkins* and *Chase*.

**A.  Significantly subaverage general intellectual functioning**

The APA states that "[s]ignificantly subaverage intellectual functioning is defined as an

_____

[18]  *See* ECF no. 79.

IQ of about 70 or below (approximately 2 standard deviations below the mean)." *See Diagnostic and Statistical Manual of Mental Disorders* at 41 (4th ed. tex. rev. 2000) ("*DSM-IV-TR*"). Petitioner's intellectual functioning has been assessed on four known occasions using successive versions of the WAIS. The United States Supreme Court has recognized the Wechsler Scales as the "standard instrument in the United States for assessing intellectual functioning." *Atkins*, 536 U.S. at 309 n.5. Taking the approximately five point standard error of measurement into account, the typical cutoff score for the intellectual functioning prong of the definition is an IQ between 70 and 75 or lower. *Atkins*, 536 U.S. at 309 n.5; *see also DSM-IV TR* at 39, 41.

In 1983, Petitioner obtained a FSIQ score of 69 on the WAIS-R as administered by Dr. King, and a FSIQ score of 71 on the WAIS when he was later tested by Dr. Whelan. (*See* Trial Tr. vol. 17, 615, 679). In 2008, he obtained a FSIQ score of 67 on the WAIS-III as administered by Dr. Zimmermann. (*See* Supp. PCR Ex. 21). In 2013, Dr. Macvaugh administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") to Petitioner, and he obtained a FSIQ of 64. (*See* Macvaugh Report at 42, 43). As noted by Dr. Macvaugh and Dr. Zimmermann, Petitioner has consistently, over the course of approximately thirty years, received FSIQ scores in the range of mild mental retardation. (*See* Macvaugh Report at 44; Supp. PCR Ex. 21, Aff. of Dr. Zimmermann). This Court determines that Petitioner has demonstrated that he suffers from significantly subaverage intellectual functioning.

## B. Significant limitations in adaptive functioning

Accordingly to the APA, a diagnosis of mental retardation requires significantly subaverage general intellectual functioning "that is accompanied by significant limitations in adaptive functioning in at least two [] skill areas." *DSM-IV-TR* at 41. Significant limitations in

adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.* at 40.

The definitions of the *DSM-IV-TR* and the 1992 manual of the AAMR ("1992 AAMR") use the same categories of adaptive skill areas to be considered. These are: (1) communication; (2) self-care; (3) home living; (4) social skills; (5) community use; (6) self-direction; (7) health; (8) safety; (9) functional academics; (10) leisure; and (11) work. *See, e.g., DSM-IV-TR* at 41; *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992).[19] Under the AAMR's most recent definition of mental retardation, a clinician making a diagnosis determines whether an individual has adaptive functioning deficits defined "as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills." AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 43 (11th ed. 2010) ("2010 AAIDD").

Both Dr. Macvaugh and Dr. Zimmermann have found Petitioner to have significant deficits in the area of functional academics. Dr. Macvaugh assessed Petitioner's adaptive behavior in the functional academic skills category using the Wide Range Achievement Test - 4

---

[19] The 1992 AAMR combines "health and safety" into one category while the *DSM-IV-TR* separates them into two categories. As such, the AAMR uses ten categories while the *DSM-IV-TR* references eleven. In 2002, the AAMR redesignated the adaptive skill areas into three categories: conceptual, social, and practical. 2002 AAMR at 73.

("WRAT4"), a standardized measure of academic achievement.  (*See* Macvaugh Report at 45).

He noted that Petitioner obtained several scores that fell at least two standard deviations below the

mean of 100, such as his composite scores in Reading, Word Reading, Spelling, and Math

Computation.  (*Id.*).  Noting that these scores were consistent with Petitioner's performance on the

WRAT as administered to Petitioner by Dr. King in 1983, as well as the standardized achievement

test scores that Petitioner obtained in his school years, Dr. Macvaugh concludes that Petitioner

suffers significant limitations in functional academics.[20]  Similarly, Dr. Zimmermann notes that

the achievement test scores in Petitioner's school records, which showed him consistently

functioning at a first grade level in vocabulary, reading, and language, were "essentially the same"

when his academic abilities were tested by Dr. King in 1983.  (Supp. PCR Ex. 21 ¶ 20).

Additionally, both experts also conclude that Petitioner has significantly limited money

management skills, which, while not a specific category listed in either the *DSM-IV-TR* or the

1992 AAMR definitions, is recognized as an example of a "practical" adaptive skill by the most

recent AAIDD manual.  *See* 2010 AAIDD at 44.  (Supp. PCR Ex. 21 ¶ 22, 23; Macvaugh Report

at 45).  Dr. Macvaugh notes that, during his evaluation of Petitioner, Petitioner was unable to

make simple calculations or to correctly count out specific amounts of money.  (*Id*. at 45).  He

determines that the conclusion that Petitioner's has a significant impairment in this area is

supported with "his consistently poor scores on standardized measures of his math computation

skills[.]"  (*Id*.).

Additionally, Dr. Macvaugh notes that there is evidence to suggest that Petitioner may

---

[20]  This conclusion correlates to a finding that Petitioner's conceptual skills are limited, if
the 2010 AAIDD definition is used.  *See* 2010 AAIDD at 44.

have significant deficits in the areas of:

> social functioning (as evidenced by his history of juvenile delinquency and multiple arrests during early adulthood leading up to the index offenses), language and communication (as evidenced by his apparent speech impediment and related articulation problems), as well as in the area of his practical daily living skill (as evidenced by the reports from collateral sources regarding his poor hygiene and personal self-care skills, including his former teachers, family members, and others who knew him in the community).

(Macvaugh Report at 46).

Dr. Zimmermann determined that Petitioner suffers from deficits in his work and community use skills, as evidenced by two independent reports that Petitioner could not leave his neighborhood and could only work at manual labor jobs that favored "muscle" over those requiring adherence to complex instruction or training. (*See* Supp. PCR Ex. 21 ¶¶ 21-23).

In light of these findings, the Court finds that Petitioner suffers significant limitations in at least two adaptive skill areas identified by the *DSM-IV-TR* and the 1992 AAMR, and in at least one area as identified by 2010 AAIDD, prior to the age of 18.

## C. Onset "before age 18 years"

Dr. Macvaugh notes that Petitioner's school records and the consistency of his FSIQ scores across time - when he was 23, 24, 48, and 53 - indicate that his intellectual deficits manifested prior to the age of eighteen. (Macvaugh Report at 44, 46). Similarly, Dr. Zimmermann notes that Dr. King found Petitioner's academic abilities in 1983 to be essentially the same as they were when he was evaluated during his school years. (Supp. PCR Ex. 21 ¶ 20). The Court finds that the record evidence is sufficient to demonstrate that the onset of Petitioner's intellectual and adaptive functioning deficits occurred prior to the age of eighteen.

**D.  Malingering**

Both Dr. Macvaugh and Dr. Zimmermann administered to Petitioner the Test of Memory

Malingering ("TOMM"), a fifty-item visual memory recognition test that consists of two learning

trials and a retention trial, and they determined that Petitioner did not attempt to malinger

intellectual deficits.  (*See* Macvaugh Report at 41, 43, 47; Supp. PCR Ex. 21 ¶ 19; Ex. 28 to Reply

to State's Response for PCR, November 2008 Aff. of Dr. Zimmermann).[21]  The Court notes with

particular interest Dr. Macvaugh's observation that Petitioner's poor school performance supports

the conclusion that his post-arrest standardized intelligence testing scores were not an attempt to

malinger, as he would have had little incentive to feign intellectual limitations during his

elementary school years.  (*See, e.g.*, Macvaugh Report at 48).

Therefore, the Court finds that Petitioner has shown by a preponderance of the evidence

that he satisfies the criteria for a diagnosis of mental retardation within the meaning of *Atkins v.*

*Virginia* and *Chase v. State*, and he is entitled to have his sentence of death vacated.[22]

### Conclusion

For the reasons stated herein, Petitioner is entitled to have his sentence of death vacated

pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Chase v. State*, 873 So.2d 1013 (Miss.

---

[21]  The Court notes that both examiners also administered the Rey15-Item Memory Test
("R-FIT") during their evaluations, which screens for feigned memory impairments.  (*See*
Macvaugh Report at 41; Supp. PCR Ex. 21 ¶ 7D).  While Dr. Macvaugh determined that
Petitioner's score was not indicative of an attempt to malinger memory deficits, Petitioner's
score on the R-FIT as administered by Dr. Zimmermann was in the range of malingering.  (Supp.
PCR Ex. 21 ¶ 12).  Dr. Zimmermann concluded, however, that Petitioner's poor performance
was "a result of his intellectual deficits and not as a result of malingering."  (*Id.* at ¶ 19).

[22]  In his federal habeas petition, Petitioner raised additional claims relating to the
sentencing phase of his trial.  Because the Court vacates Petitioner's sentence of death on the
ground of mental retardation, these issues are rendered moot.

2004).  Accordingly, it is hereby **ORDERED** that:

1.  Relief on Petitioner's claim of mental retardation is **GRANTED**, and this Court will issue a Writ of Habeas Corpus unless, within sixty days of the date the Judgment in this case becomes final, the State of Mississippi vacates Petitioner's death sentence and imposes a sentence less than death.

2.  All other federal habeas corpus relief requested by Petitioner is **DENIED**, and the remaining claims in the petition are **DISMISSED** with prejudice.

3.  All pending motions are **DISMISSED** as moot.

4.  A separate Judgment in conformity with this Opinion and Order shall issue today.

   **SO ORDERED**, **THIS** the 26th day of March, 2013.


        /s/ Sharion Aycock    
        **U.S. DISTRICT JUDGE**